CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

04/23/2019
JULIA C. DUDLEY, CLERK
BY:    s/ F. COLEMAN
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| JOHN DOE, | |
| Plaintiff, | |
| v. | Civil Action No._____ 6:19CV00023 |
| WASHINGTON AND LEE UNIVERSITY, | |
| Defendants. | |

## COMPLAINT

Plaintiff John Doe[1] ("John" or "Plaintiff"), by his attorneys, files this complaint against

Defendant Washington and Lee University ("W&L" or "the University"), and alleges as follows:

## THE NATURE OF THIS ACTION

1.     John has filed this lawsuit against W&L for unlawful gender discrimination and

retaliation in violation of federal law, breach of implied contract, and negligence resulting from

the University's grievous mishandling of a false accusation of sexual misconduct brought against

John by a female W&L student (referred to herein as "Jane Roe" or "Jane") in John's sophomore

year at W&L.  W&L wrongly found John responsible for the alleged misconduct after a flawed

and discriminatory investigation, hearing, and appeal process.  W&L sanctioned John with a one-

term suspension effective May 21, 2017, after which he would be eligible to return to W&L.

---

[1]     Contemporaneously with the filing of this complaint, John has filed a Motion for Permission to
Proceed Under Pseudonym.  As set forth in the Motion, John is entitled to proceed anonymously because
of the highly sensitive nature of the disciplinary proceeding against him that forms the basis for his
Complaint, and the fact that W&L is fully aware of his identity and will not be prejudiced in any way.
John also seeks to maintain the privacy rights of his accuser and other student-witnesses by requesting
permission to identify them anonymously.

2.      But, by late June 2017, W&L was aware that John was intent on asserting his rights under Title IX.  W&L has retaliated against John in violation of Title IX by denying him reinstatement.

3.      In the nearly two years since then, spanning six academic terms, W&L has refused to accept John back on campus as a student in good standing, even though John fulfilled all the requirements that the University initially set forth for his reinstatement, including participating in substance and sexual abuse counseling and providing the University with an evaluation from his treating psychologist, a Ph.D. trained professional with over 30 years of experience and practice in the areas of substance abuse and relationship issues.

4.      Based on multiple weekly sessions with John and several assessment questionnaires, the psychologist concluded that John posed no danger of sexual or alcohol abuse (*i.e.*, "he does not present as a sexual predator and poses no danger to the other students," his "alcohol consumption is consistent with his peers," he is aware of "the importance of setting limits and situations that could be fraught with risk after drinking"), and that John "is able to comply with the requirements of his re-instatement."

5.      John also provided W&L with his own reinstatement essays, as well as letters of recommendation in support of his reinstatement from the priest who supervised John's volunteer activities with a local parish and from his direct supervisor at his former high school where John organized fund drives for the school's food pantry and worked with freshmen groups on volunteer service activities.

6.      Finally, John provided W&L with information concerning his five-year employment history with a summer camp, his work with a realty company assisting with rental property listings, and more recently, his employment with a national department store chain.

2

7.     All to no avail.   W&L has denied reinstatement for the past two years, continually adding new, previously undisclosed "requirements" to justify its denials.

8.     As a result of W&L's wrongful conduct in the disciplinary proceeding and the unconscionably prolonged reinstatement period, John, though innocent of any wrongdoing, has lost his reputation, his ability to complete his undergraduate degree, his post-graduate opportunities, and his employment and career prospects.

9.     The motivation behind W&L's finding against John and its refusal to reinstate him after he clearly demonstrated his fitness to return is in plain view.  As alleged in detail below, W&L faced a complaint and investigation by the Department of Education, Office for Civil Rights ("OCR"), into W&L's alleged systemic mishandling of sexual assault complaints brought by female students.  The OCR investigation placed the University under intense pressure to treat male students accused of sexual assault by female students less favorably than their accusers and to find them responsible.

10.     In John's case, he was subjected to less favorable treatment in crucial ways in every phase of the proceeding.

11.     Jane Roe's complaint alleged that, on the night in question, she and John (who were sophomores and had been friends during their time at W&L) engaged for the first time in consensual sexual activity, including mutual kissing and touching, and oral sex which she performed briefly on John.  Although the two then engaged in consensual sexual intercourse, Jane claimed the next day that she had not consented to the intercourse, because she fell asleep and had no memory of it.

3

12.     She also claimed she would only consent to sexual intercourse with a partner with whom she wanted a relationship, and John did not fit that criterion.  She acknowledged she had consented to all the sexual activity before intercourse.

13.     Jane's claim to have fallen asleep and her alleged lack of memory raised obvious evidentiary questions about incapacitation:  Had she consumed too much alcohol, so that she lacked capacity to give consent?  Or, had she consumed only a moderate amount of alcohol (as she herself claimed), but because she had also taken her prescribed antidepressant medication, had that combination caused her to experience a medical condition known as "black out," during which she would appear to be normal and functioning to John and others observing her, but as to which she had no memory?  If that were the case, John would have reasonably believed Jane had consented to the activity.

14.     But, if neither excess alcohol consumption nor alcohol-and-drug interaction caused Jane's memory loss, then Jane's story that she simply "fell asleep" and had no memory of the intercourse would not be credible.  How could she possibly explain why she did not wake up from her sleep at the time the intercourse occurred?

15.     W&L's lead investigator on the case, Title IX Coordinator Lauren Kozak, and co-investigator Jason Rodocker, Associate Dean of Students, raised the incapacitation question with the parties and two witnesses who had personally observed Jane Roe at different times on the night in question.

16.     These witnesses told the investigators Jane Roe did not appear drunk, incapacitated, or unable to function or to know her whereabouts.  One of the witnesses, identified as Witness A in the Investigative Report, had engaged in consensual sexual intercourse with Jane Roe earlier that same evening.  He told the investigators Jane seemed fine.  The other witness

4

was the driver who took Jane back to her room after her time with Witness A. He told the investigators Jane appeared sober.

17.     The investigators found no evidence that Jane had been illicitly drugged at any time by anyone that evening. Jane herself told the investigators she was not drunk or incapacitated. John told the investigators that Jane and he discussed having sex, the two agreed he should get a condom, and Jane was fully aware of and an active participant in the sexual intercourse.

18.     Despite this cumulative, independent evidence that Jane was neither drunk nor otherwise incapacitated, unable to give consent, or incapable of awakening from sleep upon sexual penetration, a University Counseling Center psychologist, Dr. Janet Boller, met with Jane Roe approximately 12 days before the hearing in the case. Based solely on that one meeting, Boller prepared an expert report in which she concluded that Jane Roe exhibited symptoms of Acute Stress Disorder. The clear implication of the report was that Jane's Acute Stress Disorder was the result of the alleged sexual assault.

19.     The investigators accepted the Boller expert report as "medical evidence" relevant to Jane's allegations and sent it to the Hearing Panel for its consideration.

20.     It was not until the day before the hearing, when the investigators provided John with a revised hearing packet, that John saw for the first time the Boller expert report. With so little time before the hearing, John had no meaningful opportunity to object to the expert report, or to engage his own rebuttal expert for the hearing.

21.     Upon information and belief, subject to discovery in this matter, Jane Roe had been referred to Boller by the investigators.

22.     The investigators subjected John to a "surprise" expert report – an expert report by ambush – the effect of which was to bolster Jane's credibility and counteract the exculpatory evidence on the issue of incapacitation.  By so doing, the investigators violated their obligation to remain neutral, objective, and fair to both parties.  They accepted "medical evidence" on behalf of one party over the other, and then apparently withheld the evidence from the other party until the eve of the hearing, when it was too late to do anything about it.  Such an action indicates that the investigators intentionally treated Jane more favorably than John to his severe detriment.

23.     As set forth in this complaint, the investigators not only crossed the line from neutral fact finders into advocates, their advocacy was motivated by gender bias and was fraught with conflicts of interest.

24.     Boller was not a neutral, independent expert, and the investigators knew it.  As a therapist in the University Counseling Center, she was employed by W&L, an affiliation which could influence her to act in her employer's best interest.  Beyond that, Boller was the University's designated contact person for the University-sponsored Student Sexual Assault Survivor Support Group.  W&L's Counseling Center web site states that, "[t]his support group is open to students who have experienced a sexual assault and are seeking support in their recovery.  Contact Dr. Janet Boller at jboller@wlu.edu for more information."

25.     Thus, Boller's professional duties at W&L included supporting students who identify themselves as "survivors" of sexual assault, who are overwhelmingly female.

26.     In contrast to their conduct in accepting evidence favorable to Jane, the investigators failed to gather potentially exculpatory evidence or seek expert opinion into the possible "memory black out" effect of Jane's consumption of alcohol in combination with

Lexapro – even though Jane professed to have no memory of the evening after a certain point, but John and other witnesses agreed she did not appear to be intoxicated, incapacitated, or unaware of her surroundings.

27.     The investigators also failed to interview other students who had partied with Jane that evening and who might have provided further corroboration of Jane's lucidity.

28.     The three-member Hearing Panel in John's case relied on gender biased stereotypes and on factually unsupported conclusions to find John responsible for nonconsensual sexual penetration.

29.     The Hearing Panel acknowledged it had no objective or factual basis for believing Jane's story that she did not consent to sexual intercourse because she fell asleep and had no memory of it.  Instead, the Panel based its finding of responsibility against John on credibility determinations that exhibited gender bias.

30.     For example, the Panel "had trouble" with John's claim that receiving oral sex from a friend felt "weird," but that John would proceed to have sexual intercourse with Jane. Based on this flimsy, irrelevant quibble with John's sexual preferences, the Panel discredited John's credibility and his version of events.

