Patricia M. Hamill
(Pa. I.D. No. 48416)
CONRAD O'BRIEN PC
1500 Market Street, Centre Square
West Tower, Suite 3900
Philadelphia, PA 19102
Tel: (215) 864-9600
Fax: (215) 864-9620
phamill@conradobrien.com
(Admitted *Pro Hac Vice*)

David G. Harrison
(VSB #17590)
THE HARRISON FIRM, PC
5305 Medmont Circle SW
Roanoke, VA 24018
Tel: (540) 777-7100
Fax:  (540) 777-7101
david@harrisonfirm.us

*Attorneys for Plaintiff John Doe*

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>      Plaintiff,<br><br>v.<br><br>WASHINGTON AND LEE UNIVERSITY,<br><br>      Defendant. | **Civil Action No.:**<br>**6:19-cv-00023**<br><br>**Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss** |

## I.  INTRODUCTION

Plaintiff John Doe ("John") filed this lawsuit against Washington and Lee University ("W&L" or "the University") for unlawful gender discrimination and retaliation in violation of Title IX (Counts I and II), breach of implied contract (Count III), and negligence (Count IV) resulting from the University's grievous mishandling of a false accusation of sexual misconduct brought against him by a female W&L student in John's sophomore year at W&L, and its subsequent refusal to reinstate John after he served his disciplinary suspension, despite John's fulfillment of all of W&L's initial conditions for reinstatement.

W&L has moved to dismiss only John's claims for breach of implied contract and negligence.

With respect to the implied contract claim, W&L attacks the sufficiency of John's allegations by mischaracterizing the legal and factual basis for the claim.  W&L argues that John "has concocted a novel contract theory" that his payment of tuition established an implied contract between him and W&L, but that theory necessarily fails because Virginia does not recognize implied contracts between students and their universities based solely on tuition payment.  W&L then argues that, even if John could establish an implied contract between him and W&L, he has not alleged any facts showing a breach of this contract.

W&L's argument is wrong for three reasons.

First, John does not rely solely on payment of tuition as the legal basis for his implied contract claim.  The Complaint clearly and explicitly alleges an independent implied contract claim based on W&L's conditions and implied promises for John's reinstatement set forth in three documents that W&L provided to John prior to his first reinstatement application.  W&L subsequently breached its implied promises when it denied John's two reinstatement applications through a "bait and switch" tactic – *i.e.*, W&L imposed a new, previously undisclosed, and

unattainable *academic* condition for reinstatement. The Complaint alleges W&L's conditions, implied promises, and breaches in detail.

Second, with respect to the payment of tuition theory, W&L cites an opinion by the Fourth Circuit to support its argument that Virginia does not recognize an implied contract based on the payment of tuition. But, as more fully explained below, that case is an unpublished, non-precedential opinion and is not binding on district courts in this Circuit. The tuition payment theory rests on the well-settled notion that, "[w]here an express contract is not made, but might have been, or in equity and good conscience should have been made, the law will impose the duty and infer the necessary promises to effect a contractual relationship between the parties." *Virginia Block Co. v. Virginia Mut. Ins. Agency, Inc.*, 16 B.R. 771, 774 (W.D. Va. Bank. 1982) (citation omitted).

Third, W&L is wrong that John has not alleged any facts showing a breach of implied contract under the tuition payment theory. To the contrary, as alleged in the Complaint, that theory imposes on universities like W&L a duty not to suspend or expel students for disciplinary misconduct arbitrarily, capriciously, maliciously, discriminatorily, or otherwise in bad faith. The Complaint alleges multiple breaches of that contractual obligation, explicitly identifying W&L's arbitrary, capricious, and discriminatory conduct in every phase of the investigative and adjudicative process in John's disciplinary proceeding.

As alleged in the Complaint, and summarized in detail below, John has more than adequately alleged facts supporting his two implied contract theories to withstand W&L's motion to dismiss.

With respect to the negligence claim, W&L argues Virginia law does not recognize a "special duty" of care with respect to university and college disciplinary proceedings, and that to

2

the extent a duty did exist it came from the alleged implied contractual relationship between John and W&L, and thus, runs afoul of the economic loss rule. For the reasons set forth in detail below, John has adequately alleged that W&L had a legal duty independent of any contractual duty to exercise due care in the disciplinary process under general negligence principles. However, John pleaded his negligence claim in the alternative to his implied contract claim, so that if this Court finds an implied contract existed, John will not pursue a negligence claim.

