CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
2/10/2020
JULIA C. DUDLEY, CLERK
BY: s/ CARMEN AMOS
       DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| JOHN DOE, | |
| *Plaintiff*, | CASE NO. 6:19-cv-00023 |
| v. | MEMORANDUM OPINION |
| WASHINGTON & LEE UNIVERSITY, | |
| *Defendant*. | JUDGE NORMAN K. MOON |

Plaintiff John Doe, proceeding pseudonymously, initiated this action on April 23, 2019. Plaintiff's complaint asserts four causes of action against Defendant Washington & Lee University ("W&L"). The claims arise out of the school's suspension of Plaintiff following a university disciplinary board's finding that he had engaged in nonconsensual sexual intercourse with Jane Roe, a W&L student. Plaintiff alleges that this discipline and W&L's related conduct amounts to a violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, as well as a breach of implied contract and negligence under Virginia state law. The matter is now before the Court on W&L's motion to dismiss Plaintiff's claims of breach of implied contract (Count III) and negligence (Count IV). Dkt. 16. W&L's motion will be granted and Counts III and IV will be dismissed. W&L did not move to dismiss Plaintiff's claims arising under Title IX (Counts I and II), and therefore this case will proceed on those claims.

**Facts as Alleged**

Plaintiff enrolled as an undergraduate student at Washington & Lee University in 2015 and expected to graduate in 2019. Dkt. 1 ¶¶ 130–31. In the early morning hours of March 12, 2017, Plaintiff and a female student, Jane Roe, engaged in sexual intercourse. *Id.* ¶¶ 11, 133. Jane Roe

1

reported this incident as a sexual assault. Plaintiff alleges that this is a false accusation and that he and Jane Roe engaged in consensual sexual intercourse. *Id.* ¶ 133; *see also id.* ¶¶ 133–48.

Plaintiff alleges that he and Jane Roe became friends their freshman year at W&L. *Id.* ¶ 132. At the time of the alleged incident, both were second-term sophomores. *Id*. On March 11, 2017, at approximately midnight, Plaintiff and Jane Roe agreed to meet and walked together to his house. *Id.* ¶¶ 135–36. In the early morning hours of March 12, Plaintiff and Jane Roe kissed in his bed, and Jane Roe performed oral sex on him. *Id.* ¶¶ 139–41. The two proceeded to have sex and then fell asleep. *Id.* ¶¶ 147–48. Jane Roe left Plaintiff's house in the morning. *Id.* ¶ 148.

Jane Roe thereafter sent Plaintiff a text message asking what time they had sex the previous night. *Id.* ¶ 149. Plaintiff responded that he "honestly had no idea." *Id.* On March 14, 2017, Jane Roe met with W&L Title IX Coordinator Lauren Kozak and alleged that she had not consented to the intercourse because she had fallen asleep and had no memory of it. *See id.* ¶¶ 11, 151. Jane Roe filed a complaint with W&L's Title IX office. *Id.* ¶¶ 11, 150. Later that day, Plaintiff received a letter from Kozak asking to schedule a meeting. *Id.* ¶¶ 150–51. Plaintiff met with Kozak the following week. *Id.* ¶ 152. Lauren Kozak was the lead investigator, with Associate Dean of Students, Jason Rodocker, serving as co-investigator. *Id.* ¶¶ 15, 151. Plaintiff told the investigators that Jane Roe and he discussed having sex, that the two agreed he should get a condom, and that Jane Roe was fully aware of and an active participant in sexual intercourse. *Id.* ¶ 17.

The investigators then gathered evidence and spoke to two witnesses who had personally observed Jane Roe on the night in question. *Id*. ¶ 15. One of the witnesses was another male W&L student ("Witness A") with whom Jane Roe allegedly had sexual intercourse earlier that same evening. *Id.* ¶¶ 16, 160–61. Plaintiff was not informed of Witness A's identity—his name was omitted from the investigators' report at Witness A's request. *Id.* ¶ 161. The other witness ("Witness B") was the driver who took Jane Roe back to her dorms after her time with Witness A

and shortly before she met up with Plaintiff. *Id.* ¶¶ 15–16, 160–62. Both witnesses corroborated that Jane Roe did not appear to be intoxicated, incapacitated, or unaware of her surroundings. *Id.* ¶¶ 16, 26.

