**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION**

| | |
|---|---|
| JOHN DOE,<br><br>      Plaintiff,<br><br>v.<br><br>WASHINGTON AND LEE UNIVERSITY,<br><br>      Defendant. | **Civil Action No.:
6:19-cv-00023** |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

Patricia M. Hamill
(Pa. I.D. No. 48416)
Andrew S. Gallinaro
(Pa. I.D. No. 201326)
CONRAD O'BRIEN PC
1500 Market Street, Centre Square
West Tower, Suite 3900
Philadelphia, PA 19102
Tel: (215) 864-9600
Fax: (215) 864-9620
phamill@conradobrien.com
(Admitted Pro Hac Vice)

David G. Harrison
(VSB #17590)
THE HARRISON FIRM, PC
5305 Medmont Circle SW
Roanoke, VA 24018
Tel: (540) 777-7100
Fax: (540) 777-7101
david@harrisonfirm.us

## **TABLE OF CONTENTS**

I.     COUNTER-STATEMENT OF MATERIAL FACTS ..................................................... 2

    A.    W&L Trained John's Hearing Panel to Believe Female Victims .......................... 2

    B.    Kozak Attended Biased Trainings to Meet her Annual Training Requirements .... 4

    C.    W&L's Biased Disciplinary Proceeding Againts John ......................................... 5

        1.    W&L Assigned Far Better Advisors to Jane .............................................. 5

        2.    W&L Investigators Failed to Pursue Critical Evidence ............................. 6

        3.    W&L Allowed Jane to Submit Expert Testimony from Dr. Boller that W&L Knew was Improper and Blames John for not Objecting ................. 7

        4.    The Investigation Report Skews Facts and Analysis in Jane's Favor. ..... 10

        5.    The HSMB Hearing and Decision Evidence Gender Bias ...................... 12

        6.    W&L Surreptitiously Extended John's Sanction After Jane Complained to the University President and John Threatened to Sue. ............................. 15

        7.    W&L Only Purported to Care About Confidentiality When John Asked For Copies of His Record, and did Nothing When Jane Shared Confidential Records with the Press. ....................................................... 17

II.    ARGUMENT ....................................................................................................... 18

    A.    Standard of Review .......................................................................................... 18

    B.    Erroneous Outcome ......................................................................................... 19

        1.    Articulable Doubt ................................................................................... 20

        2.    Gender Bias ............................................................................................ 20

        3.    Pro-Victim Bias Can Demonstrate Anti-Male Bias ............................... 27

    C.    Selective Enforcement ..................................................................................... 28

    D.    Retaliation ....................................................................................................... 29

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................................18

*Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*,
    384 F. Supp. 3d 598 (E.D. Va. 2019) ..........................................................28

*Doe v. Am. Univ.*,
    2020 WL 5593909 (D.D.C. Sept. 18, 2020) .................................19, 25, 26

*Doe v. Colgate Univ.*,
    2020 WL 2079439 (N.D.N.Y. Apr. 30, 2020) ..............................................22

*Doe v. Grinnell Coll.*,
    2019 WL 10735187 (S.D. Iowa July 9, 2019) ............................................24

*Doe v. Marymount*,
    297 F. Supp. 3d at 585 .................................................................................24

*Doe v. Oberlin Coll.*,
    963 F.3d 580 (6th Cir. 2020) ................................................................22, 25

*Doe v. Purdue Univ.*,
    928 F.3d 652 (7th Cir. 2019) .......................................................................19

*Doe v. Quinnipiac Univ.*,
    404 F. Supp. 3d 643 (D. Conn. 2019) ..........................................................21

*Doe v. Syracuse Univ.*,
    2019 WL 2021026 (N.D.N.Y. May 8, 2019)..................................................23

*Doe v. Trustees of the Univ. of Pennsylvania*,
    270 F. Supp. 3d 799 (E.D. Pa. 2017) ..........................................................23

*Doe v. Univ. of Arkansas - Fayetteville*,
    2020 WL 5268514 (8th Cir. Sept. 4, 2020) ..........................................19, 27

*Doe v. Univ. of Scis.*,
    961 F.3d 203 (3d Cir. 2020)....................................................................19, 29

*Doe v. Washington & Lee Univ.*,
    2015 WL 4647996 (W.D. Va. Aug. 5, 2015) ...............................................20

*Feminist Majority Found. v. Hurley*,
    911 F.3d 674 (4th Cir. 2018) ........................................................................................29, 30

*John Doe v. Washington and Lee*,
    6:14-cv-00052-NKM-RSB (W.D.Va.) (Moon, J.).....................................................................8

*Norris v. Univ. of Colorado, Boulder*,
    362 F. Supp. 3d 1001 (D. Colo. 2019)...................................................................23, 27, 28

*Prasad v. Cornell Univ.*,
    2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016) .......................................................................28

*Schwake v. Arizona Bd. of Regents*,
    967 F.3d 940 (9th Cir. 2020) ...............................................................................................19

*Shaw v. Stroud*,
    13 F.3d 791 (4th Cir.1994) ...................................................................................................18

*Streno v. Shenandoah Univ.*,
    278 F. Supp. 3d 924 (W.D. Va. 2017) .............................................................................18, 20

*Yusuf v. Vassar College*,
    35 F.3d 709 (2d Cir. 1994)...........................................................................................18, 19, 20

Plaintiff John Doe ("John") filed this lawsuit against Washington and Lee University ("W&L" or "the University") for unlawful gender discrimination and retaliation in violation of Title IX (Counts I and II) resulting from the University's grievous mishandling of a false accusation of sexual misconduct brought against him by a female W&L student (hereafter "Jane"), and its refusal to reinstate John after he served out his disciplinary suspension. W&L seeks summary judgment by relying on its own sanitized version of the basic facts while ignoring the litany of facts discovery has exposed demonstrating substantial questions of bias that preclude summary judgment. W&L's "nothing-to-see-here" approach presumes that it can affirmatively prove the absence of bias by demonstrating it superficially ensured that case events occurred generally when they were supposed to, but little more than that.

However, the full record of what occurred in John's case depicts a far more insidious process infected by biased training and tainted with undisclosed conflicts of interest – a process where evidence was carefully massaged by W&L investigators to incriminate John and presented to a hearing panel that relied on overt sexual stereotypes to reach its erroneous decision. Moreover, W&L allowed its own psychologist, *who trained John's hearing panel on how to assess the credibility of sexual assault victims*, to act as an advocate and testify on behalf of Jane and to submit a baseless "professional clinical opinion" that Jane was telling the truth. W&L allowed this to occur despite the Title IX coordinator admitting that "there was no way she could have known definitively that [Jane] was assaulted by [John]." But having been instructed by their instructor that Jane was telling the truth, it is no surprise that the hearing panel failed to seriously test Jane's credibility and made a series of illogical credibility determinations against John that contradicted the evidence and defied common sense.

1

W&L revealed its bias not just in the mishandling of the investigation and hearing, but also in its subsequent extra-judicial efforts to indefinitely prolong John's suspension based on pressure from Jane's family and its fear of public perception that it did not take sexual assault against women seriously. W&L further demonstrated its disparate treatment of men and women in the way it sprang into action when it believed John may have violated a post-decision no-contact order (he did not), but ignored retaliatory conduct by Jane when she disclosed John's identity to reporters who published his name and hometown online and in print for no purpose other than to humiliate John and his family. Finally, W&L's argument that John cannot prove W&L refused to reinstate him in retaliation for John's threats of Title IX litigation relies entirely on a credibility assessment of its own witness, while ignoring evidence leading to a reasonable inference of W&L's improper motivation.