31.     By contrast, the Hearing Panel credited Jane's story that she would not have consented to sexual intercourse with John because she had a "personal rule" that "she only has full sexual intercourse with partners if she is interested in a relationship," and "she has never been interested in that type of relationship with the Respondent."

32.     The Hearing Panel accepted Jane Roe's subjective, unsubstantiated "personal rule" testimony as "consistent and credible."  They accepted *her* testimony on *her* sexual preferences at face value as a sign of *her* "credibility."  Yet, a red flag on Jane's credibility

regarding her "personal rule" was in the record before the Hearing Panel. The Panel knew from the Investigative Report that Jane Roe had engaged in consensual sexual intercourse earlier that same evening with Witness A.

33.     Even though Jane had put her sexual history at issue by claiming she would not have consented to sexual intercourse with John because of her "personal rule" limiting sexual intercourse, the Hearing Panel did not question Jane about Witness A. Nor did the Panel call Witness A to question him about whether Jane had expressed to him an interest in having a relationship.

34.     Finally, the Hearing Panel's ultimate finding that Jane "was not capable of providing consent because she was either asleep or nearly asleep" has no basis in the Policy. The Policy defines the inability to provide consent as follows: "An individual who is physically incapacitated from alcohol or other drug consumption (voluntarily or involuntarily) or is asleep, unconscious, unaware, or otherwise physically helpless is considered unable to give consent."

35.     The fact that a person was "nearly asleep" or that a person was "*either* asleep or nearly asleep" are *not* a basis in the Policy for finding that the person was unable to give consent. The Hearing Panel's finding is contrary to the plain terms of the Policy.

36.     Furthermore, the Hearing Panel did *not* find that Jane Roe was "physically incapacitated from alcohol or other drug consumption" or that she was "unconscious, unaware, or otherwise physically helpless." The testimony of the parties and witnesses established that Jane had none of these incapacities. Jane herself claimed only that she fell asleep. If that were truly the case, she would have awakened upon sexual penetration. The Hearing Panel's decision did not mention, much less consider, how it was possible for Jane to simply fall asleep, but to not awaken when John penetrated her.

37.     The Appeal Panel's denial of John's appeal is equally unsupportable and inexcusable.  The Appeal Panel should have but failed to reverse the Hearing Panel's finding based on the Panel's reliance on a non-existent definition of inability to give consent.

38.     Because of W&L's discriminatory actions and omissions during the proceedings, and its arbitrary and retaliatory conduct during the reinstatement period, John has sustained damages to his future education and employment prospects.

39.     John brings this action to obtain relief for violations of Title IX of the Education Amendments of 1972, breach of implied contract, and negligence.

## THE PARTIES AND JURISDICTION

40.     Plaintiff John Doe is, and at all times relevant to this Complaint has been, a natural person, citizen of the United States, and resident of the state of New Jersey.  John was a student at W&L from Fall 2015 until Spring 2017.

41.     Defendant W&L is a private liberal arts college located in the city of Lexington, Virginia, with its principal place of business located in the Commonwealth of Virginia.

42.     This Court has federal question and diversity jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332 because (i) the federal law claim arises under a statute of the United States, and (ii) John and W&L are citizens of different states.

43.     This Court has personal jurisdiction over W&L because it is conducting business within the Commonwealth of Virginia.

44.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because W&L is located in this judicial district and all of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

I. **The Standards Under Title IX for Investigating and Adjudicating Allegations of Sexual Misconduct**

    A. **Title IX and its Implementing Regulations Require a Prompt, Equitable, Fair, and Impartial Process for Resolving Sexual Misconduct Complaints**

45.    Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

46.    Under U.S. Supreme Court precedent, the meaning of "discrimination" under Title IX is "differential treatment" or "less favorable treatment," and "covers a wide range of intentional unequal treatment."

47.    Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. W&L is a recipient of federal funds and, therefore, is bound by Title IX and its regulations.

48.    The Department of Education has issued regulations that require colleges and universities receiving federal funds to establish policies and procedures to address sexual assault, including student-on-student complaints. *See* 62 Fed. Reg. 12034. The guiding principle established by federal regulations is that grievance procedures to resolve such student complaints must be "prompt and equitable." 34 C.F.R. § 106.8(b).

49.    A proceeding that arises from an allegation of dating violence, domestic violence, sexual assault, or stalking must "[i]nclude a prompt, fair and impartial process from the initial investigation to the final result." 34 C.F.R. § 668.46(k)(2)(i).

50.    A federally-funded educational institution violates Title IX if it retaliates against a student by taking adverse action against the student in response to the student's exercise of a

protected right under Title IX.

**B. OCR's 2001 Guidance Instructs Schools That Compliance with Title IX Requires an "Adequate, Reliable, and Impartial Investigation" of Sexual Misconduct Complaints and "Due Process to Both Parties"**

51.     In 2001, the Education Department's Office for Civil Rights ("OCR") issued guidance in a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" (66 Fed. Reg. 5512, Jan. 19, 2001, http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf). The 2001 Guidance identified "a number of elements in evaluating whether a school's grievance procedures are prompt and equitable," including whether the procedures provide for:

- "Notice to students . . . of the [school's] procedure";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process."

*(Id.* at 20).

52.     OCR's 2001 Guidance further provides that, *"[a]ccording due process to both parties involved*, will lead to sound and supportable decisions." (*Id.* at 22) (emphasis added).

53.     Complementing Title IX, the Clery Act, as amended in 2013, requires that school disciplinary procedures for alleged sexual misconduct must "provide a prompt, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa).

54.     Regulations implementing the Clery Act provide that campus Title IX proceedings must be "[c]onducted by officials who do not have a conflict of interest or bias for or against the accuser or the accused," and must give "timely and equal access to the accuser, the

accused, and appropriate officials to any information that will be used during informal or formal disciplinary meetings and hearings." 34 C.F.R. § 668.46(k).

### C. OCR's 2011 Dear Colleague Letter and 2014 Questions and Answers Pressure Colleges and Universities to Protect and Favor Female Complainants Alleging Sexual Misconduct

55. Starting in 2011, the federal government, including OCR, began to take aggressive steps to combat what it viewed as an epidemic of sexual assault on the nation's college campuses.

56. On April 4, 2011, without public notice and comment, OCR issued a "significant guidance document" commonly referred to as the 2011 Dear Colleague Letter. (See "*2011 Dear Colleague Letter*," Apr. 4, 2011, http://www.2ed.gov/about/offices/list/ocr/letters/colleagues-201104.pdf).)

57. The 2011 Dear Colleague Letter reaffirmed OCR's 2001 Guidance and identified certain procedures "that are critical to achieve compliance with Title IX," including that schools must ensure "[a]dequate, reliable, and impartial investigation of complaints," and that both parties "must have an equal opportunity to present relevant witnesses and other evidence." (*Id*. at 9, 11).

58. The 2011 Dear Colleague Letter, however, instructed that schools "must use a preponderance of the evidence standard (*i.e.*, it is more likely than not that sexual harassment or violence occurred)," and not the "clear and convincing standard (*i.e.*, it is highly probable or reasonably certain that the sexual harassment or violence occurred.)" (*Id*. at 11).

59. Given the fact that campus disciplinary proceedings (including W&L's proceedings) lack key procedural protections provided in court litigation (*e.g.*, discovery, the right to active representation by counsel, rules of evidence, and independent judges and juries), the preponderance standard does not adequately protect accused students' rights.

60. The 2011 Dear Colleague Letter contained an explicit funding threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation." (*Id*. at 16).

61. This portion of the 2011 Dear Colleague Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual assault proceedings as OCR wanted. (*See* NPR, "How Sexual Assaults Came to Command New Attention," Aug. 13, 2014, http://www.npr.org.2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention).

62. The 2011 Dear Colleague Letter focused on protection of women, claiming that "about 1 in 5 women are victims of completed or attempted sexual assault while in college," and that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol." (2011 Dear Colleague Letter at 2 & n.3).

63. The press release announcing the 2011 Dear Colleague Letter repeated the "1 in 5" statistic and described the "new steps" that OCR was undertaking "to help our nation's schools, universities and colleges end the cycle of sexual violence on campus."

64. The overriding purpose of the 2011 Dear Colleague Letter was "to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response," and OCR "demand[ed] that universities do so or face a loss of federal funding." *Doe v. Brandeis Univ*., 177 F. Supp. 3d 561, 572 (D. Mass. 2016).

65. In January 2014, the White House put further pressure on colleges and universities to prevent and police sexual violence on their campuses by creating a task force of senior administration officials to coordinate federal enforcement efforts. The task force made

clear that its priority was to protect women's rights over those of men because women were by far the majority of victims of sexual assault and men were the perpetrators of those assaults.

66.     The task force's first report, dated April 2014, focused on protection of women, starting with the repeated claim that "[o]ne in five women is sexually assaulted in college."  The task force pressed colleges and universities to provide "[t]rauma-informed training" for their officials, stating that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable."  (Not Alone: The First Report of the White House Task Force to Protect Students From Sexual Assault, https://www.justice.gov/ovw/page/file/905942/download (emphasis added)).

67.     In April 2014, OCR issued further guidance in the form of *Questions and Answers on Title IX and Sexual Violence* (the "2014 Questions and Answers").  (*See* https://www2.ed.gov/about/offices/list/ocr/.../qa-201404-title-ix.pdf).

68.     The 2014 Questions and Answers strongly implied that allowing an accused student to cross-examine his accuser could create a "hostile environment" and put a college or university in violation of Title IX.  (*Id.* at 31).

69.     Since cases involving alleged sexual misconduct on college campuses overwhelmingly arise from a woman accusing a man, measures that are put in place to protect alleged victims and punish alleged perpetrators necessarily intend a harsher treatment of men.