## II. FACTUAL ALLEGATIONS IN THE COMPLAINT APPLICABLE TO JOHN'S BREACH OF IMPLIED CONTRACT AND NEGLIGENCE CLAIMS

The following facts alleged in the Complaint are applicable to John's breach of implied contract and negligence claims. As explained in the Introduction, John's implied contract claim is based on two theories of liability with respect to two separate, but related, events: (i) W&L's conduct during the reinstatement proceeding, and (ii) W&L's conduct during the disciplinary proceeding. John's negligence claim is based on his allegation that W&L breached its duty of care in its conduct during the disciplinary proceeding. Here, John recites the factual allegations supporting both claims and theories in the chronological order in which they appear in the Complaint, starting with the disciplinary proceeding, followed by the reinstatement proceeding.

### A. The Disciplinary Proceeding

#### 1. The Alleged Incident

On or about March 13, 2017, a female W&L student (referred to as "Jane Roe" or "Jane" in the Complaint) reported to W&L that, in the early morning hours of March 12, 2017, she and John Doe (who were sophomores and close friends) engaged for the first time in consensual sexual activity, including mutual kissing, touching, and oral sex which she performed briefly on John. Although the two then engaged in sexual intercourse, Jane claimed the next day in her report to W&L that she had not consented to the intercourse, because she fell asleep and had no

3

memory of it. She claimed she only realized she and John had engaged in sexual intercourse when she awoke in John's room that morning and saw a condom in the trash can. She also claimed she would only consent to sexual intercourse with a partner with whom she wanted a relationship, and John did not fit that criterion. She acknowledged she had consented to all the sexual activity before intercourse. (Compl. ¶¶ 11-12, 133, 137-149, 164-165).

### 2. The Investigation

W&L Title IX Coordinator, Lauren Kozak, was lead investigator on the case and Associate Dean of Students, Jason Rodocker, was co-investigator. (*Id*. ¶¶ 15, 151).

As noted, Jane Roe told the investigators that, on the night in question, she and John engaged in consensual sexual activity, but she claimed the next day that she had not consented to the intercourse, because she fell asleep and had no memory of it. (*Id*. ¶ 11).

Jane told the investigators she had consumed only a moderate amount of alcohol that evening, had taken her usual dosage of her prescribed antidepressant medication, and did not think that she was intoxicated during the alleged incident. (*Id*. ¶¶ 13, 17, 154-155).

Jane's claim to have fallen asleep and her alleged lack of memory of engaging in intercourse raised obvious evidentiary questions about incapacitation: Had she consumed too much alcohol, so that she lacked capacity to give consent? Or, had she consumed only a moderate amount of alcohol (as she herself claimed), but because she had also taken her prescribed antidepressant medication, had that combination caused her to experience a medical condition known as "black out," a period during which she would appear to be normal and functioning to John and others observing her, but as to which she had no memory? If that were the case, John would have reasonably believed Jane had consented to the activity. (*Id*. ¶ 13).

But, if neither excess alcohol consumption nor alcohol-and-drug interaction caused Jane's memory loss, then Jane's story that she simply "fell asleep" and had no memory of the

4

intercourse would not be credible. How could she possibly explain why she did not wake up from her sleep at the time the intercourse occurred? (*Id*. ¶ 14).

W&L's investigators raised the incapacitation question with the parties and two witnesses who had personally observed Jane Roe at different times on the night in question. (*Id*. ¶ 15).

These witnesses told the investigators Jane Roe did not appear drunk, incapacitated, or unable to function or to know her whereabouts. One of the witnesses, identified as Witness A in the Investigative Report, had engaged in consensual sexual intercourse with Jane Roe earlier that same evening. He told the investigators Jane seemed fine. The other witness was the driver who took Jane back to her room after her time with Witness A. He told the investigators Jane appeared sober. (*Id*. ¶ 16, 160-161).

The investigators found no evidence that Jane had been illicitly drugged by anyone that evening. Jane herself told the investigators she was not drunk or incapacitated. John told the investigators that Jane and he discussed having sex, the two agreed he should get a condom, and Jane was fully aware of and an active participant in the sexual intercourse. (*Id*. ¶ 17).

Thus, the investigators had gathered cumulative, independent, and corroborating evidence that Jane was not drunk or otherwise physically incapacitated, unable to give consent, or incapable of awakening from sleep upon sexual penetration. That evidence should have called into question, if not conclusively refuted, Jane's story that she simply fell asleep and did not awaken during the intercourse. (*Id*. ¶¶ 18, 154, 161, 164, 192).

Instead, approximately 12 days before the hearing date in the case, a University Counseling Center psychologist, Dr. Janet Boller, met with Jane Roe. Based solely on that one meeting, Boller prepared a report in which she concluded that Jane Roe exhibited symptoms of Acute Stress Disorder. The clear implication of Boller's report was that Jane's Acute Stress

Disorder was the result of an alleged sexual assault, and was not a pre-existing condition, even though Jane had been taking a prescribed antidepressant medication. (*Id*. ¶ 18).