Kozak and Rodocker referred Jane Roe to a University Counseling Center Psychologist and head of the W&L Student Sexual Assault Survivor Support Group, Dr. Janet Boller, who met with Jane Roe and reported that she was suffering from acute stress disorder. *See id*. ¶¶ 18, 21, 24. Dr. Boller's report was accepted as "medical evidence" in the investigation. *Id.* ¶¶ 19–20. Plaintiff was not informed of the report until the day before his disciplinary hearing. *Id.*

On April 25, 2017, a three-member Hearing Panel of W&L's Harassment and Sexual Misconduct Board held a hearing and found Plaintiff responsible for nonconsensual sexual penetration, by a preponderance of the evidence. *Id.* ¶¶ 172, 176. After hearing from the parties, as well as Witnesses A and B, the panel concluded that Jane Roe was "either asleep or nearly asleep" during intercourse and therefore could not have consented. *Id.* ¶¶ 15–16, 34, 176, 188. The Hearing Panel found Jane Roe's account more credible than that of Plaintiff. *Id*. On appeal, Plaintiff claimed that the Hearing Panel failed to hold an impartial proceeding and that its decision was based on insufficient evidence. *Id.* ¶¶ 202–06. A three-member Appeal Panel denied his appeal. *Id.* ¶ 37.

The Hearing Panel sanctioned Plaintiff with a one-term suspension. *Id.* ¶ 199. Plaintiff subsequently received three documents from W&L: (1) a letter dated May 31, 2017, from W&L's Vice President for Student Affairs and Dean of Students, Sidney Evans ("May 31, 2017 Letter"); (2) the Hearing Panel Sanction Form; and (3) W&L's Reinstatement Form. *Id.* ¶¶ 209, 210, 279;

*see also id.* ¶¶ 229, 279–80.[1] These documents noted his eligibility to apply for reinstatement in the Winter 2018 term, after serving his suspension, and set forth certain prerequisites for reinstatement. *See id*. These were: (1) successful completion of counseling for substance and sexual abuse; (2) an evaluation from Plaintiff's treating healthcare provider as to whether his behavioral concerns have been resolved or improved to the point of qualifying him for return to W&L; and (3) "approximately forty hours per week in constructive undertakings," which "can include any combination of course work at an accredited four-year college or university, volunteer/community service, or similarly developmentally enriching opportunities." *Id*. ¶¶ 209–10, 229.

The Hearing Panel Sanction Form stated: "[i]n order to be considered for readmission, the Respondent shall successfully complete counseling for both sexual abuse and substance abuse." Dkt. 28-1 at 4, Ex. A. The May 31, 2017 Letter, which described reinstatement requirements, further stated that "[i]f you wish to apply for reinstatement to Washington & Lee, following are the minimum requirements for demonstrating readiness to return." The May 31, 2017 Letter also provided that "meeting these minimum requirements does not guarantee reinstatement, but rather is one of a number of factors the Committee will review and consider." Dkt. 28-2 at 1, Ex. B. The Application for Reinstatement listed application components and requirements, but it also stated

---

[1] Although these three documents were only submitted to the Court by W&L in its reply in support of its motion to dismiss, Dkt. 28-1, the Court finds that Plaintiff incorporated these documents into the Complaint by reference, as they were integral to the Complaint and there is no dispute about their authenticity. *See Goines v. Valley Comm. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (providing standard); *see, e.g.*, Dkt. 1 ¶¶ 199, 209, 210, 229, 279. Plaintiff has argued that these documents "set forth conditions and implied promises for his reinstatement." Dkt. 25 at 15 & n.1. He has also argued that they "constituted an implied promise and created in [Plaintiff] a reasonable expectation that W&L would act in good faith in evaluating [his] fitness to return to W&L based on his fulfillment of the conditions W&L had set forth in these documents." *Id*. at 16. In other words, Plaintiff acknowledges his state-law claims turn upon these documents, and this Court finds it appropriate to consider them in resolving this motion to dismiss.

4

*"[a] student will not be reinstated … if continued separation is considered to be in the best interest of the student or the University."* Dkt. 28-3 at 2, Ex. C (emphasis in original).

On November 15, 2017, Plaintiff submitted his application for reinstatement following the completion of his suspension. Dkt. 1 ¶ 209. Plaintiff submitted proof of his counseling for substance and sexual abuse, an evaluation from his treating health care provider on his readiness to return to the university, proof of his engagement in volunteer activities and employment during his suspension, and a personal essay. *Id*. On November 30, 2017, two weeks after submitting his application, Plaintiff received a letter from W&L denying reinstatement. *Id*. ¶ 215. The rejection letter stated that his personal essay "did not demonstrate [his] readiness to return" to W&L, and that a future application would be "strengthened by full-time coursework, in person," at an accredited college or university, or by volunteer work relating to "alcohol abuse and/or sexual abuse." *Id*.