## I.      COUNTER-STATEMENT OF MATERIAL FACTS

### A.      W&L Trained John's Hearing Panel to Believe Female Victims

In the fall of 2016, W&L's Title IX Coordinator, Lauren Kozak, and Dr. Janet Boller, a W&L clinical psychologist, trained every member of the Harassment and Sexual Misconduct Board (HSMB) who adjudicated John's case. (Deposition of L. Kozak, ("LK Dep.") 123:13-21[1], *see also* Ex. 1 pgs. 14, 16). W&L holds out Dr. Boller as an authority on sexual assault and the impact of trauma on victims – for years she has presented nearly a dozen trainings a year to various groups within the university, including to student hearing advisors, student activist groups, and to the Board of Trustees of the University. (LK Dep. 143:2 – 13; Deposition of J. Boller ("JB Dep") Boller at 26:15 – 24; 27:22 – 28:2; 31:24 – 32:23; 71:19 – 73:8). However, the Fall of 2016 was the first time Dr. Boller was asked to train the HSMB. (JB Dep. 75:20 – 76:13).

---

[1] Each referenced deposition transcript is attached in its entirety.

Dr. Boller's ability to train ostensibly neutral adjudicators is questionable given her activism on campus and her lack of objectivity regarding sexual assault. Dr. Boller admitted that she refuses to provide counseling to male students accused of sexual assault due to her role as a victim advocate. (JB Dep. 212:11 – 214:4) (explaining that she referred an accused male student to a colleague when he sought counseling because she "thought that it would be better to refer to someone whose expertise wasn't in working with the support side for a complainant.").

Kozak and Dr. Boller both admit that sexual misconduct accusers at W&L are overwhelmingly female and further admit they are aware when providing training relevant to accusers, that their training mostly affects women. (LK Dep. 124:13 – 125:10; JB Dep. 86:3 – 87:6).[2] And with that knowledge they taught John's adjudicators that there are two sets of rules for assessing credibility: one for accusers, and another for everyone else. Specifically, Kozak first explained how to assess witness credibility in general, advocating common-sense methods one would assume are probative of credibility: Is the witness consistent? Is there corroboration? How strong is the witness' memory? etc. (Ex. 2 at 926-927[3]; LK Dep. 129:24 – 130:16). However, Dr. Boller immediately followed up by explaining that different rules apply to "victims," for whom memory gaps as well as inconsistent and evolving testimony demonstrate veracity. (Ex. 2 at 929; Ex. 3 at 690, 693).

Boller began her presentation with what she now acknowledges (and knew then) was a discredited study of male sexual assault perpetrators proposing that a small population of men are responsible for the vast majority of sexual assaults. (Ex. 3 at 689).[4] Boller then taught the HSMB adjudicators that the common-sense ways to assess credibility (that Kozak just presented)

---

[2] *See also* W&L MSJ at ¶ 52 (27 of 35 sexual misconduct cases adjudicated in last 10 years were female vs. male)
[3] John refers to specific pages in exhibits by the final three numbers of the bates numbering affixed to each page.
[4] Dr. Boller claims she discussed this discredited study to update older training, but this explanation was nonsensical since she also admitted this was her first time training HSMB panel members. (JB Dep. 76:6 – 81:3).

3

do not apply to trauma victims, and that adjudicators should expect victim testimony to be inconsistent, incomplete and to include "evolving narratives." (JB Dep. 86:3 – 97:21; 101:10 – 102:7). In other words, shaky testimony is just more evidence someone was assaulted.

Dr. Boller also warned adjudicators that a "**Perp** story may seem more clear, less ambiguous. Possibly because its true…" (Ex. 3 at 690; JB Dep. 108:2-109:8) (emphasis added, ellipses in original). Dr. Boller's use of the word "perp" in her training notes is evidence Boller presumes respondents are responsible. As a result, John's adjudicators were trained to ignore inconsistent conduct and statements, as well as "evolving" testimony from Jane, and to be suspicious of John's story, even if it seemed clearer and less ambiguous than Jane's. Significantly, the chair of the HSMB admitted that it is wrong to assess the credibility of accusers and respondents differently, even though the adjudicators in John's case were trained to do so. (Deposition of C. Jarrett ("CJ Dep") 124:5-17).[5]

### B.  Kozak Attended Biased Trainings to Meet her Annual Training Requirements

Kozak attended a series of patently biased seminars just days before the investigation of John's case began. As a Title IX coordinator, Kozak is required under federal law to receive training at least once a year. (LK Dep. 86:12 – 87:9). In fulfillment of those requirements she attended the Campus Safety and Violence Prevention Forum. (LK Dep. 89:3 – 7; 109:21 – 110:5). Without exception each seminar Kozak chose to attend contained gendered and inappropriate training, explicitly advocating techniques to increase the chances of a guilty finding. Examples included advocating for "offender focused" investigations, depictions of college-aged men as sex offenders, advocating investigative strategies to overcome

---

[5] Jarrett, the non-voting chair of the HSMB, made this admission as a 30(b)(6) witness and was likely unaware his panel members were trained in this fashion because he did not attend the HSMB training sessions at which Dr. Boller presented. (Ex 1 at 15).

counterintuitive behaviors by "victims" and further strategies to overcome respondents' defenses – describing defenses as "barriers" and "obstacles" for investigators. (Exs. 4, 5, 6; LK Dep. 92:3 – 93:14; 96:15 – 97:18, 98:8-11; 105:2 -18).

The biased training received by Kozak fits squarely within national trends, beginning with the Office for Civil Rights' 2011 "Dear Colleague" letter and subsequent regulatory enforcement efforts that placed pressure on colleges to take sexual assault against women more seriously, prompting schools throughout the country to restrict the due process rights of accused students. (Compl. at ¶¶ 55-74). W&L was not spared from this pressure and was subject to its own OCR investigation on the handling of a female accuser's sexual assault case in 2015. Significantly, that investigation was pending at the time W&L adjudicated John's case. (Compl. ¶¶ 83, 90; W&L Ans. to Compl. admitting same).

### C.    W&L's Biased Disciplinary Proceeding Against John

#### 1.    W&L Assigned Far Better Advisors to Jane.

From the very start of the process W&L took steps to tilt the odds in Jane's favor. W&L's policy directs that students will be assigned at least one Hearing Advisor from a pool of undergraduate and law students who have been trained by W&L. Ex. 7 at 58; LK Dep. 19:7 – 20:20; 21:2 –15. However, Kozak testified that W&L prefers students to have two Hearing Advisors. (LK Dep. 18:8 – 19:6). Accordingly, Jane was assigned *two female law students* as her Hearing Advisors and permitted to select a *third* "Advisor of Choice" – a female friend who had herself been a complainant in a W&L sexual misconduct matter. (LK Dep. 177:16 – 21; 201:4 – 11; Ex. 8 at 5249). On the other hand, John was assigned *one undergraduate male* Hearing Advisor. (LK Dep. 174:8 – 24). He was not given a list of advisors to choose from and he had no option to select a law student. (*Id.*) John also asked to use a friend as his advisor, however, W&L considered that person a "Hearing Advisor" and not an "Advisor of Choice." Kozak explained

5

that although John chose his friend, that person inexplicably was not considered an "Advisor of Choice" because he had signed up to be a Hearing Advisor – even though he had never been trained and could not be assigned for that role. (LK Dep. 176:23 – 181:23). Had Kozak designated John's friend as an "Advisor of Choice," John would have been assigned a second trained Hearing Advisor, like Jane. (LK Dep. 18:8 – 19:6). Kozak did not see any unfairness with Jane having two trained law student Hearing Advisors and John having only one trained undergraduate Hearing Advisor. (LK Dep. 180:5 – 181:23).