70.     Ultimately, the Justice Department funded a "Start by Believing" campaign under which college and university investigators were trained to investigate cases from an initial presumption of guilt and to write reports "that successfully support the prosecution of sexual assault cases."  (End Violence Against Women International, *Effective Report Writing:  Using the Language of Non-Consensual Sex*, at 5,

https://www.evawintl.org/library/DocumentLibraryHandler.ashx?id=43; see also Campus Action Kit, Start by Believing, https://www.startbybelieving.org/wp-content/uploads/2018/08/Campus-Action-Kit.pdf.

71.     On May 1, 2014, as part of its aggressive enforcement, OCR published a list of 55 higher education institutions nationwide that were then under investigation for possible Title IX violations.  (https://www/ed.gov/news/press-releases/us-department-education-releases-list-higher-education-institutions-open-title -ix-sexual-violence-investigations).

72.     According to the Chronicle of Higher Education, that number eventually grew to over 500 – and as alleged below, included Washington and Lee.  (*Title IX, Tracking Sexual Assault Allegations*, https://projects.chronicle.com/titleix/.)

73.     The majority of OCR's investigations and findings have involved alleged violations of the rights of complaining students, who are overwhelmingly female.

74.     Numerous rights organizations have spoken out against the legal and financial pressure exerted by OCR to force colleges and universities to adopt inequitable procedures that favored the female complainants and that made it much more likely the accused male students would be found responsible.  (*See*, *e.g*., prominent Harvard and University of Pennsylvania Law School faculty members asserting that OCR's new rules violate the due process rights of the accused; Foundation for Individual Freedom in Higher Education (FIRE); and Families Advocating for Campus Equality (FACE).)

**D.     In September 2017, OCR Withdraws the 2011 Dear Colleague Letter and 2014 Questions and Answers and Reaffirms Title IX's Implementing Regulations and 2001 Guidance**

75.     On September 22, 2017, the Department of Education withdrew the 2011 Dear Colleague Letter and 2014 Questions and Answers and put in place OCR interim guidance to redress the lack of "fundamental fairness" that those earlier statements of policy and guidance

had fostered, explaining that "many schools have established procedures for resolving allegations that 'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.'"  (*See September 22, 2017 Dear Colleague Letter*, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf, at 1).

76.     The interim guidance reaffirmed the 2001 Guidance requiring colleges and universities to adopt grievance procedures that provide for "a prompt and equitable resolution of complaints of sexual discrimination, including sexual misconduct."  (*See September 2017 Q&A on Campus Sexual Misconduct,* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf, at 3).

77.     The interim guidance confirmed that, "[i]n every investigation conducted under the school's grievance procedures, the burden is on the school – not on the parties – to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred," and that "[a]ny right or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms."  (*Id*. at 4).

78.     The interim guidance cautioned that schools must avoid discriminatory practices against accused students (who are overwhelmingly male) that had become commonplace at colleges and universities nationwide after the issuance of the 2011 Dear Colleague Letter – *i.e*., schools (i) must not "restrict[] the ability of either party to discuss the investigation (e.g., through 'gag orders')," (ii) must not use "training materials or investigative techniques and approaches" or "[d]ecision-making techniques or approaches" that "apply sex stereotypes or generalizations," (iii) must "avoid conflicts of interest and biases for or against any party" by investigators or

adjudicators, and (iv) must "prevent institutional interests from interfering with the impartiality of the adjudication." (*Id*. at 4-5).

79.     "An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence – including both inculpatory and exculpatory evidence – and take into account the unique and complex circumstances of each case." (*Id*. at 4).

80.     On November 16, 2018, the Department of Education issued a proposed new regulation for Title IX sexual misconduct proceedings. (*See* https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf). The Department published the proposed regulation in the Federal Register on November 29, 2018, followed by a 63-day comment period.

81.     Key provisions of the proposed regulation require colleges and universities to adhere to the following procedures:

-    "Apply basic due process protections for students, including a presumption of innocence throughout the grievance process; written notice of allegations and an equal opportunity to review all evidence collected; and the right to cross-examination, subject to 'rape shield' protections."
-    "Hold a live hearing where cross-examination would be conducted through the parties' advisors."
-    Allow continued use of the preponderance of evidence standard only if the school "uses that standard for conduct code violations that do not involve sexual harassment but carry the same maximum disciplinary action."

82.     Over 100,000 comments to the proposed regulations have been filed with a common theme that the Department's efforts to restore fair processes in campus disciplinary proceedings were motivated by bias against women and disproportionately impact women, since the overwhelming majority of complainants are female.

## II. OCR's Broad Investigation Into W&L's Handling of Female Complaints of Sexual Misconduct and the 2014 Lawsuit Against W&L

83.     On February 18, 2015, OCR notified W&L President Ken Ruscio that OCR had opened an investigation of W&L in response to a Title IX complaint filed by a W&L female student, who alleged that the University mishandled her report of sexual assault in 2014.

84.     With the commencement of that investigation, W&L joined the published list of more than 100 colleges and universities facing federal investigations into allegations that they had mishandled sexual misconduct complaints, overwhelmingly brought by female students, with the concomitant possible loss of federal funding.

85.     President Ruscio announced that the University had "pledged our full cooperation with OCR" and was committed to "responding to the federal and state guidelines and directives."

86.     President Ruscio explained that OCR would investigate the University's handling of sexual misconduct complaints broadly, in addition to reviewing the complainant's specific grievance.

87.     OCR's investigation was not the only challenge to W&L's handling of sexual misconduct complaints.  In 2014, a male student sued W&L in federal court asserting that the University wrongly expelled him based on a false complaint of sexual assault brought against him by a female student ("the 2014 complainant").  The male student alleged that W&L had subjected him to a gender biased disciplinary proceeding.

88.     Kozak and Rodocker learned during their investigation of this current case that Jane Roe and the 2014 complainant were friends and partied together on the evening of Jane Roe's alleged assault.  Jane Roe chose the 2014 complainant as her "Advisor of Choice" in the disciplinary proceeding.

89.     At no point did the investigators or any W&L administrator question the propriety of Jane Roe's selection of the 2014 complainant as her Advisor of Choice.

90.     W&L settled the male student's 2014 lawsuit in February 2016.  OCR's investigation into W&L remained open for three years until it was "resolved" on February 13, 2018.  OCR has not disclosed the terms of the resolution.

### III.    W&L's 2016-17 Sexual Discrimination and Misconduct Policy

91.     In response to OCR's investigation and scrutiny by the national media on the purported nationwide college rape culture crisis, W&L revised its sexual misconduct policies and procedures.

92.     On December 1, 2014, W&L President Ruscio wrote in a Message to the Community in response to the allegations disclosed in a Rolling Stone article about an alleged gang rape at a fraternity at the University of Virginia, "I have asked Vice President for Student Affairs Sidney Evans to build upon our past efforts and continue to work directly with student leaders in the weeks ahead to have them address candidly the painful but important questions raised by the events reported in the Rolling Stone article.  It is an opportunity, a difficult and sad one to be sure, to examine our own commitments and to affirm them more strongly than ever."

93.     On August 3, 2016, President Ruscio announced a new Sexual Discrimination and Misconduct Policy (the "Policy") which remained in effect at the time of the alleged incident involving John and the investigation of Jane Roe's allegations during March and April 2017. (A true and correct copy of the August 2016 Policy is attached hereto as Exhibit 1.)

94.     President Ruscio stated in his August 3 message to the W&L community that a revised Policy was necessary because there had been "a tendency to focus on legalities, on compliance and mandates, on the mechanics of the adjudicatory hearings, on the steps in the investigations, and on so many other guidelines and directives."

95.     At the outset, the Policy stated that "the University, as an educational community, will promptly and equitably respond to reports of … sexual assault," and that "[a]ll University proceedings are to be conducted in compliance with the requirements of Title IX …."

96.     Consistent with Title IX's "prompt and equitable" mandate, the Policy promised "complainants and respondents" that they can expect a "prompt and equitable resolution of allegations of sexual misconduct," as well as the opportunity "to articulate concerns or issues about proceedings under the policy," to have "advisors, including the right to an Advisor of Choice," and "to challenge any member of the Harassment and Sexual Misconduct Board (HSMB) or an Investigation or Review Panel for bias or conflict of interest."

97.     The Policy also promised the parties "[t]he opportunity to offer information, present evidence, and identify witnesses during an investigation," and "[e]qual access to information that will be used during the resolution proceedings."

98.     The Policy stated that "[t]he University supports victims of sexual misconduct and encourages all individuals or third-party witnesses to report any incident to the University."

99.     The Policy promised students that "[t]he University is committed to treating all members of the community with dignity, care, and respect.  Any individual affected by sexual misconduct, whether as a complainant, a respondent, or a third party, will have equal access to support consistent with their needs and available University resources."

100.    The University's support resources specifically identified in the Policy included counseling provided by "medical, psychiatric, and psychological professionals" with the University Student Health and Counselling Center.  These "trained professionals … are bound by separate laws of confidentiality," and "provide counseling, information, and support under legally protected confidentiality."

101.     The Policy identified Lauren E. Kozak as the University's Title IX Coordinator, who "will oversee the University's review, investigation, and resolution of those reports to ensure the University's compliance with Title IX."  Kozak was responsible for "conducting or overseeing investigations of complaints against students."

102.     The goal of the investigation was "to gather all relevant facts and determine if there is sufficient information to support a charge against a respondent," guided by "principles of fairness and respect for all parties."

103.     Pursuant to the Policy, the University typically used a team of two investigators, one of whom may be the Title IX Coordinator, and required that "[a]ny investigator must be impartial and free of any conflict of interest."

104.     The investigators were expected to "coordinate the gathering of information from the complainant, the respondent, and any other individuals who may have information relevant to the determination."