The investigators accepted the Boller report as "medical evidence" relevant to Jane's allegations and sent it to the Hearing Panel for its consideration. It was not until the day before the hearing, when the investigators provided John with a revised hearing packet, that John saw the Boller report for the first time. With so little time before the hearing, John had no meaningful opportunity to object to the report, or to engage his own rebuttal medical expert for the hearing. (*Id*. ¶¶ 19-20).

Upon information and belief, subject to discovery in this matter, Jane Roe had been referred to Boller by the investigators. (*Id*. ¶ 21).

The investigators subjected John to a "surprise" report – a purported expert medical report by ambush – the effect of which was to bolster Jane's credibility and counteract the exculpatory evidence on the issue of incapacitation. By so doing, the investigators violated their obligation to remain neutral, objective, and fair to both parties. They accepted "medical evidence" on behalf of one party over the other, and then withheld the evidence from the other party until the eve of the hearing, when it was too late to do anything about it. Such an action indicates that the investigators intentionally subjected John to unfair, arbitrary, and discriminatory (or at the very least negligent) investigative treatment. (*Id*. ¶ 22).

The investigators knew that Boller was not a neutral, independent medical expert. As a therapist in the University Counseling Center, she was employed by W&L, an affiliation which could influence her to act in her employer's best interest. Beyond that, Boller was the University's designated contact person for the University-sponsored Student Sexual Assault Survivor Support Group. W&L's Counseling Center web site states that, "[t]his support group is

open to students who have experienced a sexual assault and are seeking support in their recovery. Contact Dr. Janet Boller at jboller@wlu.edu for more information." (*Id.* ¶ 24).

Thus, Boller's professional duties as an employee at W&L included supporting students who claim to have experienced a sexual assault, and who are treated by W&L and Boller as "survivors" of sexual assault. (*Id.* ¶ 25).

In contrast to their conduct in accepting (and possibly facilitating) "medical evidence" favorable to Jane, the investigators failed to gather potentially exculpatory evidence or seek expert opinion to determine whether Jane's consumption of a moderate amount of alcohol, in combination with her antidepressant medication, could have caused her to experience a memory " black out" at a certain point in the evening, during which she appeared alert, aware of her surroundings, and functioning normally, as John and at least two other witnesses told the investigators. (*Id.* ¶ 26). This evidence would have shown that John had no way to know that Jane was not in a normally functioning state of mind. (*Id.* ¶¶ 123-128).

The investigators also failed to interview other students who had spent time with Jane that evening and who might have provided further corroboration of Jane's lucidity. (*Id.* ¶ 27).

### 3. The Hearing

After the investigation ended, a three-member Hearing Panel held a hearing attended by John and Jane Roe and the two investigators. No witnesses were called and no written transcript or audio recording was made of the hearing. (*Id.* ¶¶ 172, 174-175). The Panel found John responsible for nonconsensual sexual penetration by concluding that Jane was "either asleep or nearly asleep" during the intercourse and was not capable of providing consent. (*Id.* ¶¶ 34, 176, 188). The Panel sanctioned John with a one-term suspension. (*Id.* ¶ 199).

The Hearing Panel acknowledged there was no objective or corroborating evidence to support Jane's allegation that she did not consent to sexual intercourse. The Panel explained

that, "the decision in this case came down to the credibility of the complainant and the respondent." (*Id.* ¶¶ 28-29). In making its credibility determinations, however, the Panel relied on gender stereotypes about sexual preferences, failed to question two witnesses whose statements to the investigators called into question Jane Roe's credibility, and invented out of whole cloth an arbitrary and absurd definition of incapacitation from which the Panel concluded that Jane did not consent to sexual intercourse because she was "either asleep or nearly asleep." (*Id.* ¶¶ 28-36, 177-194).

For example, in its decision, the Panel explained it "had trouble" with John's claim that receiving oral sex from a friend felt "weird," but that John would proceed to have sexual intercourse with Jane. When the Panel questioned John about why he felt discomfort over oral sex but not sexual intercourse with Jane, the Panel found that John's "[a]nswer to this question, as well as others, lacked detail and conviction." Based on this flimsy, irrelevant quibble with John's sexual preferences, the Panel discredited John's credibility and his version of events. (*Id.* ¶¶ 30, 171). The Panel arbitrarily imposed its own sexual mores and judgment in assessing John's alleged sexual misconduct. In fact, John provided a detailed account of his interaction with Jane, and his sexual preferences had no bearing on his credibility concerning what happened that evening. (*Id.* ¶ 178).

By contrast, the Hearing Panel credited Jane's story that she would not have consented to sexual intercourse with John because she had a "personal rule" that "she only has full sexual intercourse with partners if she is interested in a relationship," and "she has never been interested in that type of relationship with the Respondent." (*Id.* ¶¶ 31, 179). Without any factual basis, the Hearing Panel accepted Jane's "sexual preference" testimony as "consistent and credible." (*Id.* ¶¶ 32, 180).