Plaintiff again applied for reinstatement on July 29, 2018. *Id*. ¶ 220. In this application, Plaintiff claims to have better addressed his personal growth and readiness to return, as well as better described the nature of his volunteer work. *Id*. ¶¶ 221–28. However, Plaintiff alleged that it would be "highly improbable, if not impossible" for him to fulfill any full-time college coursework requirement in person, as a result of his disciplinary record from W&L. *Id*. ¶ 218. He was again rejected from W&L on August 14, 2018, just over two weeks after submitting his application. *Id*. ¶ 230. W&L again cited his lack of successful coursework as a factor. *Id*.

Plaintiff filed a complaint on April 23, 2019 alleging unlawful gender discrimination and retaliation in violation of federal law, and breach of implied contract and negligence resulting from the disciplinary process in violation of Virginia law. *Id*. ¶ 1. Before the Court is W&L's motion to dismiss the state law breach of contract and negligence claims arising under Virginia law. Dkt. 16.

**Standard of Review**

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). "Factual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor. *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 346 (4th Cir. 2005). Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

**Discussion**

1) <u>Breach of Implied Contract (Count III)</u>

Plaintiff offers two theories to support his claim of breach of implied contract. First, Plaintiff contends that he entered an implied contractual relationship with W&L through the transmission of three documents from W&L. Dkt. 1 ¶¶ 209, 210, 279; *see also* Dkt. 25 at 15–18. Second, pleading in the alternative, Plaintiff asserts that the contractual relationship was formed

6

through W&L's acceptance of his tuition and Plaintiff's enrollment at W&L. Dkt. 1 ¶¶ 273–74; *see also* Dkt. 25 at 18–20. Plaintiff cites no Virginia authority finding an implied-in-law contract under either theory in even remotely similar circumstances. Neither the law nor facts alleged support Plaintiff's claim to breach of an implied contract under Virginia law.

    a)  *Applicable Principles of Virginia Contract Law*

Under Virginia law, a plaintiff claiming breach of an express contract must establish (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by a breach of obligation. *Riley v. Barringer*, 337 F. Supp. 3d 647, 654 (W.D. Va. 2018) (Jones, J.) (citing *Ulloa v. QSP, Inc.*, 624 S.E.2d 43, 48 (Va. 2006)). It is well settled that Virginia law requires an absolute mutuality of engagement between the parties to a contract, whereby each party is bound and each party has the right to hold the other party to the agreement. *Jackson v. Liberty Univ.*, No. 6:17-cv-41, 2017 WL 3326972, at *5 (W.D. Va. Aug. 3, 2017); *Smokeless Fuel Co. v. W.E. Season & Sons*, 52 S.E. 829, 830 (Va. 1906).

In the absence of an express contract, Virginia law will in certain circumstances recognize an implied-in-fact or an implied-in-law contract. *DiMuroGinsberg, P.C. v. VLOX, LLC*, No. 1:18-cv-1046, 2019 WL 3728254, at *6 (E.D. Va. Aug. 7, 2019); *City of Norfolk v. Norfolk Cty.*, 91 S.E. 820, 822 (Va. 1917). A contract implied in fact is a true contract, differing from an express contract only in the lack of express terms and conditions. Without the intent to contract, a court cannot find a contract implied in fact. *In re Virginia Block*, 16 B.R. 771, 774 (W.D. Va. Bankr. 1982). A course of dealing, while it may be used to interpret an ambiguous contract, does not establish the existence of a contract where one does not otherwise exist. *Id.*

On the other hand, an implied-in-law contract, also known as a "quasi-contract," is not a contract at all in the ordinary sense of the word; it is "a remedy imposed by the court." *In re*

7

*Virginia Block*, 16 B.R. at 774. A court imposing an implied-in-law contract imposes liability based upon the facts and circumstances, independent of agreement or presumed intention. *Hendrickson v. Meredith*, 170 S.E. 602, 605 (Va. 1933); *Rosetta Stone, Ltd. v. Google, Inc.*, 676 F.3d 144, 166 (4th Cir. 2012) (noting that under Virginia law, "the concept of an implied-in-law contract, or quasi contract, applies only when there is not an actual contract or meeting of the minds"). In such cases, the promise is implied from the consideration received, and the legal duty imposed on the defendant defined the contract. *Spectra-4, LLP v. Uniwest Comm'l Realty, Inc.*, 772 S.E.2d 290, 293–94 (Va. 2015). It is akin to a duty to make restitution or a claim for unjust enrichment. *See, e.g.*, *In re Fas Mart Convenience Stores, Inc.*, 320 B.R. 587, 595 (E.D. Va. Bankr. 2004). However, the Supreme Court of Virginia has cautioned that "[t]he fiction of an [implied-in-law contract] will not be indulged in every case, but only where, in equity and good conscience, the duty to make such a promise exists." *Spectra-4, LLP*, 772 S.E.2d at 294 n.2 (quoting *City of Norfolk*, 91 S.E. at 825).