In addition, Kozak improperly discouraged John from using an attorney as his advisor. John explained that Kozak responded dismissively when he asked if his advisor could be an attorney, and that Kozak pointed out two example cases – one where the accused student had an attorney and was found responsible and another where the accused did not use an attorney and was found not responsible. (Deposition of John Doe ("Doe Dep.") 32:18 – 34:5). This interaction left John with a clear understanding that hiring a lawyer would be held against him.

### 2.      W&L Investigators Failed to Pursue Critical Evidence

A critical aspect of Jane's testimony about her encounter with John is that she claimed not to remember most of it – but not because of drugs or alcohol. In fact, Jane's inability to recall consensual and allegedly non-consensual sexual activity with John has no apparent explanation. (LK Dep. 213:1 – 19). She did not remember performing oral sex on John, but admitted she likely did and that she would have consented. (Ex. 9, pg. 8). She also did not remember having vaginal sex with John but claimed that she would not have consented to it and therefore, that she must have been asleep when it occurred. (*Id.*) Jane's basis for "knowing" what she would have done (despite not remembering what she did do) is her claimed lack of romantic interest in John. (*Id.*). According to the Investigation Report, Jane claimed "sexual intercourse meant something more serious than a casual hookup…and that [John] was not someone with whom she wanted to

have that connection." (*Id.*). With this explanation, Jane put her sexual practices at issue – i.e. whether she had an inflexible rule against casual sexual intercourse.

Speaking directly to that issue, Jane disclosed that she had sexual intercourse earlier that same evening with another student – Witness A.[6] But investigators never asked Jane or Witness A whether their relationship was anything more than casual. (LK Dep. 246:13 – 251:21). W&L's investigators left Jane's claims about her willingness to have casual sexual intercourse completely untested despite actual evidence suggesting inconsistent conduct with Witness A.

### 3.      W&L Allowed Jane to Submit Expert Testimony from Dr. Boller that W&L Knew was Improper and Blames John for not Objecting.

At the end of W&L's investigation, the HSMB chair, Cliff Jarret, held separate Pre-hearing Conferences with John and Jane in preparation for the hearing scheduled to occur three weeks later. W&L's Policy provides the conference is the parties' last opportunity to "submit a *written* request outlining any additional investigation steps they believe are necessary…" (Ex. 7 at 048) (emphasis added). Jarrett allowed Jane to make an *oral* request to submit a letter from Dr. Boller. (CJ Dep 31:13 – 32:20) (explaining that he disregarded the Policy's writing requirement). Nearly a week passed before Jarrett advised John that Jane planned to submit a letter from Dr. Boller and that he would be "willing to hear any objections you and your advisors might have" (Ex. 10 at 4149). But he did not describe (even generally) what the letter would address or disclose that Dr. Boller had trained the HSMB members selected for John's case – a fact John could not have known. (CJ Dep. 65:10 – 66:6). John also did not know that Dr. Boller trained one of Jane's Hearing Advisors, or that she had testified as a witness for Jane's "Advisor of

---

[6] W&L allowed Witness A to remain anonymous in the investigation, which meant John was never sure who he was despite his relevance to John's defense. John now believes that he knows that identity of Witness A and that he was not in a relationship with Jane – but John was unable to raise this at his hearing because Witness A's identity was withheld from him by W&L.

Choice" in a prior Title IX proceeding – a case that also resulted in a male being found responsible under dubious circumstances. (Ex. 1 pg. 9; JB Dep. 205:21 – 206:21).[7]

After reviewing Dr. Boller's letter, Jarrett decided that investigators should interview her. (Ex. 11; Exs. 12 & 13). Boller's letter is titled "Verification of Psychological Condition" and asserts that the symptoms Jane reported over two sessions met the criteria for Acute Stress Disorder. Dr. Boller concluded her letter by asserting: "In my professional, clinical opinion, [Jane] experienced a traumatic event, as she described when interviewed" – referring to her alleged sexual assault by John. (Ex. 12). Dr. Boller admitted that she based this conclusion exclusively on Jane's word – Dr. Boller had not read the investigation report, had not reviewed any evidence, and had never heard John's side of the story. (JB Dep. 144:21 – 149:19). Dr. Boller also admitted her practice is to believe "victims" and that she does nothing to investigate whether her patients are being truthful. (JB Dep. 64:3 – 65:17; 143:9 – 144:20). She further admitted that she could not observe most of the symptoms Jane reported – she simply accepted Jane's report of them as true. (JB Dep. 150:12 – 154:15).

Jarrett and Kozak met to discuss Boller's report and concluded that, although they believed the evidence was improper and overreaching, they would admit it unless John or his underqualified advisors objected. Kozak explained:

> Q. And did you have any concern that there was a letter purporting to opine that the complainant had been sexually assaulted based on her interview with her?
> A. Yes. I thought it was an overreach of a conclusion.
> Q. Okay. Did you address that concern with anyone?
> A. Well, the parties are welcome to submit the information. I may have had some conversations with Cliff and making sure that the parties would have an opportunity to object to that.

---

[7] The matter in which Dr. Boller testified also resulted in Title IX litigation filed in this Court by the male accused student. *See John Doe v. Washington and Lee*, 6:14-cv-00052-NKM-RSB (W.D.Va.) (Moon, J.).

Q. Okay. And you knew that, because you did the training with her, that Janet Boller had trained the panel members that were going to receive and review this letter, correct?

A. Yes. Dr. Boller did train the committee.

Q. Would you agree that by – by having her train the panel, that you had, or that W&L had presented her as an authority on trauma?

A. She is -- yes, as somebody who's knowledgeable with working with students as a counselor and has that counseling training, yes.

Q. Knowledgeable to the extent that they're qualified to train the panel members on issues related to trauma?

A. Yes.

Q. And that same person is then opining that a party in a case, in fact, has experienced a traumatic event. Did you have any concern that the weight of her authority might impact the resolution of the case?

A. No. I actually did not think it would impact the resolution of the case because the panel could give it the weight that it deserved, and it seemed -- there is no way that she could know that conclusion. But we did want to make sure the parties had an opportunity to object to it, and certainly if they had objected, it was likely --

Q. Do you agree there was no way she could have known definitively that [Jane] was assaulted by [John], correct?

A. Correct.

Q. Despite including that in her conclusion?

A. Correct.

Q. And you were trusting that the panel members would recognize that she wasn't really qualified to offer that opinion?

A: That that opinion was an improper opinion. […]

(LK Dep. 140:24 – 144:17) (objections omitted). Kozak claimed (incorrectly) this approach was required by the Policy. (LK Dep. 144:17 – 146:10). However, the Policy dictates the investigator has discretion to "delete statements of personal opinion, rather than direct observations or reasonable inferences from the facts" from the Investigation Report. (Ex.7 at 046). But even if W&L believed the Policy required an objection (it did not), its rigid adherence to "the rules" for John contrasts starkly with Jarrett's willingness to ignore the Policy for Jane. Jarrett bent the rules to allow Jane to submit evidence at the last minute without a written request, but insisted on following the rules to exclude that same evidence when he knew it was improper.

9

### 4. The Investigation Report Skews Facts and Analysis in Jane's Favor.

W&L's policy requires the Investigation Report to be a neutral summary of the evidence – investigators are not supposed to determine credibility or suggest an outcome.[8] (LK Dep. 183:11 – 24). But in multiple instances the Investigation Report does exactly that. For example, the report begins with a summary of undisputed facts, then includes an "analysis" section addressing whether penetration occurred and if so, whether Jane consented. (Ex. 9). The analysis section first summarizes Jane's position on consent, then sets forth John's position. At the end of Jane's summary, the report explains the dispositive issues the panel needs to consider if it were to credit Jane's testimony: "If [Jane] was asleep, [John] should have known that she was incapable of giving consent. If [Jane] was so near sleep that she was unaware that sexual activity was occurring, the hearing panel will need to evaluate whether a reasonable person should have known that she was incapable of consent." (*Id* at 10).