105.     During the investigation, "[t]he complainant and respondent will have an equal opportunity to be heard, to submit information, and to identify witnesses who may have relevant information."

106.     The Policy stated the "[t]he investigation is designed to provide a fair and reliable gathering of the facts.  It will be thorough, impartial, and fair, and all individuals will be treated with sensitivity and respect.  The investigation is a neutral fact-gathering process.  The respondent is presumed to be not responsible; this presumption may be overcome only where a Harassment and Sexual Misconduct Board hearing Panel concludes that there is sufficient evidence, by a preponderance of the evidence, to support a finding that the respondent violated the policy."

107.    At the conclusion of the investigation, "the investigation team will prepare a written report that summarizes the information gathered and synthesizes the areas of agreement and disagreement between the parties and any supporting information."  Before the team finalizes the report, "it will give the complainant and respondent the opportunity to review the investigation report," and to "submit any additional comments, request changes, or request further investigation …."

108.    The team "will then submit the report to the designated Chair of the Harassment and Sexual Misconduct Board for the specific matter."

109.    After reviewing the Investigative Report, the Chair of the particular HSMB Hearing Panel for the case determined whether to formally charge the respondent and notified the parties.  A charge would be issued "if it is plausible and more than a sheer possibility that the complainant's factual allegations could constitute a violation of this policy."

110.    The Policy created the new Harassment and Sexual Misconduct Board ("HSMB") to hear and decide cases and, if warranted, to administer sanctions.  Each HSMB Hearing Panel consisted of three members selected by the Panel Chair to hear the case and to make a finding by a preponderance of the evidence as to whether the respondent was responsible for a conduct violation.

111.    Under the Policy, "[e]ach member of the HSMB Panel must be impartial and free of any conflict of interest."  HSMB members "who have reason to believe they cannot make an objective determination must recuse themselves from the process."

112.    The Policy also provided the complainant and respondent with one or two Hearing Advisors, who "are law and undergraduate students who have been trained to provide support and advice to complainants and respondents."  Advisors were not permitted "to present

evidence, question witnesses, or otherwise participate."

113.     In addition, both parties had the right to obtain assistance, at their own expense, from an Advisor of Choice, who could be "a friend, mentor, family member, attorney, or any other supporter." Advisors of Choice were "not trained by the University and are not University resources."

114.     All hearings were "closed to the public" and could not be audio or video-recorded. The Hearing Panel "will review the investigation report prior to the hearing," and during the hearing "may question the complainant, the respondent, any witnesses called, and/or the investigators, and examine related information and evidence."

115.     The parties were not permitted to verbally pose questions to each other or to witnesses but could "submit written questions to the Chair of the HSMB to ask on their behalf to the relevant party or witness." The Chair was permitted to "screen the questions" and had "discretion to change the wording of the question."

116.     In cases where the respondent was found responsible, the Hearing Panel "will impose a sanction" ranging from dismissal, to suspension, probation, community service, educational and counseling consultation, and loss of privileges.

117.     The Policy imposed mandatory expulsion for any student found responsible beyond a reasonable doubt for nonconsensual sexual penetration.

118.     Under Virginia law, for a student who has been dismissed or suspended, the University must make a "prominent notation on the academic transcript, which will read: [Suspended or Dismissed] for a violation of W&L's set of standards." Va. Code Ann. § 23.1-900.A.

119.     The Policy permitted a student to appeal a decision within 72 hours of the

decision to an Appeal Panel comprised of three members of W&L's administration. Grounds for appeal included no reasonable basis for the sanction, new relevant information, procedural defect or error, or extraordinary circumstances.

120. The Policy defined nonconsensual sexual penetration as "[s]exual penetration with another individual without consent."

121. The Policy stated that individuals who choose to engage in sexual activity of any type "must first obtain the consent of the other party. Consent is demonstrated through mutually understandable words and/or actions that clearly indicate a willingness to engage freely in sexual activity."

122. The Policy provided that, "[e]ither party may withdraw consent at any time. Withdrawal of consent should be outwardly demonstrated by words or actions that clearly indicate a desire to end sexual activity. Once withdrawal of consent has been expressed, sexual activity must cease."

123. The Policy further stated that, "[a]n individual who is physically incapacitated from alcohol or other drug consumption (voluntarily or involuntarily) or is asleep, unconscious, unaware, or otherwise physically helpless is considered unable to give consent."

124. The Policy defined "incapacitation" as "the inability, temporarily or permanently, to give consent because an individual is mentally and/or physically helpless, asleep, unconscious, or unaware that sexual activity is occurring."

125. "In other words, a person may be considered unable to give valid consent due to incapacitation if the person is not able to understand the who, what, where, when, why, and/or how of a sexual interaction."

126. The Policy listed three "questions" that the University must ask and determine "in

cases of alleged incapacitation": "(1) Was complainant incapacitated? (2) If so, did the respondent know that the complainant was incapacitated? and (3) If not, would a sober, reasonable person in the same situation have known that the complainant was incapacitated based on objectively and reasonably apparent indications of impairment."

127.     Under the Policy, "[w]here alcohol or other drugs are involved, incapacitation is a state beyond drunkenness or intoxication." The "common warning signs" that a person "may be incapacitated or approaching incapacitation as a result of alcohol or drug use or consumption may include slurred speech, vomiting, unsteady gait, odor of alcohol, incontinence, combativeness, or emotional volatility."

128.     The Policy noted that, "[i]t is especially important, therefore, that anyone engaging in sexual activity be aware of the other person's level of intoxication."

129.     The Policy as a general matter prohibited the parties' prior sexual history to be admitted as evidence during an investigation and/or hearing on the basis that prior sexual history "is not relevant."

## IV.    W&L Treated John Less Favorably Than Jane Roe in Every Phase of the Disciplinary Proceeding Motivated at Least in Part by Gender Bias

### A.    The Incident

130.     John enrolled as an undergraduate student at W&L and matriculated in the Fall of 2015. Beginning at that time andcontinuing through the events giving rise to this action, John paid full tuition to attend the University.

131.     John expected to graduate in the Spring of 2019.

132.     John and Jane Roe had been friends since their freshman year. On the day of the alleged incident, both were second term sophomores.

133.     Jane Roe falsely accused John of sexually assaulting her inthe early morning

hours of March 12, 2017.

134.    John had spent the evening of Saturday, March 11, 2017, with his fraternity brothers at an off-campus house where they hung out and drank some wine.  Jane had begun sending Snapchat messages to John and they made plans to meet later in the evening.

135.    At approximately midnight, John returned to his room at the fraternity house.  He and Jane again exchanged text messages about hanging out together.

136.    John agreed to meet Jane halfway between her dorm and his fraternity house, approximately one-half mile. When they met, they both agreed to walk back to John's house. Jane appeared sober.  She did not have any trouble walking or talking as the two walked back to John's house.

137.    Upon entering John's room, Jane sat on his bed and they began to watch a show on John's laptop computer.  They were both reclining on the bed.  Jane told John she was not interested in watching the show, so he closed the laptop and put it on the floor. The two then got under the duvet on John's bed.

138.    Jane had been wearing a sweatshirt, a bralette, and a skirt.  She told John that she had left her underwear at Witness A's house.  Jane removed her bralette because she had nipple barbells inserted and they made her uncomfortable when wearing the bralette.

139.     Jane began kissing John and the two continued to kiss for a while.  They stopped for moment and Jane asked for a drink.  John retrieved a can of coconut seltzer from the mini-refrigerator in his room.  Jane drank approximately one third of the can.

140.    As they resumed kissing, Jane asked John "if it would be weird for our friendship if we have sex."  John replied that it would only be weird if she made it seem weird.

141.    Jane asked John if he would like to receive oral sex and he agreed.  After a few

26

minutes of receiving oral sex from Jane, John asked her to stop because it "felt weird" and was not pleasurable for him. The two then proceeded to make small talk.

142.    Jane asked John who he was taking to the formal event hosted by his fraternity the following week. John replied that he was still looking for a date. Jane stated that he "should take someone cool."

143.    The fraternity event was offsite and members were renting hotel rooms. Jane asked John if he had booked a single room or was he sharing a double room. She suggested that he should get a single room. John replied that he preferred a double. John sensed that Jane wanted him to ask her to the formal.

144.    Jane next asked John about the upcoming University Fancy Dress event. John told Jane who he was taking as his date and she replied that he should take someone else.

145.    Jane had recently broken up with her boyfriend and told John that she missed being in a relationship, but she said a relationship between the two of them would not work, while rubbing her head against his chest.

146.    Several times throughout their ongoing conversation, Jane asked if it would "be weird for our friendship" to have sex; however, when John asked if she wanted him to get a condom, she nodded and said, "yes."

147.    John and Jane proceeded to have sexual intercourse. Jane was fully engaged in the sexual act, so much so that John asked her to be quieter so she wouldn't wake anyone up.

148.    Afterwards, the two fell asleep. The following morning, Jane woke John and asked John to check if anyone was in the house who might see her leave. John replied no, there was not, and Jane left. John drank the rest of the seltzer from the can and went back to sleep.

149.    Jane sent John a text asking at what time they had sex the previous night. When

John awoke, he responded that he "honestly had no idea." However, it was evident that Jane knew the two had sexual intercourse the previous evening.

150. Later that same day, John received a letter from W&L Title IX Coordinator Lauren Kozak informing him that she required him to meet with her.

### B. The Investigation

151. On March 14, 2017, Jane Roe met with Title IX Coordinator Lauren Kozak, who took her complaint and appointed herself as lead investigator. Kozak enlisted Associate Dean Jason Rodocker as the second investigator.