8

The Panel's credibility assessment regarding the effect of alcohol also used a standard that was arbitrary, capricious, and discriminatory. Even though both parties acknowledged alcohol consumption, the Panel only considered that issue with respect to John's memory and credibility. The Panel disbelieved John's testimony that "his memory of the night in question was not impacted" by his intake of wine and marijuana. The Panel faulted his memory regarding the "sequence of events, general timing of events and how his pants got back on," and critiqued his "fuzzy" memory "on other details." (*Id*. ¶¶ 185-186). By contrast, the Panel never questioned Jane's alcohol intake or her memory of events, even though Jane claimed to have suffered a complete loss of memory of engaging in sexual intercourse, but had compete recall of events preceding the intercourse. (*Id*.)

Similarly, John told the Panel he could see that Jane's eyes were open during intercourse (and thus she was awake), because the room was illuminated from outside lighting sources. The Panel discredited John's testimony, concluding that the room was too dark for him to have seen that her eyes were open. But, the investigators had not asked John about the light level in his room, nor had they made an on-site visit to assess the nighttime illumination. Thus, the Panel's finding about the darkness of the room had no evidentiary basis at all. (*Id*. ¶ 187).

Likewise, the Panel's failure to call and question credibility witnesses was arbitrary, capricious, and discriminatory. The Panel knew from the Investigative Report that Jane Roe had engaged in consensual sexual intercourse earlier that same evening with Witness A. (*Id*. ¶¶ 32, 181). Even though Jane had put her sexual history at issue by claiming she would not have consented to sexual intercourse with John because of her "personal rule" limiting sexual intercourse to those with whom she wanted to be in a relationship, the Hearing Panel did not question Jane about Witness A. Nor did the Panel call Witness A to question him about whether

9

Jane had told him about her "personal rule," or whether she had expressed to him an interest in having a relationship before she consented to "full sexual intercourse." (*Id.* ¶¶ 33, 182).

In addition, the Panel did not call either Witness A, or a second witness (the driver who took Jane back to her room after her sexual encounter with Witness A), to question them about Jane Roe's level of intoxication, incapacitation, or consciousness. Both witnesses told the investigators they observed Jane late that evening, and she did not appear drunk, incapacitated, or unable to function or to know her whereabouts. The Hearing Panel chose not to hear from either of these witnesses on this issue. (*Id.* ¶¶ 15-17, 175). It appears the Panel had come to a foregone conclusion.

Finally, the Hearing Panel's ultimate finding that Jane "was not capable of providing consent because she was either asleep or nearly asleep" was completely arbitrary and capricious. The Hearing Panel knew that a finding of incapacitation and inability to provide consent required evidence demonstrating by a preponderance of the evidence that a person had been physically incapacitated from alcohol or other drug consumption, or was asleep, unconscious, unaware, or otherwise physically helpless. (*Id.* ¶¶ 34, 189). The fact that a person was "nearly asleep" or that a person was "*either* asleep or nearly asleep" was not a basis for the Hearing Panel to find that the person was unable to give consent.

The Hearing Panel did not find that Jane Roe was physically incapacitated from alcohol or other drug consumption, or that she was unconscious, unaware, or otherwise physically helpless. The testimony of the parties and witnesses established that Jane had none of these incapacities. Jane herself claimed only that she fell asleep. But, if that were truly the case, she would have awakened upon sexual penetration. The Hearing Panel's decision did not mention,

much less consider, how it was possible for Jane to simply fall asleep, but to not awaken when John penetrated her.  (*Id.* ¶¶ 36, 192).

### 4. The Appeal

John's appeal was denied by a three-member Appeal Panel.  (*Id.* ¶¶ 202-203).  The Appeal Panel failed to reverse the Hearing Panel's finding of responsibility, despite the multiple deficiencies of proof in the Panel's determinations cited above.  If for no other reason, the Appeal Panel should have reversed the Hearing Panel's decision based on the Panel's reliance on a definition of inability to give consent that was arbitrary and capricious.   (*Id.* ¶¶ 37, 204-206).

### B. The Reinstatement Proceeding

The Hearing Panel sanctioned John with a one-term suspension, after which he would be eligible to return to W&L.  (*Id.* ¶ 1).  In the nearly two years since John has been eligible to return, spanning six academic terms, W&L has refused to accept John back on campus as a student in good standing, even though he fulfilled all the conditions that the University initially set forth for his reinstatement.  W&L twice has added a new, previously undisclosed, and unattainable *academic* condition to justify its rejections of John's two reinstatement applications. (*Id.* ¶¶ 2-9, 209-244).  W&L's "bait and switch" tactic to deny John's requests for reinstatement was a blatant breach of its obligation to make good on the implied promises it had made to John prior to John's first reinstatement application.