Here, Plaintiff does not claim W&L breached any express contract. Dkt. 1 ¶¶ 272–85; Dkt. 25 at 1–2, 15–20. Nor does Plaintiff make any argument that W&L breached any contract implied-in-fact. *See id.* Rather, Plaintiff argues that the Court should recognize an implied-in-law contract based upon: (1) the three documents that he received from W&L, Dkt. 25 at 15–18; and (2) his payment of tuition to W&L, *id.* at 18–20. Neither of those purported grounds support Plaintiff's novel argument.

Ultimately, the Court declines Plaintiff's invitation to impose by operation of law a contractual relationship between Plaintiff and W&L—particularly when the express documents at issue (and upon which Plaintiff so heavily relies), demonstrate just the opposite. From the plain language of those documents, it was readily apparent that W&L always retained full discretion

8

whether to readmit Plaintiff. Put simply, he had to *apply* for readmission. Readmission plainly was not guaranteed.

The Court concludes that under the relevant precedent and the facts of this case, Plaintiff has not stated a plausible claim of an implied-in-law contract. Specifically, Plaintiff has not plausibly alleged that, "in equity and good conscience, the duty to make such a promise" between W&L and Plaintiff exists. *See Spectra-4, LLP*, 772 S.E.2d at 294 n.2.

        b)      *W&L Documents*

Plaintiff's first argument that there was an implied-in-law contract depends on his receipt of three documents from W&L: the Hearing Panel sanction form, the May 31, 2017 Letter to Plaintiff, and W&L's reinstatement application. Dkt. 1 ¶¶ 209–10, 279. Plaintiff asserts that W&L's continued refusal to reinstate him as a student constitutes a breach of the implied contract created by these documents. Dkt. 25 at 16–18. He further argues that the alleged implied contract created an expectation that W&L would exercise "good faith" in evaluating his fitness to return. *Id.* at 16; Dkt. 1 ¶ 279.

Plaintiff conceded to a lack of precedent to support his argument that such documents could form the basis for an implied contractual relationship. Furthermore, as W&L argues, this Court and numerous others have held that generally applicable university conduct policies, such as handbooks and sexual assault policies, do not establish a contract under Virginia law. *See, e.g.*, *Jackson v. Liberty Univ.*, No. 6:17-cv-00041, 2017 WL 3326972, at *6 (W.D. Va. Aug. 3, 2017); Dkt. 17 at 5–6. That is because Virginia law requires an "absolute mutuality of engagement between the parties" such that each party is bound and may hold the other party to the agreement. *Jackson v. Liberty Univ.*, 2017 WL 3326972, at *5 (citing *Smokeless Fuel Co.*, 52 S.E. at 830) ("The general rule of law is that, where the consideration for the promise of one party is the promise of the other party, there must be absolute mutuality of engagement, so that each party has

9

the right to hold the other to a positive agreement."). This mutuality is absent in university student-conduct policies, as these policies allow for unilateral revision by the university and do not bind the school. *See, e.g.*, *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 588 (E.D. Va. 2018) ("Under Virginia law, a University's student conduct policies are not binding, enforceable contracts; rather, they are behavior guidelines that may be unilaterally revised by Marymount at any time. Thus, Doe cannot rely on Marymount's Student Handbook or Sexual Assault policy as enforceable contracts, or as terms on an implied contract."); *Doe v. Washington & Lee Univ.*, No. 6:14-cv-00052, 2015 WL 4647996, at *11 (W.D. Va. Aug. 5, 2015) (explaining that "[c]ourts applying Virginia law routinely reject the notion that a 'Student Handbook' creates a mutuality of engagement where the terms of the handbook are subject to change"); *Davis v. George Mason Univ.*, 395 F. Supp. 2d 331, 337 (E.D. Va. 2005) (finding university course catalog to be an unenforceable illusory contract because of the catalog's disclaimer that it may change its terms or requirements at any time).

   This reasoning applies equally to generally applicable sexual misconduct policies as it does to student handbooks—both are understood to serve as "guidelines" for students rather than reciprocal agreements. *Jackson v. Liberty Univ.*, 2017 WL 3326972, at *6; *Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at *11; *Doe v. Marymount Univ.*, 297 F. Supp. 3d at 587–88 (holding that neither the university's student handbook nor its sexual assault policy could be relied upon as a binding, enforceable contract). Without an underlying contract, there can be no breach of contract or breach of good faith. *Jackson v. Liberty Univ.*, 2017 WL 3326972, at *7. Although an implied-in-law contract is imposed in the absence of mutual consent to contract, and thus these authorities are not alone dispositive of Plaintiff's claim, the effect of Plaintiff's novel argument would inescapably be to undermine this consistent body of precedent. The Court is not inclined to open a door to amorphous quasi-contract remedies ultimately founded on W&L's application of

10

its sexual assault policy where courts have consistently concluded such policies are not enforceable as a matter of contract.