The report next summarizes John's position on why he believed he had consent. But, it does not conclude John's section with similar instructions for the panel if it credits John's testimony. Instead it inaccurately concludes by suggesting that John *admitted* that the sex was not consensual: "John acknowledges one statement from [Jane] that expresses refusal of vaginal/penile penetration…" – referring to John's testimony that Jane stated intercourse might be weird for their friendship and offered to give him oral sex instead. (*Id.* at 11). This editorialization of John's testimony is entirely inconsistent with John's interview, where he described Jane as repeatedly asking if it would be weird to have sex in a flirtatious way, probing

---

[8] It is important to understand that the Investigation Report and its appendices constitute the entire evidentiary record. The hearing only included testimony from the parties – all other testimony and evidence were summarized by the report. The way the report summarizes and characterizes the evidence is made more influential given the short time the HSMB has to review the record. In this case, the panel was given access to the report and its 100-page appendix just the day before the hearing. (CJ Dep. 86:11-21).

John's interest in her. The report fails to mention entirely John's description of Jane's overt conduct (rubbing her body against his and placing his hand on her breasts). (Ex. 14). The report then concludes *John's section* by noting which portions of John's account Jane disputed. Notably, the report did not conclude Jane's section by explaining which claims John disagreed with, nor did it include any type of editorial gloss calling her story into question as it did for John. (LK Dep. 214:13 – 24; 237:2 – 241:20; 255:18 – 260:2).

The report is purposefully misleading in several other respects:

- The report set forth the standard of review but failed to instruct that John was entitled to a presumption of innocence. (LK Dep. 196:22 – 197:9).

- The report fails to include Jane's first description of the incident, which differed markedly from what Jane stated in subsequent interviews. (Compare Ex. 8 with Exs. 15 & 16; LK Dep. 187:1 – 194:4) (Jane initially claimed not to remember *any* sexual activity with John –she later recalled seeing John's penis as well as consensual kissing and touching while naked).

- The report fails to summarize portions of John's testimony that speak directly to Jane's romantic interest in him, despite the central role Jane's feelings on sex with non-romantic partners played in the case. (LK Dep. 241:21 – 246:12).

- The report fails to mention an inconsistency between Jane's and Witness A's testimony concerning the hickeys on Jane's neck – Witness A told investigators he specifically asked Jane not to give him hickeys, and that he likely gave her hickeys; Jane claimed the opposite. (LK Dep. 233:3 – 236:15).

- While the report notes that Witness A may have given Jane hickeys, it drops a footnote to question this, noting that John did not notice any hickeys when they met just before 1:00 a.m. – without mentioning that Jane wore a sweatshirt or that John and Jane spent most of their time together in a dimly lit bedroom. (LK Dep. 228:23 – 232:20).

- Unlike its treatment of John, the report does not question any aspect of Jane's story – for example it does not point out that Jane's claim of having bruises (as opposed to hickeys) was incredibly unlikely given there was no dispute she was not incapacitated during the encounter, and that the allegedly non-consensual sex happened while she

was simply "asleep or nearly asleep." Obviously, if John had been striking, grasping or squeezing her neck, she would not have slept through it. (LK Dep. 227:22 – 228:21).

- The report fails to include the undisputed fact that neither student was overly intoxicated even though both students agreed that was the case. This failure was significant because the HSMB determined, without basis, that John's memory was unreliable because of his supposed intoxication. (LK Dep. 207:12 – 208:22).

### 5.   The HSMB Hearing and Decision Evidence Gender Bias

John described the atmosphere of the hearing as being extremely hostile toward him, with panel members who were openly predisposed toward Jane. John and his advisors observed that the panel members glared at John with crossed arms and were dismissive when he answered questions. In contrast, the panel members made their sympathy toward Jane clear through gentle questioning, concerned expressions and attentive body language. (Doe Dep. 54:6 – 55:20).

After finding John responsible, the HSMB panel issued a written decision that relied on overt sexual stereotypes, blind acceptance of Jane's untested sexual preferences, and illogical conclusions drawn against John. The decision begins by crediting Jane's "personal rule" for only having "full sexual intercourse with partners if she is interested in a relationship" together with the fact she was not interested in John, as the basis for believing Jane did not consent. (Ex. 17). Notably, the panel was aware Jane had sex with Witness A earlier the same night, but never asked about their relationship during the hearing. (Doe Dep. 56:10 – 22; 58:2-17; 69:3 – 24).[9] The decision then explains that Jane's testimony was consistent and credible, without providing

---

[9] W&L argues that John could have submitted questions on that topic. This is evidence of W&L's improper prosecutorial mindset – W&L apparently believes that the Panel was not obligated to probe obvious holes in Jane's story despite promising to conduct a "thorough" process in its Policy. (Ex. 7 at 044). In any event, John explained that he and his advisors understood such questions were not permitted. (Doe Dep. 69:9 – 17). That is because W&L's Policy expressly prohibits, without exception, questions of "any prior sexual history of the complainant or the respondent with other individuals…". (Ex. 7 at 060). Perhaps if John had legally trained advisors (like Jane), they may have recognized that Jane's testimony "opened the door" to such questioning. Notably, the HSMB 30(b)(6) designee admitted that *he* understood Jane opened the door to this line of questioning, which begs the question of why no such questions were asked. (CJ Dep 176:7 – 23). The panel also could have called Witness A to testify, but chose not to. (CJ Dep. 177:6 – 16).

any examples. (Ex. 17). The decision ignores that Jane's testimony concerning hickeys was entirely inconsistent with Witness A's, and that her claims of being struck and bruised while she was sleeping evidenced a clear willingness to exaggerate. The decision also evidences no concern for Jane's inexplicable inability to remember most of her interactions with John, but somehow credits her ability to remember the exact wording of their conversations during consensual sexual activity she cannot recall. Finally, the decision notes that the panel believed Jane because John and Jane "were good friends…and it did not follow that she would assert a baseless claim against him." Apparently, while the panel believed a woman would not lie about a friend raping her without some obvious motive, it had no trouble believing that a man would rape a good female friend. (CJ Dep. 187:16 – 192:13).

In addition, while the HSMB determined Jane was not passed out from intoxication, against all logic it somehow concluded Jane slept through vaginal penetration and remained asleep through intercourse. W&L's HSMB designee could not explain how the panel believed that Jane slept through intercourse when she was not incapacitated. (CJ Dep. 167:14 – 168:8; 224:8 – 226:16).

The HSMB's explanation for why it disbelieved John is even more intellectually dishonest and infused with gender bias. The decision points out the panel doubted John's ability to accurately recall what happened because of the amount of alcohol and marijuana he consumed earlier that night – even though it was undisputed that John was not overly intoxicated.[10] The panel made this determination without asking any questions about John's level of intoxication during the hearing. (CJ Dep. 192:14 – 203:20). Comparatively, the panel had no trouble accepting Jane's purported memory despite evidence she drank more than John.

---

[10] Jane testified that she knew John very well, had been around him when he was drunk, and that he was "definitely not very drunk." (Ex. 18).