152. John met with Kozak and Rodocker the week following the alleged incident.

153. Witness interviews were held throughout March 2017. In late March, John met with the investigators to review his interview statement, as well as interview statements of Jane Roe and witnesses in the draft Investigative Report prepared by Kozak and Rodocker. John reviewed the final Investigative Report a day or two before the hearing. John was not allowed to take notes or have a copy of the Investigative Report, and thus, his account below of the contents of the Report is based on his best recollection.

154. Jane stated in her interview that she did not think she was intoxicated during the night of the alleged incident. Witnesses described that Jane did not appear intoxicated.

155. Jane stated that she had been taking Lexapro, an antidepressant, and believed that she had taken a dosage that night sometime between 7 p.m. and 8 p.m.

156. Prior to meeting up with John, Jane stated that she had been at the home of a female friend, a senior at W&L, and had consumed approximately four glasses of wine from approximately 8 p.m. to 10 p.m.

157. Jane's female friend was the "2014 complainant" – *i.e*., she was the W&L female student who in 2014 accused a W&L male student of sexually assaulting her. After W&L found

the male student responsible and expelled him, he sued W&L claiming he had been falsely accused and the University had subjected him to a gender biased disciplinary proceeding.

158.    The 2014 complainant became Jane Roe's Advisor of Choice for Jane's complaint against John.

159.    Jane told the investigators she left her friend's house at approximately 10 p.m. and attended an off- campus party at a fraternity where "jungle juice" was served.  She did not know how the juice was made, but knew it contained alcohol.  Jane stated her last alcoholic drink was the juice at approximately 10:30 p.m.  Jane had continued to send flirty, suggestive Snapchat messages to John throughout the evening.

160.    Jane later met up with Witness A, a male W&L student, with whom she had consensual sexual intercourse that night.

161.    When asked about Jane's intoxication level, Witness A told the investigators Jane seemed fine.  After having consensual sexual intercourse with Jane, Witness A stated that he called for a ride back to campus for Jane at around midnight.  The driver was later interviewed and stated he thought Jane appeared sober.  Witness A asked the investigators that he not be identified in the Investigative Report or otherwise, and they complied with his request.  John was never informed of Witness A's identity.  Jane Roe of course knew who Witness A was.  Witness A was the only witness whose name was not disclosed in the Investigative Report.

162.    After arriving back to her dormitory, Jane continued to message John to meet up, and they agreed to each walk halfway from their locations to meet.

163.    They walked to John's fraternity and entered his room.  Jane's account of her time with John in his room was consistent with John's account up until the sexual intercourse, although her recollection differed from John's in some relatively minor respects, *e.g.*, she

recalled that John initiated the kissing.

164.    During her interview with the investigators, and later at the hearing, Jane claimed that, after drinking the seltzer that John gave her, she fell asleep and does not remember what happened next.   Jane claimed that all of her sexual activity with John – the making out, the touching, and the oral sex – was consensual, but the sexual intercourse was not.  She also claimed she would not have consented to intercourse with John because he was not somebody with whom she wanted a relationship.

165.    She claimed that, when she awoke in John's room that morning, she saw a condom in the trash can, and only then realized that she and John had engaged in sexual intercourse.

166.    On or about April 13, 2017, W&L clinical psychologist Janet Boller from the University Counseling Center met with Jane.  According to Boller's expert report, it was the only time she met with Jane; *i.e*., she was not Jane's treating therapist.

167.    Upon information and belief, subject to discovery in this matter, Jane Roe had been referred to Boller by the investigators.

168.    On or about April 17, 2017, investigators Kozak and Rodocker met with Boller to conduct an interview.  Thereafter, Boller prepared an expert report and submitted it to the investigators.

169.    Approximately one day before the hearing, on or about April 24, 2017, Kozak and Rodocker forwarded a revised hearing packet to the Hearing Panel and John.  The revised hearing packet included the Boller expert report, which the investigators characterized as "medical evidence."

170.    This was the first time John knew about and saw the Boller expert report.

Boller's expert report had not been included in the original hearing packet provided to him. The Boller expert report was submitted to the Hearing Panel unilaterally by the investigators on the eve of the hearing, without according John an opportunity to object to it, to have a medical professional review it, or to submit a rebuttal expert report.

171.     In effect, it was presented to the Hearing Panel as an unchallenged expert opinion.

**C.     The Hearing, Decision, and Sanction**

172.     On April 25, 2017, a hearing by a Panel of the Harassment and Sexual Misconduct Board was held on April 25, 2017.

173.     Assistant Dean of Career Strategy, Cliff Jarrett, selected the Hearing Panel, comprised of three members from W&L's administration:  Mary Main, Assistant Title IX Coordinator and Executive Director of Human Resources; Steve McAllister, Treasurer and Vice President for Finance and Administration and Member of the Emergency Management Executive Team; and Lindsey Nair, Director of Content Development, Office of Communications and Public Affairs.

174.     Both John and Jane were present at the hearing along with their two Honor Advisors assigned by the University.  Kozak and Rodocker also attended.

175.     Other than Jane and John, the Hearing Panel called no witnesses to testify.  The Hearing Panel made no recording or written transcript of the hearing and made no record of the parties' questions which were submitted, rejected, asked or answered at the hearing.

176.     At the conclusion of the hearing, the Panel voted unanimously to find John responsible by a preponderance of the evidence for nonconsensual sexual penetration.  The Panel did not find John responsible "beyond a reasonable doubt," which would have imposed a mandatory sanction of expulsion.

177.     The Hearing Panel explained that, "the decision in this case came down to the

31

credibility of the Complainant and the Respondent." The Panel inexplicably concluded that it "had trouble with the Respondent's claim that receiving oral sex from a friend felt 'weird', but that he would proceed to have sexual intercourse with her. His answer to this question, as well as others, lacked detail and conviction."

178.   Here, the Hearing Panel imposed its own sexual mores and judgment in rejecting John's honest disclosure regarding his sexual preferences. For unexplained reasons, the Panel members could not accept the notion that a male student at W&L could prefer sexual intercourse over oral sex. Even more to the point, John's sexual preferences had no bearing on his credibility concerning what happened that evening. In fact, John provided a detailed (and convincing) account of his interaction with Jane to the investigators and to the Hearing Panel.

179.   The Hearing Panel also found credible Jane Roe's testimony that, "she would never consent to sex with Respondent," given her "personal rule that she only has full sexual intercourse with partners if she is interested in a relationship," and "she has never been interested in that type of relationship with the Respondent."

180.   The Hearing Panel accepted Jane Roe's subjective, unsubstantiated "personal rule" testimony as "consistent and credible" – without putting it to the test.

181.   Yet, a red flag on Jane's credibility regarding her "sexual preferences" was in the record before the Hearing Panel. The Panel knew from the Investigative Report that Jane Roe had engaged in consensual sexual intercourse earlier that same evening with Witness A.

182.   The Hearing Panel chose not to ask Jane Roe about Witness A. Nor did the Panel call Witness A to testify about his interaction with Jane Roe that evening, specifically about whether Jane Roe had expressed to him in actions or in words an interest in having a relationship. That testimony might have called into question the credibility and truthfulness of

Jane's adherence to her "personal rule."

183.     Ordinarily, a party's sexual history would be deemed irrelevant and inadmissible under the Policy, but here, Jane Roe put her sexual history and sexual preferences squarely at issue by claiming that her "personal rule" necessarily meant she would never have consented to intercourse with John.

184.     Without any factual basis, the Hearing Panel found John's sexual preference testimony not credible, but Jane's sexual preference testimony credible (*i.e.*, John was not credible in expressing a preference for sexual intercourse over oral sex, but Jane was credible in expressing her personal rule limiting sexual intercourse to potential relationship partners).  The Hearing Panel's use of a double standard strongly suggests that gender bias in favor of the female complainant motivated its credibility determination.

185.     The Hearing Panel's credibility assessment regarding the effect of alcohol and drug consumption exhibited the same lack of factual basis and the same gender-biased, one-sided favoritism.

186.     Even though both parties acknowledged alcohol and drug consumption, the Panel only considered that issue with respect to John's credibility.  The Panel disbelieved John's testimony that "his memory of the night in question was not impacted" by his intake of wine and marijuana.  The Panel faulted John's memory of the "sequence of conversations, general timing of events and how his pants got back on."  The Panel critiqued John for his strong recall of "details that would exonerate him" but "fuzzy" memory "on other details."  By contrast, the Panel found nothing questionable at all about Jane's alleged complete loss of memory of certain, selected events that evening.

187.     The Hearing Panel also arbitrarily discounted John's testimony that Jane's eyes

were open during intercourse. The Panel concluded that John could not have seen that Jane's eyes were open because the room was too dark. But, the investigators had not made an on-site visit of John's room to assess the nighttime illumination from the outdoor lights, nor had they asked John about the light level in his room from sources other than the room lights. Thus, the Panel's finding about the darkness of the room had no evidentiary basis at all.

188.    Finally, the Hearing Panel determined that Jane "was not capable of providing consent because she was either asleep or nearly asleep."

189.    This finding has no basis in the Policy. The Policy defines the inability to provide consent as follows: "An individual who is physically incapacitated from alcohol or other drug consumption (voluntarily or involuntarily) or is asleep, unconscious, unaware, or otherwise physically helpless is considered unable to give consent."

190.    The fact that a person was "nearly asleep" is *not* a basis in the Policy for a finding that the person was unable to give consent. The Hearing Panel's finding is so contrary to the plain terms of the Policy as to elude explanation.

191.    Further, the Hearing Panel never determined if Jane Roe was in fact "asleep." The Panel only found that she was *either* "asleep" or "nearly asleep." With no factual basis to find that Jane was in fact asleep, the Panel chose to concoct a new definition of consent by which the Panel could make an "either or" or "maybe" determination. But "maybe" is not a sufficient factual basis to make a finding of responsibility for sexual assault under the Policy's preponderance of the evidence standard.