W&L's initial conditions and implied promises were set forth in three separate documents provided by W&L to John in advance of his first reinstatement submission.  Those documents included the Hearing Panel's sanction form, a letter dated May 31, 2017 to John from W&L's Vice President for Student Affairs and Dean of Students, Sidney Evans, and W&L's reinstatement application form.  (*Id.* ¶¶ 209, 210, 279).

11

These initial conditions in total included: (1) successful completion of counseling for substance and sexual abuse; (2) an evaluation from John's treating health care provider as to whether his behavioral concerns have been resolved or improved to the point of qualifying him for return to the University; and (3) "approximately forty hours per week in constructive undertakings," that "can include any combination of course work at an accredited four-year college or university, employment, volunteer/community service, or similarly enriching opportunities." (*Id.* ¶¶ 209-210, 229).

After receiving these reinstatement conditions from W&L, John submitted two reinstatement applications, the first on November 15, 2017 for reinstatement for the Winter Term 2018, and the second on July 29, 2018 for reinstatement for the Fall 2018 Term. (*Id.* ¶¶ 209, 220).

In fulfillment of W&L's conditions set forth in the Hearing Panel sanction form, the May 31, 2017 Evans letter, and the reinstatement application form, John submitted proof to the University that he had participated in substance and sexual abuse counseling and provided the University with an evaluation from his treating psychologist, a Ph.D.-trained professional with over 30 years of experience in the areas of substance abuse and relationship issues. Based on multiple weekly sessions with John and several assessment questionnaires, the psychologist concluded John posed no danger of sexual or alcohol abuse ("he does not present as a sexual predator and poses no danger to the other students," his "alcohol consumption is consistent with his peers," he is aware of "the importance of setting limits in situations that could be fraught with risk after drinking"). The psychologist concluded that John "is able to comply with the requirements of his re-instatement." (*Id.* ¶¶ 3-4, 209-213).

John also submitted his own reinstatement and personal reflection essays; as well as letters of recommendation in support of his reinstatement from the priest who supervised his volunteer activities with a local parish in support of a Venezuelan refugee family and from his direct supervisor at his former high school where John organized fund drives for the school's food pantry and worked with freshman groups on volunteer service activities. John provided W&L with information concerning his five-year employment history with a summer camp and his work with a realty company assisting with rental property listings. (*Id.* ¶¶ 5-6, 214).

In rejecting John's first application, W&L arbitrarily and without warning added a new, unattainable condition: John had to enroll for "***full-time coursework, in person***, at a college or university accredited by one of the six regional accrediting agencies." (*Id.* ¶¶ 215-216) (emphasis added). W&L knew that John could not comply with this previously undisclosed condition. While W&L had forbidden John to step foot upon its campus, it now required him to ***gain admittance to another institution for full-time coursework***, even though his W&L disciplinary record – which he would have to disclose – made admittance to another school highly improbable, if not impossible. (*Id.* ¶¶ 217-218).

In rejecting John's second application, W&L persisted in demanding the impossible, rebuking John because "you have not demonstrated ***successful coursework in a rigorous academic environment***." (*Id.* ¶ 230) (emphasis added). Despite the near impossibility of even being accepted for coursework in a rigorous academic environment in light of John's suspension from W&L for sexual misconduct, W&L now demanded that John demonstrate "successful" completion of such coursework at another school as a condition of reinstatement. (*Id.* ¶ 231).

By imposing a previously undisclosed and unattainable condition for reinstatement as a basis for twice rejecting John's reinstatement applications, W&L breached the conditions and

implied promises for reinstatement set forth in the Hearing Panel form, the May 31, 2017 letter, and the reinstatement application. (*Id*. ¶ 279). The University compounded its arbitrary and capricious conduct in the disciplinary proceeding by using the reinstatement proceeding as a means to punish John far beyond the one-term suspension that the Hearing Panel imposed, effectively converting the one-term suspension into an expulsion. (*Id*. ¶¶ 234, 278).

Ironically, after his second reinstatement rejection from W&L, John applied to prospective transfer schools, since it had become clear W&L was acting in bad faith in the reinstatement process. In all his applications, he truthfully disclosed his disciplinary record from W&L. He was rejected by all four colleges and universities to which he applied. His W&L disciplinary record almost certainly was a major factor in all four rejections. (*Id*. ¶¶ 232, 233).

As a result, John's education is at a standstill; he has lost his ability to complete his undergraduate education at W&L or any other school; he has been stigmatized by W&L as a sexual offender; and his employment and economic future is completely compromised. (*Id*. ¶¶ 2, 239-244).