Plaintiff asserts that his claims differ from those in the above-cited cases because he received specific and targeted communications from W&L, in contrast to general student handbook and related sexual assault policies. Specifically, Plaintiff points to three such targeted communications as forming an implied contract between him and W&L.[2] Dkt. 1 ¶ 279. This argument is unavailing.

First, Plaintiff cites the Hearing Panel Sanction Form, which details the violations charged, the hearing panel's factual findings, and sanctions imposed on Plaintiff as establishing a promise between the parties. Dkt. 28-1, Ex. A. The form states that Plaintiff is to be suspended for the Fall 2017 term "with the earliest opportunity to apply for readmission being for the Winter 2018 term" and that "[i]n order to be *considered for readmission*, the Respondent shall successfully complete counseling for both sexual abuse and substance abuse." *Id.* (emphasis added). Nothing in the language of the form on its face purports to bind either party to any agreement that Plaintiff will be reinstated, nor does it make any promises about reinstatement. The form is clear on its face that Plaintiff must *apply* for reinstatement.

Second, Plaintiff also relies on the May 31, 2017 Letter, sent to confirm his suspension and explain the reinstatement procedure. Dkt. 28-2, Ex. B. This letter states that "[i]f you wish to apply

---

[2] The Court further notes that Plaintiff's argument is in considerable tension with itself. On the one hand, Plaintiff seeks recognition of an implied-in-law contract, which does not require mutual intent to contract, because it is in effect an equitable remedy imposed by the Court. On the other hand, Plaintiff's argument in support of that remedy relies on the three W&L documents that plainly disclaim any contract or promises with respect to reinstatement. *See, e.g.*, Dkt. 1 ¶¶ 279–80. Accordingly, while the lack of mutual intent to contract is not the end of the Court's inquiry whether Plaintiff has alleged an implied-in-law contract, Plaintiff cannot be said to have stated a plausible claim to an implied-in-law contract based on those documents, as he has argued.

11

for reinstatement to Washington & Lee, following are the *minimum requirements* for demonstrating readiness to return." *Id.* (emphasis added). These included that Plaintiff must complete at least forty hours per week in "constructive undertakings" such as course work, employment, or community service, and that he must participate in evaluation, treatment, or other resolution of behavioral or health-related concerns, including counseling for substance abuse and sexual abuse. *Id.*

Plaintiff argues that if he "fully complied with W&L's conditions" set forth in this and the other two documents, he "had a reasonable expectation of reinstatement." Dkt. 25 at 16. To the contrary, any such expectation would *not* have been reasonable. For example, the May 31, 2017 Letter clearly stated: "[*m*]*eeting these minimum requirements does not guarantee reinstatement*." Dkt. 28-2 at 2 (emphasis added). Rather, the committee would "carefully consider all aspects of each application including documentation of meeting the conditions above, and any other information it deems relevant to inform its decision." *Id.* In other words, the May 31, 2017 Letter, by its plain terms, set forth various *necessary—but not sufficient*—preconditions for reinstatement. Again, there were no guarantees made about Plaintiff's reinstatement.

Third, Plaintiff claims that the Application for Reinstatement provided another basis for an implied contract with W&L. Dkt. 28-3, Ex. C; Dkt. 28-4, Ex. D. This document lists various application components and requirements, including applicant name, reasons for previously leaving W&L, and dates of prior attendance. *Id.* It required the applicant to submit documents proving the completion of reinstatement prerequisites. *Id.* The form also states "[the committee] will make its decision in light of the above information and after consideration of the student's academic record at Washington and Lee. A student will not be reinstated if continued separation is considered to be in the best interest of the student or the University." *Id.* This language again reserves to W&L the discretion and sole right to consider and act upon Plaintiff's reinstatement

12

materials. Plaintiff's argument that the "Application for Reinstatement" supports his claim to guaranteed reinstatement upon completion of W&L's prior conditions is indeed strange: Plaintiff's completion of the document itself reflects that he was applying for reinstatement; not that it was guaranteed. *See* Dkt. 28 at 5. Again, nothing in the document supports his contention that he had any reasonable belief to guaranteed or likely reinstatement.