13

The decision goes on to explain that John was not credible because his recall was only "strong relative to the facts that would exonerate him (how their clothes came off, his statement of her affirmative assent), but fuzzy on other details of how the evening progressed between the two of them (sequence of conversations, general timing of events and how his pants got back on)." (Ex. 17). The panel's focus on John's inability to remember minor details stands in stark contrast to its acceptance of Jane's complete lack of memory concerning any of her conduct with John. And it simultaneously ignores that its criticism applies equally to Jane – her claimed memory was only strong on the facts that incriminated John (making specific statements about not wanting to have sex) but completely lacking on how the night progressed (not remembering how her clothes came off or performing oral sex). The HSMB 30(b)(6) designee was unable to explain how the panel reconciled Jane's inability to recall consensual oral sex with her purported ability to remember her specific statements during that same time. (CJ Dep. 203:21 – 210:18).

The decision also asserts that John's testimony that Jane's eyes were open during sex was inconsistent with his testimony that his bedroom was dark. However, the panel did not ask any questions about the lighting conditions in his room. (Doe Dep. 92:4 – 93:14) (John explained street lights illuminate his room at night). The panel also ignored that John's ability to see Jane's eyes was consistent with Jane's testimony that she was able to see his penis. (CJ Dep. 210:19 – 214:9). The panel also claims John's explanation for why he stopped Jane from performing oral sex on him was inconsistent, because he initially said it "seemed weird" and later said it "didn't feel good." As opposed to a real inconsistency, the panel simply nitpicked John's word choice for whether or not something felt pleasurable. (CJ Dep. 214:15 – 216:1).

But in the most blatant example of sexual stereotyping the decision notes the "Panel also had trouble with [John's] claim that receiving oral sex from a friend felt "weird", but that he

14

would then proceed to have sexual intercourse with her." (Ex. 17). In other words, the panel reasoned that if a male is comfortable with vaginal sex, he should also be comfortable with oral sex. Tellingly, the panel did not ask John about his sexual preferences or whether he even enjoys oral sex. (Doe Dep. 92:4 – 93:14). Instead, the panel members relied on a stereotype of male sexual preferences.[11]

Finally, the poorly reasoned decision must be examined in tandem with the HSMB's remarkably lenient sanction – which creates a reasonable inference that the panel did not believe John was responsible but felt compelled to find in favor of Jane regardless. Despite purportedly believing that John had sex with Jane without her consent (i.e. rape), the panel gave John a one term suspension, and further allowed him to finish out the remaining few weeks of the spring term on campus. (Ex. 17). This represented the most lenient sanction W&L had ever given to a student found responsible for a similar offense. (CJ Dep. 151:14 – 159:9).

### 6. W&L Surreptitiously Extended John's Sanction After Jane Complained to the University President and John Threatened to Sue.

After John served out his one-term suspension and completed his counseling requirements, he twice applied for reinstatement and was twice rejected. W&L asserts that it rejected John's applications for academic reasons. But W&L ignores significant evidence suggesting other inappropriate factors were at play. For example, discovery revealed that following the HSMB decision, Jane and her family continuously protested the leniency of the sanction in correspondence with Kozak, Dean Sydney Evans, and W&L President Will Dudley. (LK Dep. 278:12 – 23; 281:10 – 286:21; Deposition of R. Straughn[12] ("RS Dep.") 61:21 –

---

[11] Significantly, the HSMB 30(b)(6) designee conceded that someone's sexual preferences are not an appropriate basis to decide credibility – but that is exactly what the panel decided here. (CJ Dep. 216:8 – 224:4).
[12] Mr. Straughn is the 30(b)(6) witness designated by W&L to represent the Automatic Rule Committee that decided John's applications for reinstatement.

65:22). President Dudley and Dean Evans (a member of the ARR[13] committee) agreed to meet with Jane to discuss her objections to John's suspension. (RS Dep. 65:23- 71:16). Kozak admitted that President Dudley disagreed with John's sanction and thought it should have been longer. (LK Dep. 284:22 – 285:1). When John learned that Jane met with President Dudley, he asked for a similar audience. Strongly suggesting it had something to hide, W&L responded with a lie – falsely denying that President Dudley met with Jane regarding John's return to W&L. (*Compare* Exs. 19 & 20; RS Dep. 75:1 – 76:3; 97:14 – 101:22).

At the same time Jane was sending emails to complain about John's possible reinstatement, and before John had even submitted his application, W&L administrators were discussing their concerns with John's potential return. For example, Kozak emailed the general counsel (redacted for this litigation) immediately after the chair of the ARR committee emailed Kozak to ask if there was anything she should be concerned about with John's anticipated application – suggesting W&L was considering more than the strength of his application (which it had not even received at the time). (LK Dep. 292:6 – 295:3; RS Dep. 79:23 – 86:16). Finally, Dean Evans remained in continuous communication with Jane throughout John's efforts to be reinstated, despite the fact she sat on the ARR committee that evaluated and decided his applications. (RS Dep. 75:10 – 77:20). Evidence suggests that Dean Evans was at least emailing and possibly also speaking on the phone with Jane during the ARR meeting to review John's application. (RS Dep. 95:18 – 97:5; Ex. 21).

Finally, it is undisputed that Dean Evans was aware that John had retained "litigation counsel" before deciding on his first reinstatement application. John's attorney sent Dean Evans a document preservation notice in connection with John's Title IX proceeding. (Ex. 22).

---

[13] ARR stands for Automatic Rule and Reinstatement, which is the W&L committee that decides applications for reinstatement.

**7.   W&L Only Purported to Care About Confidentiality When John Asked For Copies of His Record, and did Nothing When Jane Shared Confidential Records with the Press.**

Following John's suspension, but during the time he was still allowed to remain on campus, Jane complained that John had violated the no-contact order because she encountered him attending an event *held by John's fraternity*. (*See* W&L MSJ ¶ 42; Doe Dep. 83:22 – 84:12). W&L acted quickly to revise the no-contact order to make clear that John must leave the area if that situation were to occur again – previously, he could remain if he was there first. (Doe 96:17 – 102:7). In comparison to W&L's swift response when it believed John violated the Policy, it did nothing when it learned that Jane likely violated the anti-retaliation provisions of the Policy.

After John filed this lawsuit, Jane provided confidential records from the disciplinary proceeding to two W&L students who worked for the student newspaper, including interview summaries and possibly the Investigation Report. (LK Dep. 51:7 – 53:8; Ex.23). The newspaper then published an article in print and online identifying John by name and hometown. W&L was aware that the student journalists received the confidential information from Jane. (LK Dep. 39:11 – 40:13). W&L did not investigate Jane or the student journalists for retaliation, despite stringent anti-retaliation provisions in its Policy. (LK Dep. 33:2 – 18; 40:14 – 17; Ex. 7 at 001, 015, 032).[14] Kozak admitted during her deposition that she is supposed to investigate any acts of retaliation she becomes aware of, regardless of whether the target of the retaliation files a complaint. (LK Dep. 24:21 – 25:16). Nevertheless, she took no action in this instance.

W&L's lack of concern for the publication of confidential disciplinary records in the student newspaper contrasts sharply with the position it took when John asked for copies of the

---

[14] W&L may dispute this by pointing to the fact that there was an Honor violation investigation about the article, which John initiated. However, this was not action by W&L. The Honor system at W&L is a student-run system, separate and apart from W&L's disciplinary process. Kozak made clear that the HSMB determines whether retaliatory acts violated W&L's policy (LK Dep. 23:20 – 24:2).

same files when he was evaluating his legal options prior to filing any suit. For John, W&L insisted the material was *highly confidential* and put severe restrictions on his access. John could only review his disciplinary records alone and could not even take notes about what he reviewed. (LK Dep. 45:8 – 46:24). W&L also refused to allow John to have an advisor present when he reviewed his own disciplinary file, even with a signed confidentiality agreement. (*Id.*; Ex. 24). Kozak admitted that if John had made copies of and published his disciplinary records, he could have faced discipline. (LK Dep. 46:9 – 24). W&L was aware that John sought these materials in connection with potential litigation when it restricted his access. Accordingly, W&L demonstrated bias in the disparate way it treated confidential information as between John and Jane, and the disparate way it reacted to learning of potential violations of the Policy.