192.    To the extent the Hearing Panel did decide that Jane Roe was in fact "asleep," that finding defies common sense and physical reality. The Panel did not find that Jane Roe was "physically incapacitated from alcohol or other drug consumption" or that she was

34

"unconscious, unaware, or otherwise physically helpless." Jane herself did not claim any of these incapacities, and John and the witnesses testified she appeared to be fine and in control of her faculties. Jane claimed only that she fell asleep. If that were truly the case, she would have awakened upon sexual penetration. The Hearing Panel's decision does not even mention, much less consider, how it was possible for Jane to simply fall asleep, but to not awaken when John penetrated her.

193. Jane's story is not credible. The Hearing Panel's finding cannot be reconciled with the standard of consent in the Policy, the consistent testimony of the parties and witnesses with respect to incapacitation, and physical reality.

194. The Panel's finding that Jane was "either asleep or nearly asleep" was not supported by even a scintilla of evidence, much less by a preponderance of the evidence, as required under the Policy. Not only did the Panel fail to ask the three "questions" that the Policy required "in cases of alleged incapacitation" (was complainant incapacitated? If so, did the respondent know? If not, would a reasonable person in the same situation have known complainant was incapacitated?), it failed in any way to wrestle with or answer those questions in support of its decision.

195. In addition to these substantive and procedural defects in the hearing process, there were conflicts of interest or the appearance of conflicts of interest among the Panel members who, upon information and belief, either reported to one another in their official capacities or represented institutional interests and by the nature of their positions had a duty to protect the liability of the University. These conflicts could affect the Panel's ability to serve as neutral and independent arbiters.

196. For example, Mary Main, in her role as Assistant Title IX Coordinator, supported

Title IX Coordinator Lauren Kozak. Kozak in turn also served as the lead investigator in the case. Since Main's Title IX job required her to "support" Kozak, she had an inherent conflict of interest as a Hearing Panel member tasked with examining the Investigative Report critically and independently.

197. Further, as Executive Director of Human Resources, Main worked within the Office of Finance and Administration and reported to co-Panelist Steve McAllister, Treasurer and Vice President of Finance and Administration. These additional employment affiliations created a conflict of interest as to Main's ability to exercise independent judgment that might place her in conflict with her two bosses – *i.e.*, investigator Kozak and co-panelist McAllister.

198. Throughout the hearing, the Panel's bias was palpable to John, both in the questions the Panel members asked John but failed to ask Jane Roe, and in the tone of deference Panel members accorded Jane but the tone of disapproval accorded to John.

199. The Hearing Panel imposed a sanction of (i) a one term suspension through the Fall 2017 term; (ii) successful completion of counseling for both sexual and substance abuse; (iii) probation beginning immediately, to be extended if readmitted through the end of the academic year 2017-18; and (iv) while on campus a no contact order with Jane requiring John to make every effort to avoid and remove himself from her presence. The sanction permitted John to apply for reinstatement for the Winter 2018 term.

200. John was allowed to remain at W&L to complete the Spring 2017 semester. The sanction of suspension went into effect on May 21, 2017.

201. The sanction also resulted in a mandatory transcript notation on John's education transcript, as follows: "Suspended for a violation of W&L's set of standards."

**D.    The Appeal**

202. John appealed the finding of responsibility and the sanction. Jane Roe appealed

the sanction.  The three-member Appeal Panel consisted of Trenya Mason, Assistant Dean of

Law Student Affairs; Keith Davis, Assistant Director for Advancement Operations; and Sally

Stone Richmond, Vice President for Admissions and Financial Aid.

203.    Both parties' appeals were denied in early May 2017.

204.    John argued on appeal that the Hearing Panel did not have a reasonable factual

basis to question his memory of events based on his alcohol and marijuana consumption.  John

pointed out in his appeal that Jane Roe told the investigators John did not seem drunk.  John

argued the investigators never questioned him about his memory and, had they done so, he

would have identified witnesses who would have corroborated Jane's testimony that he did not

seem drunk.  John argued he should be accorded the opportunity to present new, relevant

evidence to rebut the Panel's credibility finding.

205.    John also argued against the Hearing Panel's conclusion that he was not credible

when he told the Panel he could see Jane's eyes were open during intercourse.  John pointed out

in his appeal that Jane was able to describe John's room in detail to the investigators, and John

had described to the Panel the outside lighting sources that illuminated his room.

206.    Beyond these plain errors, the Appeal Panel should have reversed the Panel's

decision based on the Panel's fundamental procedural error on the definition of inability to give

consent.  As previously alleged, the Hearing Panel used an incorrect definition in finding that

Jane could not give consent because she was "either asleep or nearly asleep."  This finding by

the Hearing Panel was procedurally defective on its face.

207.    The Appeal Panel's failure to reverse the Hearing Panel's decision and to order a

new hearing free from conflicts of interest, gender biased judgments on credibility, reliance on

incorrect Policy definitions, and factually unsupported conclusions cannot be rationalized.

208.     Like the Hearing Panel, the Appeal Panel consisted of W&L administrators whose affiliations with the University created inherent conflicts of interest and called into question their ability to be neutral arbiters.  Their members represented institutional interests and by the nature of their positions they each had a duty to protect the liability of the University.

## V.     John's Applications for Reinstatement and W&L's Arbitrary Denials

209.     On November 15, 2017, John timely submitted his application for reinstatement for the Winter Term 2018 following completion of his suspension.  As required by the application for reinstatement and the sanctions determined by the Hearing Panel, John provided proof of his counseling for substance and sexual abuse; an evaluation from his treating health care provider concerning his readiness to return to the University; proof of his engagement in volunteer activities and employment during his suspension; and his personal essay.

210.     These requirements had been set forth by the University in a May 31, 2017 letter to John from W&L's Vice President for Student Affairs and Dean of Students, Sidney Evans.  The letter also stated that John must be "fully engaged" for "approximately forty hours per week in constructive undertakings.  These efforts can include any combination of course work at an accredited our-year college or university, employment, volunteer/community service, or similarly enriching opportunities …."

211.     John's reinstatement application more than adequately complied with these requirements.  His application included a sexual assault and alcohol abuse evaluation by John's treating psychologist, a Ph.D. trained professional with more than 30 years of experience and practice focusing on substance abuse and relationship issues.

212.     Based on multiple weekly counseling sessions with John and several assessment questionnaires, the psychologist concluded that John "does not present as a sexual predator," he

"poses no danger to the other students," his alcohol consumption is "consistent with that of his peers," and he is aware of sexual situations "that could be fraught with risk after drinking."

213.    The psychologist observed that John "is eager to continue his education at W&L," and that, in his professional opinion, John "is able to comply with the requirements of his re-instatement."

214.    John also provided W&L with a letter of recommendation in support of his reinstatement from the priest who supervised John's volunteer activities with a local parish, which included renovating a floor of the parish center so that a Venezuelan refugee family could move in.  John provided W&L with information concerning his employment history with a summer camp and his work with a realty company assisting with rental property listings.

215.    On November 30, 2017, John received a letter from W&L denying his reinstatement.  The letter stated that John's personal essay "did not demonstrate your readiness to return" to W&L, and that a future application would be strengthened by "full-time coursework, in person, at a college or university accredited by one of the six regional accrediting agencies."  The letter also stated that any future reinstatement application should reflect volunteer work "surrounding alcohol abuse and/or sexual abuse."

216.    The requirement for "full-time coursework, in person," at an accredited college or university was a new, additional stipulation for reinstatement that had not been listed on the original sanction form by the Hearing Board, in the May 31, 2017 Evans letter, or in the application for reinstatement.

217.    Moreover, requiring John to attend, in person, classes at an accredited college or university meant that any institution to which he would apply for full time courses would want proof that he was in good standing with a disciplinary report from his former institution.  Given

that John's report would state that he was suspended, he would be required to respond truthfully to questions as to the reason for the suspension, *i.e*., that the suspension was due to a finding of responsibility for sexual assault.

218.     Thus, while W&L had forbidden John to step foot upon its campus, the University was now requiring him to somehow gain admittance to an institution of similar standing to complete full-time course work in person, even though his disciplinary record from W&L made admittance at another school highly improbable, if not impossible.

219.     The additional, previously undisclosed requirement of volunteer work surrounding substance or sexual abuse was equally unattainable. John would have to disclose to any prospective supervisor that he had been suspended from W&L due to a finding of sexual assault with a sanction that also included mandatory counseling sessions for substance and sexual abuse. That truthful disclosure would almost certainly foreclose his acceptance for this category of volunteer work.

220.     On July 29, 2018, John timely submitted his second application to W&L for reinstatement for the Fall 2018 Term.

221.      In his four-page reinstatement essay, John attempted to address the Committee's criticism that his first personal essay "did not demonstrate your readiness to return to Washington and Lee."

222.     In his second essay, John described more fully the content and impact of his counseling sessions with his treating psychologist. He explained that the counseling focused on "substance abuse and sexual abuse" and "the Harassment and Sexual Misconduct Board decision," and that he and his counselor discussed "behaviors that contribute to these types of situations and remedial actions which include limiting alcohol consumption … and striking a

balance between academic and social activities."

223.    John also described counseling sessions he had on a regular basis with a Licensed Clinical Social Worker, during which they discussed the trauma and emotions he experienced surrounding the sexual misconduct allegation and proceeding, and how different people process stressful events based on their backgrounds and beliefs.

224.    He explained that his therapy sessions with both counselors "were educational and enlightening," and that he has "gained a great appreciation for differing perspectives from both."