## III. ARGUMENT

### A. Standard of Review

"A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; 'it does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses.'" *Doe v. Washington and Lee Univ*., 2015 WL 4647996, at *1 (W.D. Va. Aug. 5, 2015), quoting *Republican Party of North Carolina v. Martin*, 980 A.2d 943, 952 (4th Cir. 1992). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level … with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor." *Washington and Lee*, *supra*, citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Chao v. Rivendell*

14

*Woods, Inc.*, 415 F.3d 342, 346 (4th Cir. 2005). Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

      **B.     The Complaint Sufficiently Pleads Breach of Implied Contract**

          **1.     John's Implied Contract Claim Based on the Reinstatement Proceeding**

As explained in the Introduction, W&L wrongly claims that the only basis for John's breach of implied contract claim is payment of tuition. In fact, as explicitly and clearly alleged in the Complaint, John asserts a breach of implied contract claim – separate and independent from the payment of tuition implied contract claim – based on W&L's conduct during the reinstatement proceeding. The Complaint alleges the existence of three reinstatement documents provided by W&L to John in advance of his first reinstatement application that set forth conditions and implied promises for his reinstatement. Those documents were the Hearing Panel sanction form, the May 31, 2017 Evans letter to John, and W&L's reinstatement application. (Compl. ¶¶ 209, 210, 279).[1]

As explained in Section II.B., the conditions in those documents in total included: (1) successful completion of counseling for substance and sexual abuse; (2) an evaluation from John's treating health care provider as to whether his behavioral concerns have been resolved or improved to the point of qualifying him for return to the University; and (3) "approximately forty hours per week in constructive undertakings," that "can include any combination of course work

---

[1] John's reinstatement claim does not depend on W&L's Sexual Misconduct Policy. The three reinstatement documents upon which John's reinstatement claim is based are completely independent and separate from the Sexual Misconduct Policy.

at an accredited four-year college or university, employment, volunteer/community service, or similarly enriching opportunities." (*Id.* ¶¶ 209-210, 229).

These documents constituted an implied promise and created in John a reasonable expectation that W&L would act in good faith in evaluating John's fitness to return to W&L based on his fulfillment of the conditions W&L had set forth in these documents.

In reliance on W&L's representations and conditions in these official documents, John submitted two reinstatement applications, in which he demonstrated his fulfillment of W&L conditions, including proof of substance and sexual abuse counseling, a behavioral assessment of John's fitness to return to W&L from his treating psychologist, proof of his participation in a range of "constructive undertakings," including volunteer work and employment, and letters of recommendation in support of his reinstatement from the priest of a local parish church who supervised John's volunteer work assisting a Venezuelan refugee family and from his direct supervisor at his former high school who supervised his volunteer work for the school's food pantry and freshman volunteer service program. (*Id.* ¶¶ 3-6, 209-214, 220).

John fully complied with W&L's conditions set forth in the Hearing Panel sanction form, the May 31, 2017 letter, and W&L's reinstatement application. Based on his compliance with W&L's conditions, John had a reasonable expectation of reinstatement.

Instead, as alleged in the Complaint, W&L breached its conditions and implied promises when it twice rejected John's reinstatement applications by imposing a previously undisclosed and unattainable condition of "full-time coursework" and "successful coursework" in person in a "rigorous academic environment." W&L knew this new condition, which required John to enroll full-time in another college or university, was impossible for John to satisfy given his suspension from W&L for sexual misconduct. (*Id.* ¶¶ 215-218, 231, 279). Virginia law requires that there

be a "prominent notation" on John's academic transcript of his suspension for "sexual violence." Va. Code Ann. § 23.1-900. Moreover, W&L's "full-time coursework" condition imposed an *academic* requirement for reinstatement on what was a purely disciplinary suspension.

W&L's conduct was arbitrary, abusive, and in bad faith – W&L misused the reinstatement process and imposed a bogus (and impossible) academic requirement to punish John far beyond the one-term suspension that the Hearing Panel imposed, effectively converting the one-term suspension into an expulsion. (*Id*. ¶¶ 234, 278).

W&L will doubtless argue that its reinstatement documents never promised or guaranteed reinstatement, and that W&L always retained the privilege and prerogative to unilaterally change the conditions of reinstatement at any time, including changing them so as to be impossible of attainment. The implied contract theory of liability seeks to prevent such arbitrary and unjust conduct. In such circumstances, Virginia recognizes an implied-in-law contract: "Where an express contract is not made, but might have been, or in equity and good conscience should have been made, the law will impose the duty and infer the necessary promises to effect a contractual relationship between the parties." *Virginia Block Co. v. Virginia Mut. Ins. Agency, Inc*., 16 B.R. 771, 774 (W.D. Va. Bankr. 1982) (citation omitted).