The Fourth Circuit considered and rejected a similar contract claim brought by a student enrolled in a post-baccalaureate program through the University of Virginia School of Medicine. *Betts v. Rector and Visitors of Univ. of Va.*, No. 02-1567, 1999 WL 739415 (4th Cir. 1999) (unpublished). The program offered guaranteed admission to the medical school for every participant but required each student to maintain a minimum GPA throughout the program. *Id.* at *1. Plaintiff Betts was placed on academic probation after falling below this minimum GPA and subjected to specific conditions to satisfy this probation, such as meetings with the administration, tutoring, and testing with the University Learning Needs Center. *Id.* Upon alerting Betts to the terms of this probation, the program stipulated that his ultimate enrollment in the School of Medicine would be left to the judgment of the "Promotions Committee" upon review of his spring semester performance. *Id.* Betts claimed that the offer to participate in the program along with his acceptance, created a binding contract, which the university modified by adding three additional conditions to Betts's probationary enrollment. *Id.* at *9. The Fourth Circuit rejected the contract claim, holding that the university did not breach the alleged contract when it ultimately denied Betts from the affiliate medical school because it acted with "the express condition that [a university committee] retained the discretion to decide … whether Betts was prepared for the School of Medicine." *Id.*

Similarly, Plaintiff claims that the expectations imposed on him for reinstatement via the three documents discussed above constituted a contract between him and W&L. But like the

13

University of Virginia in *Betts*, W&L expressly retained discretion to decide whether Plaintiff was fit for reinstatement. The May 31, 2017 Letter states that the "Committee on Automatic Rule and Reinstatement" evaluates and makes final decisions on reinstatement. Dkt. 28-1, Ex. A. The letter is replete with language alerting Plaintiff that these "conditions" were merely "minimum requirements" in order for the Plaintiff to demonstrate a readiness to return, and that "meeting these minimum requirements does not guarantee reinstatement, but rather is one of a number of factors the Committee will review and consider." *Id*. Additionally, the Reinstatement Application states "a student will not be reinstated if … continued separation is considered to be in the best interest of the student or the University," further safeguarding W&L's discretion in deciding these matters. Dkt. 28-3, Ex. C; Dkt. 28-4, Ex. D.

Simply put, the documents which Plaintiff claims to have constituted a contract governing reinstatement demonstrate the opposite. They do not offer or imply any promise or guarantee to him or purport to bind W&L to any reciprocal promise aside from perhaps that W&L would review and consider his application. But significantly, Plaintiff does not (and cannot) argue that W&L did not review or consider his application. Indeed, Plaintiff's allegations about W&L's denials of his applications for readmission reflected individualized consideration and assessment of his specific application packages. *See, e.g.*, Dkt. 1 ¶¶ 215, 230. Plaintiff's claim is that the three W&L documents "constituted an implied promise and created in [him] a reasonable expectation that W&L would act in good faith in evaluating [his] fitness to return to W&L based on his fulfillment of the conditions W&L had set forth in these documents," Dkt. 25 at 16, but they demonstrate no such thing. Instead, they demonstrate on their face that Plaintiff was applying for (but was not guaranteed) readmission; that W&L would consider his application; and that W&L retained full discretion to decide against his readmission. As such, the Court concludes that nothing in these documents supports Plaintiff's position that "equity and good conscience" demand the Court's

14

imposition of an implied-in-law contract between Plaintiff and W&L. *See Spectra-4, LLP*, 772 S.E.2d at 294 n.2. Accordingly, the Court holds that Plaintiff has not plausibly alleged an implied-in-law contract under this theory.

        c)     *Payment of Tuition*

Plaintiff also asserts that his payment of tuition to W&L (as well as his enrollment and attendance at W&L) gave rise to an implied-in-law contract with W&L and created in Plaintiff an expectation that W&L would not prohibit Plaintiff from earning this degree arbitrarily or in bad faith. *See* Dkt. 18–20. The Court concludes that Plaintiff has failed to state a plausible claim on under this theory as well. Governing Virginia law does not impose an implied-in-law contract between a university and a student merely on account of payment of tuition, and, even if it did, Plaintiff has not alleged W&L violated any such implied contract terms.

The Eastern District of Virginia declined to recognize tuition as a basis for an implied contract between a student and a university. *Doe v. Marymount Univ.*, 297 F. Supp. 3d at 588.[3] As in *Doe v. Marymount University*, "the question is whether an implied contract existed between [the parties] under Virginia law simply because [Plaintiff] paid tuition, and if so, whether [W&L] breached a term or requirement of that implied contract." *Id.*[4] Here, as in *Doe v. Marymount University*, Plaintiff has cited no Virginia authority holding an implied contract is created through

---

[3] *Cf. Abbas v. Woleben*, No. 3:13-cv-147, 2013 WL 5295672, at *3–4 (E.D. Va. Sept. 19, 2013) (rejecting breach-of-contract claim under Virginia law based in part on payment-of-tuition theory, and explaining that, "[d]espite enrolling and paying tuition, people flunk out of school all the time").