## II.    ARGUMENT

### A.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In making this determination, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994).

The 4th Circuit has not articulated a standard for establishing claims under Title IX. District courts in Virginia have followed the 2nd Circuit's analysis in *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994), which recognizes several theories under Title IX, including: "erroneous outcome" and "selective enforcement." *See Streno v. Shenandoah Univ.*, 278 F. Supp. 3d 924, 929 (W.D. Va. 2017) (citing *Yusuf*).

More recently, however, four Circuits and the D.C. District Court have adopted an alternative approach, recognizing that the framework articulated by the Second Circuit is overly restrictive. In a decision authored by Judge Amy Coney Barrett, the 7th Circuit established a simpler test for analyzing Title IX claims involving student disciplinary proceedings: "We see no need to superimpose doctrinal tests on the statute. All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student. We prefer to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against John on the basis of sex?" *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019). The 7th Circuit's approach has since been adopted by the Third, Eighth and Ninth Circuits. *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020); *Doe v. Univ. of Arkansas - Fayetteville*, 2020 WL 5268514, at \*4 (8th Cir. Sept. 4, 2020); *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020); *see also Doe v. Am. Univ.*, 2020 WL 5593909, at \*7 (D.D.C. Sept. 18, 2020).

While John urges this Court to adopt the emerging 7th Circuit approach rather than continue to follow the 2nd Circuit,[15] the facts John articulates above are sufficient to survive summary judgment under either standard. Because this Court has previously followed the 2nd Circuit's analysis, albeit in cases decided before the 7th Circuit's *Purdue* decision, John will express his argument consistent with the "erroneous outcome" and "selective enforcement" theories.

### B.     Erroneous Outcome

"In order to state a viable Title IX claim under an erroneous outcome theory, a plaintiff must plead (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of

---

[15] Notably, no Circuit Court decided post *Purdue* has opted to continue following *Yusuf*.

the disciplinary proceeding, and (2) particular circumstances suggesting a causal relationship between that erroneous outcome and gender bias." *Streno*, 278 F.Supp. 3d at 929.

### 1. Articulable Doubt.

Consistent with W&L's argument that courts are not tasked with re-adjudicating the merits,[16] numerous courts recognize that establishing "articulable doubt" is a low burden and may be established by pointing to "evidentiary weaknesses behind the finding of an offense," "particularized strengths of the defense, or other reason to doubt the veracity of the charge" or by pointing to "particular procedural flaws affecting the proof." *Yusuf*, 35 F.3d at 715. This Court has previously found allegations that "critical omissions in what [investigators] included in the witness summaries" and W&L's failure to consider evidence concerning the parties' sexual relationship were sufficient to establish articulable doubt. *Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015). As set forth at length above, John has done more than enough to cast doubt on the proceedings by pointing to, *inter alia*: critical questions both investigators and the HSMB failed to ask Witness A and Jane about her "personal rule;" failing to summarize aspects of John's testimony demonstrating Jane's romantic interest in him; allowing admittedly improper expert evidence into the record; skewing the investigation report against John including by noting a purported (and false) admission by John that Jane refused vaginal sex; and various HSMB findings set forth at length above that were illogical and not supported by the evidence. These facts read together establish articulable doubt.

### 2. Gender Bias

The factual record in this case presents substantial evidence of bias that precludes summary judgment. While the Court must view all the evidence referenced above as a whole in

---

[16] W&L MSJ at 17

determining if there is a material dispute that bias affected the outcome, John will highlight

several categories of deficiencies in the disciplinary proceeding that demonstrate bias.

### Procedural Unfairness

John has identified multiple disturbing procedural irregularities, not the least of which

was W&L allowing the trauma expert who trained the HSMB not only to act as an advocate for

Jane, but also to offer an admittedly overreaching expert opinion. W&L argues that Dr. Boller's

opinion did not influence the panel's decision by pointing to the fact that Jarrett said so, and that

the HSMB's half-page written decision does not reference Dr. Boller's letter. But that is a

credibility determination the Court cannot make at this stage, and there are substantial reasons to

question Jarrett's credibility on this point. First, Jarrett admitted "the panel does not include

every factor or every deliberation or every piece of evidence that they consider in this, in their

writeup, for a decision." (CJ Dep. 161:19 – 24). In addition, Jarrett's purported clear recollection

that the panel never discussed Dr. Boller's report is remarkable given that he remembered almost

nothing else about the case – he could not recall a single thing stated by any party during the

hearing (CJ Dep. 140:6 – 141:10), or any specific issues discussed during deliberations (CJ Dep.

171:10 – 172:19), or even the general content of Dr. Boller's letter. (CJ Dep. 43:21 – 45:5; 56:23

– 59:24; 61:20-62:4). It is also noteworthy that W&L follows a practice of immediately

collecting and destroying all the panel members' notes as soon as they issue a decision. (CJ Dep.

133:1 – 24). This practice raises serious issues of spoliation that warrant drawing inferences

about what the panel discussed in John's favor, particularly on summary judgment.[17]

---

[17] Documents recently produced by W&L (after the depositions) reflect materials are destroyed the minute the Panel reaches a decision, unless a litigation hold is in place (before students even have an opportunity to appeal). It is patently unreasonable to expect a college student would know to instruct the HSMB to preserve documents the moment he/she received an adverse determination. This practice is clearly intended to destroy potential evidence given that litigation flowing from serious disciplinary proceedings is reasonably foreseeable. *Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 657 (D. Conn. 2019) (denying summary judgment on Title IX claim where hearing notes were destroyed by administrators, noting that "a reasonable factfinder is entitled to determine whether the Title

Other irregularities John has identified are equally problematic, including: (1) assigning better qualified advisors to Jane; (2) failing to test Jane's "personal rule" testimony in the investigation or hearing; and (3) skewing the Investigation Report in Jane's favor and ignoring significant issues with Jane's memory. Several courts have found similar defects were sufficient to establish gender bias. For example, *Doe v. Oberlin Coll.*, 963 F.3d 580, 586 (6th Cir. 2020) held that "clear procedural irregularities in the College's response to the allegations of sexual misconduct … will permit a plausible inference of sex discrimination." In that case, the alleged irregularities included the college's failure to reconcile contradictions in the accuser's testimony as well as evidence that Oberlin assigned an ineffective advisor to Doe. Similarly, in *Doe v. Colgate Univ.*, 2020 WL 2079439 at *5 (N.D.N.Y. Apr. 30, 2020) the court denied summary judgment on an erroneous outcome claim finding sufficient evidence that the process was biased against Doe because an investigator, *inter alia*, "did not thoroughly investigate inconsistencies in Roe's accounts…" "which were countered by available objective evidence."

W&L attempts to downplay the flaws in John's case by arguing that merely "skewing the facts" in Jane's favor does not demonstrate gender bias, citing *Yu v. Vassar College*, 97 F. Supp. 3d 448 (S.D.N.Y. 2015).[18] W&L misrepresents the holding in *Yu*. While the plaintiff in *Yu* argued that the investigation report was skewed, the court disagreed as a factual matter after reviewing it. *See Id.* at 466-67. The court did not hold, as W&L suggests, that summary judgment was granted for Vassar despite a skewed report. Rather, the court found that the investigation report was not skewed. *See id.*

---

IX committee's hearing notes… likely contained evidence supporting Plaintiff's claim under Title IX that gender was a motivating factor in the decision to discipline him.)