225.    He reiterated and more fully described his volunteer work at the local parish, including his work in resettling a refugee family.  He stated that he had been grateful to be "able to help a family in need resettle and move forward with their lives."

226.    He more fully described his 5-year history of employment at the summer camp as camp leader, athletic coach, and mentor, and his full-time employment at his former high school, where he organized major fund drives for the school's food pantry, worked with freshman groups on volunteer service activities, and communicated with students, parents, and teachers in preparing for retreats, service experiences, and on-campus activities.

227.    John provided W&L with a letter of recommendation in support of his reinstatement application from his direct supervisor at the high school.  The supervisor praised John, stating that "[i]n all of these roles, [John] displayed responsibility and professionalism. He was organized, positive, and always willing to help where he was needed …. To conclude, we were very happy to have [John] work with us this past year."

228.    Finally, John reflected on his efforts while he was at W&L to work with an academic coach to improve his academic performance.  He described his commitment to

continue those better study habits and his goal to graduate and to contribute to society.

229.    Collectively, these "constructive undertakings" fully satisfied the requirements for reinstatement in the sanctions determined by the Hearing Panel, the May 31, 2017 Evans letter, and the reinstatement application.

230.    On August 14, 2018, John received a letter from W&L denying his second reinstatement application.  The letter stated that, "the Committee based its decision on the fact that you have not demonstrated successful coursework in a rigorous academic environment and that your application for reinstatement revealed no clear evidence of reflection and readiness to return to Washington and Lee."

231.    Despite the near impossibility of even being accepted for coursework in a rigorous academic environment in light of John's suspension from W&L for sexual misconduct, and the near impossibility of actually "completing" such coursework, W&L persisted in making this unattainable requirement a condition of reinstatement.

232.    Ironically, after his second reinstatement rejection from W&L, John applied to prospective transfer schools, and in all his applications he truthfully disclosed his disciplinary record from W&L.  He was rejected by all four colleges and universities to which he applied, including his application as a non-matriculating student.

233.    His W&L disciplinary record almost certainly was a major factor, if not the deciding factor, in all four rejections.

234.    The imposition of next to impossible conditions for reinstatement has effectively resulted in John's permanent exclusion from W&L.  By this post-discipline device, W&L in effect has converted the Hearing Panel's one-term suspension into an expulsion.

235.    Upon information and belief, W&L's arbitrary, "bait and switch" conduct toward

John, in which the University twice imposed new, essentially unattainable requirements as justification for denial of reinstatement, was motivated at least in part by gender bias against male students like John who have been accused of and sanctioned for alleged sexual misconduct.

236.     Upon information and belief, W&L's arbitrary conduct toward John in the reinstatement process was also motivated by a desire to retaliate against him for asserting his Title IX rights.  In June 2017, W&L became aware that John had retained an attorney who specialized in Title IX litigation when that attorney wrote to the University on John's behalf seeking the investigation report in John's case and his complete student conduct file after John's direct efforts with the University for those records were unavailing.

237.     In September 2017, John brought a state court action under Virginia Supreme Court Rule 4.2 seeking those same records and information.

238.     The University's first reinstatement denial in November 2017 quickly followed that records dispute.

## VI.     Plaintiff's Entire Future is Severely Damaged by W&L's Actions

239.     As a result of W&L's actions, John's entire academic career has been halted. Without a college education, his economic and employment future is completely compromised.

240.     John's education is at a standstill.  John is unable to continue his education at W&L, or any other institution, due to W&L's wrongful finding against him and the stigma that he has suffered by being labeled a sexual predator.

241.     John's academic and disciplinary record is irrevocably and irreversibly tarnished and will not allow him to transfer to any other educational institution to complete his undergraduate degree, let along pursue post-graduate studies.

242.     As a result of W&L's actions, John's parents' financial resources used to provide

him with a good education have been squandered.

243.     Any attempt to move on with his future in the face of W&L's arbitrary and capricious outcome and reinstatement denials will be met with resistance and little likelihood of success.

244.     Without appropriate redress, the unjustified outcome of the hearing will continue to cause irreversible damage to John, with no end in sight.  John seeks redress from this Court to undo the wrongs occasioned by W&L on his education and future.

<b>COUNT I<br>
<u>Discrimination in Violation of Title IX of the Education Amendments of 1972,<br>
20 U.S.C. § 1681 <i>et seq</i>.</u></b>

245.     John repeats and incorporates the foregoing allegations as if fully set forth herein.

246.     Title IX of the Education Amendments of 1972 provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

247.     Title IX applies to all public and private educational institutions that receive federal funding.

248.     W&L is a recipient of federal funds and is therefore bound by Title IX and its regulations.

249.     Title IX prohibits the imposition of University discipline where (as here) gender bias was a motivating factor in the decision to discipline.

250.     Consistent with Title IX, W&L's Policy promised accused students that they could expect a "prompt and equitable resolution" of sexual misconduct allegations against

them, and that W&L's sexual misconduct proceedings would be guided by "principles of fairness and respect for all parties."

251.    Thus, the Policy facially complied with Title IX.

252.    But, under pressure from OCR's long-running investigation of W&L's alleged mishandling of sexual misconduct complaints (overwhelmingly brought by female students) and faced with the threat of loss of federal funding, the University's Title IX personnel in John's case failed in crucial ways in each phase of the disciplinary proceeding to adhere to Title IX's requirement of a fair and impartial proceeding free from gender bias.

253.    W&L reached an adverse, erroneous outcome in John's case.  John was innocent and wrongly found to have committed a sexual assault, and gender bias was a motivating factor behind the erroneous finding.

254.    As set forth in detail in the foregoing Nature of the Action and Sections IV and V, the investigators engaged in certain intentional acts and omissions with respect to the gathering of evidence that favored Jane Roe to John's detriment; the Hearing Panel's finding was not supported by even a scintilla of evidence, let alone the required preponderance of the evidence standard; in the absence of an objective, evidentiary basis for its finding, the Hearing Board relied on gender stereotypes in making credibility determinations in favor of Jane and against John; the Hearing Panel failed to call Witness A or to question Jane about her alleged "personal rule" on limiting sexual intercourse to potential relationship partners; the Hearing Panel used a definition of inability to consent that did not exist in the Policy; the Appeal Panel failed to reverse the Hearing Panel's decision, which was based on its erroneous application of a non-existent definition of inability to consent and was procedurally defective on its face.

255.    In summary, the following non-exclusive facts and circumstances in John's case

establish an erroneous outcome motivated at least in part by gender bias:

- The Title IX investigators accepted as "medical evidence" an expert report prepared by Janet Boller, a University Counseling Center psychologist, offering her opinion that Jane suffered from Acute Stress Disorder. The report was patently unfair because the investigators disclosed its existence to John one day before the hearing, which left John with no time to object to the report or to engage an expert of his own to prepare a rebuttal. Boller was far from being an independent, neutral medical expert. Not only was she an employee of the University, she was the University's designated contact person for the University-sponsored Student Sexual Assault Survivor Support Group. Her professional duties included supporting students who identify themselves as "survivors" of sexual assault, who are overwhelmingly female.

- Upon information and belief, subject to discovery in this matter, the investigators referred Jane Roe to Boller – not for treatment with a neutral, non-partisan therapist – but for purposes of preparing a medical report that would have the effect of bolstering the female complainant's story.

- The Hearing Panel based its finding of responsibility on a definition of inability to provide consent that does not exist in the Policy, *i.e.*, the Panel found that Jane Roe was "either asleep or nearly asleep."

- The Hearing Panel did not determine, by *any* standard of evidence, that Jane Roe had in fact been "asleep" during sexual intercourse with John. "Nearly asleep" is not included in the Policy's list of incapacitating physical or mental conditions.

- Even if Jane Roe had fallen asleep (as she claimed), she certainly would have awakened upon sexual penetration. The Hearing Panel did *not* find that Jane was intoxicated or was physically incapacitated from alcohol or drug consumption, and Jane herself never claimed otherwise. Witnesses reported that she seemed fine. The Panel's finding of a sexual assault during sleep defies physical reality, and no reasonable fact finder could have found John responsible by a preponderance of the evidence.

- The Hearing Panel accepted at face value Jane Roe's "personal rule" testimony, in which she claimed she would not have consented to sexual intercourse with John because of her "personal rule" limiting sexual intercourse to potential relationship parties. Yet, the Panel did not question Jane Roe about her sexual encounter with Witness A that same evening, which included sexual intercourse, nor did the Panel call Witness A to testify about whether Jane discussed her "personal rule" with him that evening before engaging in consensual sexual intercourse.

- There were conflicts of interest among the Hearing Panel members, all of whom were high-ranking W&L administrators, which caused them not to be neutral fact finders in the disciplinary proceeding.

- One of the Panel members, Mary Main, reported to another Hearing Panel member (Steve McAllister, who served as W&L's Treasurer and Vice President for Finance and Administration). In her role as Assistant Title IX Coordinator, Main was also tasked with "supporting" W&L's Title IX Coordinator, Lauren Kozak, who in turn appointed herself as the lead investigator in John's case. By

the nature of their positions with the University, Panel members had a duty to protect the liability of the University.

- The Appeal Panel should have reversed the Hearing Panel's finding, which was based on a patently incorrect definition of inability to give consent and was not supported by even a scintilla of evidence, let alone the required preponderance of the evidence.

- In every phase of the disciplinary proceeding, W&L's Title IX personnel failed to consider evidence that supported John's innocence and refuted Jane's implausible accusation.

- The University's requirements for John's reinstatement were revised and increased arbitrarily with new requirements that had not been listed on the original sanction form prepared by the Hearing Panel, in the May 31, 2017 Evans letter, which set forth the terms and conditions of reinstatement, or in the application for reinstatement.