The Supreme Court of Virginia has long recognized implied-in-law contracts as a means to impose a legal duty and infer a promise in order to avoid injustice. *See*, *e.g*., *Spectra-4, LLP v. Uniwest Commer. Realty, Inc*., 772 S.E.2d 290, 293-94 (Va. 2015) ("implied-in-law contracts, or 'quasi contracts,' establish liability 'from an implication of law that arises from the facts and circumstances, independent of agreement or presumed intention'") (citation omitted); *City of Norfolk v. Norfolk Cnty*., 91 S.E. 820, 825 (Va. 1917) ("The fiction of an [implied-in-law

17

contract] will not be indulged in every case, but only where, in equity and good conscience, the duty to make such a promise exists.")

The "equities of the situation" with respect to John's reinstatement provide justification for this Court to "impose a contract implied in law." *Virginia Block*, 16 B.R. at 774.

These allegations fully support a breach of implied contract claim and withstand W&L's motion to dismiss.

### 2.    John's Implied Contract Claim Based on Payment of Tuition

In the Complaint, John asserts that his payment of tuition, enrollment, and attendance at W&L created in him a reasonable expectation that the University would allow him to earn his degree, so long as he maintained satisfactory grades and complied with University rules and policies. The Complaint alleges that under this implied contract the parties owed each other certain duties, and in particular, W&L had a duty not to suspend John for disciplinary misconduct arbitrarily, capriciously, maliciously, discriminatorily, or otherwise in bad faith. The Complaint alleges that W&L breached these contractual obligations by suspending John for sexual misconduct through an investigative and adjudicative process that in the ways, and for the reasons, set forth in detail in the Complaint, were arbitrary, capricious, malicious, discriminatory, and conducted in bad faith. (*Id*. ¶¶ 273-277).

W&L argues that Virginia does not recognize an implied contract between students and their universities based solely on the payment of tuition. In support of this argument, W&L cites an opinion by the Fourth Circuit, *Butler v. Rector & Bd. of Visitors of Coll. of William & Mary*, 121 F. App'x 515 (4th Cir. 2005). But, *Butler* is an unpublished *per curiam* opinion, and is prefaced with this caveat: "Unpublished opinions are not binding precedent in this circuit." Thus, *Butler* is not binding on this Court.

18

In addition, *Butler* is inapposite here, because it did not involve a motion to dismiss. The district court in *Butler* dismissed the plaintiff's breach of implied contract claim pursuant to Federal Rule of Civil Procedure 50(a) – *i.e.*, after the case proceeded to a jury trial and the district court granted William and Mary's motion for judgment as a matter of law at the close of plaintiff's evidence on the basis of legally insufficient evidence. 121 F. App'x at 518; *see also* Rule 50(a) (judgment as a matter of law may be granted if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue").

It is true that courts in this Circuit following Virginia law hold that a university's student handbook and sexual misconduct policy are not enforceable contracts because the promises in them are aspirational statements, educational ideals, or policies that are "subject to continual examination and revision." *See Washington and Lee*, 2015 WL 4647996, at *11 (internal citations omitted). The payment of tuition theory of implied contract does not rely on the student handbook or the sexual misconduct policy, but rather, derives from the equitable notion that, "when the equities of the situation so dictate, a court may impose a contract implied in law, or quasi-contract, on the parties regardless of their intent." *Virginia Block Co.,* 16 B.R. at 774; *see also Spectra-4,* 772 S.E.2d at 293-94; *Norfolk*, 91 S.E. at 825, *supra*.[2]

It surely cannot be the case that a university's appointed Title IX investigators, Hearing Panel members, and Appeal Panel members can act arbitrarily and in bad faith with impunity in a student disciplinary proceeding with the potential for suspension or expulsion. Other courts have examined student breach of contract claims for the limited purpose of determining whether

---

[2] W&L also cites the district court's opinion in *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 588 (E.D. Va. 2018), to support its argument that "the Supreme Court of Virginia has never held that 'an implied contract is created between a student and his or her university merely through the payment of tuition.'" *Marymount* does not contradict John's point here, which is that Virginia law permits a court to impose a legal duty and infer a promise when the "equities of the situation so dictate."

the university's Title IX personnel used established disciplinary procedures in "an arbitrary, capricious, or bad faith manner in this case." *See*, *e.g.*, *Lucey v. Nevada*, 2009 WL 971667, at *6 (D. Nev. Apr. 9, 2009). Here, the "equities of the situation" provide justification for this Court to "impose a contract implied in law." *Virginia Block*, 16 B.R. at 774.