[4] To be sure, the precise question at issue in *Doe v. Marymount* was whether an implied-in-fact contract had been created on account of payment of tuition rather than an implied-in-law contract. Nonetheless, given the similarity in the arguments presented, the Court finds the Eastern District of Virginia's reasoning instructive.

payment of tuition.[5] Dkt. 25 at 18–20. Confronted with a similar dearth of authority, this Court concludes that accepting Plaintiff's argument here would "impermissibly expand Virginia law without any input from Virginia's highest court." 297 F. Supp. 3d. at 588; *accord Grayson v. Anderson*, 816 F.3d 262, 265 (4th Cir. 2016) (where "South Carolina has not recognized a cause of action for aiding and abetting common law fraud," holding that "it is not our role as a federal court to so expand state law").[6]

The court in *Doe v. Marymount* further rejected such an argument on the merits. The court held that "[n]othing in the act of paying tuition implies that a student is entitled to any specific procedural protections." 297 F. Supp. 3d at 589. Rather, "to the extent that any contract can be implied between a student and [their] university, the student is only protected from irrational, haphazard treatment by the university." *Id.* Because Marymount had provided the plaintiff with a disciplinary proceeding, regardless whether the plaintiff disagreed with its outcome, the court found that Marymount satisfied any such implied duty to refrain from arbitrary or capricious dismissal on account of the plaintiff's payment of tuition. *Id.*

---

[5] Plaintiff relies on a handful of commercial cases addressing Virginia's recognition of quasi-contracts in general terms to persuade this Court to deviate from otherwise established and persuasive precedent. *See In re Virginia Block*, 16 B.R. at 774 (holding that a contract implied in law was not established to resolve a dispute between an insurance company and an insured debtor over proper repayment of refunds and premiums); *Spectra-4, LLP*, 772 S.E.2d at 295 (holding that implied-in-fact contracts existed between owners of commercial real property and the company that provided management services).

[6] Indeed, the Supreme Court of Virginia considered and rejected a similar claim in *Dodge v. Trustees of Randolph-Macon Woman's College*, 661 S.E.2d 801 (Va. 2008). The plaintiffs, female students at Randolph-Macon Woman's College, alleged that "when they accepted the College's offer of admission, paid tuition and other fees, and registered for classes" a contract was formed, which included the promise that they would receive a four-year education at a women's college. Although the Supreme Court of Virginia emphasized the narrowness of its holding, the court ruled that the plaintiffs had not pleaded facts sufficient to demonstrate the existence of a contract. *Id.* at 803–04.

16

This Court finds the reasoning of the court in *Doe v. Marymount University* persuasive in this respect as well. Here, Plaintiff alleges that through his payment of tuition, W&L owed him a duty not to suspend him for "disciplinary misconduct arbitrarily, capriciously, maliciously, discminatorily, or otherwise in bad faith," and that W&L breached this obligation via the investigative and adjudicative process to which Plaintiff was subjected, and the extension of his suspension. Dkt. 1 ¶¶ 275–82. Plaintiff alleges that this mistreatment was compounded by W&L's "continually adding new, previously undisclosed 'requirements' to justify its denials." *Id.* ¶ 281; *see also* Dkt. 25 at 20 (alleging "multiple breaches" of W&L's breach of an implied contract by acting arbitrarily and in bad faith "in every phase of the investigative and adjudicative process in his disciplinary proceeding").

However, the lengthy and detailed allegations in the complaint relating to, among other things, W&L's 2016–17 sexual discrimination and misconduct policy, Dkt. 1 ¶¶ 91–129, the investigation in this case, *id.* ¶¶ 151–71, the hearing, decision and sanction imposed, *id.* ¶¶ 172–201, and his ultimately unsuccessful appeal, *id.* ¶¶ 202–08, undermines Plaintiff's argument that W&L acted in an irrational and haphazard manner. W&L, like Marymount, provided Plaintiff with a deliberative hearing and appeals process to address Jane Roe's allegations of sexual assault. He may disagree with the outcome of that process, and he may have good reason to disagree with some of the decisions made by W&L's investigators and adjudicators in conducting that process, or its administrators in reviewing his applications. But Virginia law does not create a contract between these parties simply on account of his payment of tuition. Any such implied terms of their agreement through Plaintiff's payment was tuition was satisfied via the university adjudicative process as alleged. Nothing in "equity and good conscience" demand more. Notably, the Court reiterates that the statutory remedy provided by Title IX is an avenue that currently remains open to Plaintiff. *See Doe v. Marymount*, 297 F. Supp. 3d at 589.