[18] W&L MSJ at 25.

### *Biased Training*

Janet Boller, a noted victim's advocate who admitted she does not treat accused male students, trained the HSMB panel that adjudicated John's case. Her training involved questionable "trauma-informed" theories asserting that "evolving" and inconsistent testimony by a "victim" demonstrates veracity. Many courts have found such training can establish gender bias. *Doe v. Syracuse Univ.*, 2019 WL 2021026, at \*7 (N.D.N.Y. May 8, 2019) (finding gender bias where Doe alleged adjudicators were taught that "inconsistencies in a complainant's story are a direct result of the trauma," and "a natural byproduct of sexual assault as opposed to an indicator that the complainant's story may lack credibility."); *Doe v. Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 823-824 (E.D. Pa. 2017) (holding allegations that university training materials "encourage the employees to believe the accuser and presume the accused's guilt… set forth sufficient circumstances suggesting inherent and impermissible gender bias to support … an erroneous outcome theory.") *Norris v. Univ. of Colorado, Boulder*, 362 F. Supp. 3d 1001, 1013 (D. Colo. 2019) (holding that university's use of "a trauma-informed approach" that "overlooked inconsistencies of Roe's account" supported an inference of gender bias.). John asserts that the poorly reasoned decision of the HSMB panel (which nitpicked minor inconsistencies in John's testimony while ignoring gaping holes in Jane's) is evidence that Dr. Boller's training influenced the outcome. This training is also consistent with Kozak's failure to see any significance in the fact Jane initially could not recall *any* sexual activity with John, and later claimed to recall much more – her story had simply "evolved."

### *The Improper and Inexplicable Written Decision*

John points out two serious issues with W&L's written decision that are independently sufficient to establish bias. First, W&L's decision relies on an explicit sexual stereotype of male

sexual preferences. The Panel stated that it "had trouble with John's claim" that he did not want

oral sex from Jane because he was willing to have vaginal sex with her. And it did so without

asking John if he enjoys oral sex. It is difficult to imagine adjudicators reasoning similarly if

John were female – i.e. a woman must be comfortable with oral sex if she is also comfortable

with vaginal sex. In *Marymount* the court emphasized that an adjudicator's expression of

outdated and gendered views of sexuality are alone sufficient to show of gender bias:

> one particular allegation is noteworthy because, if accepted as true, it
> reveals that Doe's adjudicator, Professor Lavanty, adhered to certain
> gendered beliefs. Specifically, Doe alleges that in a subsequent sexual
> assault investigation at Marymount, a male student accused a female
> student of touching his genitals without his consent and of pushing his
> hand into her genitals without his consent. Professor Lavanty served as
> the investigator in that case and allegedly asked the male student "were
> you aroused" by this unwanted touching? When the student responded,
> "no," Lavanty, in apparent disbelief, allegedly asked the male student
> again, "not at all?" This unpleasant exchange … reveals that Lavanty's
> decision-making was infected with impermissible gender bias, namely
> Lavanty's discriminatory view that males will always enjoy sexual
> contact even when that contact is not consensual.
> […] this allegation alone is sufficient to satisfy Doe's burden….

(*Doe v. Marymount*, 297 F. Supp. 3d at 585).[19] At least one court has relied on this same

rationale to deny summary judgment. In *Doe v. Grinnell Coll.*, 2019 WL 10735187, at *11 (S.D.

Iowa July 9, 2019), the court determined there was a genuine issue of material fact on the issue

of gender bias in an erroneous outcome claim where the written decision of the adjudicators

included a stereotypical view regarding the behavior of women during sexual encounters. In

determining that Roe did not consent the decision relied on "the gendered assumption that a

woman would not consent to sex she felt was meaningless." (*Id*. at *12).

---

[19] In *Marymount* the statement was alleged to have been made in a separate case and was taken as evidence the adjudicator's biased viewpoints likely infected Plaintiff's case. Here it is even worse because the statement was made by the entire panel as a justification for finding against John. In other words, this Court does not need to infer that bias influenced the result – the decision is explicitly based on a discriminatory sexual stereotype.

Second, the record reflects significant flaws in the HSMB panel's reasoning, including: (1) relying on Jane's memory of specific statements despite her inability to recall almost the entire time she spent with John; (2) failing to question Jane's "personal rule" against casual sex despite evidence she engaged in casual sex with another person the same night; (3) finding John's memory unreliable based on intoxication despite undisputed evidence he was not; (4) faulting John for minor inconsistencies in testimony while ignoring significant inconsistencies by Jane; (5) discrediting John's ability to see Jane's eyes during sex even though Jane testified the room was light enough to see his penis; and (6) believing against common sense that Jane slept through vaginal intercourse when she had not drank for hours and testified she was not drunk.

In *Doe v. Oberlin*, the Sixth Circuit recognized that when a university's decision is "arguably inexplicable," it will support both elements of an erroneous outcome claim: articulable doubt, and gender bias. *Oberlin*, 963 F.3d at 587-588. In *Oberlin* the disciplinary panel found that Roe was incapacitated from alcohol despite substantial evidence she was not and further ignored significant contradictions in Roe's testimony. The Court upheld Doe's erroneous outcome claim reasoning "Doe's strongest evidence [of bias] is perhaps the merits of the decision itself in his case. … when the degree of doubt passes from "articulable" to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias." *Id.* citing *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (reasoning that a "perplexing" basis of decision can support an inference of sex bias).

The recent case of *Doe v. American Univ.*, 2020 WL 5593909, at *7 (D.D.C. Sept. 18, 2020) also determined an illogical decision was evidence of bias in a factually similar case. American University employed a single-investigator model where the investigator made findings of fact and determined responsibility. The Court found evidence of bias by comparing the way in

which the investigator determined credibility between Doe and Roe. The court found the investigator "made no effort to reconcile [a] significant inconsistency" in Roe's testimony and "never considered how Roe's memory impairment might have affected her ability to recount events." *Id* at *7. In comparison the investigator "faulted Doe for a modest testimonial deviation…"  *Id.* at *8. The same was true of W&L, for example where the panel faulted John for not remembering exactly when he put his pants back on, but ignored that Jane could not recall performing consensual oral sex on John.

The Court in *American* also found probative of bias the fact that the investigation report questioned the credibility of a witness for Doe on grounds that applied equally to a witness for Roe. When summarizing the testimony of Doe's witness, the report editorialized that "it is important to note" the witness's information came from Doe and not Roe or Roe's friend. The Court observed that the report did not acknowledge the same criticism was true of Roe's witness who got her information from Roe. The Court reasoned this evidenced gender bias because the "statement plausibly could be read to discount H.S.'s reporting merely because it came from an accused male, as opposed to a female accuser and her female roommate." *Id.* These same flaws were present in John's case where, for example the HSMB decision questioned John's credibility on grounds that applied equally (if not more so) to Jane.

### *Lenient Sanction*

W&L's Policy requires dismissal for students found responsible for non-consensual sexual penetration beyond a reasonable doubt. But when the finding is by a preponderance, the Policy allows for a range of sanctions, up to and including dismissal. (Ex. 7 at 052). John was found responsible by a preponderance and suspended for only one term. By comparison, W&L suspended a student found responsible for "unwanted sexual touching not constituting rape" in

26

2014 for one year, and suspended a student for "non-consensual sexual contact" in 2019 for one

term – both lesser offenses. (W&L MSJ Ex. 31). W&L's president also did not believe John's

sanction was commensurate with the seriousness of the offense.

The 8th Circuit recently recognized that an overly lenient sanction given when a school is

under OCR investigation is evidence of gender bias because it demonstrates the university felt

compelled to find a male student responsible despite believing he was innocent. *Doe v.*

*University of Ark.*, 2020 WL 5268514 at * 5 (8th Cir. Sept. 4, 2020) ("A decision that is against

the substantial weight of the evidence and inconsistent with ordinary practice on sanctions may

give rise to an inference of bias" based on gender when decided "against the backdrop of

substantial pressure on the University to demonstrate that it was responsive to female

complainants.")[20] W&L admits in the pleadings it was under OCR investigation in connection

with a female student's complaint at the time John's case was adjudicated,[21] therefore there is a

reasonable inference to be drawn that W&L felt pressured to find John responsible (even though

he was not) and "make it up to him" with a light sentence.

### 3.    Pro-Victim Bias Can Demonstrate Anti-Male Bias.

W&L urges this Court to find that any flaws in its proceeding against John demonstrate

only pro-victim bias and not anti-male bias, citing two district court cases.[22] W&L fails to

acknowledge substantial authority rejecting this rationale. For example, *Norris v. Univ. of*

*Colorado, Boulder*, 362 F. Supp. 3d 1001, 1014 (D. Colo. 2019) recognizes that there is a

significant split in authority on the issue of "whether a pro-victim bias melds into an anti-male

---

[20] *Univ. of Arkansas* is also noteworthy because the Court questioned the university's acceptance of the female accuser's testimony that "she did not remember whether she consented, but did not know why she would have." The court found that crediting such testimony supported a determination that the finding was against the substantial weight of the evidence. In John's case, W&L credited similar testimony from Jane – i.e. her ability to determine whether she would have consented to oral and vaginal sex, even though she couldn't recall either occurring.
[21] W&L Ans. To Compl. at ¶¶ 83 & 90.
[22] W&L MSJ at 25.

bias when the overwhelming majority of accusers are female and the overwhelming majority of those accused are male." *Id.* There the Court found that a university's pro-victim approach "taken in concert with the allegations of gender bias concerning the process of the investigation" was sufficient to establish bias. The alleged procedural flaws in *Norris* that supported an inference of bias included: (1) conflicts of interest by an investigator; (2) Roe received procedural advantages that Doe did not; (3) the university failed to punish Roe for sharing confidential documents; and (4) adjudicators overlooked inconsistencies in Roe's account. *Id.* at 1012-1013. As noted in the facts set forth above, every one of those things occurred in John's disciplinary proceeding at W&L.

Despite W&L's argument to the contrary, it is significant that both Kozak and Dr. Boller acknowledged an understanding that their training on accuser credibility would disproportionately favor women. Although W&L is correct that disparate impact cannot form the sole basis of Title IX claim, district courts have recognized that "[w]hile statistical evidence of a disparate impact on one gender cannot form the basis of a Title IX claim, this type of evidence might support Plaintiff's claim that gender influenced the outcome of his disciplinary proceeding." *Prasad v. Cornell Univ.*, 2016 WL 3212079, at *17 (N.D.N.Y. Feb. 24, 2016). Here, the evidence reflects that the first time Dr. Boller trained an HSMB panel (John's panel) to favor accusers was also at a time when W&L was under OCR investigation based on a female student's complaint. Accordingly, the Court may draw an inference that her training was intended to increase the likelihood women were believed in W&L's disciplinary proceedings.

## C.    Selective Enforcement

To support a claim of selective enforcement, a male plaintiff must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the [school]." *Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598, 608–09

(E.D. Va. 2019) (*internal* citation omitted). Here, there is evidence that, despite purporting to observe a strict anti-retaliation policy, W&L did not investigate whether Jane purposefully exposed John's identity in the press. And it did not investigate (and still has not) whether Jane supplied the Investigation Report to reporters in violation of her confidentiality agreement, despite evidence she may have. (*See* Ex. 23). At least one court has found selective enforcement present under similar circumstances. *See Doe v. Univ. of Scis.*, 961 F.3d 203, 211 (3d Cir. 2020) (finding selective enforcement adequately pled where school had notice of and failed to investigate "that Roe 1 and Witness 1 breached the Policy's confidentiality provision by colluding with each other about the investigation.").

### D.      Retaliation

To establish a Title IX retaliation claim John must demonstrate two elements: (1) that he engaged in protected activity under Title IX, and (2) that he suffered an adverse action by W&L as a result. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018). W&L does not dispute that threatening a Title IX suit is protected activity but argues disingenuously that the letter from John's attorney was not clear enough to constitute a threat of litigation.

On June 29, 2017, John's attorney wrote to Dean Evans and Lauren Kozak and opened with the following statement: "The undersigned has been retained as *litigation counsel* by [John Doe]…" (Ex. 22, emphasis added).[23] The letter goes on to request copies of the records from Doe's Title IX disciplinary proceeding, and concludes by issuing a litigation hold. (*Id.*). This letter constitutes a clear warning of potential litigation, and only through willful blindness could one claim not to understand such litigation would include Title IX claims. After receiving this letter, W&L retaliated in two ways: (1) by unreasonably restricting John's access to records he

---

[23] The letter came from the same attorney that had recently sued W&L in another Title IX case brought by a male student. *See* FN 6 above.

was entitled to review – the same records it allowed Jane to publish without repercussion; and (2) by rejecting his applications for reinstatement when he met the criteria to return.

W&L's claim that there is no evidence the ARR committee knew that John threatened suit is false. Dean Evans received the letter and was on the ARR committee. Kozak also received the letter and was later contacted by the chair of the ARR committee (Gwyn Campbell) who asked whether the ARR committee needed to be concerned about something in John's file. (Ex. 25). This prompted Kozak to reach out to W&L's general counsel in an email redacted for privilege. (*Id.*). Again, John had not yet submitted his application, but for some reason there were internal discussions already taking place on his reinstatement.

This Court cannot conclude on summary judgment that the ARR committee did not retaliate against John solely on the testimony of one of its members that it based its decision on concerns that John would struggle academically. And there is reason to doubt that assertion. While the University is correct that John, at one time, was on academic probation – he was not at the time of his suspension. In fact, he had demonstrated steady improvement over the prior two terms, earning his highest GPA in the term he withdrew – a 3.67. The ARR's 30(b)(6) designee conceded that John's applications demonstrated he completed his counseling with adequate reflection on what he learned, and that he was "fully engaged" with work and volunteering - the two core requirements W&L outlined for John to be reinstated. (RS Dep. 119:13 – 122:4; 141:1 – 142:19; Ex. 26). John contends that the ARR committee only insisted he attend school at a school comparably rigorous to W&L because it knew that he could not satisfy this requirement. Indeed, John was rejected from four schools, even as a non-matriculating student, because of his disciplinary record. (Compl. at 232). These facts present questions of W&L's true motivation for rejecting John's applications that cannot be decided on Summary Judgment.

30

Respectfully submitted,

*/s/ Andrew S. Gallinaro*_____
Patricia M. Hamill (Pa. I.D. No. 48416)
Andrew S. Gallinaro (Pa. I.D. No. 201326)
CONRAD O'BRIEN PC
1500 Market Street, Centre Square
West Tower, Suite 3900
Philadelphia, PA 19102
Tel: (215) 864-9600/Fax: (215) 864-9620
phamill@conradobrien.com
(Admitted Pro Hac Vice)

David G. Harrison (VSB #17590)
THE HARRISON FIRM, PC
5305 Medmont Circle SW
Roanoke, VA 24018
Tel: (540) 777-7100/Fax: (540) 777-7101
david@harrisonfirm.us

*Counsel for Plaintiff*