- W&L's conduct with respect to John's reinstatement was a continuation of the University's pattern throughout the disciplinary proceeding of bias against John due to gender, and constituted impermissible retaliation against John by the University.

256. Upon information and belief, W&L's lack of fairness in its handling of the disciplinary proceeding in John's case was intentional and was motivated by institutional gender bias created by the long-running OCR investigation into W&L's alleged mishandling of female complaints of sexual misconduct, with the threat of withdrawal of federal funds, and by a campus climate that supported student "survivors" of sexual assault, who are overwhelmingly

female, and who are presumed to be victims based on their accusation before an investigation and adjudication even begins.

257.    W&L's student group SPEAK personified the "survivor" approach to campus sexual assault.  Its mission was to "support survivors" and to "spread awareness about sexual misconduct."  Those can be laudable goals, but they are impermissible under Title IX when accompanied (as was the case in the proceeding against John) by institutionalized pressure to presume that accused students (who are overwhelmingly male) are perpetrators and their accusers (who are overwhelmingly female) are "survivors" and "victims."

258.    In 2015, SPEAK applauded the University's then-recent hiring of Title IX coordinator Lauren Kozak for her activism on behalf of female complainants, noting that Kozak "is doing much more education about the policy, consent, reporting options and how to file a report," and that "sexual assault is one of the most important and common problems affecting college students."

259.    SPEAK's Facebook pages described its activities in promoting "campus climate activism" in support of "survivors" of sexual assault.  Some of those events included the participation of University administrators, including "University Psychologist Dr. Janet Boller and Title IX Coordinator Lauren Kozak," who were featured panelists on the topics of "handling cases of sexual assault, and how incidents have changed over time."

260.    W&L's Title IX personnel in John's case were influenced, at least in part, by institutional pressures to find John responsible as a male student accused of sexual assault, including OCR's long-running three-year investigation of W&L prompted by a female student's complaint against it, OCR's 2011 Dear Colleague Letter with its explicit threat of loss of federal funding, OCR's 2014 Questions and Answers, and the White House's sexual assault task force

with its emphasis on training investigators to support "survivors," as well as a campus climate which fostered the notion that sexual assault accusers are to be believed and supported based on the accuser's word.

261.    Based on the foregoing intentional acts and omissions, John was subjected to a gender biased, prejudicial, and explicitly unfair process in violation of Title IX.

262.    W&L was on notice of, and was deliberately indifferent to, the serious flaws in the investigation of Jane Roe's complaint and the bias demonstrated by the investigators, the Hearing Panel, and the Appeal Panel in favor of Jane and against John.  W&L did nothing to address or remedy the harm to John.

263.    The University selectively enforced its Title IX policies by treating John as a male student accused of sexual misconduct less favorably than it would treat a similarly situated female student.

264.    W&L's conduct was so severe, pervasive, and objectively offensive that it denied John equal access to education that Title IX is designed to protect.

265.    This unlawful discrimination in violation of Title IX proximately caused John to sustain substantial injury, damage, and loss, including without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

266.    As a result, John is entitled to injunctive relief, specific performance, and damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT II
## Retaliation in Violation of Title IX of the Education Amendments of 1972,
## 20 U.S.C. § 1681 *et seq*.

267.    John repeats and incorporates the foregoing allegations as if fully set forth herein.

268.    A federally-funded educational institution violates Title IX if it retaliates against a student by taking adverse action against the student in response to the student's exercise of a protected right under Title IX.

269.    As set forth in detail in Section V herein, W&L retaliated against John in violation of Title IX by refusing to reinstate him as a student in good standing, in spite of John's fulfillment of W&L's required suspension activities, once the University became aware that John had retained an attorney nationally known for his Title IX work to assert John's rights under Title IX.

270.    This unlawful retaliation in violation of Title IX proximately caused John to sustain substantial injury, damage, and loss, including without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

271.    As a result, John is entitled to injunctive relief, specific performance, and damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT III
## Breach of Implied Contract

272.    John repeats and incorporates the foregoing allegations as if fully set forth herein.

273.    John paid the University sums of money for his education, and in return, the

51

University was to provide John with access to its undergraduate degree program.

274. John's enrollment in, and attendance of, classes at W&L created in John an expectation that he would be allowed to continue his course of study until he earned his degree from the University, provided that he maintained satisfactory grades and complied with University rules and polices.

275. Accordingly, an implied contractual relationship exists between John and the University, under which each party owes the other certain duties.

276. Under the implied contract between John and W&L, W&L had a duty not to suspend John for disciplinary misconduct arbitrarily, capriciously, maliciously, discriminatorily, or otherwise in bad faith.

277. The University breached these contractual obligations by suspending John for sexual misconduct through an investigative and adjudicative process that in the ways, and for the reasons, set forth above were arbitrary, capricious, malicious, discriminatory, and conducted in bad faith.

278. The University has compounded its arbitrary and capricious conduct by punishing John far beyond the one-term suspension that the Hearing Panel imposed.

279. In the nearly two years since the Hearing Panel sanctioned John, spanning six academic terms, W&L has refused to reinstate him as a student in good standing, even though John fulfilled all the requirements that the University initially set forth for his reinstatement in three separate documents, including the Hearing Panel's sanction form, the May 31, 2017 Evans letter, and the reinstatement application. These documents constituted contracts or implied contracts between John and W&L.

280. In fulfillment of these contractual (or implied contractual) requirements, John

participated in substance and sexual abuse counseling, provided the University with an evaluation in support of his reinstatement from his treating psychologist, a Ph.D. trained professional with over 30 years of experience and practice in the areas of substance abuse and relationship issues, and engaged in constructive activities with volunteer organizations and through sustained, gainful employment.

281.    W&L has denied reinstatement for the past two years, continually adding new, previously undisclosed "requirements" to justify its denials.

282.    As a result of W&L's wrongful conduct in the disciplinary proceeding and the unconscionably prolonged reinstatement period, John, though innocent of any wrongdoing, has lost his reputation, his ability to complete his undergraduate degree, his post-graduate opportunities, and his employment and career prospects.

283.    As a direct and proximate result of this breach, an erroneous finding that John committed sexual assault has been made part of John's educational record, which may be released to educational institutions and prospective employers to whom John applies, substantially limiting his ability to gain acceptance to transfer schools to complete his undergraduate education, to graduate school, or to secure future employment.

284.    As a direct and proximate result of the above conduct, John has sustained damages, including without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.  John's interest in the results of the disciplinary process are significant.

285.    As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements as a result of W&L's breach of an implied contract in the process of

investigating and adjudicating Jane Roe's sexual misconduct complaint against John, and in
subjecting John to an unfair and unconscionably prolonged reinstatement process.

**COUNT IV**
**<u>Negligence</u>**

286.    John repeats and incorporates the foregoing allegations as if fully set forth
herein.

287.    In order to state a negligence claim under Virginia law, a plaintiff must show
that the defendant owed the plaintiff a duty; that the defendant breached such a duty; and a
showing that the breach was the proximate cause of the injury.

288.    Plaintiff must establish each element, including the presence of a duty arising
under Virginia tort law.

289.    Here, W&L formed a university-student relationship with John and had a duty to
him to conduct the disciplinary process with due care, to perform an investigation free from bias
or conflicts of interest, to have proper training in investigating and evaluating the alleged
conduct under W&L's policies, and to ensuring a fair and impartial hearing.

290.    The foregoing duties were breached when John was subjected to a biased and
prejudicial disciplinary process, to his severe detriment.

291.    John's injury was caused by W&L's breach of its duties owed to him as a
student of the University.  He suffered immeasurable harm in the form of delayed or
permanently impaired educational opportunities, lost or postponed career opportunities and
wages, emotional and psychological damage, and reputational harm.

292.    As a direct and proximate result of the above conduct, John has sustained
damages, including without limitation, emotional distress, loss of educational and career
opportunities, economic injuries and other direct and consequential damages.  John's interests

54

in the results of the disciplinary process are significant.

293.     As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements as a result of W&L's negligence in the process of investigating and adjudicating Jane Roe's sexual misconduct complaint against him.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John demands judgment against W&L as follows:

(i)     on the first cause of action for discrimination in violation of Title IX, a judgment against W&L awarding John damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction against W&L ordering W&L to expunge John's educational and disciplinary record of any notation regarding the finding and sanction, requiring W&L to destroy all records concerning the disciplinary proceeding; and reinstating John to the University as a student in good standing to complete his undergraduate degree;

(ii)     on the second cause of action for retaliation in violation of Title IX, a judgment against W&L awarding John damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction against W&L ordering W&L to expunge John's educational and disciplinary record of any notation regarding the finding and sanction, requiring W&L to destroy all records concerning the disciplinary proceeding; and reinstating John to the University as a student in good standing to complete his undergraduate degree;

(iii)     on the third cause of action for breach of an implied contract, a judgment awarding John damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, exemplary damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)     on the fourth cause of action for negligence, a judgment awarding John damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, exemplary damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## JURY DEMAND

Plaintiff John Doe demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

**Dated: April 23, 2019**

Respectfully submitted,


By:

_s/ David G. Harrison_
David George Harrison
(VSB #17590)
**THE HARRISON FIRM, PC**
5305 Medmont Circle SW
Roanoke, VA 24018
Phone: (540) 777-7100
Fax:  (540) 777-7101
Email: david@harrisonfirm.us

and

Patricia M. Hamill
(Pa. I.D. No. 48416)
phamill@conradobrien.com
(_pro hac vice_ application pending)
**CONRAD O'BRIEN PC**
1500 Market Street, Centre Square
West Tower, Suite 3900
Philadelphia, PA 19102
Phone: (215) 864-9600
Fax: (215) 864-9620