W&L also is wrong that John has not alleged any facts showing a breach of implied contract under the tuition payment theory. To the contrary, the Complaint alleges multiple breaches of W&L's contractual obligation, explicitly identifying W&L's arbitrary, capricious, and bad faith conduct in every phase of the investigative and adjudicative process in his disciplinary proceeding.

John has more than adequately alleged facts supporting his payment of tuition claim.

### C.     The Complaint Sufficiently Pleads Negligence

W&L argues in its motion to dismiss that John's negligence claim should be dismissed on two alternative grounds: (1) Virginia does not impose a duty on universities to exercise special or due care with respect to their disciplinary programs; (2) alternatively, if the Court identifies an implied contract between W&L and John, John's negligence claim must be dismissed under the economic loss rule, which bars parties from recovering in tort simply by recasting a contract claim as a tort claim.

With respect to the latter contention, W&L cannot have it both ways. W&L has argued that no contractual relationship existed between John and W&L. If that is the case, then the economic loss rule is not an impediment to John's separate negligence claim. In any event, John wishes to clarify that he has pleaded his negligence claim in the alternative to his implied contract claim. If this Court finds that an implied contract exists, then John will not pursue a negligence claim. If this Court finds that an implied contract did *not* exist, then John asserts that W&L had a legal duty to exercise due care in the disciplinary process under general negligence

20

principles, notwithstanding W&L's argument to the contrary. The Complaint alleges that this duty of care required W&L to perform an investigation free from gender bias or conflicts of interest, to provide proper training in investigating and evaluating the alleged conduct, and to ensure a fair and impartial hearing. (Compl. ¶ 289). W&L breached these duties as alleged throughout the Complaint. (*Id*. ¶ 20).

"General negligence principles require a person to exercise due care to avoid injuring others." *RGR, LLC v. Settle*, 288 Va. 260, 275 (Va. 2014). "This general duty is owed to those within reach of a defendant's conduct." *Id*. at 276. "Whenever one person is by circumstances placed in such a position with regard to another … that if he did not use ordinary care and skill in his own conduct with regard to those circumstances, he would cause danger of injury to the person … of the other, a duty arises to use ordinary care and skill to avoid such injury." *Id*.

These principles describe W&L's relationship to John. <u>First</u>, John was "within reach of" W&L's conduct throughout the disciplinary proceeding, which was wholly within the control of W&L's Title IX personnel. <u>Second</u>, W&L's investigators, Hearing Panelists, and Appeal Panelists knew they were in a position to cause a danger of harm to John if they did not perform their investigative and decision-making duties with care and skill. Here, the disciplinary proceeding resulted in an erroneous and unfair outcome – harm which could have been avoided by W&L in the exercise of ordinary care and skill.[3]

---

[3] This Court has noted that, "it is unlikely that Virginia would conclude that a special relationship exists as a matter of law between colleges and universities and their students." *Jackson v. Liberty Univ*., 2017 WL 3326972, at *9 (W.D. Va. 2017), citing *Schieszler v. Ferrum Coll*., 236 F. Supp. 2d 602, 608-09 (W.D. Va. 2002). John has not alleged the existence of a "special relationship" as the basis for his negligence claim, which is premised on general principles of ordinary negligence as articulated by the Supreme Court of Virginia in *Settle*, *supra*.

21

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny W&L's

Motion to Dismiss and allow John to proceed with his breach of implied contract and negligence

claims to rectify the grievous harm that W&L has inflicted on him and to win back his

reputation, his education, and his future.

Dated: August 5, 2019                          Respectfully submitted by:


*s/ David G. Harrison*
David George Harrison (VSB #17590)
**THE HARRISON FIRM, PC**
5305 Medmont Circle SW
Roanoke, VA 24018
Tel: (540) 777-7100
Fax: (540) 777-7101
david@harrisonfirm.us

Patricia M. Hamill
(Pa. I.D. No. 48416)
**CONRAD O'BRIEN PC**
1500 Market Street, Centre Square
West Tower, Suite 3900
Philadelphia, PA 19102
Tel: (215) 864-9600
Fax: (215) 864-9620
phamill@conradobrien.com
(Admitted *Pro Hac Vice*)

## CERTIFICATE OF SERVICE

I certify that on August 5, 2019, I electronically filed the foregoing document with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to

W&L's counsel of record as follows:

R. Craig Wood, Esq.
McGuire Woods LLP
652 Peter Jefferson Parkway, Ste. 350
P.O. Box 1288
Charlottesville, VA 22902
cwood@mcguirewoods.com

Micah B. Schwartz, Esq.
McGuire Woods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
mschwartz@mcguirewoods.com

*/s David G. Harrison*
David G. Harrison, Esq. (VSB #17590)
**THE HARRISON FIRM, PC**
5305 Medmont Circle S.W.
Roanoke, VA 24018
(540) 777-7100
david@harrisonfirm.us