At bottom, Plaintiff urges the Court to conclude that "equity and good conscience" demand that the Court imply a contract, to impose a duty, inferring necessary promises and intent where no such express contract was made, but might have been, or should have been, made by the parties. *In re Virginia Block,* 16 B.R. at 774. But the fiction of an implied-in-law contract is not to be indulged in every case, only where, in "equity and good conscience, the duty to make such a promise exists." *City of Norfolk.*, 91 S.E. at 825. And here, Plaintiff has neither cited for the Court precedent imposing a quasi-contract in remotely similar circumstances nor has Plaintiff plausibly alleged circumstances that would establish that a contract "should have been made by the parties" or that "equity and good conscience" demand such a remedy. As such, the Court will dismiss Count III of Plaintiff's complaint.

  2) <u>Negligence (Count IV)</u>

Plaintiff also brings a negligence claim against W&L, alleging that W&L had a duty to "conduct the disciplinary process with due care" and that W&L breached this duty by subjecting Plaintiff to a "biased and prejudicial disciplinary process." Dkt. 1 ¶ 289. As emphasized by W&L, this Court has previously rejected negligence claims arising within the context of similar student-university relationships and maintains that position in the present case. *Jackson v. Liberty Univ.*, 2017 WL 3326972, at *9; *see Doe v. Virginia Wesleyan Coll.*, 2015 WL 10521466 at *10 (2015); *see also Schieszler v. Ferrum Coll.*, 236 F. Supp. 2d 602, 608–09 (W.D. Va. 2002).

A plaintiff who seeks to establish negligence must plead the existence of a legal duty, violation of that duty, and proximate causation which results in injury. *Marshall v. Winston*, 389 S.E.2d 902, 904 (Va. 1990). Negligence is not actionable unless there is a legal duty. *Fox v. Curtis*, 372 S.E.2d 373, 375 (Va. 1988). Thus, the threshold question is whether a duty of care exists, under Virginia law, on the part of a defendant to a plaintiff. *Id.*

18

A federal district court is not empowered to recognize a new common law tort that has not been previously recognized by the Virginia courts. *See Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998). Virginia law does not support the proposition that a university owes its students a duty of care in these circumstances. *Jackson v. Liberty Univ.*, 2017 WL 3326972 at *9; *Doe v. Marymount Univ.*, 297 F. Supp. 3d at 589; *Doe v. Virginia Wesleyan Coll.*, No. CL14-6942-01, 2015 WL 10521466, at *10 (Va. Cir. Ct. 2015) (stating that "the college/student relationship does not constitute a special relationship that would impose a duty on [the college] to warn or protect [a student]"); *see also Schieszler v. Ferrum Coll.*, 236 F. Supp. 2d 602, 608–09 (W.D. Va. 2002) ("[I]t is unlikely that Virginia would conclude that a special relationship exists as a matter of law between colleges and universities and their students."). Much like the claim at issue, the plaintiff in *Doe v. Marymount* asserted that the university owed him "a duty to be fair." 297 F. Supp. 3d at 589. And in *Jackson v. Liberty Univ.*, this Court similarly dismissed a negligence claim arising from a university Title IX proceeding that—like Plaintiff's—was unsupported by Virginia precedent. 2017 WL 3326972, at *9. Theories of a "special relationship" between university and student have been summarily rejected by courts dealing with the issue.

Attempting to distinguish his claims from those dismissed in the cases discussed above, Plaintiff seeks to establish a duty via "general principles of ordinary negligence." Dkt. 25 at 21 n.3. Plaintiff's theory describes negligence at its most basic level, describing "a general duty owed to those within reach of a defendant's conduct." *Id.* at 21. However, this Court has addressed negligence in a nearly identical context to the one at issue and specifically rejected the idea that a duty exists under Virginia law, "general" or otherwise, to a Plaintiff in this position. *Jackson v. Liberty Univ.*, 2017 WL 3326972, at *9. Recognizing this theory would expand Virginia law and should be approached cautiously. *See Doe v. Marymount Univ.*, 297 F. Supp. 3d at 590

19

(considering a Title IX Plaintiff's negligence claim under the general principle of the "law of associations"). In that case, the court held that "[b]ecause the expansion of the law of associations into the educational sphere would have significant policy implications, Virginia law will not be expanded in this federal case when there is no indication that Virginia's appellate courts would so expand the law." *Id.* at 591. Similarly, because Plaintiff has not sufficiently distinguished his circumstances from existing jurisprudence which roundly rejects his theory of negligence, Plaintiff's negligence claim will be dismissed.

## Conclusion

For these reasons, the Court will grant W&L's motion to dismiss Counts III and IV of Plaintiff's Complaint, in an accompanying Order, to follow. Plaintiff's claims arising under Title IX, Counts I and II, remain.

An appropriate Order will issue, and the Clerk of the Court is hereby directed to send a copy of this Memorandum Opinion and the accompanying Order to the parties.

ENTERED this  10th   day of February, 2020.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE