Deposition of Janet Boller (JB Dep)



Deposition of:

# Janet Boller , PsyD

*August 12, 2020*

In the Matter of:

# John Doe Vs. Washington & Lee University

Veritext Legal Solutions

888.777.6690 | cs-midatlantic@veritext.com | 215-241-1000

Page 1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
1              LYNCHBURG DIVISION
2                   - - -
3
4      JOHN DOE,                  :
                                  :
5           Plaintiff,            :
                                  : No.  6:19-CV-00023
6           vs.                   :
                                  :
7      WASHINGTON AND LEE         :
       UNIVERSITY,                :
8                                 :
            Defendant.            :
9
                        - - -
10
11          Wednesday, August 12, 2020
11
                        - - -
12
13          CONFIDENTIAL AND UNDER SEAL
13
                        - - -
14
15          Oral deposition of JANET BOLLER, PsyD,
16     taken remotely at the home of Janet Boller, 616
17     South Main Street, Lexington, Virginia,
18     commencing at 9:00 a.m., and stenographically
19     recorded by Theresa F. Franco, a Court Reporter
20     and Notary Public.
21                      - - -
22
            VERITEXT LEGAL SOLUTIONS
23            MID-ATLANTIC REGION
          1801 Market Street - Suite 1800
24         Philadelphia, Pennsylvania 19103

- - -

Page 2

1 APPEARANCES:  (Remotely via teleconference)
2   CONRAD O'BRIEN
    By:  ANDREW GALLINARO, ESQUIRE
3       PATRICIA HAMILL, ESQUIRE
    1500 Market Street, Centre Square
4   West Tower, Suite 3900
    Philadelphia, Pennsylvania  19102
5   215-864-9600
    agallinaro@conradobrien.com
6   phamill@conradobrien.com
    Representing the Plaintiff, John Doe
7
8
    MCGUIRE WOODS, LLP
9   By:  R. CRAIG WOOD, ESQUIRE
       MICAH SCHWARTZ, ESQUIRE
10  652 Jefferson Parkway, Suite 530
    P.O. Box 1288
11  Charlottesville, Virginia  22902
    434-977-2558
12  cwood@mcguirewoods.com
    mschwartz@mcguirewoods.com
13  Representing the Defendant, Washington and
    Lee University
14
15
    ALSO PRESENT:
16
    JENNIFER KIRKLAND - Representative of
17     Washington and Lee University
    JANA SHEARER - In-house counsel for
18     Washington and Lee University
19         - - -
20
21
22
23
24

Page 3

1          I N D E X
2          - - -
3  Witness: JANET BOLLER, PSYD          PAGE
4  By Mr. Gallinaro . . . . . . . . . . .  6
5          - - -
6        E X H I B I T S
7          - - -
8  NUMBER        DESCRIPTION        PAGE
9  Exhibit-1  Written Discovery response    28
10    to a request for what
    trainings are provided at
    the university
11
    Exhibit-2  Document titled, Sexual    38
12    Misconduct at W&L, Awareness,
    Resources and Response,
13    Speak and One In Four,
    fall 2011
14
    Exhibit-3  Speech from Take Back the    39
15    Night
16  Exhibit-4  Speech from Take Back The    41
    Night event, 2017/2018 year
17
    Exhibit-5  Speak Training sign-in    47
18    sheet, dated 11/15/2015
19  Exhibit-6  Document titled, Sexual    54
    Relationships at W&L,
20    How to Support Healthy Sexual
    Relationships and How to
21    Respond When Things Go Wrong,
    referred to as Peer Leader
22    Training, Fall of 2016
23
24

Page 4

1        EXHIBITS CONTINUED
2          - - -
3  NUMBER        DESCRIPTION        PAGE
4  Exhibit-7  Document titled, Sexual    70
    Assault Prevention at W&L,
5    Board of Trustees, October
    7th, 2016
6
    Exhibit-8  Sexual Assault Patterns and  73
7    Responses, Presentation to
    HSMB, September 2016,
8    Janet Boller, PsyD
9  Exhibit-9  Email exchange between    120
    Dr. Boller and ████████
10    on April 7th, 2017
11  Exhibit-10 Letter Dr. Boller prepared  113
    for ███████
12
    Exhibit-11 The DSM5          137
13
    Exhibit-13 Summary of Dr. Boller's    183
14    interview with Ms. Kozak
    and Mr. Rodocker on
15    April 17, 2017
16  Exhibit-14 Interview summary of    205
    Dr. Boller by Mr. Rodocker
17    and Ms. Kozak, 11/7/2014
18          - - -
19
20      REQUEST FOR DOCUMENTS
21  PAGE    LINE
22  114    19
23
24

Page 5

1          - - -
2      THE COURT REPORTER:  The attorneys
3  participating in this deposition
4  acknowledge that I am not physically
5  present in the deposition room and that I
6  will be reporting this deposition
7  remotely.  They further acknowledge that,
8  in lieu of an oath administered in person,
9  I will administer the oath remotely.  The
10  parties and their counsel consent to this
11  arrangement and waive any objections to
12  this manner of reporting.
13      Please indicate your agreement by
14  stating your name and your agreement on
15  the record.
16      MR. GALLINARO:  Andrew Gallinaro on
17  behalf of Plaintiff, and I agree.
18      MR. WOOD:  Craig Wood on behalf of
19  the defendant, and we agree.
20          - - -
21      JANET BOLLER, PSYD, having been
22  first remotely duly sworn pursuant to
23  agreement of counsel, was examined and
24  testified as follows:

2 (Pages 2 - 5)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 6

1          - - -
2          EXAMINATION
3          - - -
4   BY MR. GALLINARO:
5       Q.    Good morning, Dr. Boller.  How are
6   you?
7       A.    Good morning.  How are you?
8       Q.    Good, thank you.  I want to start
9   by just saying thank you for participating
10  virtually here today.  I know these are unusual
11  times, and we're all doing the best we can, and
12  I appreciate you making yourself available.
13      A.    Sure.
14      Q.    You should have received a package.
15      A.    I did.
16      Q.    If you could open that so that you
17  have the binder of things in there.
18      A.    This is sealed in a few places.
19      Q.    Top secret stuff here.
20      A.    Understandable.  Yes.  Okay.  So
21  there's a binder, yes.
22      Q.    Okay.  If you just keep that handy.
23  I'll be referring to it from time to time.
24      A.    Okay.  Great.

Page 7

1       Q.    So just sort of by way of
2   introduction, my name is Andrew Gallinaro.  I
3   represent the plaintiff in this case.  In this
4   litigation he goes by the name John Doe, but I
5   think you understand his name is ████████████
6   correct?
7       A.    Correct.
8       Q.    And you understand that you're here
9   today to provide deposition testimony in that
10  litigation?
11      A.    Correct.
12      Q.    Just sort of some ground rules for
13  the proceeding today.  This is a question and
14  answer session.  We have a court reporter here
15  taking down everything that we say.  As you
16  just heard, the testimony is under oath just as
17  if we were in court.  Because she's trying to
18  write down everything that we both say, it's
19  important that we don't talk over each other
20  because they can't type two things at the same
21  time.  So I'll do my best to let you finish
22  your responses before I ask my next question,
23  and I'd ask you to wait for me to finish my
24  question before you start your response.

Page 8

1       A.    Okay.
2       Q.    Another thing that the court
3   reporter can't take down, which I see you're
4   doing now, is nodding the head and statements
5   like "uh-huh" and "uh-uh" are difficult for the
6   court reporter to capture.  So when you answer
7   my questions, I would appreciate it if you
8   could make your responses verbal.
9       A.    I will do my best.  Yes.
10      Q.    If anything that I ask you isn't
11  clear to you or you don't understand the
12  question that I've asked, just let me know and
13  I'll do my best to rephrase it so that I'm sure
14  that you can understand it.
15      A.    Okay.
16      Q.    If you answer my question, I'll
17  assume that you've understood what I asked you.
18  Is that fair?
19      A.    Yes.
20      Q.    Okay.  Is there any reason sitting
21  here today, either medication or not feeling
22  well, that you would have any difficulty
23  sitting for your deposition or concentrating?
24      A.    No.

Page 9

1       Q.    Okay.  Can you tell me if you've
2   ever been deposed before?
3       A.    Yes, I have.
4       Q.    How many times?
5       A.    This is either my fourth or my
6   fifth.
7       Q.    Okay.  So it's old hat.
8             What are the nature of the cases in
9   which you've been deposed?
10      A.    I was deposed in -- I'm trying to
11  remember -- two cases where Washington and Lee
12  was a named party where I was not, that I, like
13  today, was providing some information about
14  maybe one of the involved parties.  One case
15  where a student, a Washington and Lee student's
16  family was involved but Washington and Lee was
17  not a named party, but I was the therapist for
18  the student involved, and so I was asked some
19  professional opinions about that.  And I was
20  deposed for a case back when I was in graduate
21  school where I was part of a -- I don't know
22  that it was technically a class action, but it
23  was that sort of a situation, where there was a
24  group making a claim against the university

3 (Pages 6 - 9)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 10

1 for, again, I don't know that this is a
2 technical legal term, but essentially a breach
3 of contract situation.  That was about like 20
4 years ago.
5     Q.    Okay.  The two cases involving
6 Washington and Lee, were those -- were those
7 cases involving claims of sexual assault?
8     A.    One of them was.  One of them was
9 not.
10     Q.    What was the topic of the other
11 one, just generally?
12     A.    A student who had a suicide
13 attempt.
14     Q.    And as best you can recall, when
15 was the -- when did you provide the deposition
16 testimony in the sexual assault-related matter?
17     A.    I don't remember the year.  I would
18 say it was something like 2015 or 2016, so five
19 years ago or so.
20     Q.    And then the suicide case?
21     A.    That was earlier this year.
22     Q.    And then you referred to another
23 case involving a Washington and Lee student but
24 not in which the school was a party?

Page 11

1     A.    Correct.
2     Q.    Am I understanding you correct that
3 he or she brought a claim against some third
4 party in which they needed your testimony to
5 support some aspect of their claim?
6     A.    That's right.
7     Q.    Okay.  Okay.  What have you done to
8 prepare for your deposition today?
9     A.    I met with counsel who are present
10 today on one occasion.
11     Q.    Okay.  About how long was that
12 meeting?
13     A.    An hour and a half.
14     Q.    Anything else?
15     A.    And I spoke to Mr. Wood for about
16 ten minutes this morning.
17     Q.    Did you, like, look through any of
18 the files or review any documents aside --
19     A.    I -- aside from what?
20     Q.    -- aside -- setting aside the
21 meeting with the attorneys, have you done any
22 independent review of your files or documents?
23     A.    Only what they showed to me during
24 the prep meeting.

Page 12

1     Q.    Okay.  I just want to ask some,
2 sort of, background questions.
3     A.    Okay.
4     Q.    Are you -- are you the author of
5 any books or manuals?
6     A.    No.
7     Q.    Have you authored any articles that
8 have been published in any scientific journals?
9     A.    Not as a lead author.  It's
10 possible that I am a secondary author on
11 articles from many years ago, with researchers
12 that I worked with back --
13     Q.    Can you tell me, just generally,
14 what the nature of those articles were?
15     A.    Yes.  What those would have been
16 would have been related to either my mentor's
17 research in graduate school, which was related
18 to a scale that was used to measure people's
19 affect and cognitive processes in a general way
20 sort of detecting psychopathology, and then
21 possibly also related to a Principal
22 Investigator's research at the Medical College
23 of Wisconsin, who did AIDS intervention
24 research where we were interviewing couples and

Page 13

1 asking about safe sex practices.
2     Q.    And other than those two articles,
3 are there any other articles that you can
4 recall either participating in the drafting of
5 or in the research of?
6     A.    Not that I recall.
7     Q.    Same question, and it may be the
8 same answer, but any academic journals,
9 articles?
10     A.    Those -- those projects may have
11 been in academic journals.  It's just been long
12 ago, and I don't remember.
13     Q.    Okay.  I know that you have given a
14 number of presentations inside the Washington
15 and Lee community.  I want to put those aside
16 for the moment --
17     A.    Okay.
18     Q.    -- and ask you if you've ever given
19 any public presentations or speeches on Title
20 IX related matters outside Washington and Lee?
21     A.    No.
22     Q.    So, no, you haven't attended
23 conferences or seminars of any organizations in
24 which you've presented material?

4 (Pages 10 - 13)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 14

1    A.    Not where I've presented.

2    Q.    And I'm sorry, I didn't ask this,
3    but going back to the articles, just to be
4    clear, the two articles you described didn't
5    have anything to do with sexual assault; did
6    they?

7    A.    Correct.  No, they did not.

8    Q.    Now with regard to conferences and
9    seminars, how about ones that you just attended
10   for your own education?  Have you attended
11   conferences or seminars that are relevant to
12   the Title IX issues of sexual assault on
13   college campuses?

14   A.    Yes.

15   Q.    Can you tell me what conferences
16   you've attended?

17   A.    I will do my best.

18   Q.    Sure.

19   A.    Which is going to be pretty vague
20   because I don't remember dates or probably even
21   titles, but I have attended -- I'm not even
22   sure I could give you a number without looking
23   back at my continuing education file.  But I've
24   attended several, three, maybe four, related to

Page 15

1    trauma or, you know, sexual assault or that
2    field.

3    Q.    Do you remember the names of any of
4    the organizations that put on those programs?

5    A.    One was the -- I might get it, not
6    exactly, the title right, but like, the
7    Department of Criminal Justice Services for the
8    Commonwealth of Virginia.

9    Q.    Okay.  Any others that you can
10   recall?

11   A.    I'm trying to think.  I just don't
12   think I'm going to remember the actual -- the
13   names of the, you know, the actual conference
14   or the group that sponsored it off the top of
15   my head.

16   Q.    Okay.  Are you familiar with an
17   organization called ATIXA?

18   A.    Yes.

19   Q.    I know that they provide a number
20   of trainings in that space.  Have you ever
21   attended one of theirs?

22   A.    I'm not sure.

23   Q.    Are you familiar with that
24   organization?

Page 16

1    A.    I've heard of it.

2    Q.    Do you receive any emails or
3    written materials from them as part of the
4    Listserv?

5    A.    I think -- sorry.

6    Q.    I'm sorry.  I started to cut you
7    off.  I just clarified as part of the Listserv.

8    A.    Not currently.

9    Q.    Have you in the past?

10   A.    Possibly, so.

11   Q.    The conferences that you attended,
12   did you attend those with other members of
13   Washington and Lee?

14   A.    At times I did.  At times I was
15   alone.

16   Q.    Okay.  For the one that you could
17   recall was the Department of Criminal Justice
18   for the State of Virginia, was that one that
19   you attended with other members of W and L?

20   A.    I believe so.

21   Q.    Who attended that, as best you can
22   recall?

23   A.    I believe Jan Kauffman may have
24   attended that conference with me.

Page 17

1    Q.    Okay.  Who's that?

2    A.    She is the Director of Health
3    Promotion at Washington and Lee.

4    Q.    Okay.  Anybody else that you can
5    recall, either that conference or any other
6    conference?

7    A.    Any other conference?

8    Q.    Yeah.

9    A.    I attended a workshop or conference
10   with Rallie Snowden, and she is --

11   Q.    Is that someone's name, I
12   apologize?

13   A.    Yes.  Rallie, R-A-L-L-I-E, for the
14   reporter, Snowden.

15   Q.    And who's that?

16   A.    She is a Licensed Clinical Social
17   Worker in the Counseling Center at Washington
18   and Lee.

19   Q.    Have you ever attended any
20   conferences with Lauren Kozak?

21   A.    Possibly one, but I don't remember
22   for certain.

23   Q.    Okay.  Could you -- could you give
24   me a, sort of a -- I don't need excruciating

5 (Pages 14 - 17)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 18

1  detail, but just a synopsis of your educational
2  history starting with college?
3      A.   I attended Bennington College for
4  undergrad and majored in Childhood Development
5  and Politics.  And I attended Seton Hall
6  University for graduate school.  I received a
7  Masters in Education, as well as a PsyD, a
8  P-S-Y-D, a doctoral degree in Clinical
9  Psychology.
10     Q.   Any other -- I'm sorry, I heard an
11  echo.
12          Any other formal education at any
13  academic institution other than those two?
14     A.   Nope.
15     Q.   Okay.  Do you hold any licenses or
16  certifications?
17     A.   I'm a Licensed Clinical
18  Psychologist.
19     Q.   And who is that through?
20     A.   The Commonwealth of Virginia.
21     Q.   Okay.  Would you -- would you give
22  me your employment history since finishing grad
23  school?
24     A.   I will do my best.

Page 19

1      Q.   Yep.
2      A.   I worked for the Medical College of
3  Wisconsin at their Center for Aids Intervention
4  Research in Milwaukee, Wisconsin, as I was
5  finishing grad school and upon finishing.  I
6  worked there for about two years, I believe.  I
7  then --
8      Q.   I'm sorry to interrupt you --
9      A.   Yeah, sorry.
10     Q.   If you can recall the years as
11  you're telling me these different positions, it
12  would be helpful, but I understand it's not
13  always the easiest thing to remember, but just
14  the best you can.
15     A.   Okay.  Early 2000s, like maybe 2001
16  to 2003.
17     Q.   Okay.
18     A.   I then -- shall I continue?
19     Q.   Yes, please.
20     A.   Then I moved to Boston,
21  Massachusetts, and I worked at a small private
22  clinic called Two, as in the number, Brattle
23  Center, which was a clinic where I did my post
24  doctoral fellowship.  And that was for a year,

Page 20

1  so I guess that would have been about 2003
2  to 2004.
3      Q.   And what was the nature of the work
4  that you did there?
5      A.   That was a clinic offering
6  intensive psychotherapy in an intensive
7  outpatient program for adolescents and adults.
8  I focused more on the adolescent program where
9  we did groups and individual therapy and the
10  treatment protocol that I primarily used was
11  something called Dialectical Behavior Therapy
12  or DBT, which is designed to treat people who
13  present with self-injurious behavior, suicidal
14  attempts or behavior with that kind of specific
15  treatment protocol.
16     Q.   And after the Two Brattle Center?
17     A.   I worked at the Judge Baker
18  Children's Center, part of their Manville
19  School, which was also in Boston, and I
20  worked --
21     Q.   What was the nature --
22     A.   I'm sorry?
23     Q.   What was the nature of that work?
24     A.   I was a, you know, served as one

Page 21

1  of, I can't remember how many, you know ten to
2  12 members of the counseling team.  All of the
3  children -- it was a therapeutic school for
4  children with behavioral and emotional
5  disabilities.  And all of the kids in the
6  program had a therapist, so I was one of the
7  therapists providing clinical services to the
8  students.
9      Q.   Okay.  And after that position,
10  what came next?
11     A.   Then we moved to Lexington,
12  Virginia, and I had a private practice in
13  Lexington for two to three years.
14     Q.   And roughly what year was that?
15     A.   2007 to 2010.
16     Q.   Okay.  And was there any particular
17  focus or specialty of your private practice?
18     A.   It was fairly general, although I
19  was one of the local people who did see
20  children and adolescents, but I wouldn't say it
21  was my specialty.
22     Q.   Okay.  And then from there, did you
23  join W and L?
24     A.   Yes.

6 (Pages 18 - 21)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 22

1    Q.    Okay.  And what has your -- have
2  you always been in the same position or have
3  you had different roles within the university
4  since being employed?
5    A.    I've held the same position.
6    Q.    And that's as a clinical
7  psychologist in the Student Health Counseling
8  Center?
9    A.    In the University Counseling
10  Center, correct.
11    Q.    Okay.  Okay.  And that's been
12  since, roughly, 2010?
13    A.    Yes.
14    Q.    Thank you for that.
15    A.    Sure.
16    Q.    Had any of the prior positions up
17  until the time you were employed by W&L, had
18  any of them had any particular focus in the
19  areas of trauma or sexual assault?
20    A.    Not a particular focus, no.
21    Q.    Are you -- are you associated with
22  any nonprofits or charities?
23    A.    I suppose.  What do you mean by
24  associated with?

Page 23

1    Q.    I guess I'll start with, do you
2  have any -- are you in any leadership position
3  of any charity or nonprofit organization?
4    A.    Not currently.  I guess I'm
5  technically on the board of our local soccer
6  club.
7    Q.    Okay.
8    A.    But we only meet once a year.
9    Q.    And hopefully they have nothing to
10  do with trauma or sexual assault.
11    A.    They do not.
12    Q.    Have you ever -- have you been in a
13  leadership role of any nonprofit or charitable
14  organizations in the past that dealt with those
15  issues?
16    A.    Not that dealt with those issues,
17  no.
18    Q.    Are you a member of any nonprofit
19  or charitable organizations that deal with
20  those issues?
21    A.    Not a member, no.
22    Q.    Do you have any association at all
23  with any organizations that deal with those
24  issues?

Page 24

1    A.    Again, I've attended conferences
2  that have been hosted by some of those
3  organizations, and I have donated money to
4  Project Horizon, which is a local
5  shelter/hotline service.
6    Q.    When you said you attended
7  conferences hosted by those organizations, do
8  you recall what they were?
9    A.    No.  I'm referring back to what we
10  were talking about before where I'm just not
11  recalling specifically, but I think some of
12  them could have been hosted by organizations
13  that, sort of, support that issue in general.
14    Q.    Okay.  Other than attending those
15  trainings or conferences or seminars, however
16  we're referring to them, but those
17  organizations that deal with Title IX issues,
18  is there any other way in which you stay up to
19  date or educate yourself on issues related to
20  sexual assault in a campus setting?
21    A.    Reading, reading articles, reading
22  books.
23    Q.    Can you tell me what articles and
24  books you've read, as best you can recall?

Page 25

1    A.    Probably not.  You know, Bessel van
2  der Kolk's The Body Keeps The Score, is a
3  really, sort of, well-known text related to
4  trauma.  I've read that.  I've read something
5  called Trauma Stewardship.  What's the other
6  man's name?  I don't remember that author.
7  There's someone named Peter Levine who writes
8  about trauma, whose work I've read.  And then
9  articles, there's just no way I can remember.
10    Q.    Okay.  Do you feel that through
11  that activity that you're keeping yourself up
12  to date on, sort of, the general state of
13  knowledge in that sphere in the scientific
14  community?
15    A.    I believe so.
16    Q.    I'd like to turn now to the
17  training that you provide.
18    A.    Okay.
19    Q.    We had -- well, let me start with,
20  how did you -- I understand from reviewing
21  documents and certain Discovery responses in
22  this case, that you've provided a number of
23  trainings to a number of different groups on
24  campus.

7 (Pages 22 - 25)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 26

1      How did you first become involved
2  in providing training to the W&L community?
3      A.   I'm not sure that I recall just
4  other than when I was hired it was part of the
5  job as I understood it, as it was explained to
6  me, that I provide presentations on, you know,
7  as a member of the counseling team, on various
8  topics.  And I've done that really since the
9  beginning.
10     Q.   Okay.  So do other members of that
11  counseling center do similar trainings that you
12  do?
13     A.   When you say similar, what do you
14  mean?
15     Q.   Well, let's just start more
16  general.  Are other members of that office
17  expected to perform training of any kind within
18  the W&L community?
19     A.   Yes.
20     Q.   And yours seem to have a particular
21  focus on sexual assault; would you agree with
22  that?
23     A.   Probably more of the trainings I do
24  are related to that topic, yes.

Page 27

1      Q.   Are there any other members of the
2  office that provide that kind of training on
3  that topic?
4      A.   Some of them have probably helped
5  with some of those efforts, but none of them
6  probably provide it to the extent that I do.
7      Q.   Okay.  And who in the office has
8  helped you with those efforts?
9      A.   Again, Rallie Snowden, the name I
10  mentioned earlier, has done some of the
11  prevention programming that we offer.  I'm
12  trying to think.  A counselor who used to work
13  there who no longer works there was also
14  involved with some of those programs.  Her name
15  is Beth Curry.  She's no longer a part of the
16  university, and I don't recall if she was at
17  the time of the case we're talking about today.
18  And I don't recall if the others have, you
19  know, been involved in any of the trainings or
20  presentations related to this specific topic or
21  not.
22     Q.   Okay.  So if I'm understanding you
23  correct, out of the topics that others may
24  present, you're the one that does the most with

Page 28

1  this particular topic, which is sexual assault?
2      A.   Correct.
3      Q.   There is, if you open your binder
4  to tab one.
5      A.   Okay.
6              - - -
7          (Whereupon the document was marked,
8      for identification purposes, as
9      Exhibit-1.)
10             - - -
11  BY MR. GALLINARO:
12     Q.   I want to just see if we can, sort
13  of, have a common understanding of how many
14  trainings you've provided and what the topics
15  were.  The university, in tab one, had
16  responded to written Discovery requests that we
17  had asked for that asked for, you know, what
18  are all the trainings that are provided at the
19  university.  So a number of them are in this
20  tab one that refer to you.  And I just want to
21  tick through them with you and see if you think
22  it's a complete list or there's more that we
23  need to talk about.
24     A.   Okay.

Page 29

1      Q.   So the first one appears on page 1,
2  August 14th, 2012.  It is Bringing in the
3  Bystander training, and it's training that you
4  provided at least to Jason Rodocker.
5          Do you see that?
6      A.   I do.
7      Q.   Okay.  Without, you know, just give
8  me sort of like the couple-sentence synopsis of
9  what Bringing in the Bystander training is?
10     A.   Bringing in the Bystander is a
11  program that we don't specifically use by that
12  name any longer, but at the time it was our --
13  our bystander intervention training, which is
14  our primary prevention program for preventing
15  sexual misconduct.
16     Q.   And I'm not sure if the list of who
17  attended is complete.  I suspect it's not.
18  Would that be something that you would have
19  provided to multiple people?
20     A.   Yes.
21     Q.   Okay.  The next training appears on
22  page 6, and that's the one dated November 4th.
23  It's a Safe Space training?
24     A.   Yep.

8 (Pages 26 - 29)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 30

1    Q.    You and the individual you
2  identified before, Rallie Snowden, presented
3  training to at least Lauren Kozak and Jason
4  Rodocker; is that correct?
5    A.    Yes.  Again, very likely to have
6  been more people than just the two of them.
7    Q.    Okay.  And what, again, just a
8  brief synopsis of what Safe Space training is?
9    A.    Safe Space training at Washington
10 and Lee is related to, as it says, offering
11 support for the lesbian, gay, bisexual,
12 transgender, queer community.  Really just
13 providing, again, support, awareness,
14 information about how to -- how to work with
15 people in the LGBTQ community in the most
16 supportive way.
17    Q.    The next training appears on page
18 9, and that's the one dated October 7th, 2015?
19    A.    Okay.
20    Q.    And it's Hearing Advisor training?
21    A.    Okay.
22    Q.    And you see that you and Lauren
23 Kozak provided that training?
24    A.    I see that.

Page 31

1    Q.    Okay.  Can you tell me what Hearing
2  Advisor training entails?
3    A.    To the best of my ability, this is
4  something we haven't done in a long time.  I
5  think the nature of that may have changed.  I
6  have not been involved with that for some time.
7  The best of my ability or recollection is that,
8  hearing advisors are students who are trained
9  in order to assist other students who may be
10 going through a hearing process of some kind on
11 campus.  That could be our honor violation
12 hearing process or the sexual misconduct
13 process, or the conduct process, to the best of
14 my knowledge.  And hearing advisors are
15 students who are trained to just sort of serve
16 as a support resource for students who are
17 facing or have been involved with any of those
18 hearing bodies.  Does that make sense?
19    Q.    Yeah.  You see a reference there to
20 Student B, who is a hearing advisor to Ms. Roe.
21 I'll represent to you, Ms. Roe refers to ▮▮▮▮
22 ▮▮▮▮▮▮  Do you have any idea who Student B is?
23    A.    No idea.
24    Q.    What's -- break down for me, I

Page 32

1  understand your description of the training
2  involved, sort of, how the Title IX process
3  works.  If you could, sort of, break down for
4  me who takes responsibility for what, as it
5  appears you and Lauren co-trained that program.
6    A.    Right.  So I would not have been
7  involved in the Title IX process part of it.
8  Lauren Kozak has always presented on policy,
9  process, and answering any questions about that
10 or explaining those -- or explaining that to
11 whatever body of people, whether that's
12 students or other members of the community in
13 some way.
14        And my role in those trainings,
15 although I don't recall this one specifically,
16 but in those types of trainings, my role would
17 be to kind of talk about what would be typical
18 for someone who had experienced sexual
19 misconduct, so what -- how they might present.
20 What might be -- what that, a person in that
21 situation, might be going through so that
22 someone like a hearing advisor could be as
23 sensitive as possible to the issues.
24    Q.    Okay.  The next one appears on page

Page 33

1  13.  That's an August 30th, 2016 Harassment and
2  Sexual Misconduct Board Training that you
3  presented with a number of other folks at the
4  university.
5    A.    I'm sorry, what page are we on?  I
6  don't see my name on this page.
7    Q.    I'm sorry, 14.
8    A.    Sorry, I'm on the wrong page.
9  Okay.  Yes, I see that now.
10    Q.    Okay.  What is the nature of that
11 training?
12    A.    So, again, to the best of my
13 recollection, this training was to this board,
14 the HSMB Board, at least some of those names
15 are listed here in the column.  There could
16 have been more.  I suspect that there were
17 more.  And my role would have been similar to
18 what I just described with the hearing
19 advisors, where I'm sort of talking about,
20 clinically, what someone who may have
21 experienced sexual misconduct would be going
22 through, what they would be experiencing in
23 order for people to, sort of, really have an
24 awareness and an understanding of what that's

9 (Pages 30 - 33)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 34

1  like, what we know about trauma, what we know
2  about those experiences for the awareness of
3  people who would be hearing from students in
4  that situation.
5      Q.    Okay.  If you turn to the next
6  page, there's a September 2nd training.
7      A.    Okay.
8      Q.    This is Bystander Intervention
9  Training for Facilitators?
10     A.    Mm-hmm.
11     Q.    Tell me what the nature of that
12  training is.
13     A.    So this would have been similar to
14  what we talked about earlier with the Bringing
15  In The Bystander.  It may have been around this
16  time that we switched the actual name of the
17  program, and we were doing a Bystander
18  Intervention Program that was no longer the
19  trademarked program called Bringing In The
20  Bystander, but basically the same idea where we
21  are training members of the community to -- in
22  bystander skills and what it means to be able
23  to step in and speak up when you see something
24  that's concerning to you or something that

Page 35

1  makes you uncomfortable.
2          So we would train -- that program
3  is offered to all incoming first-year students
4  every year, both undergraduate and law
5  students, so that's a lot of people.  And we
6  offer that program in groups of about 20.  So
7  that means many, many programs are happening to
8  reach, you know, the entire population of both
9  of those -- those first-year students.  So we
10  recruit other members of the community to offer
11  that program, and so I, along with Jan
12  Kauffman, who's listed here, would train the
13  facilitators to deliver the program.  And then
14  all of us would go out and offer a couple of
15  programs to the students directly.
16         So this says it was a training for
17  those facilitators.
18     Q.    And then on page 16, dated
19  September 13, 2016, there's another
20  Harassment/Sexual Misconduct Board Training
21  that you were a part of.
22     A.    Yes.
23     Q.    And I assume that's the same
24  program that you would have provided a few

Page 36

1  weeks before, two weeks before, on August 30th,
2  2016?
3      A.    I would assume that as well.
4      Q.    Okay.  So those are the ones that
5  are listed in the University's Discovery
6  Responses.  I'm going to show you a few more,
7  but I wanted to see if any others stood out in
8  your mind as relevant trainings you've provided
9  on this topic that we didn't already cover.
10     A.    I mean, I can think of a few.  As
11  you noted earlier, that this is a topic that I
12  offer a lot of presentations on.  I'm sure
13  there's no way I could remember them all, but I
14  do know that each year, I offer a presentation
15  to groups, including the peer counselors.
16  That's a program of students who get trained in
17  lots of mental health issues to be able to
18  offer peer support, as well as our resident
19  advisors, our resident life students, RAs for
20  example.  I usually offer a presentation to
21  both of those student groups at the beginning
22  of the fall term, like during our orientation
23  period.  So I would say that that is something
24  I've probably done most years since I've been

Page 37

1  at Washington and Lee.
2          I've also, most years I think,
3  probably provided a presentation to a group
4  called Speak, S-P-E-A-K, Speak -- it doesn't
5  stand for anything -- who are self-selected
6  members who are interested in this topic of
7  campus sexual misconduct.  And I usually speak
8  to them about some of the issues and offering
9  support.  That's sort of one of the roles that
10  they play.  All of these students, actually the
11  idea is that they, as peers, may be the first
12  people to hear from one of their, another
13  student that they've experienced something.  So
14  for them to be receiving that kind of
15  information, just to have them be as informed
16  as possible to be able to offer the most, you
17  know, sort of, support that they can to someone
18  who's maybe disclosed this to them.  So that
19  would be another group that I've offered
20  similar training to that I've done, again,
21  probably most years.
22         I'm not recalling anything else off
23  the top of my head, but I feel as though it's
24  possible that I have done others as well.

10 (Pages 34 - 37)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 38

1    Q.    Okay.  I'll take -- I'm sorry.  I
2  keep hearing an echo and think someone's
3  objecting.  Sorry.
4         I'll take you through some more.
5    A.    Okay.
6    Q.    So if you'll turn to tab two.
7    A.    Okay.
8              - - -
9         (Whereupon the document was marked,
10    for identification purposes, as
11    Exhibit-2.)
12             - - -
13  BY MR. GALLINARO:
14    Q.    I think you referenced this one
15  already.
16    A.    Yes.
17    Q.    There's a document here that is
18  titled, Sexual Misconduct at W&L, Awareness,
19  Resources and Response, Speak and One In Four,
20  fall 2011.  Do you see that?
21    A.    I do.
22    Q.    And is that the training you were
23  just describing that you provide every year,
24  did you say?

Page 39

1    A.    I said most years.  I recall doing
2  it most years.  I can't say for sure that it
3  has been every single year.
4    Q.    Okay.
5    A.    But that is an example of what I'm
6  talking about that I would have provided to
7  that group called Speak, yes.
8    Q.    And what's One In Four?
9    A.    That was a -- that was a program, a
10  similar program to Speak, but for men.  So
11  Speak was a program for women who were
12  interested in this topic, and One In Four was
13  the program for men who were interested in this
14  topic.  I don't remember when, but One In Four
15  was, sort of, dissolved and Speak Now includes
16  any gender individual who's interested in the
17  topic.
18    Q.    Okay.  If you'll turn to tab three.
19    A.    Okay.
20             - - -
21         (Whereupon the document was marked,
22    for identification purposes, as
23    Exhibit-3.)
24             - - -

Page 40

1  BY MR. GALLINARO:
2    Q.    There's a written presentation here
3  that I assume is yours, but maybe take a look
4  at it and just let me know if I'm correct.
5    A.    Yes.  You're correct.  This is
6  mine.  This was a speech.
7    Q.    Okay.  And am I correct that the
8  TBTN stands for Take Back The Night?
9    A.    Correct.
10    Q.    And what is that?
11    A.    Take Back The Night is a national,
12  sort of, vigil or rally that many college
13  campuses and many communities offer.  I don't
14  believe there's a set date.  I think they're
15  often in the spring, but I don't know that for
16  sure.  But it's been around for decades, where
17  it's, again, sort of a vigil, a gathering of
18  support for people who have experienced sexual
19  assault in some way.
20         And Washington and Lee has done
21  that, again, I would say most years since I've
22  been a member of the Washington and Lee
23  community.  This is something that Speak, the
24  student group that I referred to, would have

Page 41

1  helped sponsor.
2    Q.    Other than being a speaker at those
3  events, are you otherwise involved with the
4  Take Back The Night organization?
5    A.    I'm not always a speaker at that
6  event.  I have done it a few occasions when
7  asked, but, no, I wouldn't really say that I've
8  been involved in, sort of, the planning of
9  that.  I've attended sometimes, and sometimes I
10  have not.
11    Q.    Okay.  You'll see on the first page
12  of this speech, in the third paragraph, you had
13  mentioned that you had no personal story.  And
14  you were referring to sexual assault; is that
15  correct?
16    A.    Correct.
17    Q.    And then if you'll turn to tab
18  four, please.
19    A.    Yes.
20             - - -
21         (Whereupon the document was marked,
22    for identification purposes, as
23    Exhibit-4.)
24             - - -

11 (Pages 38 - 41)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 42

1 BY MR. GALLINARO:
2     Q.    Am I correct that this represents a
3 speech you gave at another Take Back The Night
4 event, this time in the 2017/2018 year?  If
5 you'll look at the third paragraph, I think it
6 reflects that.
7     A.    Yes.  I see that.  Correct.
8     Q.    Have you reviewed this document in
9 preparation for your deposition?
10    A.    No.
11    Q.    Do you recall giving this speech?
12    A.    Yes.
13    Q.    Okay.  We saw in your 2013 speech
14 that you said you didn't have a story, and here
15 you reference that, and you said, "It doesn't
16 sound believable to say I don't have my own Me
17 Too moment.  All of the women I know, and here
18 I am talking about my friends, peers and
19 colleagues, have one.  Literally if I know them
20 well enough, they do."
21          What are you referring to when you
22 say a "Me Too" moment?
23    A.    If you recall, that was the year
24 of, sort of, the hashtag Me Too movement when

Page 43

1 many celebrity figures, including, sort of, the
2 famous case with Harvey Weinstein, were facing
3 public accusations from mostly women who they
4 worked with in different capacities.  You know,
5 everything on the scale from, you know,
6 harassment and degrading work environments to
7 sexual assault and rape.  So I'm referring to
8 that and saying that most women that I know,
9 myself included, have experienced at the
10 minimal, you know, some low-level harassing
11 type derogatory language at times in our lives.
12    Q.    Okay.  So --
13    A.    So while I --
14    Q.    I'm sorry.  I didn't mean to cut
15 you off.
16    A.    I was saying, so while I haven't
17 experienced a sexual assault or a rape, that I
18 have experienced the harassment that became
19 much more, sort of, publicly discussed during
20 that Me Too year.
21    Q.    Okay.  So the reference to everyone
22 you know having a Me Too story doesn't
23 necessarily mean something that rises to the
24 level of assault.  It can include harassment or

Page 44

1 someone making you feel uncomfortable,
2 something like that?
3     A.    Exactly.  Right.
4     Q.    And you feel that's something that
5 every woman you know has experienced?
6     A.    Again, the people I know well have
7 experienced something along those lines.  I
8 certainly can't speak for every woman to say
9 that every woman has experienced that, but
10 people I know have experienced something in
11 that category.
12    Q.    You go on to tell a speech -- I'm
13 sorry, a story in your speech about the fact
14 that when you first gave the speech you didn't
15 recall or you didn't believe you had a Me Too
16 moment, and then you, on further reflection,
17 you do have one, and it involves an incident
18 with a 7th grade math teacher.
19          Do you recall having those --
20    A.    Yes.
21    Q.    -- comments in this speech?
22    A.    Yes.
23    Q.    What was it that occurred that
24 allowed you to remember that as a Me Too

Page 45

1 incident that you hadn't recalled back in 2013?
2     A.    I'm looking back at this for one
3 second.
4     Q.    Sure.
5     A.    I don't see where it says that I
6 didn't recall it.  I didn't ever not remember
7 this math grade -- this seventh grade math
8 teacher.  I remember his name.  I remember him
9 very well.  It was just something that I think
10 came -- became relevant to me again in that
11 year where people were talking about these
12 kinds of experiences that so many women and
13 girls face in our culture.  So nothing sort of
14 made me recall something that I had previously
15 not recalled; it just is something that was
16 relevant at the time.
17    Q.    Okay.  And you referred to the
18 teacher by his name.  Is there a particular
19 reason you did that?
20    A.    Because I remembered it.
21    Q.    Okay.  If you could turn to tab
22 five, please.
23    A.    Okay.  Yes.
24          - - -

12 (Pages 42 - 45)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 46

1       (Whereupon the document was marked,
2    for identification purposes, as
3    Exhibit-5.)
4              - - -
5    BY MR. GALLINARO:
6       Q.    This is what appears to be a Speak
7    Training sign-in sheet, dated 11/15/2015.
8       A.    Okay. Yep.
9       Q.    Your name there at the top as, I
10   assume, one of the presenters?
11      A.    Yes.
12      Q.    And we've discussed Speak already.
13      A.    Yes.
14      Q.    And it's something you did -- you
15   presented to most years but maybe not every
16   year; that's what you said?
17      A.    That's the best of my recollection.
18      Q.    How is it that you're invited to do
19   these trainings? Who invites you?
20      A.    So Jan Kauffman, who I had
21   mentioned before and whose name is also on this
22   list, I think is technically the advisor to
23   that group. And so either she or the members
24   of the steering committee of Speak themselves

Page 47

1    have usually asked me to participate in the
2    training or the presentation.
3       Q.    And you'll see that one of the
4    names listed the third line down is ████
5    ████  Do you see that?
6       A.    I do.
7       Q.    Was she a member of the steering
8    committee?
9       A.    I don't recall.
10      Q.    Do you recall interacting with her
11   in any type of capacity on behalf of Speak?
12      A.    No.
13      Q.    Do you recall that she attended
14   this training?
15      A.    No.
16      Q.    Did you have any -- any
17   relationship with her at all before you had --
18   she had seen you in the counseling center for
19   the assault that -- or the alleged assault that
20   brings us here today?
21      A.    No.
22      Q.    Would you have -- did you recognize
23   her when she came in or was she just completely
24   unfamiliar to you?

Page 48

1       A.    I don't remember.
2       Q.    Okay. You said earlier that the
3    organization Speak was merged with a different
4    organization called One In Four?
5       A.    Correct.
6       Q.    What does -- what is that a
7    reference to?
8       A.    That is a reference to the number
9    of women who will experience a sexual assault
10   from, you know, sort of the time they're adults
11   through their college-age years.
12      Q.    Okay. And what is that -- is that
13   an understanding that you have, that that's --
14      A.    I believe the current number is
15   more like one in five. That's the number
16   that's sort of the rate that I have quoted more
17   recently.
18      Q.    What's the source of that
19   information?
20      A.    Oh, boy, I've seen that referenced
21   in many places, you know, from -- I don't even
22   know that I could specifically say where, but
23   I've checked that statistic and was one of the
24   people who did update it in recent years from

Page 49

1    one in four. Just like I said before, trying
2    to keep up with the current knowledge, whether
3    that's from websites or articles on the -- you
4    know, that I find from different organizations.
5    But I don't think I could say specifically
6    where.
7       Q.    Okay. When you say you've seen
8    references to it, are those articles referring
9    to studies or have you read the studies
10   themselves that establish that as a statistic?
11      A.    A little bit of both.
12      Q.    And what studies have you read that
13   establish that as a statistic?
14      A.    Again, I wouldn't be able to quote
15   a specific name or a study.
16      Q.    Okay.
17      A.    This would have been years ago for
18   a lot of these things.
19      Q.    Are you aware of any criticism of
20   the methodology or the data underlying those
21   statistics?
22      A.    I'm aware that criticism and
23   skepticism exists.
24      Q.    And what criticism are you aware

13 (Pages 46 - 49)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 50

1  of?
2      A.    Again, I wouldn't know a specific
3  name or article that is disputing it, but you
4  know, people doubting that that number is as
5  high as it is, people doubting, sort of, the
6  definitions that may have been used or people's
7  ability to recall.
8      Q.    Or the participation rate of the
9  students?
10     A.    Possibly so.  Sure.
11     Q.    Have you seen, I believe there's
12  a -- one of the more common sources of that
13  statistic is, I think it's an organization
14  called AAU.  I might be getting it wrong.  Does
15  that sound familiar to you?  AAU, like Campus
16  Climate Survey or something like that.
17     A.    I've heard of the Campus Climate
18  Survey.  I'm not sure what AAU stands for or
19  not but...
20     Q.    Maybe I'm misremembering.
21     A.    Yes.
22     Q.    But there's, in one of the years
23  that Campus Climate, I believe, survey came
24  out, there was an executive summary that

Page 51

1  cautioned against using it to support
2  one-in-four or one-in-five statistics and
3  criticized the media for doing so.  Are you
4  familiar with that or do you recall reading
5  anything like that?
6      A.    I don't recall that.
7      Q.    The training that we're looking at
8  here on Exhibit-5, do you recall what this
9  training would have entailed?
10     A.    Not specifically this one.  What I
11  had described earlier about the Speak trainings
12  in general is what I would guess this one
13  included, but I couldn't say specifically how
14  this one may have been slightly different than
15  others or not.
16     Q.    Has the Speak training that you've
17  provided, has it evolved over time, or is it
18  more or less consistent with what we saw in the
19  tab that we looked at earlier, which I believe
20  was tab two?
21     A.    I would say, in general, it's the
22  same, but at the same time I would say it has
23  evolved a little bit.
24     Q.    Okay.  In what ways, if you can

Page 52

1  recall, has it -- have you updated it or has it
2  evolved?
3      A.    So I'm looking back at this tab
4  two, with that particular presentation
5  from 2011, and some -- some are, like,
6  statistics that are provided.  There are some
7  definitions that are provided.  I believe the
8  most current versions of this presentation I've
9  given don't include those things.  Some of the
10  common reactions that a person may experience
11  if they had, you know, experienced a sexual
12  assault or some type of misconduct, that would
13  be -- I think that all looks very similar.  I
14  think that's roughly the same as what I do now
15  or most recently.  What to do, how to be a
16  support, a lot of that looks like that would be
17  very similar, if not the same, as what I say
18  now.  And I believe, you know, resources would
19  be the same or, if not, just updated to reflect
20  anything new that's come about in terms of
21  organizations that can provide support and
22  resources.
23           And I think I talk a little bit now
24  in a way that I didn't back in 2011 about sort

Page 53

1  of holding a high standard of behavior for
2  ourselves in our community in terms of what we
3  expect from ourselves with how we treat one
4  another.  That doesn't look like it's in this
5  version.
6      Q.    Okay.  Do you keep in your files
7  the various versions of the presentations that
8  you provide?
9      A.    Sometimes I probably override them
10  if I'm making minor updates, just sort of save
11  it as a new document with minor changes, and
12  sometimes I probably have the old versions.  I
13  don't -- I don't purposely do one or the other.
14     Q.    In this case, were you asked to
15  gather and provide to either university counsel
16  or a law firm representing the university your
17  materials that relate to the trainings you've
18  provided?
19     A.    Yes.
20     Q.    And did you undertake to do so
21  thoroughly?
22     A.    Yes.
23     Q.    So if you had a training, you would
24  have provided it to counsel?

14 (Pages 50 - 53)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 54

1    A.   Yes.  Absolutely.
2    Q.   If you could turn to tab six.
3    A.   Okay.
4         - - -
5         (Whereupon the document was marked,
6    for identification purposes, as
7    Exhibit-6.)
8         - - -
9    BY MR. GALLINARO:
10   Q.   This is a document titled, Sexual
11   Relationships at W&L, how to Support Healthy
12   Sexual Relationships and How to Respond When
13   Things Go Wrong, and it's referred to as Peer
14   Leader Training, Fall of 2016.  Do you see
15   that?
16   A.   I do.
17   Q.   What is peer leader training?
18   A.   So that would refer to the peer
19   counselors or the Residence Life staff, any of
20   those peer groups who have leadership roles.
21   Q.   And just remind me again, are
22   those -- are those students or are those --
23   A.   Yes.  Both of those groups would be
24   student groups.

Page 55

1    Q.   And, again, what is their -- what
2    organizations are they part of that makes them
3    a peer leader?
4    A.   Okay.  So one is the peer counselor
5    program, and that is a group of students who
6    are selected by one of the other counselors in
7    the counseling center to be trained.  They
8    receive hours and hours, like a week long of
9    training, at least, on recognizing and
10   responding to different forms of stress that a
11   peer might present to them with.  They're sort
12   of like on the front lines of being peer
13   support.  So they get trained in all sorts of
14   mental health issues provided by different
15   members of the counseling center.  And, you
16   know, one of the topics that they get -- you
17   know, hear presentations on is related to this
18   topic that you see here.
19        The other group that I'm referring
20   to as peer leaders are the Residence Life
21   staff, so resident advisors, community advisors
22   who are employees of the university who, you
23   know, serve in the housing -- in residents --
24   residential housing as, you know, support and,

Page 56

1    you know, someone who's knowledgeable, who
2    lives in, especially with first years, but also
3    with the upper division students.
4    Q.   Do you know whether any of the
5    parties in the underlying proceeding were
6    either peer counselors or part of the RA staff
7    that you were just referring to?
8    A.   So the parties, meaning ███ or
9    ████████?
10   Q.   Yeah.
11   A.   I don't believe ███ was in either
12   of those groups.  I don't know about ████████.
13   Q.   Do you know whether their advisors
14   were?
15   A.   I have no idea.
16   Q.   How often have you participated in
17   this kind of a training, peer leader trainings?
18   A.   I would say probably most years, if
19   not every year, that I've been at Washington
20   and Lee.
21   Q.   And who asks you to do that?
22   A.   Kirk Luder.  He is a psychiatrist
23   and member of the University Counseling Center.
24   Q.   And is this a training that you do?

Page 57

1    I only see your name listed on the program.  Is
2    this a training that you do on your own or do
3    other members of the counseling center assist?
4    A.   This particular presentation I have
5    always done alone.
6    Q.   If you turn to page 759, there's
7    numbers in the bottom right hand of the --
8    A.   Oh, I see.
9    Q.   And there's, if you could turn to
10   759.
11   A.   Yes.  Okay.
12   Q.   All right.  I'm getting there
13   myself.
14        You describe in this page and the
15   following page common reactions to sexual
16   assault violence; do you see that?
17   A.   I do.
18   Q.   Where did you obtain this
19   information or what was your source to develop
20   this list of common reactions?
21   A.   Probably no particular source, as
22   in not like one single source, rather a, sort
23   of, culmination of information that come from
24   literature or diagnostic material related to

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 58

1 trauma or experiencing any type of traumatic,
2 you know -- any type of traumatic situation.
3 So it would have been culled probably from
4 multiple sources and from my own clinical, sort
5 of, experience and judgment of working with
6 people who have experienced, you know, trauma
7 or abuse in multiple forms.
8     Q.    Understanding that it's an
9 amalgamation of various sources, are there
10 any -- are there any specific sources that you
11 could identify that would have contributed to
12 your understanding of this issue?
13     A.    I mean in terms of diagnosis and
14 assessment in a formal way, I would say the
15 Diagnostic and Statistical Manual for Mental
16 Disorders, know as the DSM, in different
17 versions of that that have been published
18 through the years, different updates.  So in
19 terms of like a symptomatic kind of, you know,
20 assessment list, that would be -- that would be
21 one.  And then, again, I think the others would
22 be harder to pinpoint a specific source other
23 than both my clinical experience, as well as,
24 you know, many, many sort of different writings

Page 59

1 on trauma reactions and, you know, anxiety and
2 dealing with, sort of, troubling experiences
3 that people have.
4     Q.    Would you say there's any
5 particular research or authority in this field
6 that has most informed your understanding of
7 trauma?
8     A.    Again, maybe Bessel van der Kolk is
9 considered an expert in the field, as a name,
10 you know, if there's like a particular name.
11     Q.    I didn't spell that before, but the
12 court reporter would probably need that one.
13 So if you could --
14     A.    Okay.  I will do my best.  The
15 first name is Bessel, B-E-S-S-E-L, and the last
16 name is Van Der Kolk, V-A-N-D-E-R-K-O-L-K.
17     Q.    Any other authorities that you can
18 think of that have informed your understanding
19 of the trauma and impact of sexual violence?
20     A.    Again, I think I mentioned this
21 name earlier, Peter Levine is someone,
22 L-E-V-I-N-E, as someone that I recall that I've
23 read some of his work on trauma.  And I've
24 heard speakers as well, but that's where I

Page 60

1 would probably not remember any specific names.
2     Q.    I'm sorry, there are window washers
3 outside my window that just got started.
4         Are you familiar with any of
5 Rebecca Campbell's work?
6     A.    No.
7     Q.    Have you heard of someone with the
8 last name Bennett?
9     A.    Not sure.
10     Q.    Other than the names you've already
11 given me, are there any other researchers or
12 authorities that you can think of that have
13 most informed your understanding of the issue
14 of sexual violence and trauma?
15     A.    I don't think by a specific name,
16 no.
17     Q.    Okay.
18         MR. GALLINARO:  Can I go off the
19 record for one minute?
20             - - -
21     (A short recess was taken.)
22             - - -
23 BY MR. GALLINARO:
24     Q.    When we left off from the break, we

Page 61

1 were discussing the peer leader training
2 written materials that you presented in the
3 fall of 2016.
4     A.    Correct.
5     Q.    Could you turn to, excuse me,
6 page -- in the bottom right-hand corner, page
7 757?
8     A.    Sure.  Okay.  Yes, I have that.
9     Q.    This references something we had
10 been discussing previously, the statistics
11 concerning the number of women who will
12 experience some form of sexual assault in
13 college.  Here you state that one in five
14 college women have been the victims of rape or
15 attempted rape.
16         Do you believe that that's an
17 accurate statistic?
18     A.    Again, that seems to be the
19 statistic that I have found and that my
20 colleague Jan Kauffman, who I've mentioned
21 before, who is the advisor to Speak and works
22 with me on some of these -- in these roles and
23 this programming, have found in multiple
24 sources.  So I have trusted that as a -- as

16 (Pages 58 - 61)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 62

1    stated, that I have shared with students in
2    these type of presentations they've done, based
3    on the sources of where I found it.
4        Q.    I've seen other references to, in
5    some of your presentations, to One In Four or
6    One In Five but with regard to sexual assault.
7    Is there a distinction in your mind between
8    rape or attempted rape and sexual assault?
9        A.    Is there a distinction in my mind,
10   that's your question?
11       Q.    Yes.
12       A.    You know, certainly rape has a
13   specific legal definition or a policy
14   definition that I know can vary from location
15   to location.  But I believe that has a specific
16   definition.  And I would say that sexual
17   assault is more of a broad term that could
18   encompass, you know, a variety of behaviors or
19   misconduct.  Does that answer your question?
20       Q.    It does.  So I guess my question
21   is, is the statistics that you typically review
22   and rely upon in providing these presentations,
23   is it that one in five women will experience
24   the broader definition of sexual assault, which

Page 63

1    could be as broadly defined as an unwanted
2    attempted kiss or is it rape as you've put in
3    here?
4        A.    I would say that it's not -- it's
5    not specific to the legal definition of rape.
6    I would say that it's more broad.
7        Q.    Okay.  So setting aside the legal
8    definition of rape, if you are using the word
9    rape, are you equating that with any type of
10   sexual assault?
11       A.    No.
12       Q.    So do you stand by this statistic
13   that one in five women will experience rape or
14   attempted rape?
15       A.    I don't -- I don't recall us
16   writing it that way.  I'm not saying this is
17   incorrect, but I would have thought that that
18   would more likely have been worded as rape or
19   sexual assault.
20       Q.    Okay.  That's what -- I think I've
21   seen it that way in other materials.  That's
22   why I wanted to pass through it.
23       A.    Okay.
24       Q.    If you could turn to page 761 of

Page 64

1    this Exhibit-6.
2        A.    Okay.
3        Q.    And this is a slide that -- with
4    the heading, "What To Do"?
5        A.    Yes.
6        Q.    And it sets forth, my understanding
7    is it sets forth the things you should do if
8    someone tells you they've been sexually
9    assaulted; is that correct?
10       A.    Yes, some suggestions for how to
11   respond when someone has disclosed that to you.
12       Q.    Do you observe these practices in
13   your role as a university counselor?
14       A.    Yes.
15       Q.    Okay.  And that includes the first
16   one on the slide that says, "believe the
17   person"?
18       A.    Yes.
19       Q.    And then there's a note at the
20   bottom that references that that's the single
21   most important thing you can do; is that
22   correct?
23       A.    Yes.
24       Q.    Okay.  Is there any circumstance

Page 65

1    that you can think of where it would not be
2    appropriate to believe the person who is
3    reporting to you that they've been assaulted?
4        A.    In my role?
5        Q.    Yeah, as a counselor.
6        A.    In my role as a counselor, I
7    believe the truth that people bring to me in
8    counseling, on any topic, not just sexual
9    assault.  That is where I have to meet them
10   with that story that they're telling me with
11   that information that they provide.  So I think
12   my stance is to believe what the truth is as
13   their truth, as they're telling it to me.
14       Q.    It's not your role to investigate
15   whether what they're telling you is true or
16   not?
17       A.    Exactly.
18       Q.    You have to take it at, sort of,
19   face value for what they report to you as the
20   truth?
21       A.    From the point of view of the story
22   that they're telling me, yes, I would say that
23   that's true.  There are other factors that I
24   may take into account in terms of what is being

17 (Pages 62 - 65)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 66

1  presented to me and whether that is consistent
2  with the things that they say, but as we said,
3  I'm not an investigator and I'm not trying to
4  determine some sort of, you know, definition of
5  truth to an outsider, but rather working with
6  the person clinically, you know, in a clinical
7  domain, who's come to me.
8      Q.   Are there circumstances you could
9  think of where upon listening to someone
10 telling you their story, you would question
11 whether, you know, you should follow your sort
12 of baseline rule, which is to believe them?  I
13 understand sometimes a doctor may have a
14 concern that someone is, for example, drug
15 seeking, so they might be misreporting --
16     A.   Sure.
17     Q.   -- things.  Are there circumstances
18 like that that you've encountered as a
19 counselor?
20     A.   I'm trying to think.  I would say
21 that there are times when I think someone isn't
22 telling me everything, that I think there's
23 more to, you know, a story that someone isn't
24 sharing.  It would be rare for me to come up --

Page 67

1  I'm not sure I can come up with an example of
2  where I think someone has blatantly lied about
3  something.  And I think that I would partly
4  attribute that to the idea that people come
5  voluntarily to me in counseling.  I don't do
6  mandated treatment.  And so if someone is
7  coming for help, they're coming for help or
8  support.  If they don't tell me what is going
9  on, what they've experienced, how they're
10 feeling, if they're not truthful in that
11 telling, I don't understand how they would get
12 help from me.
13     So I think that that would probably
14 partly explain why I think what they are
15 telling me is largely true.  Again, are there
16 times I thought maybe they're not telling me
17 everything there is to be told?  Possibly so.
18 But I don't feel like people have come and
19 lied, and I think the reason is because they
20 have come out of their own volition, right, to
21 come get support or advice or treatment from
22 me, and I'm not going to be able to do that
23 effectively if I don't know what's going on.
24     Q.   Let me give you a hypothetical

Page 68

1  example where someone might come at the
2  recommendation of someone else.
3      A.   Okay.
4      Q.   So you only treat -- first of all,
5  let me back up.  Do you only treat students or
6  does your practice at W&L expand beyond the
7  student community?
8      A.   We only offer counseling services
9  to students.  That's correct.
10     Q.   Okay.  So if a student came to you
11 and said, you know, I'm involved in this
12 litigation.  It's a personal injury thing.  My
13 lawyer told me it would be helpful and make me
14 a more credible witness if I actually sought
15 out some sort of treatment for what I'm
16 claiming.  I'm here because my lawyer thinks
17 it'll help make me a more believable witness.
18 So could you just, like, check this box and say
19 that I came for treatment?  Would that be a
20 situation where you would have some skepticism
21 of whether the person legitimately needed
22 treatment?
23     A.   Yes.
24          MR. WOOD:  Before you answer --

Page 69

1       Jana, before you answer, I object to the
2       form of the question.
3          MR. GALLINARO:  Sure.
4  BY MR. GALLINARO:
5      Q.   You can answer.
6          MR. WOOD:  You can answer.
7          THE WITNESS:  Okay.  Now I -- were
8       you asking if I would have skepticism
9       about at the voracity of their --
10 BY MR. GALLINARO:
11     Q.   Yeah.
12     A.   I suppose, hypothetically, yes.
13     Q.   So, in other words, could you
14 conceive of someone coming to see you with an
15 ulterior motive to establish facts in their
16 support if they were involved in an adversarial
17 proceeding?
18          MR. WOOD:  Object to the form.
19          THE WITNESS:  Should I answer?
20          MR. WOOD:  Yes.
21          THE WITNESS:  Again,
22       hypothetically, sure.  I could conceive
23       that that would be possible.
24

18 (Pages 66 - 69)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 70

BY MR. GALLINARO:
1
2     Q.    Could you turn for me to Exhibit-7?
3     A.    Okay.
4                - - -
5           (Whereupon the document was marked,
6     for identification purposes, as
7     Exhibit-7.)
8                - - -
9  BY MR. GALLINARO:
10    Q.    This is a document that's titled,
11 Sexual Assault Prevention at W&L, Board of
12 Trustees, October 7th, 2016, and your name, as
13 well as Jan Kauffman's name, is listed.
14          Do you see that?
15    A.    I do.
16    Q.    And what is the nature of this
17 training that you presented to the board of
18 trustees?
19    A.    I don't know that I would say it
20 was a training as much as just sort of a
21 presentation of -- I mean I'd have to look
22 through it, but my recollection is that it was
23 more of a presentation on the nature of the
24 programming and our approach to this topic.

Page 71

1     Q.    Okay.  And who do you recall
2  invited you to present to the board of
3  trustees?
4     A.    I believe it was Dean Sidney Evans.
5     Q.    Have you done any other
6  presentations to the board?
7     A.    I think I did one other time, but I
8  don't -- yes, I did one other time present to
9  the board.
10    Q.    When was that?
11    A.    I don't remember the year, and it
12 was on a different topic.
13    Q.    What was the topic, if you can
14 recall?
15    A.    It was on our diversity and
16 inclusion efforts at Washington and Lee.
17    Q.    So unrelated to sexual assault?
18    A.    Yes.
19    Q.    We've now been through a number of
20 trainings.  We started with the six that were
21 listed on Exhibit-1.
22    A.    Okay.
23    Q.    We reviewed training materials from
24 four other presentations in Exhibits 2, 5, 6

Page 72

1  and 7, as well as two speeches at the Take Back
2  The Night.  And some of these presentations are
3  ones that you give more than once, correct?
4     A.    Correct.
5     Q.    So would you agree that you're
6  pretty active in this space at the W&L
7  community?
8     A.    Yes.  I agree with that.
9     Q.    Do you believe that you are -- are
10 you -- does the university consider you an
11 authority on this topic?
12          MR. WOOD:  Object to the form.
13          THE WITNESS:  I don't know what you
14    mean by the university.
15 BY MR. GALLINARO:
16    Q.    Well, I guess given that you're
17 invited to speak to the board of trustees and
18 present trainings at university functions and
19 for groups on campus, you're understanding that
20 you are asked to do that because you have
21 expertise in this area?
22          MR. WOOD:  Object to the form.
23          THE WITNESS:  Go ahead and answer,
24    Craig?

Page 73

1          MR. WOOD:  Yes.
2          THE WITNESS:  That's good.  I
3    believe I would -- I believe it's true
4    that there are at least some people,
5    probably including Sidney Evans, who
6    regard me to be among the people who have
7    some special interest in training and
8    authority on this topic.
9  BY MR. GALLINARO:
10    Q.    In other words, they didn't pick
11 you out of a hat.  You were chosen to do these
12 trainings because of your practice and your
13 research and your knowledge; is that correct?
14    A.    Right.
15          MR. WOOD:  Object to the form.
16          You can answer.
17          THE WITNESS:  Correct.
18                - - -
19          (Whereupon the document was marked,
20    for identification purposes, as
21    Exhibit-8.)
22                - - -
23 BY MR. GALLINARO:
24    Q.    I'd like to -- I'd like to turn now

19 (Pages 70 - 73)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 74

1  to Exhibit-8. And I just want to confirm that
2  this is the training, if I understand
3  correctly, this is called, Sexual Assault
4  Patterns and Responses, Presentation to HSMB,
5  September 2016, Janet Boller, PsyD. I'd like
6  to confirm that this is the training that we
7  saw back in Exhibit-1 that you presented on --
8  in August as well as in September to the
9  members of the Harassment and Sexual Misconduct
10  Board?
11      A.   Yes. I believe that this would be
12  that training that was referred to.
13      Q.   Okay. So though this one is dated
14  September, it would have been the same material
15  presented in August?
16      A.   Probably so, yes.
17      Q.   You don't think you would have come
18  up with a different slide deck for the --
19      A.   Not in a month's time, no.
20      Q.   Okay. Have you reviewed this
21  document in preparation for your deposition?
22      A.   No.
23      Q.   Are you generally familiar with
24  what it contains? Do you recall giving this

Page 75

1  presentation?
2      A.   I generally recall giving the
3  presentation. If you wanted me to say anything
4  that's in there, I would take a quick look
5  through it.
6      Q.   Sure. Did you -- did you assemble
7  this material for these trainings in 2016
8  specifically for this training, or is this
9  material that you've had from previous
10  trainings?
11      A.   I would say a little bit of both.
12  I think if I'm speaking to a specific group, I
13  might tailer it a little bit, including a few
14  different or additional pieces, but there will
15  be some, like I can already see quickly
16  flipping through, common reactions that you
17  would probably have seen, basically copied and
18  pasted through a lot of my presentations. So I
19  would say a little bit of both.
20      Q.   And I didn't recall seeing on the
21  chart at least presentations to the HSMB
22  members other than these two. Do you have any
23  understanding of whether you've given this
24  training to other members of the panel other

Page 76

1  than in this August and September training?
2      A.   I don't believe so.
3      Q.   Have you done any since then, like
4  up until the present?
5      A.   I don't think so.
6      Q.   So you've only been asked to train
7  the board members of the HSMB on two occasions,
8  as best you can recall?
9      A.   Correct.
10      Q.   Okay. So you would have had no
11  reason to have updated any of this material
12  since presenting it in 2016?
13      A.   Yeah. Right. I don't think so.
14      Q.   If you were asked to present,
15  again, this type of training to the HSMB, is
16  there anything that you think you would need to
17  update in this training?
18      A.   I'm not sure that I would include
19  this first slide after the introduction that's
20  titled, The Study of Perpetrators, on page 689
21  at all.
22      Q.   And why is that?
23      A.   At the time, I believe that this
24  work had been recently discredited, but David

Page 77

1  Lisak's name was fairly known in the field and
2  was a name that I had used in the past. So I
3  was really making that distinction that this is
4  work that had been discredited. But now that
5  actually feels so outdated to me, I don't think
6  I would make reference to it at all.
7      Q.   Okay. Tell me as best you can
8  recall what it is that you present here when
9  you discuss A Study of Perpetrators by David
10  Lisak.
11      A.   I would say essentially what is
12  written in the notes section on that same page,
13  you know, that he did this survey of, you know,
14  college men, and the way that, you know, others
15  in a community, either wittingly or unwittingly
16  sometimes camouflage a perpetrator's actions,
17  and that it sort of becomes sort of a
18  community, kind of, problem. But again, this
19  was -- you know, this was work that was -- his
20  methodology was discredited essentially.
21      Q.   And you reference that it's now
22  discredited. Do you recall when it was
23  discredited?
24      A.   I don't.

20 (Pages 74 - 77)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 78

1    Q.    Is there a particular reason you
2  included it as the beginning of your
3  presentation to the HSMB, even though you were
4  aware it had been discredited?
5        MR. WOOD:  Object to form.
6        THE WITNESS:  So my recollection of
7     why I put it in here was because, again,
8     as I mentioned a minute ago, I think that
9     this was a name that had been, I believed
10    to have been sort of well known in the
11    field and could have been something even
12    that myself and others in -- at Washington
13    and Lee has used in other -- making
14    reference to him in other presentations
15    that we did.  So I'm trying to be clear
16    about that with work that had been cited
17    in the past.  Now, you know, we believe
18    some of this, it appears to have been
19    discredited.  So I think just being clear
20    about that.
21 BY MR. GALLINARO:
22    Q.    Well, you wouldn't have trained the
23 HSMB members before, so is there a reason you
24 felt you needed to address something that had

Page 79

1  been included in other training materials that
2  you were recognizing was now discredited?
3        MR. WOOD:  Object to form.
4        THE WITNESS:  I mean, I -- I really
5     can't say specifically.  I just don't
6     recall what my -- what my thought process
7     was.
8  BY MR. GALLINARO:
9     Q.    Were you presenting it to the panel
10 because, even though it was discredited, you
11 felt it was still good or helpful information?
12    A.    I don't recall.
13    Q.    And the study that David Lisak
14 performed was a study of only male
15 perpetrators, correct?
16    A.    Yes.
17    Q.    And did you, in presenting the
18 materials associated with this slide, did you
19 train the hearing panel members on what are the
20 characteristics of perpetrators?  Is that
21 something that you gleaned from this study?
22    A.    No, not necessarily.  I didn't feel
23 that I was trying to train them on any
24 particular characteristics of perpetrators, no.

Page 80

1    Q.    So what were you training them
2  about perpetrators?  What information did you
3  convey?
4     A.    Again, I wouldn't be able to recall
5  anything in particular that I said other than
6  what I see here on the notes that are on this
7  page.
8     Q.    Okay.  So you would have had a
9  discussion with the panel members that there's,
10 according to the notes, a small percentage of
11 men who are responsible for a high percentage
12 of rapes; is that correct?
13        MR. WOOD:  Object to form.
14        You can answer.
15        THE WITNESS:  You're asking if
16    that's what I was saying about this work?
17 BY MR. GALLINARO:
18    Q.    Yeah.  Well, that's what the notes
19 say --
20    A.    Right.
21    Q.    -- and you were saying you can't
22 remember beyond the notes, so is that an
23 accurate depiction then of what you would have
24 been presenting?

Page 81

1     A.    If that's what that says here, yes.
2  I didn't catch the exact part you were reading
3  from, but...
4     Q.    The following page, 690, if you
5  could turn to that.
6     A.    Yes.
7     Q.    You trained the panel members on
8  the effects of trauma; is that correct?
9     A.    Yes.
10    Q.    I know we've discussed, sort of,
11 your understanding of trauma and what it's
12 based upon.  Is there any other research that
13 we haven't already discussed that would have
14 informed your preparation of the material in
15 this slide?
16    A.    Not -- again, not by anyone's,
17 like, particular name, but there were, you
18 know, there are -- again, there are notes that
19 I would take from conferences or presentations
20 I attended with experts, again, whose names I
21 don't remember, that possibly would have
22 informed this type of -- the type of
23 information that's on this, that's on this
24 slide and in the notes here.

21 (Pages 78 - 81)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 82

1    Q.    Okay.  If you look towards the
2 bottom of the page, you have, again, some
3 notes.  Is it your practice that where you
4 have, like, more information to present on a
5 slide, you include notes on the bottom to help
6 you through that slide?
7    A.    Yeah.  Those are really notes for
8 myself.  Not that I -- I don't read them word
9 for word, and I don't share them, you know,
10 necessarily with the audience.  It's really
11 just to help me remember what were some of the
12 things that I was going to be sharing.
13    Q.    So if we're seeing notes on a
14 slide, it's more likely that that's a slide
15 where you're spending a little bit more time?
16        MR. WOOD:  Object to form.
17 BY MR. GALLINARO:
18    Q.    Is that correct?
19    A.    I don't know that it means -- that
20 it refers to how much time I spent, just to
21 help me remember the different things I want to
22 say.  Some slides that may be more self-evident
23 of what needed to be discussed.  I don't think
24 it would refer to the amount of time.

Page 83

1    Q.    The fifth note -- I guess I'll call
2 paragraph -- starts with the phrase "Trauma
3 victims, paren, not just sexual assault, will
4 make statements that are incomplete and
5 inconsistent partly due to effects of trauma
6 itself."
7    A.    Yes.  I see that.
8    Q.    "This can make us question
9 credibility but should not."
10        Do you see that?
11    A.    I do.
12    Q.    This is -- and this is part of the
13 training that you provide to the people who are
14 going to adjudicate Title IX sexual misconduct
15 cases?
16    A.    I'm sorry, is that a -- did you ask
17 me a question?
18    Q.    Yes.  I'm just confirming that
19 that's the --
20    A.    Oh, confirming.
21    Q.    -- information you're presenting to
22 adjudicators?
23    A.    Yes.  Confirming, yes.
24    Q.    Is that something that you -- do

Page 84

1 you remember before, I asked you if you would
2 have updated anything in the training.  Is that
3 something you still would present if you were
4 including a training today?
5    A.    These statements that you just read
6 to me, would I include those in a training?
7    Q.    Yes.
8    A.    In a training to a hearing board in
9 particular or in general?
10    Q.    Yeah, to a hearing board.
11    A.    I mean that's just hard to say
12 since I haven't been asked to do that.  I stand
13 by those statements.
14    Q.    Okay.  And those statements, in the
15 context of a sexual misconduct proceeding,
16 those would only apply to the accuser, correct,
17 because the accuser is the only person that
18 could be the victim?
19        MR. WOOD:  Object to the form.
20        THE WITNESS:  I mean I wouldn't --
21 I wouldn't know if the respondent in a
22 situation like that had also experienced
23 trauma.  I mean that's certainly possible.
24

Page 85

1 BY MR. GALLINARO:
2    Q.    Well, in a case where there wasn't,
3 sort of, competing, you know, cross claims,
4 where one student accused another of sexual
5 assault, if we're going to be understanding
6 your training about how to assess the two
7 students' credibility, this would apply to the
8 accuser and not to the respondent, correct?
9    A.    So I'm not training anyone in how
10 to assess credibility.  That's absolutely not
11 my domain.  Just to clarify that.  But --
12    Q.    Why do you say that it could make
13 us question credibility but should not --
14        MR. WOOD:  She didn't finish her
15 answer, Andy.  Let her finish her answer.
16        MR. GALLINARO:  Okay.  I'm sorry, I
17 didn't realize.  Go ahead.
18        MR. WOOD:  She was still talking.
19        THE WITNESS:  I don't remember.
20 Now I don't remember what -- you had --
21 you had sort of framed the question by
22 saying assessing or training on
23 credibility, and you had asked me -- I
24 think there was a second part to that

22 (Pages 82 - 85)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 86

1    question.
2  BY MR. GALLINARO:
3     Q.   Sure.  We'll try to retread that
4  ground.  You're providing a training here to
5  adjudicators, and you're referencing a fact
6  about trauma that you believe would not --
7  should not affect someone's credibility.
8          And my question to you was:  In a
9  situation where there was not cross claims
10  between two students, where one student accused
11  another student of sexual assault, that this
12  training then, would only apply to the accuser
13  because they're the ones who are potentially
14  traumatized.
15     A.   I see.  Right.  Okay.  I agree with
16  that.  I would say that, more or less, that if
17  I'm talking about the trauma victims and that,
18  in the case that is being, you know, heard,
19  that if one of them is not claiming that and
20  the other is, that we're talking about the
21  person who is.  That's what I'm referring to.
22     Q.   Okay.  And do you agree with me
23  that more often than not in Title IX
24  proceedings, the accuser is a female?

Page 87

1          MR. WOOD:  Object to the form.
2          THE WITNESS:  You know, I am not
3      aware of all the claims that come before a
4      Title IX Hearing Board.  The general data
5      nationally would support that there are
6      more women who experience this.
7  BY MR. GALLINARO:
8     Q.   Okay.  Would you agree with me
9  that -- let's sort of just step away from the
10  Title IX setting and just --
11     A.   Okay.
12     Q.   -- sort of, the common sense.
13  Would you agree with me that one of the more
14  common sense or common understandings that
15  people have if you're trying to assess
16  someone's credibility is whether they're able
17  to keep their stories straight?
18          MR. WOOD:  Object to the form.
19          THE WITNESS:  I would guess that
20      most people would agree with that
21      statement.
22  BY MR. GALLINARO:
23     Q.   And that's generally because, would
24  you agree, that it's easier to remember

Page 88

1  something that actually happened to you than to
2  keep straight something that you made up?
3          MR. WOOD:  Object to the form.
4          THE WITNESS:  I mean, again, I'm
5      not, sort of, an expert in that, but I
6      would say that most people in a common
7      sense way would agree with that.
8  BY MR. GALLINARO:
9     Q.   Okay.  Do you agree with me that a
10  more commonly understood method of determining
11  whether someone is being truthful with you is
12  whether they claim to remember more details of
13  an event later in time than they did closer in
14  time to the evident?
15          MR. WOOD:  Object to the form.
16          THE WITNESS:  I think I got tripped
17      up on what you're saying which would be
18      more credible if it was sooner or later.
19  BY MR. GALLINARO:
20     Q.   I'll give you a -- I'll give you a
21  hypothetical just to try to paint a clearer
22  picture.  If you asked me what did I have for
23  breakfast this morning, and I said, you know, I
24  can't -- honestly, that's weird, I can't

Page 89

1  remember.  I don't remember what I had for
2  breakfast this morning.  And then we were
3  having a conversation next month, and you said,
4  do you remember what you had for breakfast on
5  August 12, and I said you know, strangely
6  enough, I do because it was such an incredible
7  breakfast.  It was a monumental breakfast that
8  I had.  I never had any other breakfast like
9  that breakfast.  It was the best breakfast I
10  ever had.  Wouldn't you question, well, you
11  didn't remember it that day and now you're
12  saying it's this monumental event a month
13  later?  Wouldn't you question whether that
14  memory was accurate?
15     A.   I would want to know --
16          MR. WOOD:  Object to the form.
17          THE WITNESS:  I would want to know,
18      yeah, what helped you remember it from the
19      time -- you know, memory is this sort of
20      thing that if you had remembered it later
21      that day because of different triggers,
22      you know, different areas of the brain
23      really will remember or resonate, you
24      know, with different things.  If you

23 (Pages 86 - 89)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 90

1    smelled something later and say, ah, yes,
2    I remember that it was eggs.  Now I
3    remember that.  A month later with no
4    other sort of context that would have
5    helped you remember that, that doesn't
6    seem very credible.
7  BY MR. GALLINARO:
8    Q.   Sure.  So in most -- in most
9  contexts, without some sort of the external
10 assistance or triggering, you would agree with
11 me that people's memories don't generally
12 improve over time; you usually remember less
13 and less details of something over time?
14          MR. WOOD:  Object to the form.
15          THE WITNESS:  Yeah.  I'm not sure
16    that I would go that far to say that
17    that's always true.
18 BY MR. GALLINARO:
19    Q.   Just as a general matter, I'm not
20 saying always.
21          MR. WOOD:  Object to the form.
22 BY MR. GALLINARO:
23    Q.   You wouldn't agree with that as a
24 general matter, our memories don't improve with

Page 91

1  time?
2          MR. WOOD:  Object to the form.
3          THE WITNESS:  I mean, I guess I
4    just can't think of enough examples to say
5    that definitively but, you know, possibly
6    so.
7  BY MR. GALLINARO:
8    Q.   Okay.  And if you'll turn to page
9  693.  Let me know when you're there.
10    A.   I am.
11    Q.   There's a bullet point there where
12 you continue on with reactions of someone who's
13 experienced trauma as an evolving narrative of
14 events.
15    A.   Yes.
16    Q.   I assume that means their
17 description of what happened to them changes
18 over time?
19    A.   Yes.  That refers to, typically,
20 closer to the time of the event, not like
21 months down the road, and it has become
22 standard practice, or it is becoming, I should
23 say, with investigators.  And this I remember
24 coming up in that training you referred to

Page 92

1    earlier with the Department of Criminal Justice
2    Services where there were investigators, you
3    know, detectives, people associated with the
4    law enforcement field and the job of
5    investigating, where they were talking about
6    this becoming more of a standard, that close to
7    a traumatic event, that, for example, it was
8    common practice to -- it was becoming more
9    common practice to allow someone to have two
10   sleep cycles before you would expect to have a
11   more complete version of their memory or of the
12   situation.
13          So that's sort of what I'm
14   referring to that, initially, especially -- and
15   I wouldn't be able to give exact time frames.
16   That's not something I'm aware of or have read
17   anything recently on that, but that especially
18   close to the time of a trauma, that the way our
19   memory is encoded and formed, how we remember
20   may be more in bits and pieces or particular to
21   like certain senses rather than others, like a
22   smell or like, you know, an image, rather than
23   like a full narrative story, the way we, you
24   know, tend to expect things to be very

Page 93

1    sequential with lots of detail, that that may
2    not be true for someone who has experienced a
3    trauma.  And that it's the trauma itself and
4    the way that it affects the brain, the way that
5    it affects the formation of memory that would
6    be responsible for that.
7    Q.   Okay.  Sorry about the echo again.
8          Is that part of the information
9    that you provide as you're presenting these
10   materials, that understanding of what an
11   evolving narrative of events could mean?
12    A.   I might have said something.  I
13   don't recall specifically, but what I just said
14   to you might have been the type of thing that I
15   would say to explain that bullet point.
16    Q.   Okay.  So when you're giving these
17   kind of observations to the panel members that
18   trauma victims can make incomplete and
19   inconsistent statements because of the trauma
20   and that their story could evolve because of
21   the trauma, is your intent in letting panel
22   members know that so that they will not employ
23   the kind of common sense approaches to how we
24   typically assess whether someone's being

24 (Pages 90 - 93)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 94

1    truthful that you and I just discussed?
2        A.   I'm certainly not asking them to
3    give way to common sense, definitely not, but
4    rather to point out that someone who has
5    experienced trauma, that's not -- that's not
6    something most people in a common sense way
7    know about.  I mean I don't think that the
8    particularities that we know about trauma and
9    the way it affects people is common sense.  So
10   I think it's to just sort of fill out that
11   picture.  And to recognize that it wouldn't be
12   inconsistent, right, with how someone
13   presented, not to say that something happened
14   or didn't happen, but to say that it wouldn't
15   be inconsistent if you saw these types of
16   things.
17       Q.   Right.  So you want adjudicators to
18   understand that, although you might normally
19   question someone who is unable to keep their
20   stories straight, in an instance where someone
21   has been traumatized, that is not necessarily
22   an indicator that they're not being truthful?
23           MR. WOOD:  Object to form.
24           THE WITNESS:  I don't think it's so

Page 95

1    much that they can't keep their story
2    straight, but that from the time they
3    first said something until questions that
4    may have been asked of them later in the
5    process, there could have been other
6    details that were filled in.  So, yes, I
7    suppose I'm letting the panel members know
8    that from a clinical perspective, from
9    someone who is the treatment provider,
10   someone who diagnoses and assesses, that
11   that would not be inconsistent.
12   BY MR. GALLINARO:
13       Q.   Well, there's statements that, you
14   know, I think as you were referring to, that
15   someone would make that were incomplete but
16   they filled in later, and then there's your
17   reference to inconsistent statements, which
18   would mean they're saying something at one
19   point that conflicts with something they said
20   at a different point.
21           So how is it that -- I mean, aren't
22   you advising the panel members that you
23   shouldn't hold it against someone if they're
24   being inconsistent because that could just be

Page 96

1    an indication that they're a victim of trauma?
2            MR. WOOD:  Object to the form.
3            THE WITNESS:  Again, I'm not sure
4        that I'm advising them.  I don't know what
5        they take from the presentations that I
6        give.  From a clinical perspective, I'm
7        letting them know that some degree of
8        inconsistency in that someone has filled
9        in a gap later, would not necessarily mean
10       that someone was being untruthful.
11   BY MR. GALLINARO:
12       Q.   Well, when you say in your note
13   here, "This can make us question credibility,
14   but should not," is that something you think
15   you stated during the presentation?
16           MR. WOOD:  Object to the form.
17           THE WITNESS:  I don't know that I
18       read that.  Again, I don't typically read
19       from my notes.  I'm someone who really
20       likes to look up and make eye contact.
21       Those are for me.  I may or may not have
22       said those words out loud, but I think
23       that, yeah, it doesn't necessarily mean
24       what the person said is not credible.  I

Page 97

1        think you have to take into account the
2        whole picture and all of the other
3        factors.
4    BY MR. GALLINARO:
5        Q.   So earlier when we were talking
6    about how this would apply to accusers because
7    they're the ones in the circumstance of being
8    potentially traumatized.  So would you agree
9    with me that, in your training, adjudicators
10   are taught to evaluate inconsistency in
11   testimony differently depending on whether the
12   person is an accuser or a respondent?
13       A.   I don't know how they're being
14   trained to evaluate those two different pieces
15   of information.  I mean, I don't know how -- I
16   don't know what other training they receive on
17   what they would need from a respondent's point
18   of view.  I'm really there as the person
19   talking, again clinically, what presentation
20   would look like for someone who may have
21   experienced a traumatic event.
22       Q.   All right.  When you were -- when
23   you provided this training, it was -- you
24   co-trained it with Lauren Kozak, correct?

25 (Pages 94 - 97)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 98

1    A.    I think maybe -- did it say that on
2  the calendar that you showed me in Exhibit-1?
3  Her name is not on this presentation that I'm
4  looking at here.
5    Q.    Yeah. It was in the, if you want
6  to look back, it's page 14 of Exhibit-1 --
7    A.    Okay.
8    Q.    -- as well as page 16 of
9  Exhibit-1 --
10    A.    Okay. Yeah, okay. We --
11    Q.    -- listed.
12    A.    So, okay. I don't know what
13  your -- sorry. So now I'm not sure what your
14  question was. Her name isn't on the
15  presentation itself.
16    Q.    Sure. Just that this is a
17  presentation that you provide during training
18  that's being presented where others are also
19  presenting information, correct?
20    A.    Correct, yes.
21    Q.    And one of those people was Lauren
22  Kozak?
23    A.    Yes.
24    Q.    Are you present or are you invited

Page 99

1  into the room to provide your portion and then
2  you're asked to leave the room when your
3  portion is done?
4    A.    Over the years in the different
5  presentations I've done, I've done both. There
6  are times where I have a conflict and I can't
7  stay, and I don't. There are times where I've
8  heard Lauren present. I honestly have no idea
9  if I was present that day for hers.
10    Q.    I'm just talking about these two
11  trainings in particular, because these are the
12  only two times you've ever trained the HSMB.
13    A.    Right.
14    Q.    All right. Do you recall, in the
15  only two times that you've trained the HSMB,
16  whether you were present for the entire
17  training or whether you only came in for your
18  portion and then left upon completing it?
19    A.    I definitely wasn't present for the
20  entire training. I feel like they were there
21  for a large part of the days and hours, and it
22  looked like even in the calendar you showed,
23  there were different presentations. So I was
24  certainly not there for the entirety. And, no,

Page 100

1  I actually don't remember if I was present for
2  Lauren's portion.
3    Q.    Did you work with Lauren at all at
4  putting together a slide deck?
5    A.    Not that I recall.
6    Q.    If the content of this -- this
7  slide deck that we're looking at in Exhibit-8
8  was also in a slide deck of Lauren Kozak's for
9  the same training, do you have any
10  understanding as to how that would have
11  happened?
12    A.    Oh. Then, okay, we probably shared
13  it, but I don't -- I mean I just don't recall.
14  I wouldn't have not shared with her, you know,
15  the information that I was preparing or
16  planning to present. So I'm sure I shared it
17  with her.
18    Q.    Do you recall whether you
19  collaborated with her on what she would cover
20  and what you would cover in the training?
21    A.    I don't recall whether we
22  collaborated. My recollection is that she
23  would have been one of the people inviting me
24  to do a presentation. And she may have, sort

Page 101

1  of, then provided the scope for me of what she
2  was, you know, why she was asking me to come,
3  but I don't remember a collaboration, per se.
4    Q.    And you don't recall that her
5  portion of the training included a discussion
6  of how to assess credibility in general?
7        MR. WOOD:  Object to the form.
8        THE WITNESS:  I don't recall.
9  BY MR. GALLINARO:
10    Q.    When you talk about the impact of
11  trauma and how it can affect credibility, is it
12  your position that if someone is inconsistent
13  or they're demonstrating an evolving narrative
14  that that adds to their credibility because it
15  reflects that they are likely the victim of
16  trauma, or are you suggesting that it just
17  shouldn't be a negative?
18        MR. WOOD:  Object to the form.
19        THE WITNESS:  I'm not saying it
20  adds -- sorry. I'm not saying it adds to
21  the credibility, no. I'm saying it just
22  shouldn't be disregarded as -- it
23  shouldn't be disregarded.
24

26 (Pages 98 - 101)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 102

1  BY MR. GALLINARO:
2      Q.    Okay.  So it shouldn't detract from
3  someone's credibility?
4          MR. WOOD:  Object to the form.
5          THE WITNESS:  That's -- that's what
6      I would say, that I wouldn't think that it
7      would detract from credibility.
8  BY MR. GALLINARO:
9      Q.    Does your training include anything
10  of a similar nature with regard to respondents?
11      A.    Training I've received or training
12  I have provided?
13      Q.    Training that you would provide.
14  Do you address any kind of similar concepts,
15  for example, on behaviors you might normally
16  think would make someone's story less credible
17  but that, given the circumstance the person is
18  in, we should not?
19      A.    Not exactly that.  Although I think
20  I have been asked on occasion by -- I can't say
21  that it was at this presentation to the Hearing
22  Board, right, but maybe from students, you
23  know, how do you respond to a peer maybe who's
24  come and said that they have been accused, you

Page 103

1  know, and how do you support that person?  And
2  so I have answered questions about that.  But I
3  wouldn't say that I've -- I don't recall being
4  part of a discussion or a presentation
5  regarding credibility of someone who's been
6  accused.
7      Q.    And if you'll look quickly at page
8  694 of this slide deck in Exhibit-8, we see
9  here a slide describing possible reactions of
10  the respondent.  Could you read those?
11      A.    Sure.  "Scared, angry, confused,
12  defensive, sad."
13      Q.    And there are no notes associated
14  with this slide that discuss how any of that
15  may impact on a respondent's credibility,
16  correct?
17      A.    Correct.
18      Q.    Do you -- do you discuss that at
19  all?
20      A.    Do I discuss what, the slide?
21      Q.    Whether any of these reactions in
22  any way bear upon credibility of a respondent.
23      A.    I don't recall discussing it in
24  terms of credibility, just that those would be

Page 104

1  natural reactions when someone has been
2  accused, especially if they feel wrongly
3  accused.
4      Q.    Would you -- would you agree with
5  me that it could be traumatic to be falsely
6  accused of rape?
7          MR. WOOD:  Object to the form.
8          THE WITNESS:  On the surface, I
9      wouldn't necessarily believe that that
10      would classify as a trauma, just the
11      accusation.
12  BY MR. GALLINARO:
13      Q.    Okay.  If someone -- if someone
14  were, and assume for me for purposes of these
15  questions that it is a false allegation, a
16  flagrantly false allegation against someone.
17      A.    Okay.  I'll assume that it's a
18  false allegation; that's what you're asking me
19  to assume?
20      Q.    Yes.
21      A.    Okay.
22      Q.    If someone were falsely accused of
23  rape and then were going to be put through, you
24  know, a proceeding to determine whether that

Page 105

1  was true and there would be serious
2  consequences if it were, do you think that that
3  would be traumatic for the person that was
4  falsely accused?
5          MR. WOOD:  Object to the form.
6          THE WITNESS:  It would be hard to
7      say.  You know, that's a diagnose -- I
8      mean, trauma can be used as a formal
9      diagnosis, right, in the form of Post
10      Traumatic Stress Disorder, PTSD, or Acute
11      Stress Disorder.  So without, sort of,
12      really knowing how all of that sort of
13      played out for that particular person, I
14      wouldn't be in a position to say that it
15      would be a diagnosis for sure.  Is it
16      possible that that whole experience felt
17      traumatic to an individual?  Again,
18      depending on all the particularities of
19      that, I would say I guess that's possible.
20  BY MR. GALLINARO:
21      Q.    But there's nothing in your
22  training, at least that I can see, that would
23  address the possible impact of the trauma of
24  being falsely accused; am I correct?

27 (Pages 102 - 105)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 106

1        MR. WOOD:  Object to the form.
2  BY MR. GALLINARO:
3      Q.    You just don't address that topic
4  in your training?
5      A.    I don't address that, correct.
6      Q.    Back on page 690, the Exhibit-8.
7      A.    Yes.
8      Q.    The very last note says, "The
9  perp's story may seem more clear and less
10  ambiguous possibly because it's true, dot, dot,
11  dot."  Why the trailing ellipsis at the end of
12  that statement?
13      A.    Possibly because it's true.  You
14  know, I don't know anymore than that.  I
15  wouldn't want to say that their story is more
16  clear and less ambiguous because it's not true.
17  I don't know.  It's possibly because it's true.
18  That's one explanation for that.  And, again,
19  I'm not really -- I wasn't really focusing the
20  training on the experiences of the respondent.
21  That wasn't like the thrust of the
22  presentation.
23      Q.    Do you refer to the respondent as a
24  perpetrator?

Page 107

1      A.    Not in the presentation.
2      Q.    So the note, you wouldn't have
3  repeated the phrase "perp"?
4      A.    Very unlikely.
5      Q.    Okay.  And that would -- why would
6  that be?  Why would it be unlikely that you
7  would have repeated that?
8      A.    I'm usually pretty careful about
9  how I'm going to characterize people.  I think
10  even over time, I have removed words like
11  victim from my presentations and just talk
12  about what people experience, rather than like
13  a label.  And I don't think perpetrator is
14  usually -- implies a determination that I don't
15  know to be true.  It's just not language that I
16  would typically use when I'm giving a
17  presentation or talking about it.
18      Q.    And someone who's potentially a
19  perpetrator, it's your training that their
20  story, nevertheless, may seem more clear and
21  less ambiguous than the victim's; is that
22  correct?
23        MR. WOOD:  Object to the form.
24        THE WITNESS:  Can you repeat that?

Page 108

1  BY MR. GALLINARO:
2      Q.    Sure.  Your training, according to
3  this note, is that someone who is possibly a
4  perpetrator, may, nevertheless, still seem more
5  clear and less ambiguous than the victim?
6      A.    I mean, yes, saying --
7        MR. WOOD:  Object to the form.
8        THE WITNESS:  I'm saying that it
9      could be, given the above, right, given
10      that some -- someone who's experienced
11      trauma may have incomplete information to
12      report based on the trauma itself and the
13      way the brain processes, et cetera, that
14      we talked about before, it may in contrast
15      seem like a respondent's story is more
16      clear and sort of less ambiguous or more
17      consistent.  I'm not saying that that's
18      always the case.  I'm saying that may be
19      true especially in contrast to the above.
20  BY MR. GALLINARO:
21      Q.    Okay.  So just to sort of be clear
22  about the way that we're addressing how we
23  evaluate accusers and respondents, according to
24  your training, accusers should be given a

Page 109

1  little latitude for incomplete, inconsistent
2  and evolving stories, but respondents should be
3  viewed with suspicion even if their stories are
4  more clear and less ambiguous?
5      A.    I do not believe --
6        MR. WOOD:  Object to the form.
7        THE WITNESS:  I don't believe
8      that's what I'm saying.
9  BY MR. GALLINARO:
10      Q.    Okay.  Do you believe that the
11  training we've been discussing about how trauma
12  impacts an accuser's ability to recall events,
13  things of that nature that we've just been
14  discussing, do you believe that represents the
15  current understanding of trauma within your
16  field?
17        MR. WOOD:  Object to the form.
18        THE WITNESS:  My most recent review
19      of, sort of, the field and the literature
20      in that would say that this is largely
21      consistent currently.
22  BY MR. GALLINARO:
23      Q.    Any aspect of it that you feel is
24  not consistent?

28 (Pages 106 - 109)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 110

1     A.    I mean, again, I couldn't say
2  definitively.  I have not looked at that
3  research -- I don't remember when the last time
4  was.  Nothing that is jumping out at me that I
5  would say seems inconsistent.
6          MR. GALLINARO:  I'm going to change
7     topics now, and I think we've been going
8     for about another hour so good time for a
9     rest?  Why don't we take about ten minutes
10    this time?
11            - - -
12         (A short recess was taken.)
13            - - -
14  BY MR. GALLINARO:
15    Q.    All right.  Before the break, we
16  were going over your slide deck on the
17  presentation that you gave to the HSMB, and we
18  were talking generally about common sense ways
19  people view credibility and then comparing it
20  to some of the materials that you present on.
21        And is it your view that the
22  subject matter of trauma and how it can impact
23  a person is generally not within lay people's
24  common understanding?

Page 111

1          MR. WOOD:  Object to the form.
2          THE WITNESS:  I mean, I don't -- I
3     don't know what lay people know, but I
4     don't know that the everyday person has an
5     understanding of trauma.
6  BY MR. GALLINARO:
7     Q.    Okay.  And as we discussed, you
8  feel that you have expertise in that area, and
9  that's why you're invited to speak to the
10  various organizations you do, including the
11  HSMB; is that correct?
12    A.    I don't know if other people regard
13  me as an expert or not.  I do know that I'm
14  invited and I'm among the people who are
15  believed to have some background and training
16  on this topic, and that's why I'm invited.
17    Q.    And who are the other people that
18  are invited to speak on that topic?
19    A.    Well, on the broad topic, Lauren
20  Kozak often presents to these same groups that
21  I do.
22    Q.    Okay.  But just referring to
23  trauma.  I thought I understood you to say,
24  with regard to that topic, you're among other

Page 112

1  people who are recognized as having --
2     A.    I see.
3     Q.    -- expertise in that subject
4  matter.
5     A.    I'm sorry.  Okay.  So I was
6  referring just to sexual misconduct and all the
7  presentations I do on that topic.  Trauma
8  specifically, I suppose -- I guess -- I don't
9  think I know of anyone else at the university
10  who's been asked -- who works at the university
11  who's been asked to speak on that.
12    Q.    We discussed earlier that your
13  practice is exclusively devoted to students; is
14  that correct?
15    A.    At Washington and Lee, yes, that's
16  correct.
17    Q.    And you don't have any additional
18  private practice going on; this is your
19  full-time gig, right?
20    A.    That's correct.
21    Q.    Okay.  Excluding the current, you
22  know, moment where I'm assuming you're not
23  seeing any students, during a typical semester,
24  how frequently are you meeting the students?

Page 113

1     A.    I mean every day, five days a week
2  that I'm in the office.
3     Q.    Okay.  So it's a -- it's a busy
4  practice that you have despite the fact that
5  it's limited to a small population of students?
6     A.    Yes.
7     Q.    And it's busy enough where you feel
8  that you see students almost every day, if not
9  every day?
10    A.    Yes.
11    Q.    Okay.  I want to turn now to the
12  letter that you prepared for ██████ and
13  that's at Exhibit-10.
14    A.    Okay.  Exhibit-10, oh, I see.
15  Okay.  I have it.
16            - - -
17         (Whereupon the document was marked,
18      for identification purposes, as
19      Exhibit-10.)
20            - - -
21  BY MR. GALLINARO:
22    Q.    Okay.  And I'm sorry, earlier when
23  I said that you see students almost every day,
24  I think we both understood I didn't mean you

29 (Pages 110 - 113)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 114

1  just see them around, like they see you for
2  counseling, correct?
3     A.   I see students for appointments
4  every day when we're in session for classes.
5     Q.   Okay.  All right.  So this letter
6  you submitted on behalf of ████████ in the
7  first sentence, you mention that you first met
8  with her on March 24th, 2017, and that she was
9  referred to you for counseling by Lauren Kozak,
10  and then you say, "We have met on two
11  occasions"; is that correct?
12     A.   Yes.
13     Q.   Okay.  During the two meetings that
14  you had with her, did you take notes?
15     A.   Yes.
16     Q.   Do your notes of those meetings
17  still exist?
18     A.   Yes.
19     Q.   I'd ask you to, please, make sure
20  that those are preserved as we will likely be
21  requesting them from counsel.
22     A.   Okay.
23     Q.   I want to see if we can just
24  establish, as best we can, a timeline for the

Page 115

1  two meetings.  You state in here the first
2  meeting was on March 24th?
3     A.   Okay.
4     Q.   The letter is dated April 13th.  So
5  do you know when between the first meeting and
6  the letter you saw her for the second time?
7     A.   I have no idea.
8     Q.   Okay.  She had reached out to you
9  to ask you to prepare this letter.
10        Did you see her the second time as
11  a result of that request or had you already
12  seen her and were able to prepare this letter
13  based on the two times you had already seen
14  her?
15     A.   I don't recall.
16     Q.   Okay.  About how long was each
17  meeting with her?
18     A.   I don't recall without looking at
19  my notes.
20     Q.   Okay.  Do you have those available
21  to you?
22     A.   Right now?
23     Q.   Yeah.
24     A.   No.

Page 116

1     Q.   Okay.  Did they -- were they, sort
2  of, consistent with your normal -- I mean do
3  you have a normal length of session if someone
4  is coming to see you?  Do you have an
5  appointment --
6     A.   Yes.
7     Q.   -- time window?
8     A.   Sure.
9     Q.   What would the typical time window
10  be for an appointment?
11     A.   It typically would be between 45
12  minutes to an hour.
13     Q.   Okay.  Do you have any reason to
14  believe that meetings with her wouldn't have
15  been consistent with that?
16     A.   No.
17     Q.   Did you review your notes of the
18  meetings you had with her in preparation for
19  your deposition?
20     A.   No.
21     Q.   When's the last time you looked at
22  them, if you can recall?
23     A.   I have no idea.  I mean it's been a
24  long time.

Page 117

1     Q.   Would you have had any reason to
2  look at them again after you prepared this
3  letter?
4     A.   After I had prepared the letter,
5  they would have been in her chart and that was
6  an active chart.
7     Q.   So did you continue seeing her for
8  counseling after this date of this letter?
9     A.   I did.
10     Q.   Okay.  And you have notes of those
11  meetings as well?
12     A.   Yes.
13     Q.   About how long did you continue
14  seeing her?
15     A.   I really don't recall the duration
16  or frequency of our time together after these
17  two visits.
18     Q.   Did she continue to see you for the
19  duration of her time at Washington and Lee, or
20  did there come a time where she was still a
21  student but no longer in counseling with you?
22     A.   I, honestly, don't recall.
23     Q.   Okay.  When you met with her for
24  your counseling sessions, did you -- do you

30 (Pages 114 - 117)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 118

1  conduct any type of physical examination?
2      A.   No.
3      Q.   Do you review her health history to
4  determine whether she has any preexisting
5  medical condition that might explain some of
6  the symptoms she's presenting with?
7      A.   Just her self-report.
8      Q.   So no -- you don't solicit from any
9  other healthcare provider her file or get notes
10 of any other medical provider?
11     A.   I had not done that in this case,
12 no.
13     Q.   Were you aware at the time that you
14 were treating her that she had previously been
15 diagnosed with an anxiety disorder and had been
16 prescribed Lexapro?
17         MR. WOOD:  Object to the form.
18         THE WITNESS:  I don't remember if
19     or when I knew that information.
20 BY MR. GALLINARO:
21     Q.   Okay.
22     A.   I just don't remember.  I mean it's
23 possible that I had that, but I don't recall.
24     Q.   You just don't know one way or the

Page 119

1  other?
2      A.   Correct.
3      Q.   And do you believe that two
4  45-minute to an hour sessions, without having
5  an understanding of her full medical history,
6  is sufficient to diagnose a mental disorder to
7  a reasonable degree of professional certainty?
8         MR. WOOD:  Object to the form.
9         THE WITNESS:  Yes.
10 BY MR. GALLINARO:
11     Q.   Is it typical that you'll arrive at
12 a diagnosis for a patient after two sessions?
13     A.   Yes.
14     Q.   Does it usually take two sessions
15 or can you do it in one?
16     A.   I think sometimes I have a good
17 idea after one.
18     Q.   Okay.  Does a diagnosis ever change
19 based on continuing treatment?
20     A.   Yes.
21     Q.   Okay.  So is it -- is it an initial
22 diagnosis or assessment, or is it a confirmed
23 psychological diagnosis at the point of -- at
24 the point in which you provided your opinion

Page 120

1  for ████████
2      A.   I mean it was initial as well as
3  confirmed to the best of my ability with the
4  information that I had at the time.
5      Q.   Okay.  You'll see at the top that
6  it says, "Verification of psychological
7  condition."  Is that something other than a
8  diagnosis?
9      A.   No.  It's a diagnosis.
10     Q.   Okay.  If you could flip back to,
11 we skipped over an exhibit, Exhibit-9.
12     A.   Okay.
13                --- 
14         (Whereupon the document was marked,
15     for identification purposes, as
16     Exhibit-9.)
17                ---
18 BY MR. GALLINARO:
19     Q.   Jest let me know when you've had a
20 moment to look at that.
21     A.   Look at that?  Okay.  Yeah.  Okay.
22 I've looked at that.
23     Q.   Okay.  And I'll represent to you
24 this is an email that you received from ████

Page 121

1  ████ in response to a Discovery request we
2  had made to her.  And this is an email exchange
3  between you and ████████ on April 7th
4  of 2017.  Does that look accurate to you?
5      A.   Yes.
6      Q.   Okay.  And you can see on the first
7  email, which is the last page, it says, on
8  April 7th at 10:20 a.m., "Hi, Dr. Boller.  I
9  met with my hearing advisor yesterday and they
10 suggested that I ask you for a letter that
11 could be included in the investigation report.
12 This letter would simply illustrate how you
13 have seen this experience affect me.  Please
14 let me know as soon as possible if you are
15 willing to do this."
16         Do you see that?
17     A.   I do.
18     Q.   Okay.  Do you recall her telling
19 you that it was her advisor's idea that she get
20 a letter from you?
21     A.   I mean I see it written here.  I
22 don't know that I would have recalled that if I
23 hadn't been referring to this email.
24     Q.   Do you remember early in the

31 (Pages 118 - 121)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 122

1 deposition we discussed the scenario in which
2 someone might come to you at the prompting of
3 perhaps a lawyer or someone in an adversarial
4 proceeding and whether that might raise your
5 suspicion as to why they were coming to you?
6 Did you have any concern like that based on the
7 request she was giving you here?
8    A.   No.
9    Q.   Okay.  Why not?
10    A.   Why wasn't I concerned or why
11 didn't I have suspicion?
12    Q.   Yeah.  If she's asking you for
13 something that her advisor is suggesting would
14 be helpful for her case, why that wouldn't have
15 presented any issue for you.
16    A.   Because she's requesting that I
17 illustrate how the experience has affected her,
18 and that is something within my purview and
19 something that I felt able to provide.
20    Q.   Okay.  Is there anything that you
21 could tell the panel that she couldn't tell
22 them directly about how the experience affected
23 her?
24       MR. WOOD:  Object to the form.

Page 123

1       THE WITNESS:  I don't know.  I
2    don't feel like I'm in a position to say
3    that -- I don't know.
4 BY MR. GALLINARO:
5    Q.   Well, do you know anything about
6    █████ other than what she's told you?
7    A.   No.
8    Q.   Okay.  So if she thinks it would be
9 helpful for you to submit a letter to explain
10 to the board how the experience affected her,
11 is there any reason why she wouldn't be able to
12 just provide that information directly instead
13 of through you?
14       MR. WOOD:  Object to the form.
15       THE WITNESS:  I assume that she
16    could also tell them herself.
17 BY MR. GALLINARO:
18    Q.   Okay.  So what was your
19 understanding at this time, when she is asking
20 you to just sort of reiterate what she's
21 already told you about how the experience
22 affected her, about what you would be providing
23 in response to this request?
24       MR. WOOD:  Object to the form.

Page 124

1       THE WITNESS:  My own observations
2    of -- and my own sort of clinical opinion
3    of how that experience has affected her.
4 BY MR. GALLINARO:
5    Q.   Was there anything that occurred
6 between her request on April 7th for a letter
7 that would simply illustrate how the request
8 affected her and what you prepared as the
9 April 13th letter where it sort of evolved from
10 illustrating how the experience affected her to
11 you providing a verification of a psychological
12 condition?  How did you go from one to the
13 other?
14       MR. WOOD:  Object to the form.
15       THE WITNESS:  I don't remember
16    anything happening in intervening that --
17    I don't know that I see it as evolving,
18    but I -- I don't remember what, if
19    anything, happened between April 7th and
20    April -- was the date the 13th, when I
21    wrote the -- when I wrote the document.
22    I'm not sure anything happened at all.  I
23    don't know.
24

Page 125

1 BY MR. GALLINARO:
2    Q.   Did you discuss with either her or
3 her advisors what the content of the letter
4 would be in any more detail than what we see
5 here in Exhibit-9?
6    A.   I don't recall any contact with her
7 advisors, and I don't recall talking
8 specifically with █████ about that or not.
9    Q.   Does seeing this email on April 7th
10 refreshing your recollection in any way as to
11 whether you would have had to see her for the
12 second time in order to prepare that letter or
13 whether you had already seen her by the time
14 you received this request?
15    A.   I, honestly, don't -- I don't know
16 if I had seen her the second time yet or not.
17 I just don't know.
18    Q.   Would that be reflected in your
19 notes, the date that you had seen her?
20    A.   Certainly.
21    Q.   Are you able to recall, without
22 access to your notes presently, whether she
23 reported the symptoms that you describe in your
24 letter in the first or second meeting?

32 (Pages 122 - 125)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 126

1     A.   No.  I don't know.

2     Q.   You have no sense of higher
3  understanding of how the incident impacted her
4  evolved from, you know, the first time you met
5  her?

6     A.   Until the second?

7     Q.   Until the time you wrote the
8  letter.

9     A.   Oh.  Well, I would have felt that I
10  had all the adequate information to be able to
11  write the letter in order to write it.  So,
12  and, you know, in a first session, I'm
13  certainly, you know, I'm a trained clinician,
14  so I'm always, you know, listening and
15  assessing.  Whether I'm formulating a diagnosis
16  or not, I'm really assessing, you know, the
17  whole picture of someone's presentation that
18  includes, you know, symptoms that are visible
19  to me as well as symptoms that they may report.
20  So all of that is happening in, certainly, in
21  one session and would be just sort of either
22  confirmed or elaborated upon if there had been
23  a second session before I wrote the letter.

24     Q.   You'll see in the second paragraph

Page 127

1  here, the last sentence it says, "████ is
2  working in counseling to develop and utilize
3  coping strategies to reduce the likelihood of
4  this outcome."

5          Do you see that?

6     A.   Yes.

7     Q.   What counseling are you referring
8  to?

9     A.   Counseling with me.

10     Q.   Okay.  Were you aware at the time
11  that she was also seeing a counselor from
12  Project Horizon?

13          MR. WOOD:  Object to the form.

14          THE WITNESS:  I may have been aware
15     of that at the time.  I don't recall that
16     right now.

17  BY MR. GALLINARO:

18     Q.   If, in fact, that were the case, do
19  you think that you may have been referring to
20  that in this letter, or are you confident
21  you're referring to your own counseling with
22  her?

23     A.   No.  If I was aware of that, I
24  could have been referring to that as well.

Page 128

1     Q.   If you were aware of the Project
2  Horizon counselor, and I understand you don't
3  recall whether you were, but if you were aware,
4  would you have wanted to consult with that
5  person before arriving at your diagnosis?

6          MR. WOOD:  Object to the form.

7          THE WITNESS:  I mean, I don't know.
8     It appears that I did not consult with
9     that counselor if I had been aware.  It
10     feels very hypothetical.  I'm not sure.

11  BY MR. GALLINARO:

12     Q.   Well, just sort of as a general
13  matter then, if you see a student for
14  counseling who is also treating with another
15  counselor simultaneously, would you want to
16  know what that counselor thought before you
17  arrived at a diagnosis?

18          MR. WOOD:  Object to the form.

19          THE WITNESS:  Yeah.  Again,
20     hypothetically, possibly so.  It really
21     depends on the situation.

22  BY MR. GALLINARO:

23     Q.   Give me an example of a situation
24  where you would want to hear from the other

Page 129

1  counselor.

2          MR. WOOD:  Object to the form.

3          THE WITNESS:  If the student wanted
4     me to.

5  BY MR. GALLINARO:

6     Q.   Okay.

7     A.   I would certainly want to make that
8  connection and make that contact.  It's one
9  example I could think of.  I mean there could
10  be, you know, a variety of reasons why I might
11  want to.  Again, it feels difficult to say
12  hypothetically.  It would really just be case
13  by case and what seemed appropriate or called
14  for in this situation.

15     Q.   I'm just trying to see if I can
16  better understand what circumstances you would
17  feel it appropriate to speak with another
18  healthcare provider.  I don't know if there's a
19  better way to phrase it if you're not
20  understanding it, but if you're treating with
21  someone who you know is treating with someone
22  else, is it part of your practice normally to
23  want to understand and have the information
24  regarding the other provider and what they're

33 (Pages 126 - 129)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 130

1   seeing and observing?
2        MR. WOOD:  Object to the form.
3        THE WITNESS:  I would say there are
4    times that I have done that and times that
5    I haven't.  I wouldn't say either is
6    necessarily standard for me.  I think
7    there are times that either have occurred.
8   BY MR. GALLINARO:
9        Q.   Are there any -- are there any
10   factors other than a student asking you to do
11   that where you would assume that you would take
12   that action?
13       A.   I don't know if I'd say there are
14   any times I would assume that I would take that
15   action.  Again, just it being sort of case by
16   case and that there would be a lot of factors
17   that would weigh into that.
18       Q.   Yeah, and I'm just trying to get a
19   sense of what those factors would be.  So if
20   you could give me any specific examples of what
21   those factors would be that would weigh into
22   that.
23       A.   So, again, not referring to
24   anything specific or I'm not remembering any

Page 131

1    particular case, but it might be how long they
2    knew the other person.  It might be how long
3    ago they had seen that person, if they plan to
4    continue with that person, what they were --
5    what was the purpose of that treatment, you
6    know, was it coinciding with what I understood
7    the person to be seeking treating with me for.
8    Was it something completely separate?
9        Q.   If I could stop you there.
10       A.   Sure.
11       MR. WOOD:  You agreed at the top of
12   this deposition that you and she would not
13   interrupt one another, and now you're
14   interrupting her.  So I would ask you to
15   let her finish her answer.
16       MR. GALLINARO:  I thought she was
17   wrapping up, but there was something that
18   she had just said I wanted to make sure I
19   didn't lose track of.
20   BY MR. GALLINARO:
21       Q.   But is there more factors you
22   wanted to describe?
23       A.   I'm not sure.  Just that those are,
24   I guess, some examples, I guess, is all I would

Page 132

1    say.  I'm not saying that's all inclusive
2    because I am, sort of, speaking, you know
3    hypothetically and not referring to a
4    particular situation, but those would be some
5    of them.
6        Q.   Okay.  One of them that you
7    mentioned was if they were treating with the
8    other professional for something similar or
9    something completely different.  If they were
10   treating for something similar, would that make
11   it more likely you would want to speak with
12   them or less likely you would want to speak
13   with them?
14       A.   I guess, again, it's just, I mean,
15   possibly more likely.  But it's, again, just a
16   case-by-case situation or what I knew, when I
17   knew it and how I -- how I understood that --
18   that work to be and the type of person that
19   they were working with.  Yeah.
20       Q.   Okay.
21       A.   I just don't know how to be more
22   specific than that.
23       Q.   Okay.  You have relationships with
24   the folks over at Project Horizon; is that

Page 133

1    right?
2        A.   I know some of them.
3        Q.   Okay.  And they're involved in that
4    Speak organization, I believe, that we
5    discussed earlier?
6        A.   I don't know what you mean by
7    involved.  They have sometimes given
8    presentations to that Speak group by the
9    invitation of the Speak members.
10       Q.   Okay.
11       A.   I believe.
12       Q.   And do they provide -- do they have
13   people in your position at Project Horizon:
14   Psychologists, psychiatrists, mental healthcare
15   providers?
16       A.   They typically have someone.  I
17   don't remember what that would have been at the
18   time of this case that we're talking about
19   in 2017.  But my understanding, my
20   recollection, is that the years that I have
21   been aware of them as an organization, they
22   have someone with the title of counselor.
23   Again, I don't remember in 2017, but there have
24   been times during my work at Washington and Lee

34 (Pages 130 - 133)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 134

1    when that counselor, the person with that
2    title, was not a licensed counselor, was not
3    someone with a license to practice counseling.
4    So it was more -- I'm not sure how to
5    characterize it. So it wasn't someone who was
6    able to diagnose, but someone more who would
7    have been able to provide support.
8        Q.    In your time treating students at
9    W&L, have you ever had occasion to consult with
10   Project Horizon over a student that you were
11   mutually providing mental health services to?
12       A.    I don't recall either that
13   situation coming up at all or a consultation in
14   that regard.
15       Q.    Okay. Once you completed this
16   letter in Exhibit-10, who did you send it to?
17       A.    I mean it appears it's written to
18   Mr. Jarrett, Cliff Jarrett, who was a member of
19   the HSMB.
20       Q.    Okay. Do you have any recollection
21   of whether you sent it directly to him or
22   whether you would have provided it to your
23   client to provide to the board, or whether you
24   submitted it to someone else?

Page 135

1        A.    I really don't recall.
2        Q.    Do you remember discussing the
3    contents of the letter with Lauren Kozak before
4    you prepared it?
5        A.    No.
6        Q.    Did you consult with her in any way
7    about the content of the letter before you --
8        A.    Did I --
9        Q.    Sorry -- before you turned it in,
10   right? Before it was done, did you consult
11   with Lauren Kozak at all about the letter?
12       A.    I don't believe so.
13       Q.    Did you consult with anyone from
14   the Title IX staff about the content of the
15   letter?
16       A.    I was interviewed after I had
17   written the letter by --
18       Q.    I'm just focusing --
19       A.    I was interviewed after.
20       Q.    I'm sorry. I'm just focusing on
21   the time period before. So for purposes of
22   these questions, it's before you turned it in.
23   Okay?
24           So did you consult with -- you said

Page 136

1    you didn't consult with Lauren Kozak. Did you
2    consult with Jason Rodocker at all?
3        A.    I don't believe so.
4        Q.    Okay. Would you have consulted
5    with any of your colleagues at the Student
6    Health Counseling Center?
7        A.    Unlikely. I don't recall. I don't
8    believe so.
9        Q.    So is it your best recollection
10   that you prepared this on your own, having only
11   spoken with ▮▮▮▮▮▮▮?
12       A.    I believe so.
13       Q.    Your opening paragraph, it provides
14   your opinion that ▮▮▮ meets the diagnostic
15   criteria for Acute Stress Disorder.
16           Do you see that?
17       A.    I do.
18       Q.    Okay. And I assume, based on some
19   testimony you gave earlier, that that would be
20   pursuant to the criteria that's set forth in
21   the DSM?
22       A.    Correct.
23       Q.    Do you know whether she had a
24   diagnosis from her other counselor that either

Page 137

1    was the same or different?
2        A.    The other counselor being someone
3    from Project -- I don't know. I don't know.
4        Q.    Okay. I'm going to refer back and
5    forth between your letter and Exhibit-11, which
6    is a copy of the DSM5.
7            Would this have been the version of
8    the DSM that you would have been following in
9    reaching your diagnosis?
10       A.    If this is the version that was up
11   to date in 2017. I haven't looked at the
12   publishing date. If that's the version, then
13   yes.
14               - - -
15           (Whereupon the document was marked,
16           for identification purposes, as
17           Exhibit-11.)
18               - - -
19   BY MR. GALLINARO:
20       Q.    Okay. First of all, I guess, do
21   you agree that ▮▮▮ didn't claim to have
22   consciously experienced a traumatic event,
23   rather she claimed to have learned about it
24   after the fact? Do you recall that being the

35 (Pages 134 - 137)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 138

1    case?
2        A.   I recall that she didn't remember
3    aspects of the event.
4        Q.   Well, why don't we start this way.
5    Why don't you tell me, as best you can recall,
6    everything she told you about the event?
7        A.   Okay.  Like I said, I haven't
8    reviewed the chart since, so I am not going to
9    remember very much, but that -- I mean I'm
10   really not even sure that I can accurately
11   reflect it without looking at my notes for this
12   situation, to be honest with you.
13       Q.   Okay.  Do you recall that she --
14   that her claim was that the sexual penetration
15   occurred while she was asleep, and she learned
16   about it the next morning when she saw a condom
17   on the floor --
18           MR. WOOD:  Object to the form.
19   BY MR. GALLINARO:
20       Q.   -- and asked Mr. ▮▮▮ about it?
21       A.   Yes.  That is my recollection.
22       Q.   Okay.  And so in a situation where
23   someone is not either conscious or awake, do
24   you consider those synonyms?  When you're

Page 139

1    asleep are you conscious?
2        A.    I don't know medically.  I would
3    use those terms to mean the same thing.
4        Q.   Okay.  Well, that's the -- I just
5    want to have a shared understanding --
6        A.    Sure.
7        Q.    -- when I say she wasn't conscious,
8    I'm referring to possibly being asleep.
9            So if she were not conscious when
10   the alleged sexual penetration occurred, how
11   does that affect the way you're diagnosing her,
12   if at all?
13       A.    So if you look at the criteria, you
14   know, a lot of this would really still be
15   applicable to how -- to the symptoms that she
16   was experiencing as a result of that incident.
17       Q.    Okay.  Well, so the diagnostic
18   criteria -- well, let me back up.
19           Turning back to your letter, you
20   say in paragraph one, "Direct exposure to a
21   traumatic event."  And I guess I'm just trying
22   to understand whether the traumatic event that
23   she was directly exposed to was learning of the
24   sexual assault because it happened while she

Page 140

1    was unconscious, or was it experiencing a
2    sexual assault while she wasn't conscious?
3        A.   Are you referring to number one?
4        Q.   Yes.
5        A.   Yes.  The traumatic event I'm
6    referring to is the event of the sexual
7    assault.
8        Q.   Okay.  Which she wouldn't have
9    known occurred without asking Mr. ▮▮▮ about
10   it.
11           MR. WOOD:  Object to the form.
12           THE WITNESS:  I mean, her body
13       experienced this incident, so in some way
14       she did know it occurred even if she did
15       not recall.
16   BY MR. GALLINARO:
17       Q.   Okay.  I'm just trying to
18   understand that.  Like if we -- if -- does your
19   body experience trauma, then, when you undergo
20   surgery?
21       A.   I don't know.  That's not my area.
22   Some people might say yes.
23       Q.   Okay.
24       A.   But if someone is knocked

Page 141

1    unconscious in an explosion and they don't
2    recall it, I would very firmly say that they
3    still experienced that trauma.
4        Q.   Sure.  But if something is done to
5    you while you're not conscious and aware that
6    it's happening, your understanding is that can
7    still be the traumatic event necessary to
8    support an acute stress disorder diagnosis?
9        A.   Yes, like --
10           MR. WOOD:  Object to form.
11           THE WITNESS:  -- in the example I
12       just gave.  I'm sorry.  Craig, I'm sorry.
13   BY MR. GALLINARO:
14       Q.   Okay.  Well, how about the example
15   of someone who's unaware that they were
16   sexually assaulted because they were
17   unconscious; is that an additional example?
18       A.   Yes.
19       Q.   Okay.  I just wanted to be clear
20   whether you were referring to the learning of
21   it after the fact or the experience itself.
22           So if you look over to the DSM, the
23   diagnostic criteria in paragraph A refers to
24   the exposure to actual or threatened death,

36 (Pages 138 - 141)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 142

1    serious injury or sexual violation in any one
2    or more of the following ways.  One is
3    "directly experiencing the traumatic event."
4            And would that be the one that you
5    believe is supported by her experience?
6        A.   Yes.
7        Q.   Okay.  Your paragraph one -- I'm
8    sorry, I'm going to be flipping back and forth.
9    So in Exhibit-10, paragraph one, you said,
10   "Direct exposure to a traumatic event as
11   reported in the investigation report."
12           Did you have a copy of the
13   investigation report?
14       A.   No.
15       Q.   Okay.  So what -- how is it that
16   you were referring to what was reported in it?
17       A.   I'm referring to the fact that this
18   was already established for the hearing board,
19   that this was something that they had
20   information about from investigators.
21       Q.   Okay.  When you say that it was
22   established, do you mean that it was
23   established that it was her claim?
24       A.   Yes.  It was established in writing

Page 143

1    through trained investigators who took her
2    report.
3        Q.   Okay.  So she claimed to have
4    experienced the traumatic event, that's what
5    you're referring to?
6            MR. WOOD:  Object to the form.
7            THE WITNESS:  Yes.
8    BY MR. GALLINARO:
9        Q.   Okay.  So I guess if that forms --
10   and that's required, right, you have to meet --
11   in order to be diagnosed with acute stress
12   disorder, you have to, first, have been exposed
13   to a traumatic event before we start looking at
14   whether the remaining criteria are met,
15   correct?
16       A.   Right.  That's for A, Criteria A,
17   yes.  The exposure is part of it.
18       Q.   Okay.  So would you agree with me
19   that you have to accept as a starting point the
20   truth of what the Title IX hearing is trying to
21   determine as an end point, which is whether or
22   not she was sexually assaulted.
23           MR. WOOD:  Object to the form.
24           THE WITNESS:  In most situations

Page 144

1            where someone is coming to me with a
2            traumatic experience, I am accepting their
3            experience as told to me, and in this case
4            as already reported through the
5            investigators.
6    BY MR. GALLINARO:
7        Q.   So you, as we discussed before, you
8    believe the patient when they tell you
9    something?
10       A.   I do believe the patient when they
11   tell me something, and then there are the other
12   factors that I am assessing, which are, you
13   know, their presentation, including things that
14   are behavioral, nonverbal and whether those
15   would consistently match up with what they're
16   telling me in terms of a diagnosis.
17       Q.   Okay.  But as we said before, you
18   don't do any independent investigation of
19   whether their claim is true, correct?
20       A.   I'm not investigator, that's true.
21       Q.   And you didn't read the
22   investigation report, so you didn't know what
23   the respondent's version of the story was,
24   correct?

Page 145

1        A.   Correct.
2        Q.   You just accepted her claim that
3    she was exposed to a traumatic event, correct?
4        A.   I was her counselor and therapy --
5    you know, treating -- treatment provider, so
6    yes.
7        Q.   And your concluding paragraph of
8    your letter, which reads, "In my professional
9    clinical opinion, ▇▇▇ experienced a traumatic
10   event as she described when interviewed."
11           Just to be clear, so you're
12   referring to the sexual assault, correct?
13       A.   Yes.
14       Q.   Okay.  So rather than a diagnosis,
15   you're concluding -- your conclusion as set
16   forth in this letter is that she was assaulted?
17           MR. WOOD:  Object to the form.  The
18           report speaks for itself.
19   BY MR. GALLINARO:
20       Q.   Do you agree that your conclusion
21   is that ▇▇▇ experienced a traumatic event?
22       A.   My conclusion, yes, is that, in my
23   clinical opinion, that she experienced a
24   traumatic event based on, you know, all the

37 (Pages 142 - 145)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 146

1  other criteria and symptoms that are listed,
2  that may have been the traumatic event that she
3  described in the report.  It could have been
4  something else, but that she met criteria for
5  that diagnosis based on my clinical
6  interpretation and observations and assessment
7  of her and what she reported to me.
8      Q.    But you didn't say it may have been
9  something else; you said that she experienced
10  the traumatic event as she described when
11  interviewed, referring to the investigation
12  report.  So your conclusion was that she was
13  sexual assaulted by ███████████ correct?
14          MR. WOOD:  Object to the form.
15          THE WITNESS:  My conclusion is that
16      those would all be consistent.
17  BY MR. GALLINARO:
18      Q.    I'm sorry, I didn't follow that.
19  Those would all be consistent with what?
20      A.    The experience of her trauma as she
21  described it when interviewed would be
22  consistent with her clinical presentation.
23      Q.    Okay.  And based upon that, you
24  concluded that she experienced the traumatic

Page 147

1  event, correct?
2      A.    Her symptoms would be consistent
3  with the traumatic event as she described it.
4  That's my -- that was my clinical opinion.
5      Q.    Okay.  Well, you didn't say -- you
6  didn't say it would be consistent.  You said
7  based on your professional clinical opinion,
8  she experienced a traumatic event.  Did you
9  make a mistake?
10      A.    No.  I'm saying that's my clinical,
11  professional opinion.
12      Q.    Okay.  And, again, you hadn't
13  reviewed any of the evidence that was
14  available, correct?
15      A.    I wasn't privy to any of that
16  information.
17      Q.    And you're aware that you were
18  providing this letter with this opinion to the
19  board members who would be deciding the
20  responsibility of Mr. ████ in the disciplinary
21  proceeding, correct?
22      A.    I was aware of that, and my role is
23  not as a forensic professional.  My role is as
24  a clinical professional.  I'm not trained

Page 148

1  forensically.  I'm not purporting that my
2  clinical opinion is set forth to answer policy
3  or legal questions.  I was requested to provide
4  a letter that spoke to the experience as I
5  understood it from ████ and so I am providing
6  that clinical opinion.
7      Q.    Okay.  And were you aware that the
8  board members that you were supplying this
9  letter to were people that you had trained in
10  2016 during those presentations that we
11  reviewed earlier in your deposition?
12          MR. WOOD:  Object to the form.
13          THE WITNESS:  I don't know if that
14      was on my mind or not.
15  BY MR. GALLINARO:
16      Q.    Whether it was on your mind, do you
17  know if -- did you know at the time that those
18  were the individuals who would be receiving the
19  report?
20      A.    I probably knew some of them.  I
21  didn't know the current composition, the entire
22  composition of the board.
23      Q.    Would you agree with me that when
24  two people dispute whether an event happened,

Page 149

1  you should typically hear from both sides
2  before you form an opinion as to whether that
3  event happened?
4          MR. WOOD:  Object to the form.
5          THE WITNESS:  Would I agree that
6      who should do that?
7  BY MR. GALLINARO:
8      Q.    You.  If you're going to --
9      A.    I'm not --
10      Q.    -- that an event happened, would
11  you first want to hear from the other side of
12  the case?
13          MR. WOOD:  Object to the form.
14          THE WITNESS:  I mean it's
15      hypothetical.  That would be case by case,
16      but I'm usually working with one
17      individual in a clinical counseling
18      setting, and I'm not an investigator or a
19      member of a hearing board.
20  BY MR. GALLINARO:
21      Q.    Okay.  Looking back to the symptoms
22  that you've described here in paragraphs one --
23  starting with paragraph number one, the
24  symptoms seem to track the language that's used

38 (Pages 146 - 149)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 150

1  in the DSM. Is that -- is that the way that
2  ████ described her symptoms to you or do you
3  sort of recast them based on your understanding
4  of the DSM?
5      A.   That would have been both her
6  report, my observations of her behavior and
7  affect, as well as, you know, the appropriate
8  clinical terms to use to describe experiences
9  that a student may be using, you know, lots of
10  different language to report. I wasn't quoting
11  her but summarizing the experiences.
12      Q.   Okay. I guess I'd like to kind of
13  go through each one and ask you which of these
14  you were able to personally observe. So were
15  you able to personally observe that she had
16  experienced recurrent involuntary and intrusive
17  memories?
18      A.   No. That would have been her
19  report.
20      Q.   Okay. Were you able to personally
21  observe that she had recurrent distressing
22  dreams?
23      A.   Nope. That would have been her
24  report.

Page 151

1      Q.   Okay. Did you personally observe
2  her negative mood?
3      A.   Yes.
4      Q.   Okay. Describe that, what you
5  observed, if you can.
6      A.   I would need to refer to my
7  clinical notes at the time to accurately use
8  the best words to describe that, but that would
9  have certainly been something that I observed
10  in her.
11      Q.   Okay. Did you observe avoidance
12  symptoms?
13      A.   Not necessarily. That depends.
14  Sometimes, again, I don't recall without seeing
15  my notes if that's something that was
16  observable or not.
17      Q.   Okay. The paragraph five here that
18  says avoidance symptoms, it goes on to provide
19  a little bit more detail. It says, "████
20  avoids being alone, attempts to distract
21  herself from thoughts, and avoids particular
22  places on campus."
23      Do you know what places on campus?
24  Do you recall what places on campus she

Page 152

1  avoided?
2      A.   I don't.
3      Q.   Did you check with -- you didn't
4  check with any of her friends to see if that
5  was consistent with what they were
6  experiencing, right?
7      A.   That would be beyond the scope and
8  beyond the limits of my confidentiality with
9  her.
10      Q.   Did you understand that one of the
11  places she would have wanted to avoid being was
12  near the fraternity house where the event
13  occurred?
14      A.   I don't remember.
15      Q.   You don't recall? Did you observe
16  paragraph number six, her sleep disturbances?
17      A.   No.
18      Q.   So, again, that's just her report?
19      A.   Correct.
20      Q.   Did you observe her hypervigilance?
21      A.   That is something that could be
22  observable, again, without looking at my notes,
23  but that would be something that could be
24  observable in a clinical setting.

Page 153

1      Q.   How would you observe if she were
2  hyperaware of her surroundings and making sure
3  she was aware of who was around and whether she
4  feels safe?
5      A.   How would someone display those?
6      Q.   Yes.
7      A.   Because I don't recall what she
8  specifically did, so I just want to clarify
9  that.
10      Hypervigilance could look like, in
11  a clinical way, someone whose eyes are flitting
12  about, someone whose -- any sound that is made
13  in a room, that someone is having a -- let's
14  see, it could be a startle response. It could
15  also just be a response, you know, really
16  noticing any sounds or other people that may
17  be, you know, even in the periphery of their
18  view. Those are examples.
19      Q.   Okay. And you just don't recall
20  whether you actually observed any of those
21  things with regard to ████
22      A.   I don't recall if part of that was
23  my observation, part of it was her report, or a
24  little bit of both.

39 (Pages 150 - 153)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 154

1    Q.    With regard to the sleep
2 disturbance, did you ask her any questions
3 about whether she would have been taking
4 sleeping aids or anything in followup to her
5 report that she had experienced sleep
6 disturbance?
7    A.    Without my notes, I don't recall.
8    Q.    Okay.  Paragraph eight, difficulty
9 concentrating, is that anything you were able
10 to observe?
11    A.    Again, I don't recall.  That's
12 certainly something that can be observable for
13 a clinician.  Are you able to concentrate when
14 I'm talking to you right now, you know, that is
15 something you can determine.
16    Q.    Okay.  Could you walk me through
17 your method in determining that she has these
18 symptoms?  How do you go about tracking what
19 she's reporting and arriving at the diagnosis?
20        MR. WOOD:  Just a clarification --
21        THE WITNESS:  Are you asking --
22        MR. WOOD:  Yeah.  Are you asking in
23    this case or in general?
24

Page 155

1 BY MR. GALLINARO:
2    Q.    I guess I'll start with in general.
3    A.    In general, I would be doing a lot
4 of listening to what the person is saying,
5 first and foremost, in terms of why they've
6 come and, you know, what they are -- what they
7 are here to talk about.  And then I would be
8 asking a lot of questions possibly to determine
9 the different ways it's affecting somebody.
10 Now these are questions that I would be asking
11 when I meet a person for the first time whether
12 it was sexual assault or not.  So I'm going to
13 ask people about -- I'm going to ask them
14 about, you know, how they're doing in school,
15 you know, those sorts of things.  So some of
16 them are going to be questions that I ask in
17 general when I'm assessing somebody.  Asking
18 questions to get them to sort of describe more,
19 right, about their experiences and the
20 different ways.
21        So I might not be asking about a
22 specific symptom, but rather sort of drawing
23 things out of them to tell me more about their
24 daily life, how things are going for them,

Page 156

1 maybe what is different now than it used to be
2 for them.  So if they only recently experienced
3 depression, what was their -- how did they
4 experience life before that?  What's been the
5 change?  So those sorts of things.
6        So I'm just trying to draw out as
7 much description from them as possible about
8 their functioning and their emotional
9 experiences, their cognitive experiences.  That
10 would be my -- I can't say there's not
11 something I'm not thinking of, but those would
12 be, sort of, the typical ways that I might be
13 assessing someone who's presenting to me new
14 for the first time or early on.
15    Q.    In going through the questions, do
16 you have a checklist sort of or a cheat sheet
17 of things you should be asking about or is it
18 all upstairs?
19    A.    Typically, when I'm meeting someone
20 for the first time, I have a form, I guess, I
21 would use, with some prompts about their mental
22 status, their sleep.  I'm not looking at it
23 right now.  I can't think, but I -- typically,
24 I can't say for sure, again, that I used that

Page 157

1 it in her case.  I usually use something like
2 that that is prompting me to kind of, you know,
3 ask those questions.  If I didn't have that in
4 front of me, you know, these are the types of
5 interviews that I've been doing for, you know,
6 my entire career starting with training, so you
7 know, there are things that come pretty readily
8 once you're building that rapport with someone
9 and kind of, you know, asking about, you know,
10 some pretty standard types of things.
11    Q.    We were just discussing your sort
12 of general practices.  Is there any reason you
13 think in this case your interaction with ████
14 would have differed from your general practice?
15    A.    Not any reason that I can recall.
16    Q.    Okay.  Are there particular
17 diagnoses that you're, sort of, more concerned
18 with when you're interviewing someone that's
19 reported they have been sexually assaulted?
20 Like are you, just to try to clarify what I
21 mean, are there a specific set of, like PTSD,
22 acute stress disorder, ones that are like right
23 there at the top of what you're expecting the
24 person to maybe experience, so you ask

40 (Pages 154 - 157)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 158

1  questions sort of geared towards whether
2  they're experiencing those symptoms?  Does that
3  make sense?
4      A.   Yeah.  Sure.  I would be thinking
5  about those symptoms if someone -- if that was
6  what they came and presented with.  Those would
7  be things I would be tuned into especially.
8      Q.   So what are the, sort of, the top,
9  you know, top-of-the-list conditions that you'd
10  be on the lookout for for someone who reported
11  as a -- that they had been sexually assaulted?
12      A.   So as you said, certainly, you
13  know, the possibility of a trauma diagnosis or
14  PTSD.  You know, acute stress disorder and PTSD
15  are related to differences in the timing,
16  relation to the event and sort of the duration,
17  so I'd be paying attention to that, but I'd be
18  paying attention to mood generally.  I'd be
19  paying attention to anxiety.  Those can be --
20  those can exist in a co-morbid way, right.
21  They can also be -- they can also be distinct
22  for some people.  I'd be asking about, you
23  know, maybe substance abuse in some cases.
24          There are, you know, it's not that

Page 159

1  I don't ask certain questions, but, yes, I
2  might be tuning in more to those things if
3  someone said they had an experience of an
4  assault or an abuse history.
5      Q.   Do you do anything to make sure
6  that you're not suggesting symptoms to your
7  patient?
8      A.   I mean, I am trying not to put
9  words in their mouth.  I'm not interrogating
10  them.  I'm not -- I'm not an investigator.  So
11  I'm really just asking, tell me about your
12  sleep.  Tell me about your mood.  If they don't
13  know what I mean, I might say, well, is it more
14  like this or more like that, but I'm really
15  trying to let them tell me what they're
16  experiencing.  And I would say, again, that's
17  my general practice, not with regards
18  specifically to someone who's reporting an
19  assault experience.
20      Q.   Okay.  Would your practice be any
21  different for someone who had reported a sexual
22  assault experience?
23      A.   I don't think so.
24      Q.   Okay.  Do you make sure you ask

Page 160

1  them about each and every symptom of the acute
2  stress disorder or PTSD in your interviews to
3  see if they meet those diagnostic criteria?
4      A.   It depends.
5      Q.   Okay.  Do you think you did that in
6  ▓▓▓▓▓ case?
7      A.   I certainly wouldn't have reported
8  anything that I didn't feel I had either asked
9  about or that she had reported.  So if it's --
10  you know, based on the fact that I'm looking at
11  this letter and I'm reporting these things
12  then, I'm sure that it was covered in the
13  sessions that I had with her.
14      Q.   Okay.  And I guess what I'm trying
15  to understand is, do you have to draw out
16  whether she's experiencing these things or is
17  she able to sort of tick off by just talking to
18  you, without you prompting her, each and every
19  one of these symptoms that you've reflected
20  here?
21      A.   It would be very unusual in my
22  experience that someone comes in and ticks off
23  a list of symptoms.  So unusual I would almost
24  say that I don't know that I've really ever

Page 161

1  experienced that.  It's usually in the course
2  of conversation, of talking with them and, as
3  you said, drawing things out so that I can
4  better understand.  Again, people don't come to
5  me on a mandate, so people are coming to me
6  asking for treatment or, you know, they may not
7  use that word, but asking for support, asking
8  for guidance or advice.  And they are, you
9  know, often in distress about something that's
10  happened or uncomfortable with, you know, how
11  things are going for them.  So, you know, it
12  becomes a, sort of a conversation of me trying
13  to really fully understand all of those things
14  for them and listening to them say what they
15  need to say as well as asking questions when I
16  feel I need more information.
17      Q.   Do you think or did you think it
18  was important to consider ▓▓▓▓ motive in
19  obtaining a diagnosis from you when you
20  prepared it?
21      A.   I'm not seeing where ▓▓▓▓ asked for
22  a diagnosis.
23      Q.   Well, she asked you for something,
24  right?  She asked you for some kind of letter?

41 (Pages 158 - 161)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 162

1    A.    Yes.
2    Q.    And you drafted this letter that
3  we're reviewing in Exhibit-10, correct?
4    A.    Correct.
5    Q.    So did you -- did you provide her
6  with a diagnosis without her asking you to do
7  that?
8         MR. WOOD:  Object to the form.  She
9  testified as to what she was requested
10 already.
11        THE WITNESS:  I mean, ███ asked
12 for me to ex -- the letter would
13 illustrate how I had seen the experience
14 affect her, and I don't recall my exact
15 thinking process, but one way for me to
16 illustrate that as a professional is to
17 provide that in the form of, you know, an
18 official, sort of, clinical assessment.
19 BY MR. GALLINARO:
20   Q.    So it was your idea to provide it
21 in the form of a diagnosis as opposed to just
22 relaying what she had experienced?
23   A.    I don't recall being asked to
24 provide it in the form of a diagnosis from

Page 163

1  anyone else.
2    Q.    So given that's the case then, it
3  would have been your decision to do that?
4    A.    I think so.
5    Q.    Okay.  You understood that
6  ███ -- the reason for ███ request was to
7  help influence the outcome of her disciplinary
8  proceeding?
9         MR. WOOD:  Object to the form.
10        THE WITNESS:  She said that her
11 hearing advisor said it would be helpful,
12 I believe, is what the email says.
13 BY MR. GALLINARO:
14   Q.    This wasn't in furtherance of her
15 treatment, right?  This wasn't in furtherance
16 of the counseling you were providing her; this
17 was for a different purpose.  This was to
18 influence the outcome of her disciplinary
19 proceeding, correct?
20        MR. WOOD:  Object to the form.
21        THE WITNESS:  I mean I think that's
22 assuming what she was thinking, which I
23 don't know, but it says a letter that
24 could be included in her investigation

Page 164

1  report, is what the hearing advisors
2  recommended to her, so I guess to at least
3  be one piece in that investigation report.
4  BY MR. GALLINARO:
5    Q.    Well, it was your understanding
6  that this was to be used to help bolster her
7  claim in the Title IX proceeding.
8    A.    I don't know that I would say that
9  that's exactly what I was thinking.  I think
10 that she asked for me to do something, and I
11 was doing it to really support her.  I don't
12 know what I thought or how it would be viewed
13 or weighted or regarded.  I was really doing it
14 because she asked.
15   Q.    Okay.  But you wrote it to the
16 chair of the hearing board, so you had an
17 understanding of what you were doing, right?
18 You were providing this to the board members.
19        But is it your testimony that you
20 didn't understand what the purpose of that
21 would then be used for?
22   A.    I don't know how --
23        MR. WOOD:  Object to the form.
24        THE WITNESS:  Sorry.  I don't know

Page 165

1  how they would weight that or view that.
2  I don't know what else, as you asked
3  before, I didn't see any other aspects of
4  the report.  I really just viewed it as
5  one piece that represented my clinical
6  impressions.
7  BY MR. GALLINARO:
8    Q.    Do you think it would be a piece
9  that would support her case, undermine her case
10 or be detrimental to her case?
11        MR. WOOD:  Object to the form.
12        THE WITNESS:  I think it was
13 consistent with what her claim was.
14 BY MR. GALLINARO:
15   Q.    If you flip back to the DSM, there
16 is a section amongst the criteria that says
17 have to be met that include "associative
18 symptoms."  Do you see that?  And that's on
19 page 281 of Exhibit-11.
20   A.    Yes.  I do see that.
21   Q.    Okay.  And associative symptoms
22 include "inability to remember an important
23 aspect of a traumatic event," correct?
24   A.    It says that, yes.

42 (Pages 162 - 165)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 166

1    Q.    Okay.  And you did not include that
2  in your diagnosis, correct?
3    A.    It doesn't appear so in my letter.
4    Q.    Okay.  And so because it's not in
5  your letter, would I be correct in concluding
6  you did not ascribe her inability to remember
7  the sexual intercourse with any kind of amnesia
8  or memory issues related to trauma?
9    A.    I'm not sure I understand your
10  question --
11    Q.    Okay.
12    A.    -- exactly the way -- I'm just not
13  sure how...
14    Q.    I'll try to rephrase it.
15        There's an aspect of acute stress
16  disorder that falls under the category of
17  associative symptoms which --
18    A.    Right.
19    Q.    -- references an inability to
20  remember part of the traumatic event or aspects
21  of the traumatic event.
22        You did not include that in your
23  diagnosis of ████
24    A.    Right.

Page 167

1    Q.    So what I'm asking is if, is it
2  fair for me to then conclude that you don't
3  believe that the reason she can't remember the
4  sexual assault is because she was traumatized?
5  That's not the conclusion you reached.
6    A.    I mean I can't say that for sure.
7  I agree that it wasn't one of the things that I
8  listed that -- that met the criteria for the
9  trauma diagnosis.  I guess I can't say
10  definitively that that means I ruled out every
11  single other thing on this list.
12    Q.    Okay.
13    A.    I just can't say for sure that I
14  hadn't ruled out anything that wasn't there,
15  but the ones that I put were things that I
16  felt were salient to me at the time based on my
17  interview and meetings with her.
18    Q.    Did you form any opinions as to why
19  she was unable to remember the traumatic event?
20    A.    I don't think it was clear a
21  hundred percent.
22    Q.    Okay.  So because it wasn't clear
23  to you, you couldn't form an opinion to a
24  reasonable degree of professional certainty,

Page 168

1  correct?
2    A.    I mean, I just don't remember
3  weighing it in that particular way to say that
4  I agree with the statement as you just put it.
5  But you are asking, you know, what did I think,
6  and to the best of my ability, I don't remember
7  it being, sort of, clear why -- or that I had
8  an opinion as to why she couldn't remember.
9    Q.    Okay.  Flipping back to the DSM,
10  just to kind of walk through how you meet the
11  criteria here, under paragraph A, you first
12  have to be -- you first have to have
13  experienced trauma, right?
14    A.    Correct.
15    Q.    And B was, assuming you've
16  experienced a trauma, then you need to
17  experience nine or more of the following
18  symptoms, correct?
19    A.    Yes.
20    Q.    Okay.  Your letter, if we look back
21  at it now, includes as paragraph one, "direct
22  exposure to the traumatic event."  So that's
23  paragraph A of the DSM, correct?
24    A.    Yes.

Page 169

1    Q.    Okay.  And then B, we now have to
2  find nine symptoms, and in your letter, would
3  you agree with me, that paragraph number nine
4  and ten are not the symptoms that are listed
5  under B?
6    A.    Let me just clarify.  Let me look
7  at that for one second.
8    Q.    Sure.
9    A.    Correct.  Yes, I agree.
10    Q.    Okay.  So excluding one and nine
11  and ten, we only have seven symptoms, and the
12  DSM requires nine.
13        Do you agree that you haven't
14  actually listed criteria that supports the
15  diagnosis you provided?
16    A.    No.  I don't agree.
17    Q.    Okay.  Well, where are the other
18  symptoms that are required?  You need nine; do
19  you agree?
20    A.    Well, since none of these are, like
21  in categories, and so there could be more than
22  one in any of those categories.  I'm just
23  looking at this to pull out an example if I
24  can.  Let me see.

43 (Pages 166 - 169)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 170

1    Q.   Okay.
2    A.   Okay.  So, for example, under
3  Avoidance, that's number five for me, and say
4  there were avoidance symptoms.  But if you look
5  at avoidance in the DSM on page 281, there are
6  two separate ways that that can be manifested.
7  So in my bullet point number five, I include
8  both of those types.  Do you see what I'm
9  saying?
10   Q.   I do.  And the DSM goes on to
11 require, once you've met those, you've ticked
12 off nine of the symptoms of the 14 that are
13 listed, you also have to satisfy a duration
14 which you address, I believe, in paragraph ten,
15 correct?
16   A.   Yes.  I think so.
17   Q.   Okay.
18   A.   Yes.  Right.
19   Q.   Okay.  And then paragraph D says,
20 "The disturbance causes clinically significant
21 distress or impairment in social, occupational
22 or other important areas of functioning."
23        Can you tell me where your letter
24 addresses that requirement?

Page 171

1    A.   Yeah.  No, it does not address
2  that.
3    Q.   Okay.  So is that something that's
4  missing from the diagnosis?
5    A.   I think I was sort of wrapping it
6  into the conclusion that these symptoms affect
7  her in, sort of, the affect of the emotional,
8  cognitive and behavioral condition overall, but
9  I did not specifically layout criteria in, I
10 guess it's D.
11   Q.   Okay.  What would -- what does it
12 mean to say that a distress or impairment is
13 clinically significant?  What does that mean?
14   A.   You know, like most of what I do in
15 this work, as you can probably see, you know,
16 it's subjective, and it's kind of the
17 collective -- I mean I feel like this is sort
18 of a summary, criterion D, of all of these
19 things are happening and it's distressing for
20 ██████  And that distress is shown, you know, by
21 sort of the collective of all of these symptoms
22 and just the way that it's affecting her.
23   Q.   Can you recall what, if any,
24 clinically significant impairment or distress

Page 172

1  ██████ experienced that would have satisfied this
2  diagnostic criteria?
3    A.   I can't tell you what exactly I was
4  thinking at the time, but just looking back at
5  this, I would say she's having trouble
6  sleeping.  She's having trouble concentrating.
7  She's a student, so that's affecting her
8  ability to function as a student, both if she
9  can't sleep, if she can't concentrate.  It's
10 affecting socially if she's worried about where
11 she's going, et cetera.  Like those would be
12 the things that support that.
13   Q.   And, again, those are the type of
14 things that you would be understanding based on
15 her self-report?
16   A.   Correct, as is true for all of the
17 work that I do, essentially.
18   Q.   I think it's 12, almost 40.  It's a
19 good time -- I'm getting a little hungry if --
20   A.   As am I.
21   Q.   -- you wouldn't mind taking a lunch
22 break.
23   A.   That would be great.
24

Page 173

1           - - -
2     (Lunch recess 12:38-1:10 p.m.)
3           - - -
4  BY MR. GALLINARO:
5    Q.   Dr. Boller, we just came back from
6  a break, and if it's all right with you we'll
7  proceed now.
8    A.   Yes.
9    Q.   Okay.  I'd like you to turn to
10 Exhibit-13 if you could.
11   A.   Okay.
12          - - -
13     (Whereupon the document was marked,
14    for identification purposes, as
15    Exhibit-13.)
16          - - -
17 BY MR. GALLINARO:
18   Q.   And do you recognize this document?
19   A.   Yes.
20   Q.   Okay.  And did you review this
21 document in preparation for your deposition?
22   A.   Yes, briefly I looked at it.
23   Q.   And you would agree with me this is
24 the summary of your interview with Lauren Kozak

44 (Pages 170 - 173)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 174

1  and Jason Rodocker on April 17, 2017?
2      A.   Yes.  Correct.
3      Q.   Do you recall who contacted you to
4  set up this interview?
5      A.   It was either Lauren Kozak or Jason
6  Rodocker.
7      Q.   Do you recall any discussion about
8  why they wanted to interview you?
9      A.   I don't recall a discussion about
10  why, no.
11      Q.   Did you have any understanding of
12  what they were interested in hearing about from
13  you before you actually sat down and
14  interviewed with them?
15      A.   I don't remember exactly what they
16  said ahead of time.  I mean, I knew it was
17  about the, you know -- I knew it was about ▮▮▮
18  and the case, but I don't know that I knew
19  anything more than that.
20      Q.   Okay.  Is it your recollection that
21  this is, while maybe not a verbatim transcript,
22  but that it fully describes what occurred
23  during the interview, or is this more of a
24  summary of the main points that occurred during

Page 175

1  the interview?
2      A.   I don't know if this answers your
3  question, but what I would say is that I don't
4  believe they asked me other questions that are
5  not reflected here, but I think that the
6  answers are a summary of the answers that I
7  provided.
8      Q.   Okay.  About how long did the
9  interview last, do you think?
10      A.   I don't recall, but I would say not
11  more than an hour.
12      Q.   Were you -- did you have any
13  materials with you when you provided the
14  interview?
15      A.   I don't remember if I had my notes
16  in front of me or not.
17      Q.   Okay.  Did they have any materials
18  with them when they interviewed you?
19      A.   I mean, they had a pad of paper and
20  I believe were taking notes, but I don't know
21  if they had other materials.
22      Q.   Did they show you any documents?
23      A.   No.
24      Q.   The first question that's listed

Page 176

1  here says, "In the Listed Criteria, it says
2  that ▮▮▮ experiences memories of the event.
3  What memories did she describe?"
4          And then the answer that's
5  reflected here says, "▮▮▮ doesn't remember the
6  incident itself.  Rather she remembers details
7  about being with him, wanting to go asleep,
8  saying she was thirsty.  She has memories of
9  the next day when she saw the used condom and
10  asking him about that.  Her memories all relate
11  to aspects surrounding the event but not the
12  event itself."
13          Did I read that correctly?
14      A.   Yes.
15      Q.   Okay.  Did you -- this describes
16  her inability to remember the event itself, and
17  I presume by that, you mean the nonconsensual
18  sexual intercourse that occurred.
19      A.   Correct.
20      Q.   Did you have any discussion with
21  the investigators pertaining to ▮▮▮
22  inability to recall the consensual sexual
23  activity that proceeded the nonconsensual
24  activity?

Page 177

1      A.   I don't recall asking about this or
2  talking about that at all.
3      Q.   Okay.  So a topic of their
4  questions didn't address why she was unable to
5  remember consensual acts.  They focused on the
6  nonconsensual act; is that accurate?
7      A.   I think they just focused on this
8  one incident.
9      Q.   Well, did you understand that ▮▮▮
10  reported that there was consensual and
11  nonconsensual activity?
12      A.   I actually don't recall that until
13  you're saying that right now.
14      Q.   I'll represent to you that
15  according to her, there -- let me back up.
16          I'll represent to you that the
17  parties did not dispute that oral sex occurred.
18  ▮▮▮ position was that she did not recall
19  specifically performing oral sex but thinks
20  that she likely did, and if she did, it would
21  have been consensual.  That was her position.
22      A.   Okay.
23      Q.   With that representation, do you
24  remember that being part of anything that ▮▮▮

45 (Pages 174 - 177)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 178

1  told you during your counseling sessions?
2      A.   I just don't recall.
3      Q.   Okay.  And you don't recall whether
4  the investigators asked you about any of her
5  inability to remember that aspect of their
6  encounter, the oral sex?
7      A.   I really don't recall anything like
8  that.
9      Q.   Okay.  So because you don't recall
10 any, even knowing that there was consensual
11 sexual activity, would it be fair then to
12 conclude that you didn't form an opinion as to
13 why she was unable to remember consensual
14 sexual activity?
15          MR. WOOD:  Object to the form.
16          THE WITNESS:  Again, without
17     looking at my notes, I really don't know
18     if I had an opinion as to that or not,
19     because I don't remember -- I don't really
20     remember any of the details you're
21     accounting to me, so I just don't know.
22 BY MR. GALLINARO:
23     Q.   Okay.  The second question they ask
24 you mentions, "The criteria mentions having

Page 179

1  daily dreams related to rape.  Did she describe
2  the dreams?"  And then the response reflected
3  here is, "▇▇▇ recorded daily dreams in which
4  her perpetrator tells her calmly that he has
5  raped her in the past and that she didn't know
6  it.  In other words, her dreams are not
7  memories of the incident, but about hearing
8  from her perpetrator that he raped her and she
9  did not know it."
10         First, did I read that correctly?
11     A.   Yes.
12     Q.   Okay.  And as we described before,
13 this is based on your understanding, based on
14 what ▇▇▇ has reported to you, correct?
15     A.   Yes.
16     Q.   Is it your -- is it typical in your
17 experience dealing with sexual assault victims
18 that their dreams -- that they would have
19 dreams about other interactions with the
20 perpetrator -- I'll use that word -- other than
21 what actually happened?
22     A.   I don't think there's any typical
23 in that situation.  I think that it's so
24 variable for people who've experienced trauma.

Page 180

1  If there are dreams and the content of those
2  dreams, I just don't think there is a typical.
3      Q.   Okay.  The third question is, "In
4  the listed criteria, it says that the symptoms
5  are not attributable to any other condition.
6  Can you describe the difference between acute
7  stress disorder and generalized anxiety
8  disorder?"  And then your answer goes on to
9  address that, correct?
10     A.   Right.  Yes, correct.
11     Q.   You note that, "Even though the
12 symptoms between those two disorders overlap,
13 the quantity and specificity of the symptoms
14 indicate that ASD is the more accurate and
15 appropriate."
16         Is that correct?
17     A.   Yes.
18     Q.   Okay.  But you didn't have any
19 understanding of what her symptoms were that
20 led to her generalized anxiety disorder; did
21 you?
22     A.   Again, without my notes, I don't
23 know how much detail was shared with me about a
24 prior diagnosis of anxiety or not.  That

Page 181

1  doesn't mean none of those symptoms would have
2  come up or that I have no -- you know, that I
3  haven't taken any notes about that, but I don't
4  recall.  And, again, there is -- you know,
5  there is overlap, and some of those general
6  symptoms of anxiety, you know -- you know, may
7  or may -- may or may not have been present, but
8  because the acute stress disorder criteria is
9  sort of a higher threshold and more -- you need
10 more, sort of, specific symptoms to meet that,
11 that that one still seems like the appropriate
12 diagnosis.
13     Q.   Okay.  If you come down a little
14 bit, though, it does say here that Dr. Boller
15 did not know ▇▇▇ before this incident, so she
16 cannot offer a pre and post comparison.
17         Do you see that?
18     A.   Right.  Yes, I do.  Correct.
19     Q.   If she had had all these prior
20 symptoms and it were unrelated to any trauma,
21 would that have influenced your diagnosis?
22     A.   I mean, that's hard to say.  But
23 are you saying -- can you ask it one more time?
24     Q.   Sure.  Like, let's imagine a

46 (Pages 178 - 181)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 182

1  scenario where you did -- you got in touch with
2  her, you know, a counselor who had -- whoever
3  it was that previously diagnosed her with GAD
4  and prescribed Lexapro, and you conclude from
5  that that it seems like she has been
6  experiencing most, if not all, of the symptoms
7  that you referenced in your letter, would that
8  --
9      A.   Okay.
10     Q.   -- affect your diagnosis?
11     A.   Again, as you pointed out when we
12  talked about that letter earlier, you know,
13  criterion A is that there's a trauma.  So it
14  would affect my diagnosis possibly depending on
15  whether there was a previous trauma that would
16  have explained those symptoms at that time.
17     Q.   Well, so let's assume that the
18  trauma -- that she had all the symptoms, right,
19  but no trauma, and that's what led to the GAD,
20  and then she experienced trauma, and then she
21  continued to have all the same symptoms that
22  she already had beforehand.  Would that be a
23  reason to switch the disorder diagnosis from
24  GAD to ASD, or would you conclude it doesn't

Page 183

1  appear that the trauma has changed her symptoms
2  in any way because she had all of these before?
3  Does that make sense?
4      A.   I believe it does.
5      Q.   Great.
6      A.   I mean, it's just -- it's hard for
7  me to say what I would have thought
8  retrospectively.  If there was a trauma, it
9  could have informed it.  If I hadn't seen it
10  myself and there were just factors of, you
11  know, is it possible that it would have
12  influenced me to think about it differently?  I
13  suppose it's possible.  That just -- that
14  wasn't the scenario that I was dealing with, so
15  I can't really say.
16     Q.   Knowing that she had a previous
17  diagnosis, would it have made you -- would you
18  have been able to be more certain of your
19  diagnosis if you had actually been able to
20  review what led to that diagnosis?
21          MR. WOOD:  Object to the form.
22          THE WITNESS:  I felt certain enough
23      with my diagnosis to prepare the letter
24      that I did.  It's hard to say what would

Page 184

1      have made me feel more certain or less
2      certain hypothetically speaking.
3  BY MR. GALLINARO:
4      Q.   Okay.  Well, if you knew -- we
5  don't know what the symptoms, you know, that --
6  neither of us know whatever symptoms she had
7  that led to the GAD.  Right?  So we're both
8  sort of operating in a vacuum here.  But you
9  said that if she had all the same symptoms,
10  that it might impact your current understanding
11  of whether she had ASD.
12          Are we having a shared
13      understanding?
14          MR. WOOD:  Object to the form.
15          THE WITNESS:  I mean, it's all just
16      hypothetical.  So I'm just not -- I'm just
17      not sure.  I mean you're asking if I had
18      different information, would I have
19      reached a different conclusion, and I'm
20      saying that's possible, but I don't know.
21  BY MR. GALLINARO:
22      Q.   Well, you knew that there was
23  information you didn't have, right?  You knew
24  that there was a diagnosis, and you did not

Page 185

1  know the basis for it, correct?
2          MR. WOOD:  Object to the form.
3          THE WITNESS:  I don't remember if I
4      did know that.  I don't remember if I knew
5      that there was a diagnosis.
6  BY MR. GALLINARO:
7      Q.   It's written here in your answer.
8  It says -- in the Listed Criteria, it says
9  "symptoms are not attributable to another
10  condition.  Can you describe the difference
11  between acute stress disorder and generalized
12  anxiety disorder?"
13          Did you not understand they were
14  asking those questions because she already had
15  a preexisting diagnosis?
16     A.   I didn't necessarily think that
17  that's why they were asking that, but also,
18  this came after I had already written the
19  letter.
20     Q.   Okay.  So you're not sure if you
21  knew that she had -- that she ever had GAD?
22     A.   I really just don't recall without
23  seeing my notes.
24     Q.   Okay.  So I guess I'm just

47 (Pages 182 - 185)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 186

1   requesting you to operate under the assumption
2   that she did have a previous diagnosis of GAD.
3   Okay?
4           MR. WOOD:  Object to the form.
5   BY MR. GALLINARO:
6       Q.   Can we -- can we -- can we start
7   from, I'll ask you to just accept for purposes
8   of my question that --
9       A.   Okay.
10      Q.   -- before she ever saw you, she had
11  a previous diagnosis of GAD, for which she had
12  been prescribed Lexapro?
13      A.   Okay.
14      Q.   I want you to assume that's true.
15      A.   Okay.
16      Q.   Okay.  So if you were to -- if you
17  wanted to arrive at the best diagnosis you
18  could possibly give, would you want to know why
19  she had been previously diagnosed with GAD
20  before you arrived at your conclusion that now
21  she has ASD?
22          MR. WOOD:  Object to the form.
23          THE WITNESS:  Possibly so.
24

Page 187

1   BY MR. GALLINARO:
2       Q.   As we discussed, if all the
3   symptoms were the same prior to the traumatic
4   event to after, that might influence your
5   opinion as to whether she actually suffered
6   from ASD?
7           MR. WOOD:  Object to the form.
8           THE WITNESS:  It could have meant
9       that I would have diagnosed her with both.
10  BY MR. GALLINARO:
11      Q.   I guess the point is, you don't
12  know because you didn't have the information,
13  correct?  You don't know how it might have
14  impacted your diagnosis?
15      A.   Exactly.  That's what I'm saying.
16  It feels very hypothetical.  I don't know how
17  it would have impacted me.
18      Q.   Okay.  All right.  The fourth
19  question, I'd like to focus on that now.
20          It says, "Can acute stress disorder
21  be caused if someone believes they have
22  experienced a traumatic event but didn't
23  actually experience it?  Secondly, could it
24  have been caused by the stress of going through

Page 188

1   the investigation and hearing process?"
2           So you were asked whether someone
3   could exhibit symptoms, and again, you -- there
4   are symptoms which you've never observed her to
5   exhibit, correct?
6       A.   Some of them were by her report.
7       Q.   The first sentence of your answer,
8   you say, "Well, Dr. Boller cannot say that that
9   would never be true.  In her opinion, it's
10  highly unlikely to be the explanation for
11  ███████ symptoms."
12          And my first question is, which
13  aspect of the question are you referring to?
14  Because they asked you, could someone have this
15  disorder if someone believes they have
16  experienced something or didn't, and secondly
17  could it have been caused by the stress of
18  going through the process?  And your answer
19  says you can't say it would never be true, but
20  it seems unlikely to be the explanation.
21          Which of those two things is
22  unlikely to be the explanation?
23      A.   I'm just looking at the rest of the
24  answer to see if it was separated out.

Page 189

1       Q.   Sure.
2       A.   It doesn't look like I specify
3   anything that's related to the stress of the
4   process in this answer.  It appears that it is
5   all related to the first question.
6       Q.   Okay.  You go on to say that
7   "Trauma experts believe that trauma is
8   experienced cognitively, emotionally and
9   bodily."
10          With regard to your reference to
11  trauma experts, are there any individuals that
12  you might have been referring to there that we
13  haven't discussed already when I've asked you
14  who's informed your understanding of trauma?
15      A.   Nothing more specific than what I
16  answered earlier.
17      Q.   The next two -- let's move on to
18  the next two sentences.  So, "The body
19  experiences and absorbs trauma and reflects it
20  in a particular way.  It's difficult to imagine
21  a scenario where a person would experience the
22  range and specificity of symptoms as ███████ has
23  when the experience was believed to be true but
24  not actually true.  It would cause one to

48 (Pages 186 - 189)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 190

1  wonder what happened to render the belief so
2  strong.  A possibility would include the
3  presence of a psychotic disorder where reality
4  is acutely disturbed."
5        Are you opining here that unless
6  ███ has some sort of psychotic disorder then
7  what she's saying happened, happened?
8     A.   I'm not sure that I'm saying that.
9  I'm saying that the presentation and my
10  clinical assessment of that presentation,
11  which, yes, it's from self-report, but that is
12  the job that I do every day when I diagnose
13  people, whether it's related to sexual assault
14  or not.  That doesn't mean I'm never wrong but
15  that is like the clinical tool that I have sort
16  of honed over time is sort of like collecting
17  all of that information, right.  I'm saying all
18  of that as presented and assessed, in my
19  opinion, was that that specificity would not
20  be -- would be hard to, sort of, imagine that
21  being experienced if it was something that
22  didn't actually happen.
23     Q.    Okay.  But that doesn't address
24  whether she could have been not telling the

Page 191

1  truth with regard to what experience she was --
2  what symptoms she was experiencing, correct?
3     A.    I wasn't being asked to make a
4  determination of the credibility of her claim.
5  I was asked for my clinical expertise, my
6  clinical opinion.
7     Q.    Okay.  I want to ask you about --
8  and I apologize, I'm just going to close my
9  office door.  I'll be right back.
10        I just want to ask you about, you
11  said you couldn't imagine a scenario, and so I
12  want to discuss with you a potential scenario
13  based on the way the investigation report
14  reflected what occurred.  This is a case, as
15  I've told you, where she has -- there were at
16  least two sexual acts, one of which was
17  consensual according to her, and one of which
18  was nonconsensual according to her, and she
19  doesn't remember either.  Are you with me?
20     A.    Okay.  I mean I don't recall it,
21  but I'm with you.
22     Q.    Okay.  She -- her testimony in the
23  case was that she knew that the vaginal
24  intercourse would have been nonconsensual

Page 192

1  because she has -- at least part of the reason
2  she knew it would have been nonconsensual is
3  because she had a personal rule that she never
4  has sexual intercourse with people that she's
5  not interested in a relationship with, and that
6  Mr. ███ didn't meet that criteria.
7        Do you recall that being a topic of
8  anything you discussed with her?
9     A.    Now that you're saying that, it
10  vaguely rings a bell, but I don't think I would
11  have remembered that otherwise.
12     Q.    Okay.  So the scenario we have is
13  someone who is experiencing something or claims
14  to be experiencing something where they can't
15  remember, sort of, a large portion of their
16  evening.  And they're making assumptions based
17  on what would have been consensual or
18  nonconsensual based on their own personal
19  rules.  Are you with me?
20     A.    I think so.
21        MR. WOOD:  I'm going to object to
22     the form of it, predicate, but you can go
23     ahead.
24

Page 193

1  BY MR. GALLINARO:
2     Q.    So if she -- would you agree with
3  me that sometimes people don't always follow
4  their own personal rules, particularly if
5  they've been drinking?
6        MR. WOOD:  Object to the form.
7        THE WITNESS:  I mean...
8  BY MR. GALLINARO:
9     Q.    Just as a general matter.  Are you
10  aware that alcohol lowers people's inhibitions?
11     A.    Sure.  Yes.
12     Q.    Okay.  Sometimes people do things
13  after they've had a few drinks that they wish
14  they didn't do, right?
15        MR. WOOD:  Object to the form.
16        THE WITNESS:  Yes.  I would imagine
17     that's true.
18  BY MR. GALLINARO:
19     Q.    Okay.  So in a scenario like the
20  one that ███ reported, where she doesn't
21  remember having -- doing oral sex or vaginal
22  sex with Mr. ███ and she's assuming that she
23  would have steadfastly adhered to her personal
24  rule during a time she can't remember, and

49 (Pages 190 - 193)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 194

1  that's the basis for her believing she were
2  assaulted, would that result in the kind of
3  traumatic symptoms that you recorded if she
4  actually were wrong, if she --
5      MR. WOOD: Objection.
6  BY MR. GALLINARO:
7      Q.   -- actually did actively
8  participate in sex and was just wrong that she
9  didn't adhere to her personal rule because she
10  can't remember it?
11      MR. WOOD:  Object to the form.
12  BY MR. GALLINARO:
13      Q.   Are you with me?
14      A.   I mean that's a -- I mean I think
15  so.  It just feels impossible for me to say.
16      Q.   Well, you said you couldn't imagine
17  a scenario in which someone could believe the
18  event to have occurred had it not occurred
19  unless they had some kind of psychotic
20  disorder.  So what I'm giving to you now is the
21  scenario that likely did occur between ███
22  and ███  We know that she didn't remember
23  either act of sex but contested that one was
24  consensual and one was nonconsensual based on

Page 195

1  her own personal rule, but which she likely
2  would have been okay with during a time she
3  can't remember.  Do you understand?
4      A.   Mm-hmm.  I think so.
5      MR. WOOD:  Objection to the
6      predicate.
7  BY MR. GALLINARO:
8      Q.   So if she were not -- if she
9  didn't, for whatever reason, because she had
10  had a couple of drinks that night, she didn't
11  adhere to her personal rule and just doesn't
12  remember it but believes, because she just has
13  this rule, it must have been rape, would that
14  still result in the kind of symptoms that
15  you've described here?
16      MR. WOOD:  Object to the form.
17      THE WITNESS:  Yeah.  I mean, I'm
18      not agreeing to what you're painting as
19      the likely scenario, but you're presenting
20      it as a hypothetical, and I still say it
21      just feels impossible for me to say how --
22      what that would have meant for her
23      diagnosis.  Is that what you're saying?  I
24      mean, I don't know.

Page 196

1  BY MR. GALLINARO:
2      Q.   Okay.  It's not a scenario that you
3  considered in forming your diagnosis, correct?
4      A.   I don't know.
5      Q.   You didn't consider whether she
6  were just mistaken, that she believed that she
7  wouldn't have done something during a time she
8  can't remember when she actually actively
9  participated in it.  You didn't consider
10  whether that could have been the case?
11      A.   Object to the form.
12      THE WITNESS:  I don't believe
13      someone would experience the consistency
14      of traumatic symptoms if it was a mistake
15      and it's not really what happened.  That
16      does not adhere to me with what I know
17      about trauma --
18  BY MR. GALLINARO:
19      Q.   Okay.  And --
20      A.   -- and clinical symptoms.
21      Q.   So a mistaken belief that you were
22  traumatized --
23      A.   Is not the same as trauma.
24      Q.   -- symptoms; is that what you're

Page 197

1  saying?
2      A.   I'm sorry.  I think I cut you off
3  because I thought you were done.  Say the last
4  part of that question.
5      Q.   I'm speaking slow because I'm
6  tired.  A mistaken belief that you've been
7  traumatized because you simply don't remember
8  what happened to you, but you're later told
9  that you were -- you were traumatized, but you
10  weren't, you don't think that that could result
11  in symptoms?
12      A.   I don't have experience with
13  that -- with that situation.
14      Q.   Okay.  The final question in your
15  interview says, "Did ███ express any reason
16  she believes she did not remember the
17  incident?"  And your answer is, "███ wondered
18  whether there were drugs in her seltzer offered
19  to her by the perpetrator because she felt so
20  heavily drowsy so suddenly afterwards in a way
21  that was not normal for her sleep pattern."
22  And Dr. Boller remarked that, "Some people
23  block out traumatic events.  Additionally,
24  someone may not remember due to physical injury

50 (Pages 194 - 197)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 198

1    or someone may be blacked out due to excessive
2    alcohol use.  Dr. Boller cannot say what
3    happened here."
4          Were you opining one way or another
5    whether any of those explanations were the
6    likely cause of her inability to remember?
7       A.   I think I'm being really clear in
8    that response that ███ said one thing, and
9    that I'm proposing possible alternatives that
10   occur to me.
11      Q.   Okay.  But you didn't form -- you
12   didn't -- you weren't concluding that those
13   were likely; you're just saying here's a range
14   of things that might explain it, but I don't
15   really know what happened.  Is that your
16   testimony?
17      A.   I think what I've written here is
18   just really clear that I'm presenting what ███
19   said and other possibilities.
20      Q.   Okay.  And you conclude by saying,
21   "You can't say what happened here," right?
22      A.   I wasn't there.  I have no
23   definitive knowledge of what happened in that
24   situation.

Page 199

1       Q.   Right.  So I just wanted to make
2    sure I'm understanding that you weren't
3    offering any kind of view or expertise of why
4    she couldn't remember.  You're essentially
5    saying you're not sure?
6       A.   I was offering possibilities,
7    including ███ opinion as she presented it to
8    me.
9       Q.   Okay.  But not weighing in with
10   your own expertise saying that it's more likely
11   that this would have happened or something else
12   would have explained it?
13      A.   It doesn't appear that I've stated
14   it that way.
15      Q.   When you reference the fact that
16   ███ wondered whether there were any drugs in
17   the seltzer offered to her, you weren't aware
18   of any medical evidence that would speak to
19   whether ███ had drugs in her system; were you?
20      A.   No. I don't believe so.
21      Q.   Okay.  And other than ███
22   wondering whether that were the case, you can't
23   offer any other detail about that, correct?
24      A.   Right, which is why I didn't.  I'm

Page 200

1    just sort of reporting what she said to me.
2       Q.   Are you aware that ███ reported
3    that the consensual oral sex that she reported,
4    which she was unable to remember, happened
5    before she alleges she drank from the can of
6    seltzer?
7       A.   I don't recall.
8       Q.   Okay.  Well, if you accept for me
9    that that was her statement in the
10   investigation, that I drank the seltzer after
11   the oral sex that I don't remember, are you
12   aware of any drug that can erase memories from
13   before you ingested it?
14      A.   I have -- I mean, I'm not an expert
15   in medications and how it would affect memory
16   either way, so I don't know.
17      Q.   So you don't have experience with
18   date-rape drugs, despite all of your experience
19   treating sexual assault survivors?
20         MR. WOOD:  Object to the form.
21         THE WITNESS:  There are so --
22   sorry, Craig.
23         There are so many different drugs
24   that are used as, quote, date-rape drugs,

Page 201

1    which is why it's difficult to test for
2    them because you'd be running a panel of
3    tests for a multitude of things.  So I'm
4    not familiar with each of them and whether
5    they affect retroactive memory or -- I'm
6    just -- I'm not an expert in that by any
7    stretch.
8    BY MR. GALLINARO:
9       Q.   You can't opine one way or the
10   other whether a drug could do that?
11      A.   I don't know.
12      Q.   Okay.  You note that some people
13   block out traumatic events, right?
14      A.   Yes.  I believe that can happen.
15      Q.   Okay.  But that wouldn't explain
16   her inability to remember consensual sex,
17   right?
18         MR. WOOD:  Object to the form.
19         THE WITNESS:  I mean, again, just
20   difficult -- difficult to say how much
21   memory is affected when someone is
22   blocking out a memory.
23   BY MR. GALLINARO:
24      Q.   So a traumatic event might include

51 (Pages 198 - 201)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 202

1  a blocking of a memory of the events leading up
2  to the traumatic event?
3      A.   Yes.  It can.  It could.
4      Q.   Are you a memory expert?
5      A.   No.
6      Q.   Okay.  That's your understanding of
7  how trauma affects memory?
8      A.   I'm saying that my experience is
9  that some people who've experienced trauma can
10  have difficulty with their memory, and that
11  would be of the things that happened up to and
12  including the event.  So which things are
13  remembered or which things are not, I don't
14  know.  I think it can affect your memory.  So
15  it can affect your memory in different ways.
16      Q.   Okay.  And the nonconsensual sexual
17  activity in this case, according to █████
18  occurred while she was asleep.  I think we
19  discussed this before, but, so we can't -- we
20  can't form memories when we're asleep, right?
21          MR. WOOD:  Object to the form.
22          THE WITNESS:  We remember things
23      when we are asleep, like dreams, so again
24      I'm just not sure what else to say about

Page 203

1      that.
2  BY MR. GALLINARO:
3      Q.   Okay.  When you talk about blocking
4  out memories, are you talking about the concept
5  of repressed memory?
6      A.   Not necessarily.  I'm just saying
7  sometimes people don't remember things,
8  literally from, like even from a head trauma,
9  right.  You cannot remember some things after
10  there has been -- whether that's a, you know, a
11  physical trauma or an emotional trauma.  That's
12  what I'm saying.
13          - - -
14      (Mr. Schwartz entered the
15      proceeding.)
16          - - -
17  BY MR. GALLINARO:
18      Q.   Okay.  And when you reference
19  someone may be blacked out due to excessive
20  alcohol, were you aware, based on █████
21  report, that she was not overly intoxicated at
22  the time of the sexual activity?
23      A.   I don't remember how much alcohol
24  she had ingested.  I don't know.

Page 204

1      Q.   You've acted, I believe, in two
2  other Title IX matters other than this one; is
3  that correct?
4      A.   Oh.  I really don't recall.  Do you
5  mean like in the hearing at, like, with the
6  hearing board?
7      Q.   Well --
8      A.   I don't remember being a witness.
9      Q.   -- exactly.  So I'll tell you why
10  I'm asking the question.  We've asked the
11  university in a written Discovery request to
12  identify other matters in which you had
13  provided testimony as a witness, and they
14  identified a matter that occurred in the 2014
15  and 2015 academic year, and a matter that
16  occurred in the 2015/2016 academic year.  I
17  don't know too much more than that, so that's
18  why I'm going to ask you questions, if you can
19  help me identify the sexual misconduct cases
20  where you participated as a witness.
21      A.   I don't recall participating as a
22  witness in front of the hearing board.  I don't
23  recall ever being called in front of the
24  hearing board.

Page 205

1      Q.   Well, how about being interviewed
2  by the investigators?
3      A.   I remember being interviewed one
4  other time, very vaguely.  I don't remember if
5  it was two or not.  I do remember being
6  interviewed one other time.
7      Q.   Okay.  Could you turn to the final
8  exhibit, Exhibit-14.
9      A.   Okay.
10          - - -
11      (Whereupon the document was marked,
12      for identification purposes, as
13      Exhibit-14.)
14          - - -
15  BY MR. GALLINARO:
16      Q.   Take a moment to review that.  I
17  believe there's an email that is in back of it
18  that may also help you, but once you've had a
19  chance to review it, just let me know.
20      A.   Okay.  I read all that.
21      Q.   Okay.  So Exhibit-14 is an
22  interview summary of you by Jason Rodocker and
23  Lauren Kozak, dated 11/7/2014.
24          Having reviewed that, do you recall

52 (Pages 202 - 205)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 206

1  that you did provide an interview to
2  investigators in at least one other Title IX
3  matter?
4      A.   Are you saying in addition to this
5  one or that this is the one?
6      Q.   Well, right now I'm just asking
7  about this one.
8      A.   Okay.  Yes.  I mean, I read this --
9  this.  I recall it now, having read this.
10     Q.   Okay.  Do you recall that the
11  student who was the complainant in this -- I'm
12  sorry.
13         Do you recall that the student who
14  was the complainant in this case is someone --
15  do you recall that the student who was the
16  complainant in this case was ████████?
17     A.   That sounds right.
18     Q.   Okay.  And were you aware that
19  ████████ was one of ████████ advisors?
20     A.   I don't recall if I knew that at
21  the time or not.
22     Q.   Okay.  Did you ever discuss ████
23  ████ case with ████████?
24     A.   I would not be permitted to discuss

Page 207

1  anything clinical with another person.  That
2  would violate confidentiality.
3      Q.   Did you ever have any discussions
4  with the two of them?  Given that ████ had
5  asked you based on the recommendation of one of
6  her advisors to get this letter, did you ever
7  have new followup with ████ and her advisors?
8      A.   I don't recall ever talking with
9  ████ advisors.
10     Q.   Okay.  Do you recall how many times
11  you had treated -- well, first of all, is the
12  reason you provided testimony on behalf of
13  ████████ because you had treated her?
14         THE WITNESS:  Craig, can I answer
15     that?
16         MR. WOOD:  You can't answer
17     anything about your clinical relationship
18     with ████████ or ████████ because
19     in both cases they're protected by HIPAA.
20     You can answer whether you met with her
21     and during what period of time, but not
22     anything about the clinical relationship.
23  BY MR. GALLINARO:
24     Q.   Okay.

Page 208

1      A.   So what's the question?
2      Q.   My question was:  Was the reason
3  you were providing this interview because you
4  had treated ████████?
5      A.   It's because I had met with her at
6  some point when she was a student.
7      Q.   You met with her in your role as a
8  counselor at the SHC, correct?
9      A.   Correct.
10     Q.   Okay.  So you weren't -- you
11  weren't a factual witness somehow involved in
12  the underlying incident; this is related to
13  your treatment of her, correct?
14     A.   Yes.  I suppose that would be fair
15  to say.
16     Q.   Okay.  Do you recall how many times
17  you saw her before you provided this testimony
18  on her behalf?
19     A.   No.  I have no idea.
20     Q.   Do you recall how she was referred
21  to you?
22     A.   No.
23     Q.   Do you recall whether she came to
24  you specifically for the purpose of having you

Page 209

1  serve as a witness?
2      A.   I don't believe so.
3      Q.   Okay.  Do you recall whose idea it
4  was for you to act as a witness for her?
5      A.   Nope.
6      Q.   Okay.  Do you recall, I've
7  represented to you the university has said that
8  there was another matter where you provided
9  witness testimony, which occurred the following
10  academic year in 2015/2016.
11         Do you recall that?
12     A.   So, again, if you mean by witness
13  like doing something like being interviewed?
14     Q.   Yes.
15     A.   That's -- I don't recall.  I guess
16  that's possible.  I was not in front of the
17  hearing board as a witness.  If there was
18  another interview, that's possible, but I don't
19  recall anything specific.
20     Q.   Okay.  And I don't want to throw
21  you off with the word witness.
22     A.   Okay.
23     Q.   When I say witness, in these Title
24  IX proceedings, we refer to people who are

53 (Pages 206 - 209)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 210

1  interviewed by the investigators as
2  witnesses --
3      A.   Okay.
4      Q.   -- even if they don't come before
5  the board.
6      A.   Got it.
7      Q.   So with that understanding, were
8  you interviewed by the Title IX coordinator --
9  were you interviewed by the investigators in a
10  Title IX matter for another case, other than
11  ▅▅▅▅ and ▅▅▅▅, that you can
12  recall?
13      A.   I mean if they say that I was, I
14  believe that I was, but I don't remember the
15  situation.
16      Q.   Have you only participated in Title
17  IX investigations as a witness, as we're using
18  that term, on behalf of complainants?
19      A.   So the only two that I recall are
20  for ▅▅▅ and ▅▅▅ and in both cases they were
21  complainants.
22      Q.   Okay.  Have you ever -- have you
23  ever acted as a witness on behalf of a male
24  student?

Page 211

1      A.   I don't believe so.  Not that I
2  recall, but I don't recall the other incident.
3      Q.   Okay.
4      A.   I have clinically met with students
5  and worked with students who are men who had
6  reported sexual assault to me, but I don't
7  remember -- I don't remember the situation,
8  so...
9      Q.   Okay.  Do you recall whether the
10  other -- I know you're not recalling the other
11  matter.  I'm trying to figure out how I can ask
12  you a question about it.
13          Do you know if you participated as
14  a witness in any matter that ultimately was
15  withdrawn?
16      A.   Because I don't remember the
17  situation, I just can't say.
18      Q.   Okay.  And I'm just trying to see
19  if I can prompt something, so bear with me.
20      A.   Okay.  Yeah.
21      Q.   Would you have participated as a
22  witness in any matter where a student pled
23  guilty, you know a case where the respondent
24  accepted responsibility for it?

Page 212

1      A.   A situation I knew of or one where
2  I was a witness for that?
3      Q.   In one where you were a witness.
4      A.   I can't recall a specific time when
5  a respondent pled guilty, so to speak.  I don't
6  recall a situation like that.
7      Q.   Okay.  Have you ever -- you said
8  you've counseled -- you've counseled male
9  students who have experienced assault, correct?
10      A.   Yes.  Yes, I have.
11      Q.   Have you ever counseled male
12  students who were accused of assault?
13      A.   There was an occasion where a
14  student presented to our -- what we call, our
15  urgent session in the counseling center, where
16  you don't have to have an appointment ahead of
17  time.  You know, you can kind of show up.
18  People know what time of day that is.  We
19  rotate who is covering, you know, that spot in
20  the day.  And a student had, from my
21  recollection, I might not remember all the
22  details, but he had just learned that he was
23  being investigated for that, a charge related
24  to that and was understandably, you know,

Page 213

1  distraught at hearing that he was going to be
2  investigated and came to the urgent session,
3  and I was the person covering it.  So I did
4  offer support and other resources, and I
5  connected him with a followup with another
6  counselor.
7      Q.   Any -- I'm sorry, that echo again.
8  Any other instances that you can recall where
9  you provided counseling to an accused male
10  student?
11      A.   Not that I recall.
12      Q.   And you said you referred him to a
13  different counselor.  Was that within the
14  office?
15      A.   Yes.
16      Q.   Is there any particular reason why
17  you referred him to someone else?
18      A.   I'm very affiliated with all the,
19  you know -- not all, with many of the cases of
20  sexual assault.  It's on my bio on our website
21  that students who've experienced it would come
22  to me, and I didn't know if there would be a
23  conflict about someone reaching out to me
24  specifically for help with the support on the

54 (Pages 210 - 213)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 214

1 trauma side if I was already seeing him, and
2 thought that it would be better to refer to
3 someone whose expertise wasn't in working with
4 the support side for a complainant.
5     Q.    Okay.  Is there anyone in the
6 office, the SHC office, that does focus on
7 counseling accused students?
8     A.    No.
9     Q.    But there are others who don't feel
10 that they're in as conflicted position as you
11 are?
12     A.    I imagine so.
13     Q.    Are there any counselors that
14 you're aware of who will not work with students
15 who are alleged that they are victims of a
16 sexual assault, sort of the flip side of your
17 situation?
18     A.    I don't know that any of them would
19 say they would just actually refuse to do it.
20 Many -- I know at least a couple would have
21 specifically referred them to me or maybe even
22 Rallie Snowden at times because of our
23 experience with it.  I'm not -- I don't know
24 that I've ever heard anyone say they won't see

Page 215

1 it.  Everyone is equipped to deal with it in an
2 urgent situation, and some would, likewise,
3 maybe then refer to me or Rallie for someone
4 who wanted ongoing care.
5     Q.    Okay.  If someone comes to the SHC
6 alleging that they have been assaulted, are
7 they -- do you handle most of those or are
8 there multiple people who would potentially
9 respond to that?
10     A.    I just want to clarify one thing
11 because I'm worried how it's going to read in
12 the transcript later.  So SHC is Student Health
13 Center and I'm at the University Counseling
14 Center.
15     Q.    I'm sorry.
16     A.    The Health Center -- no, it's okay.
17 I just thought later if I was reviewing the
18 transcript that...
19         So the Health Center is our health
20 clinic, and students might also present there.
21 That's why I just wanted to be clear.  They
22 might present there for care, medical care, et
23 cetera, and they would present there because
24 they're open 24 hours.  We are not.  The

Page 216

1 Counseling Center, the director is the same.
2 There's one director for health and counseling.
3 We are sometimes referred to as health and
4 counseling, so there is a connection, but
5 they're actually two separate...
6     Q.    Just so that we're clear, I'm
7 intending to only have been asking you about
8 your office.
9     A.    I understood that, yes.
10     Q.    And what should I call it, just
11 so --
12     A.    The Counseling Center.
13     Q.    I had asked you if someone comes to
14 the Counseling Center alleging that they had
15 experienced sexual assault, would that
16 typically be steered to you or are there
17 multiple people who handle that?
18     A.    So I'd be one of the people it
19 would be steered to, unless, again, the person
20 didn't want to see me or that there was a
21 conflict because I was already seeing someone
22 else who was involved, or something like that.
23 Rallie Snowden might be another one.  Those --
24 we might be the top two, but again, other

Page 217

1 people would see someone, and someone might
2 request seeing someone.  I would venture that
3 all of us at times, clinically in our
4 professional experiences, have worked with and
5 met with students who have experienced that or
6 an abuse history, just because it's pervasive
7 enough in our culture that someone has that in
8 their background.
9         If someone's presenting for the
10 first time and saying that it was a recent
11 incident, I think that our administrative
12 assistant would probably steer them towards me
13 and Rallie at least as an initial instinct.
14     Q.    Okay.  We discussed at least the
15 two cases you can recall where you participated
16 as a witness, again with the understanding of
17 the word witness.  Have you -- have you ever
18 been told that going forward you should no
19 longer do that?
20     A.    I don't recall that.
21     Q.    Would you act in that role again if
22 another student came to you and requested it?
23         MR. WOOD:  Object to the form.
24         THE WITNESS:  So you're -- so if a

55 (Pages 214 - 217)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 218

1    student came to me and asked me to provide
2    like a letter like I did with ▮▮▮▮
3    BY MR. GALLINARO:
4        Q.    Sure.
5        A.    I would at least consider the
6    request from the student and try to understand
7    what it was they were hoping for with that
8    request.
9        Q.    So you haven't -- you haven't been
10   advised by anyone at the university that that
11   isn't something that would be appropriate for
12   you to do again?
13       A.    I don't recall that.
14       Q.    Okay.  I'm not suggesting that it
15   has happened; I'm just asking --
16       A.    Yeah.  No.
17       Q.    Okay.  So as far as you know, you
18   could -- you could do that again for another
19   student in another Title IX proceeding?
20       A.    Yeah.  I mean, I'm not often told
21   what I can or can't do when it pertains to just
22   my clinical opinion or my clinical judgments,
23   and, again, that's how I see that letter, what
24   the purpose of that letter was.  So I don't

Page 219

1    recall ever being told anything with regard to
2    sort of that clinical, how I would proceed
3    clinically in that way.
4        Q.    Do you know if anyone else from the
5    Counseling Center has done something similar?
6    And by that I mean act as a witness or provide
7    a letter in support of someone in a Title IX
8    proceeding.
9        A.    I don't know.
10       Q.    Have you had any discussions with
11   any of your colleagues that would lead you to
12   believe that they had done that?
13       A.    I mean, I can't say that hasn't
14   happened, but I don't recall specifically.
15       Q.    Well, I'm just asking you if you
16   have any personal knowledge that anyone has
17   done that.
18       A.    Right.  I'm saying I don't recall
19   specifically -- like I don't recall
20   specifically hearing that from somebody.
21       Q.    Okay.
22             MR. GALLINARO:  I'm going to just
23   see if -- let's take a five-minute break.
24   I think I'm done.  I just want to check my

Page 220

1    notes.
2             THE WITNESS:  Sure.
3             MR. GALLINARO:  And your counsel
4    may have questions for you, but let's go
5    back on the record at, let's say, 2:15.
6             THE WITNESS:  Okay.
7             MR. WOOD:  And when you come back
8    on the record, Micah will take over from
9    there.
10             - - -
11       (A short recess was taken.)
12             - - -
13   BY MR. GALLINARO:
14       Q.    I just had a couple of followup
15   questions.  Do you recall at the very beginning
16   of the deposition I had asked you questions
17   about whether you had been deposed before, and
18   you identified a couple other cases?
19       A.    Yes.
20       Q.    One of which was a sexual assault
21   case -- W&L students.
22             - - -
23       (Discussion was held off the
24   record.)

Page 221

1             - - -
2    BY MR. GALLINARO:
3        Q.    All right.  So you recall at the
4    very beginning of the deposition I had asked
5    you questions about other cases in which you
6    had been deposed?
7        A.    Correct.  I remember that.
8        Q.    And you had identified at least one
9    case involving sexual assault that involved W&L
10   students, correct?
11       A.    Right.
12       Q.    Okay.  And so now, with that in
13   mind and knowing that you were interviewed in a
14   case involving ▮▮▮▮▮ were you aware
15   that ▮▮▮▮ case resulted in
16   litigation?
17       A.    Yes.
18       Q.    And was that the case that you were
19   deposed in?
20       A.    Yes.
21       Q.    Okay.  And can you recall whether
22   there were -- I think you said the other one
23   had to do with a suicide, correct?
24       A.    A suicide attempt.

56 (Pages 218 - 221)

JANET BOLLER, PSYD - CONFIDENTIAL/UNDER SEAL

Page 222

1    Q.    Okay.  And there were no other
2   cases involving sexual assault, correct?
3    A.    Where I was deposed?  No.
4    Q.    Okay.  I believe those are all the
5   questions that I have, but hang on a second.
6         Oh, were you -- were you called as
7   a witness by W&L or were you called as a
8   witness by the other side in that ███████████
9   litigation, or do you know?
10    A.    Do I know?
11    Q.    In other words, do you know who
12   asked for your deposition?
13    A.    Well, I was deposed by the opposing
14   counsel.  That, I remember.  If that helps.
15    Q.    Okay.
16    A.    In other words, they led the
17   questioning.
18    Q.    Okay.  And that matter was one in
19   which ███████████ was a -- was the accusing
20   student, and the lawsuit was brought by the
21   responding student, correct?
22    A.    She was the complainant.  That's
23   right.
24    Q.    But in the litigation -- the

Page 223

1   litigation was brought by the respondent in
2   that case, correct?
3    A.    Yes.  I believe so.
4    Q.    Okay.  Just give me one moment.
5         MR. GALLINARO:  I think those are
6   all the questions that I have.  Yep, those
7   are all the questions that I have.  Thank
8   you for your time.  I don't know if your
9   counsel may have some followup.
10         MR. SCHWARTZ:  I do not have any
11   questions.
12         MS. SHEARER:  But you do want her
13   to read, right?  We do want her to read,
14   right?
15         MR. SCHWARTZ:  Correct.  That's
16   right.  She will read.
17         MR. GALLINARO:  All right,
18   Dr. Boller, thank you very much for your
19   time today.  I appreciate it.  And you are
20   free to go.
21         THE WITNESS:  You're welcome.
22         - - -
23         (Witness excused.)
24         - - -

Page 224

1         (Deposition concluded at 2:20 p.m.)
2         - - -

Page 225

C E R T I F I C A T E

1
2
3         I do hereby certify that I am a Notary
4   Public in good standing, that the aforesaid
5   testimony was taken before me, pursuant to
6   notice, at the time and place indicated; that
7   said deponent was by me duly sworn to tell the
8   truth, the whole truth, and nothing but the
9   truth; that the testimony of said deponent was
10   correctly recorded in machine shorthand by me
11   and thereafter transcribed under my supervision
12   with computer-aided transcription; that the
13   deposition is a true and correct record of the
14   testimony given by the witness; and that I am
15   neither of counsel nor kin to any party in said
16   action, nor interested in the outcome thereof.
17
18         WITNESS my hand and official seal this
19   28th day of August, 2020.
20
21
22
23   _____
    Theresa F. Franco
24   Notary Public

57 (Pages 222 - 225)

Page 226

JANET BOLLER, PHD
INSTRUCTIONS TO WITNESS

1
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8      After doing so, please sign the errata
9  sheet and date it.
10      You are signing same subject to the
11  changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13      It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the
16  deposition transcript by you.  If you fail to do
17  so, the deposition transcript may be deemed to
18  be accurate and may be used in court.
19
20
21
22
23
24

Page 228

ACKNOWLEDGMENT OF DEPONENT

1      I, JANET BOLLER, PSYD, do hereby
2  certify that I have read the foregoing pages
3  _____ to _____ and that the same is a correct
4  transcription of the answers given by me to the
5  questions therein propounded, except for the
6  corrections or changes in form or substance, if
7  any, noted in the attached Errata Sheet.
8  _____   _____
9  DATE       SIGNATURE
10
11      Subscribed and sworn to before me this
12  _____ day of _____, 2020.
13
14      My commission expires:
15      _____
16
17      _____
18  Notary Public
19
20
21
22
23      Assignment No. 4207492
24

Page 227

JANET BOLLER, PHD
- - - - -
E R R A T A
- - - - -
PAGE  LINE  CHANGE

1
2
3
4
5  _____ _____ _____
6  Reason for Change:_____
7  _____ _____ _____
8  Reason for Change:_____
9  _____ _____ _____
10  Reason for Change:_____
11  _____ _____ _____
12  Reason for Change:_____
13  _____ _____ _____
14  Reason for Change:_____
15  _____ _____ _____
16  Reason for Change:_____
17  _____ _____ _____
18  Reason for Change:_____
19  _____ _____ _____
20  Reason for Change:_____
21  _____ _____ _____
22  Reason for Change:_____
23
24  Assignment Number: 4207492

Page 229

1  R. Craig Wood,Esquire
2  cwood@mcguirewoods.com
3      August 28, 2020
4  RE:   John Doe v. Washington & Lee University
5  8/12/2020, Janet Boller , PsyD (#4207492)
6  The above-referenced transcript is available for
7  review.
8  Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12  The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-midatlantic@veritext.com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25

58 (Pages 226 - 229)

[& - abuse]                                                                                     Page 1

| & | |
|---|---|
| **&** 229:4 | |

| 0 | |
|---|---|
| **00023** 1:5 | |

| 1 | |
|---|---|

**1** 3:9 28:9 29:1
  71:21 74:7 98:2,6
  98:9
**10** 4:11 113:13,14
  113:19 134:16
  142:9 162:3
**10:20** 121:8
**11** 4:12 137:5,17
  165:19
**11/15/2015** 3:18
  46:7
**11/7/2014** 4:17
  205:23
**113** 4:11
**114** 4:22
**12** 1:10 21:2 89:5
  172:18
**120** 4:9
**1288** 2:10
**12:38-1:10** 173:2
**13** 4:13 33:1 35:19
  173:10,15
**137** 4:12
**13th** 115:4 124:9
  124:20
**14** 4:16 33:7 98:6
  170:12 205:8,13
  205:21
**14th** 29:2
**1500** 2:3
**16** 35:18 98:8
**1622** 225:22
**17** 4:15 174:1
**1800** 1:23

**1801** 1:23
**183** 4:13
**19** 4:22
**19102** 2:4
**19103** 1:24

| 2 | |
|---|---|

**2** 3:11 38:11 71:24
**20** 10:3 35:6
**2000s** 19:15
**2001** 19:15
**2003** 19:16 20:1
**2004** 20:2
**2007** 21:15
**2010** 21:15 22:12
**2011** 3:13 38:20
  52:5,24
**2012** 29:2
**2013** 42:13 45:1
**2014** 204:14
**2015** 10:18 30:18
  204:15
**2015/2016** 204:16
  209:10
**2016** 3:22 4:5,7
  10:18 33:1 35:19
  36:2 54:14 61:3
  70:12 74:5 75:7
  76:12 148:10
**2017** 4:10,15 114:8
  121:4 133:19,23
  137:11 174:1
**2017/2018** 3:16
  42:4
**2020** 1:10 225:19
  228:12 229:3
**205** 4:16
**215-864-9600** 2:5
**22902** 2:11
**24** 215:24
**24th** 114:8 115:2

**28** 3:9 229:3
**281** 165:19 170:5
**28th** 225:19
**2:15** 220:5
**2:20** 224:1
**2nd** 34:6

| 3 | |
|---|---|

**3** 3:14 39:23
**30** 226:15 229:17
**30th** 33:1 36:1
**38** 3:11
**39** 3:14
**3900** 2:4

| 4 | |
|---|---|

**4** 3:16 41:23
**40** 172:18
**41** 3:16
**4207492** 227:24
  228:23 229:5
**434-977-2558** 2:11
**45** 116:11 119:4
**47** 3:17
**4th** 29:22

| 5 | |
|---|---|

**5** 3:17 46:3 51:8
  71:24
**530** 2:10
**54** 3:19

| 6 | |
|---|---|

**6** 3:4,19 29:22
  54:7 64:1 71:24
**616** 1:16
**652** 2:10
**689** 76:20
**690** 81:4 106:6
**693** 91:9
**694** 103:8
**6:19** 1:5

| 7 | |
|---|---|

**7** 4:4 70:2,7 72:1
**70** 4:4
**73** 4:6
**757** 61:7
**759** 57:6,10
**761** 63:24
**7th** 4:5,10 30:18
  44:18 70:12 121:3
  121:8 124:6,19
  125:9

| 8 | |
|---|---|

**8** 4:6 73:21 74:1
  100:7 103:8 106:6
**8/12/2020** 229:5

| 9 | |
|---|---|

**9** 4:9 30:18 120:11
  120:16 125:5
**9:00** 1:18

| a | |
|---|---|

**a.m.** 1:18 121:8
**aau** 50:14,15,18
**ability** 31:3,7 50:7
  109:12 120:3
  168:6 172:8
**able** 34:22 36:17
  37:16 49:14 67:22
  80:4 87:16 92:15
  115:12 122:19
  123:11 125:21
  126:10 134:6,7
  150:14,15,20
  154:9,13 160:17
  183:18,19
**absolutely** 54:1
  85:10
**absorbs** 189:19
**abuse** 58:7 158:23
  159:4 217:6

**academic** 13:8,11
18:13 204:15,16
209:10
**accept** 143:19
186:7 200:8
**accepted** 145:2
211:24
**accepting** 144:2
**access** 125:22
**account** 65:24
97:1
**accounting** 178:21
**accuracy** 229:9
**accurate** 61:17
80:23 89:14 121:4
177:6 180:14
226:18
**accurately** 138:10
151:7
**accusation** 104:11
**accusations** 43:3
**accused** 85:4
86:10 102:24
103:6 104:2,3,6,22
105:4,24 212:12
213:9 214:7
**accuser** 84:16,17
85:8 86:12,24
97:12
**accuser's** 109:12
**accusers** 97:6
108:23,24
**accusing** 222:19
**acknowledge** 5:4,7
**acknowledgment**
228:1 229:12
**act** 177:6 194:23
209:4 217:21
219:6
**acted** 204:1
210:23

**action** 9:22 130:12
130:15 225:16
**actions** 77:16
**active** 72:6 117:6
**actively** 194:7
196:8
**activity** 25:11
176:23,24 177:11
178:11,14 202:17
203:22
**acts** 177:5 191:16
**actual** 15:12,13
34:16 141:24
**acute** 105:10
136:15 141:8
143:11 157:22
158:14 160:1
166:15 180:6
181:8 185:11
187:20
**acutely** 190:4
**addition** 206:4
**additional** 75:14
112:17 141:17
**additionally**
197:23
**address** 78:24
102:14 105:23
106:3,5 170:14
171:1 177:4 180:9
190:23
**addresses** 170:24
**addressing** 108:22
**adds** 101:14,20,20
**adequate** 126:10
**adhere** 194:9
195:11 196:16
**adhered** 193:23
**adjudicate** 83:14
**adjudicators**
83:22 86:5 94:17

97:9
**administer** 5:9
**administered** 5:8
**administrative**
217:11
**adolescent** 20:8
**adolescents** 20:7
21:20
**adults** 20:7 48:10
**adversarial** 69:16
122:3
**advice** 67:21 161:8
**advised** 218:10
**advising** 95:22
96:4
**advisor** 30:20 31:2
31:20 32:22 46:22
61:21 121:9
122:13 163:11
**advisor's** 121:19
**advisors** 31:8,14
33:19 36:19 55:21
55:21 56:13 125:3
125:7 164:1
206:19 207:6,7,9
**affect** 12:19 86:7
101:11 121:13
139:11 150:7
162:14 171:6,7
182:10,14 200:15
201:5 202:14,15
**affiliated** 213:18
**aforesaid** 225:4
**agallinaro** 2:5
**age** 48:11
**ago** 10:4,19 12:11
13:12 49:17 78:8
131:3
**agree** 5:17,19
26:21 72:5,8
86:15,22 87:8,13

87:20,24 88:7,9
90:10,23 97:8
104:4 137:21
143:18 145:20
148:23 149:5
167:7 168:4 169:3
169:9,13,16,19
173:23 193:2
**agreed** 131:11
**agreeing** 195:18
**agreement** 5:13,14
5:23
**ah** 90:1
**ahead** 72:23 85:17
174:16 192:23
212:16
**aided** 225:12
**aids** 12:23 19:3
154:4
**alcohol** 193:10
198:2 203:20,23
**allegation** 104:15
104:16,18
**alleged** 47:19
139:10 214:15
**alleges** 200:5
**alleging** 215:6
216:14
**allotted** 229:20
**allow** 92:9
**allowed** 44:24
**alternatives** 198:9
**amalgamation**
58:9
**ambiguous** 106:10
106:16 107:21
108:5,16 109:4
**amnesia** 166:7
**amount** 82:24
**andrew** 2:2 5:16
7:2

andy  85:15
angry  103:11
answer  7:14 8:6
  8:16 13:8 62:19
  68:24 69:1,5,6,19
  72:23 73:16 80:14
  85:15,15 131:15
  148:2 176:4 180:8
  185:7 188:7,18,24
  189:4 197:17
  207:14,16,20
answered  103:2
  189:16
answering  32:9
answers  175:2,6,6
  228:4
▮▮▮▮  7:5 56:9
  56:12 146:13
  194:21
anxiety  59:1
  118:15 158:19
  180:7,20,24 181:6
  185:12
anybody  17:4
anymore  106:14
anyone's  81:16
apologize  17:12
  191:8
appear  166:3
  183:1 199:13
appearances  2:1
appears  29:1,21
  30:17 32:5,24
  46:6 78:18 128:8
  134:17 189:4
applicable  139:15
  229:8
apply  84:16 85:7
  86:12 97:6
appointment
  116:5,10 212:16

appointments
  114:3
appreciate  6:12
  8:7 223:19
approach  70:24
approaches  93:23
appropriate  65:2
  129:13,17 150:7
  180:15 181:11
  218:11 226:5
april  4:10,15
  115:4 121:3,8
  124:6,9,19,20
  125:9 174:1
area  72:21 111:8
  140:21
areas  22:19 89:22
  170:22
arrangement  5:11
arrive  119:11
  186:17
arrived  128:17
  186:20
arriving  128:5
  154:19
article  50:3
articles  12:7,11,14
  13:2,3,9 14:3,4
  24:21,23 25:9
  49:3,8
ascribe  166:6
asd  180:14 182:24
  184:11 186:21
  187:6
aside  11:18,19,20
  11:20 13:15 63:7
asked  8:12,17 9:18
  28:17,17 41:7
  47:1 53:14 72:20
  76:6,14 84:1,12
  85:23 88:22 95:4

99:2 102:20
  112:10,11 138:20
  160:8 161:21,23
  161:24 162:11,23
  164:10,14 165:2
  175:4 178:4 188:2
  188:14 189:13
  191:3,5 204:10
  207:5 216:13
  218:1 220:16
  221:4 222:12
asking  13:1 69:8
  80:15 94:2 101:2
  104:18 122:12
  123:19 130:10
  140:9 154:21,22
  155:8,10,17,21
  156:17 157:9
  158:22 159:11
  161:6,7,7,15 162:6
  167:1 168:5
  176:10 177:1
  184:17 185:14,17
  204:10 206:6
  216:7 218:15
  219:15
asks  56:21
asleep  138:15
  139:1,8 176:7
  202:18,20,23
aspect  11:5 109:23
  165:23 166:15
  178:5 188:13
aspects  138:3
  165:3 166:20
  176:11
assault  4:4,6 10:7
  10:16 14:5,12
  15:1 22:19 23:10
  24:20 26:21 28:1
  40:19 41:14 43:7

43:17,24 47:19,19
  48:9 52:12 57:16
  61:12 62:6,8,17,24
  63:10,19 65:9
  70:11 71:17 74:3
  83:3 85:6 86:11
  139:24 140:2,7
  145:12 155:12
  159:4,19,22 167:4
  179:17 190:13
  200:19 211:6
  212:9,12 213:20
  214:16 216:15
  220:20 221:9
  222:2
assaulted  64:9
  65:3 141:16
  143:22 145:16
  146:13 157:19
  158:11 194:2
  215:6
assemble  75:6
assess  85:6,10
  87:15 93:24 101:6
assessed  190:18
assesses  95:10
assessing  85:22
  126:15,16 144:12
  155:17 156:13
assessment  58:14
  58:20 119:22
  146:6 162:18
  190:10
assignment  227:24
  228:23
assist  31:9 57:3
assistance  90:10
assistant  217:12
associated  22:21
  22:24 79:18 92:3
  103:13

**association** 23:22
**associative** 165:17
  165:21 166:17
**assume** 8:17 35:23
  36:3 40:3 46:10
  91:16 104:14,17
  104:19 123:15
  130:11,14 136:18
  182:17 186:14
**assuming** 112:22
  163:22 168:15
  193:22
**assumption** 186:1
**assumptions**
  192:16
**atixa** 15:17
**atlantic** 1:23
**attached** 226:12
  228:7 229:11
**attempt** 10:13
  221:24
**attempted** 61:15
  62:8 63:2,14
**attempts** 20:14
  151:20
**attend** 16:12
**attended** 13:22
  14:9,10,16,21,24
  15:21 16:11,19,21
  16:24 17:9,19
  18:3,5 24:1,6
  29:17 41:9 47:13
  81:20
**attending** 24:14
**attention** 158:17
  158:18,19
**attorney** 226:14
  229:13
**attorneys** 5:2
  11:21

**attributable** 180:5
  185:9
**attribute** 67:4
**audience** 82:10
**august** 1:10 29:2
  33:1 36:1 74:8,15
  76:1 89:5 225:19
  229:3
**author** 12:4,9,10
  25:6
**authored** 12:7
**authorities** 59:17
  60:12
**authority** 59:5
  72:11 73:8
**available** 6:12
  115:20 147:14
  229:6
**avoid** 152:11
**avoidance** 151:11
  151:18 170:3,4,5
**avoided** 152:1
**avoids** 151:20,21
**awake** 138:23
**aware** 49:19,22,24
  78:4 87:3 92:16
  118:13 127:10,14
  127:23 128:1,3,9
  133:21 141:5
  147:17,22 148:7
  153:3 193:10
  199:17 200:2,12
  203:20 206:18
  214:14 221:14
**awareness** 3:12
  30:13 33:24 34:2
  38:18

**b**

**b** 3:6 31:20,22
  59:15 168:15
  169:1,5

**back** 3:14,16 9:20
  12:12 14:3,23
  24:9 40:8,11 41:4
  42:3 45:1,2 52:3
  52:24 68:5 72:1
  74:7 98:6 106:6
  120:10 137:4
  139:18,19 142:8
  149:21 165:15
  168:9,20 172:4
  173:5 177:15
  191:9 205:17
  220:5,7
**background** 12:2
  111:15 217:18
**baker** 20:17
**based** 62:2 81:12
  108:12 115:13
  119:19 122:6
  136:18 145:24
  146:5,23 147:7
  150:3 160:10
  167:16 172:14
  179:13,13 191:13
  192:16,18 194:24
  203:20 207:5
**baseline** 66:12
**basically** 34:20
  75:17
**basis** 185:1 194:1
**bear** 103:22
  211:19
**becoming** 91:22
  92:6,8
**beginning** 26:9
  36:21 78:2 220:15
  221:4
**behalf** 5:17,18
  47:11 114:6
  207:12 208:18
  210:18,23

**behavior** 20:11,13
  20:14 53:1 150:6
**behavioral** 21:4
  144:14 171:8
**behaviors** 62:18
  102:15
**belief** 190:1
  196:21 197:6
**believable** 42:16
  68:17
**believe** 16:20,23
  19:6 25:15 40:14
  44:15 48:14 50:11
  50:23 51:19 52:7
  52:18 56:11 61:16
  62:15 64:16 65:2
  65:7,12 66:12
  71:4 72:9 73:3,3
  74:11 76:2,23
  78:17 86:6 104:9
  109:5,7,10,14
  116:14 119:3
  133:4,11 135:12
  136:3,8,12 142:5
  144:8,10 163:12
  167:3 170:14
  175:4,20 183:4
  189:7 194:17
  196:12 199:20
  201:14 204:1
  205:17 209:2
  210:14 211:1
  219:12 222:4
  223:3
**believed** 78:9
  111:15 189:23
  196:6
**believes** 187:21
  188:15 195:12
  197:16

[believing - cautioned]                                                                                           Page 5

**believing** 194:1
**bell** 192:10
**bennett** 60:8
**bennington** 18:3
**bessel** 25:1 59:8,15
**best** 6:11 7:21 8:9
  8:13 10:14 14:17
  16:21 18:24 19:14
  24:24 31:3,7,13
  33:12 46:17 59:14
  76:8 77:7 89:9
  114:24 120:3
  136:9 138:5 151:8
  168:6 186:17
**beth** 27:15
**better** 129:16,19
  161:4 214:2
**beyond** 68:6 80:22
  152:7,8
**binder** 6:17,21
  28:3
**bio** 213:20
**bisexual** 30:11
**bit** 49:11 51:23
  52:23 75:11,13,19
  82:15 151:19
  153:24 181:14
**bits** 92:20
**blacked** 198:1
  203:19
**blatantly** 67:2
**block** 197:23
  201:13
**blocking** 201:22
  202:1 203:3
**board** 4:5 23:5
  33:2,13,14 35:20
  70:11,17 71:2,6,9
  72:17 74:10 76:7
  84:8,10 87:4
  102:22 123:10

134:23 142:18
  147:19 148:8,22
  149:19 164:16,18
  204:6,22,24
  209:17 210:5
**bodies** 31:18
**bodily** 189:9
**body** 25:2 32:11
  140:12,19 189:18
**boiler** 1:15,16 3:3
  4:8,9,11,16 5:21
  6:5 74:5 121:8
  173:5 181:14
  188:8 197:22
  198:2 223:18
  226:1 227:1 228:1
  229:5
**boiler's** 4:13
**bolster** 164:6
**books** 12:5 24:22
  24:24
**boston** 19:20
  20:19
**bottom** 57:7 61:6
  64:20 82:2,5
**box** 2:10 68:18
**boy** 48:20
**brain** 89:22 93:4
  108:13
**brattle** 19:22
  20:16
**breach** 10:2
**break** 31:24 32:3
  60:24 110:15
  172:22 173:6
  219:23
**breakfast** 88:23
  89:2,4,7,7,8,9,9
**brief** 30:8
**briefly** 173:22

**bring** 65:7
**bringing** 29:2,9,10
  34:14,19
**brings** 47:20
**broad** 62:17 63:6
  111:19
**broader** 62:24
**broadly** 63:1
**brought** 11:3
  222:20 223:1
**building** 157:8
**bullet** 91:11 93:15
  170:7
**busy** 113:3,7
**bystander** 29:3,9
  29:10,13 34:8,15
  34:17,20,22

**c**

**c** 225:1,1
**calendar** 98:2
  99:22
**call** 83:1 212:14
  216:10
**called** 15:17 19:22
  20:11 25:5 34:19
  37:4 39:7 48:4
  50:14 74:3 129:13
  204:23 222:6,7
**calmly** 179:4
**camouflage** 77:16
**campbell's** 60:5
**campus** 24:20
  25:24 31:11 37:7
  50:15,17,23 72:19
  151:22,23,24
**campuses** 14:13
  40:13
**capacities** 43:4
**capacity** 47:11
**capture** 8:6

**care** 215:4,22,22
**career** 157:6
**careful** 107:8
**carefully** 226:4
**case** 7:3 9:14,20
  10:20,23 25:22
  27:17 43:2 53:14
  85:2 86:18 108:18
  118:11 122:14
  127:18 129:12,13
  130:15,16 131:1
  132:16,16 133:18
  138:1 144:3
  149:12,15,15
  154:23 157:1,13
  160:6 163:2 165:9
  165:9,10 174:18
  191:14,23 196:10
  199:22 202:17
  206:14,16,23
  210:10 211:23
  220:21 221:9,14
  221:15,18 223:2
**cases** 9:8,11 10:5,7
  83:15 158:23
  204:19 207:19
  210:20 213:19
  217:15 220:18
  221:5 222:2
**catch** 81:2
**categories** 169:21
  169:22
**category** 44:11
  166:16
**cause** 189:24
  198:6
**caused** 187:21,24
  188:17
**causes** 170:20
**cautioned** 51:1

[celebrity - comments]                                                                                                    Page 6

celebrity   43:1
center   17:17 19:3
    19:23 20:16,18
    22:8,10 26:11
    47:18 55:7,15
    56:23 57:3 136:6
    212:15 215:13,14
    215:16,19 216:1
    216:12,14 219:5
centre   2:3
certain   17:22
    25:21 92:21 159:1
    183:18,22 184:1,2
certainly   44:8
    62:12 84:23 94:2
    99:24 125:20
    126:13,20 129:7
    151:9 154:12
    158:12 160:7
certainty   119:7
    167:24
certifications
    18:16
certify   225:3
    228:2
cetera   108:13
    172:11 215:23
chair   164:16
chance   205:19
change   110:6
    119:18 156:5
    227:4,6,8,10,12,14
    227:16,18,20,22
changed   31:5
    183:1
changes   53:11
    91:17 226:11
    228:6 229:10
characteristics
    79:20,24

characterize   107:9
    134:5
charge   212:23
charitable   23:13
    23:19
charities   22:22
charity   23:3
charlottesville
    2:11
chart   75:21 117:5
    117:6 138:8
cheat   156:16
check   68:18 152:3
    152:4 219:24
checked   48:23
checklist   156:16
childhood   18:4
children   21:3,4,20
children's   20:18
chosen   73:11
circumstance
    64:24 97:7 102:17
circumstances
    66:8,17 129:16
cited   78:16
claim   9:24 11:3,5
    88:12 137:21
    138:14 142:23
    144:19 145:2
    164:7 165:13
    191:4
claimed   137:23
    143:3
claiming   68:16
    86:19
claims   10:7 85:3
    86:9 87:3 192:13
clarification
    154:20
clarified   16:7

clarify   85:11
    153:8 157:20
    169:6 215:10
class   9:22
classes   114:4
classify   104:10
clear   8:11 14:4
    78:15,19 106:9,16
    107:20 108:5,16
    108:21 109:4
    141:19 145:11
    167:20,22 168:7
    198:7,18 215:21
    216:6
clearer   88:21
client   134:23
cliff   134:18
climate   50:16,17
    50:23
clinic   19:22,23
    20:5 215:20
clinical   17:16 18:8
    18:17 21:7 22:6
    58:4,23 66:6 95:8
    96:6 124:2 145:9
    145:23 146:5,22
    147:4,7,10,24
    148:2,6 149:17
    150:8 151:7
    152:24 153:11
    162:18 165:5
    190:10,15 191:5,6
    196:20 207:1,17
    207:22 218:22,22
    219:2
clinically   33:20
    66:6 97:19 170:20
    171:13,24 211:4
    217:3 219:3
clinician   126:13
    154:13

close   92:6,18
    191:8
closer   88:13 91:20
club   23:6
cognitive   12:19
    156:9 171:8
cognitively   189:8
coinciding   131:6
collaborated
    100:19,22
collaboration
    101:3
colleague   61:20
colleagues   42:19
    136:5 219:11
collecting   190:16
collective   171:17
    171:21
college   12:22
    14:13 18:2,3 19:2
    40:12 48:11 61:13
    61:14 77:14
column   33:15
come   52:20 57:23
    66:7,24 67:1,4,18
    67:20,21 68:1
    74:17 87:3 101:2
    102:24 117:20
    122:2 155:6 157:7
    161:4 181:2,13
    210:4 213:21
    220:7
comes   160:22
    215:5 216:13
coming   67:7,7
    69:14 91:24 116:4
    122:5 134:13
    144:1 161:5
commencing   1:18
comments   44:21

copies  229:14
coping  127:3
copy  137:6 142:12
corner  61:6
correct  7:6,7,11
  11:1,2 14:7 22:10
  27:23 28:2 30:4
  40:4,5,7,9 41:15
  41:16 42:2,7 48:5
  61:4 64:9,22 68:9
  72:3,4 73:13,17
  76:9 79:15 80:12
  81:8 82:18 84:16
  85:8 97:24 98:19
  98:20 103:16,17
  105:24 106:5
  107:22 111:11
  112:14,16,20
  114:2,11 119:2
  136:22 143:15
  144:19,24 145:1,3
  145:12 146:13
  147:1,14,21
  152:19 162:3,4
  163:19 165:23
  166:2,5 168:1,14
  168:18,23 169:9
  170:15 172:16
  174:2 176:19
  179:14 180:9,10
  180:16 181:18
  185:1 187:13
  188:5 191:2 196:3
  199:23 204:3
  208:8,9,13 212:9
  221:7,10,23 222:2
  222:21 223:2,15
  225:13 228:3
corrections  226:4
  226:6 228:6

correctly  74:3
  176:13 179:10
  225:10
counsel  2:17 5:10
  5:23 11:9 53:15
  53:24 114:21
  220:3 222:14
  223:9 225:15
  229:14
counseled  212:8,8
  212:11
counseling  17:17
  21:2 22:7,9 26:7
  26:11 47:18 55:7
  55:15 56:23 57:3
  65:8 67:5 68:8
  114:2,9 117:8,21
  117:24 127:2,7,9
  127:21 128:14
  134:3 136:6
  149:17 163:16
  178:1 212:15
  213:9 214:7
  215:13 216:1,2,4
  216:12,14 219:5
counselor  27:12
  55:4 64:13 65:5,6
  66:19 127:11
  128:2,9,15,16
  129:1 133:22
  134:1,2 136:24
  137:2 145:4 182:2
  208:8 213:6,13
counselors  36:15
  54:19 55:6 56:6
  214:13
couple  29:8 35:14
  195:10 214:20
  220:14,18
couples  12:24

course  161:1
court  1:1,19 5:2
  7:14,17 8:2,6
  59:12 226:18
cover  36:9 100:19
  100:20
covered  160:12
covering  212:19
  213:3
craig  2:9 5:18
  72:24 141:12
  200:22 207:14
  229:1
credibility  83:9
  85:7,10,13,23 86:7
  87:16 96:13 101:6
  101:11,14,21
  102:3,7 103:5,15
  103:22,24 110:19
  191:4
credible  68:14
  88:18 90:6 96:24
  102:16
criminal  15:7
  16:17 92:1
criteria  136:15,20
  139:13,18 141:23
  143:14,16 146:1,4
  160:3 165:16
  167:8 168:11
  169:14 171:9
  172:2 176:1
  178:24 180:4
  181:8 185:8 192:6
criterion  171:18
  182:13
criticism  49:19,22
  49:24
criticized  51:3
cross  85:3 86:9

cs  229:15
culled  58:3
culmination  57:23
culture  45:13
  217:7
current  48:14 49:2
  52:8 109:15
  112:21 148:21
  184:10
currently  16:8
  23:4 109:21
curry  27:15
cut  16:6 43:14
  197:2
cv  1:5
cwood  2:12 229:2
cycles  92:10

**d**

d  3:1 18:8 59:16
  170:19 171:10,18
daily  155:24 179:1
  179:3
data  49:20 87:4
date  24:19 25:12
  40:14 117:8
  124:20 125:19
  137:11,12 200:18
  200:24 226:9
  228:9
dated  3:18 29:22
  30:18 35:18 46:7
  74:13 115:4
  205:23
dates  14:20
david  76:24 77:9
  79:13
day  89:11,21 99:9
  113:1,8,9,23 114:4
  176:9 190:12
  212:18,20 225:19
  228:12

days 99:21 113:1
226:15 229:17
dbt 20:12
deal 23:19,23
24:17 215:1
dealing 59:2
179:17 183:14
dealt 23:14,16
dean 71:4
death 141:24
decades 40:16
deciding 147:19
decision 163:3
deck 74:18 100:4,7
100:8 103:8
110:16
deemed 226:17
defendant 1:8
2:13 5:19
defensive 103:12
defined 63:1
definitely 94:3
99:19
definition 62:13
62:14,16,24 63:5,8
66:4
definitions 50:6
52:7
definitive 198:23
definitively 91:5
110:2 167:10
degrading 43:6
degree 18:8 96:7
119:7 167:24
deliver 35:13
demonstrating
101:13
department 15:7
16:17 92:1
depending 97:11
105:18 182:14

depends 128:21
151:13 160:4
depiction 80:23
deponent 225:7,9
228:1 229:13
deposed 9:2,9,10
9:20 220:17 221:6
221:19 222:3,13
deposing 226:14
229:13
deposition 1:15
5:3,5,6 7:9 8:23
10:15 11:8 42:9
74:21 116:19
122:1 131:12
148:11 173:21
220:16 221:4
222:12 224:1
225:13 226:3,12
226:16,17
depression 156:3
der 25:2 59:8,16
derogatory 43:11
describe 57:14
125:23 131:22
150:8 151:4,8
155:18 176:3
179:1 180:6
185:10
described 14:4
33:18 51:11
145:10 146:3,10
146:21 147:3
149:22 150:2
179:12 195:15
describes 174:22
176:15
describing 38:23
103:9
description 3:8
4:3 32:1 91:17

156:7
designed 20:12
despite 113:4
200:18
detail 18:1 93:1
125:4 151:19
180:23 199:23
details 88:12
90:13 95:6 176:6
178:20 212:22
detecting 12:20
detectives 92:3
determination
107:14 191:4
determine 66:4
104:24 118:4
143:21 154:15
155:8
determining 88:10
154:17
detract 102:2,7
detrimental
165:10
develop 57:19
127:2
development 18:4
██████ 4:9,11
31:22 47:5 113:12
114:6 120:1 121:1
121:3 136:11
206:23 207:18
██████ 160:6
206:19 210:11
devoted 112:13
diagnose 105:7
119:6 134:6
190:12
diagnosed 118:15
143:11 182:3
186:19 187:9

diagnoses 95:10
157:17
diagnosing 139:11
diagnosis 58:13
105:9,15 119:12
119:18,22,23
120:8,9 126:15
128:5,17 136:24
137:9 141:8
144:16 145:14
146:5 154:19
158:13 161:19,22
162:6,21,24 166:2
166:23 167:9
169:15 171:4
180:24 181:12,21
182:10,14,23
183:17,19,20,23
184:24 185:5,15
186:2,11,17
187:14 195:23
196:3
diagnostic 57:24
58:15 136:14
139:17 141:23
160:3 172:2
dialectical 20:11
differed 157:14
difference 180:6
185:10
differences 158:15
different 19:11
22:3 25:23 43:4
48:3 49:4 51:14
55:10,14 58:16,18
58:24 71:12 74:18
75:14 82:21 89:21
89:22,24 95:20
97:14 99:4,23
132:9 137:1
150:10 155:9,20

156:1 159:21
163:17 184:18,19
200:23 202:15
213:13

**differently** 97:11
183:12

**difficult** 8:5
129:11 189:20
201:1,20,20

**difficulty** 8:22
154:8 202:10
█████ 206:16,19
207:13,18 208:4
221:14 222:8,19
█████ 206:23
210:11 221:15

**direct** 139:20
142:10 168:21

**directly** 35:15
122:22 123:12
134:21 139:23
142:3

**director** 17:2
216:1,2

**disabilities** 21:5

**disciplinary**
147:20 163:7,18

**disclosed** 37:18
64:11

**discovery** 3:9
25:21 28:16 36:5
121:1 204:11

**discredited** 76:24
77:4,20,22,23 78:4
78:19 79:2,10

**discuss** 77:9
103:14,18,20
125:2 191:12
206:22,24

**discussed** 43:19
46:12 81:10,13

82:23 94:1 111:7
112:12 122:1
133:5 144:7 187:2
189:13 192:8
202:19 217:14

**discussing** 61:1,10
103:23 109:11,14
135:2 157:11

**discussion** 80:9
101:5 103:4 174:7
174:9 176:20
220:23

**discussions** 207:3
219:10

**disorder** 105:10
105:11 118:15
119:6 136:15
141:8 143:12
157:22 158:14
160:2 166:16
180:7,8,20 181:8
182:23 185:11,12
187:20 188:15
190:3,6 194:20

**disorders** 58:16
180:12

**display** 153:5

**dispute** 148:24
177:17

**disputing** 50:3

**disregarded**
101:22,23

**dissolved** 39:15

**distinct** 158:21

**distinction** 62:7,9
77:3

**distract** 151:20

**distraught** 213:1

**distress** 161:9
170:21 171:12,20
171:24

**distressing** 150:21
171:19

**district** 1:1,1

**disturbance** 154:2
154:6 170:20

**disturbances**
152:16

**disturbed** 190:4

**diversity** 71:15

**division** 1:1 56:3

**doctor** 66:13

**doctoral** 18:8
19:24

**document** 3:11,19
4:4 28:7 38:9,17
39:21 41:21 42:8
46:1 53:11 54:5
54:10 70:5,10
73:19 74:21
113:17 120:14
124:21 137:15
173:13,18,21
205:11

**documents** 4:20
11:18,22 25:21
175:22

**doe** 1:4 2:6 7:4
229:4

**doing** 6:11 8:4
34:17 39:1 51:3
155:3,14 157:5
164:11,13,17
193:21 209:13
226:8

**domain** 66:7 85:11

**donated** 24:3

**door** 191:9

**dot** 106:10,10,11

**doubting** 50:4,5

**dr** 4:9,11,13,16 6:5
121:8 173:5

181:14 188:8
197:22 198:2
223:18

**drafted** 162:2

**drafting** 13:4

**drank** 200:5,10

**draw** 156:6 160:15

**drawing** 155:22
161:3

**dreams** 150:22
179:1,2,3,6,18,19
180:1,2 202:23

**drinking** 193:5

**drinks** 193:13
195:10

**drowsy** 197:20

**drug** 66:14 200:12
201:10

**drugs** 197:18
199:16,19 200:18
200:23,24

**dsm** 58:16 136:21
137:8 141:22
150:1,4 165:15
168:9,23 169:12
170:5,10

**dsm5** 4:12 137:6

**due** 83:5 197:24
198:1 203:19

**duly** 5:22 225:7

**duration** 117:15
117:19 158:16
170:13

**e**

**e** 3:1,6 17:13 37:4
59:15,15,16,22,22
225:1,1 227:2

**earlier** 10:21
27:10 34:14 36:11
48:2 51:11,19
59:21 92:1 97:5

112:12 113:22
133:5 136:19
148:11 182:12
189:16
**early** 19:15 121:24
156:14
**easier** 87:24
**easiest** 19:13
**echo** 18:11 38:2
93:7 213:7
**educate** 24:19
**education** 14:10
14:23 18:7,12
**educational** 18:1
**effectively** 67:23
**effects** 81:8 83:5
**efforts** 27:5,8
71:16
**eggs** 90:2
**eight** 154:8
**either** 8:21 9:5
12:16 13:4 17:5
46:23 53:15 56:6
56:11 77:15 125:2
126:21 130:5,7
134:12 136:24
138:23 160:8
174:5 191:19
194:23 200:16
**elaborated** 126:22
▮▮▮▮ 206:16,19,22
207:13,18 208:4
210:11,20 221:14
221:15 222:8,19
**ellipsis** 106:11
**email** 4:9 120:24
121:2,7,23 125:9
163:12 205:17
**emails** 16:2
**emotional** 21:4
156:8 171:7

203:11
**emotionally** 189:8
**employ** 93:22
**employed** 22:4,17
**employees** 55:22
**employment** 18:22
**encoded** 92:19
**encompass** 62:18
**encounter** 178:6
**encountered** 66:18
**enforcement** 92:4
**entailed** 51:9
**entails** 31:2
**entered** 203:14
**entire** 35:8 99:16
99:20 148:21
157:6
**entirety** 99:24
**environments**
43:6
**equating** 63:9
**equipped** 215:1
**erase** 200:12
**errata** 226:6,8,11
226:14 228:7
229:11,13,17
**especially** 56:2
92:14,17 104:2
108:19 158:7
**esquire** 2:2,3,9,9
229:1
**essentially** 10:2
77:11,20 172:17
199:4
**establish** 49:10,13
69:15 114:24
**established** 142:18
142:22,23,24
**et** 108:13 172:11
215:22

**evaluate** 97:10,14
108:23
**evans** 71:4 73:5
**evening** 192:16
**event** 3:16 41:6
42:4 88:13 89:12
91:20 92:7 97:21
137:22 138:3,6
139:21,22 140:5,6
141:7 142:3,10
143:4,13 145:3,10
145:21,24 146:2
146:10 147:1,3,8
148:24 149:3,10
152:12 158:16
165:23 166:20,21
167:19 168:22
176:2,11,12,16
187:4,22 194:18
201:24 202:2,12
**events** 41:3 91:14
93:11 109:12
197:23 201:13
202:1
**everyday** 111:4
**evidence** 147:13
199:18
**evident** 82:22
88:14
**evolve** 93:20
**evolved** 51:17,23
52:2 124:9 126:4
**evolving** 91:13
93:11 101:13
109:2 124:17
**ex** 162:12
**exact** 81:2 92:15
162:14
**exactly** 15:6 44:3
65:17 102:19
164:9 166:12

172:3 174:15
187:15 204:9
**examination** 6:2
118:1
**examined** 5:23
**example** 36:20
39:5 66:14 67:1
68:1 92:7 102:15
128:23 129:9
141:11,14,17
169:23 170:2
**examples** 91:4
130:20 131:24
153:18
**excessive** 198:1
203:19
**exchange** 4:9
121:2
**excluding** 112:21
169:10
**exclusively** 112:13
**excruciating**
17:24
**excuse** 61:5
**excused** 223:23
**executive** 50:24
**exhibit** 3:9,11,14
3:16,17,19 4:4,6,9
4:11,12,13,16 28:9
38:11 39:23 41:23
46:3 51:8 54:7
64:1 70:2,7 71:21
73:21 74:1,7 98:2
98:6,9 100:7
103:8 106:6
113:13,14,19
120:11,11,16
125:5 134:16
137:5,17 142:9
162:3 165:19
173:10,15 188:3,5

[exhibit - firmly]                                                                                      Page 12

205:8,8,13,21
**exhibits**  4:1 71:24
**exist**  114:17
  158:20
**exists**  49:23
**expand**  68:6
**expect**  53:3 92:10
  92:24
**expected**  26:17
**expecting**  157:23
**experience**  48:9
  52:10 58:5,23
  61:12 62:23 63:13
  87:6 105:16
  107:12 121:13
  122:17,22 123:10
  123:21 124:3,10
  140:19 141:21
  142:5 144:2,3
  146:20 148:4
  156:4 157:24
  159:3,19,22
  160:22 162:13
  168:17 179:17
  187:23 189:21,23
  191:1 196:13
  197:12 200:17,18
  202:8 214:23
**experienced**  32:18
  33:21 37:13 40:18
  43:9,17,18 44:5,7
  44:9,10 52:11
  58:6 67:9 84:22
  91:13 93:2 94:5
  97:21 108:10
  137:22 140:13
  141:3 143:4 145:9
  145:21,23 146:9
  146:24 147:8
  150:16 154:5
  156:2 161:1

162:22 168:13,16
172:1 179:24
182:20 187:22
188:16 189:8
190:21 202:9
212:9 213:21
216:15 217:5
**experiences**  34:2
  45:12 59:2 106:20
  150:8,11 155:19
  156:9,9 176:2
  189:19 217:4
**experiencing**
  33:22 58:1 139:16
  140:1 142:3 152:6
  158:2 159:16
  160:16 182:6
  191:2 192:13,14
**expert**  59:9 88:5
  111:13 200:14
  201:6 202:4
**expertise**  72:21
  111:8 112:3 191:5
  199:3,10 214:3
**experts**  81:20
  189:7,11
**expires**  228:14
**explain**  67:14
  93:15 118:5 123:9
  198:14 201:15
**explained**  26:5
  182:16 199:12
**explaining**  32:10
  32:10
**explanation**
  106:18 188:10,20
  188:22
**explanations**
  198:5
**explosion**  141:1

**exposed**  139:23
  143:12 145:3
**exposure**  139:20
  141:24 142:10
  143:17 168:22
**express**  197:15
**extent**  27:6
**external**  90:9
**eye**  96:20
**eyes**  153:11

**f**

**f**  1:19 225:1,23
**face**  45:13 65:19
**facilitators**  34:9
  35:13,17
**facing**  31:17 43:2
**fact**  44:13 86:5
  113:4 127:18
  137:24 141:21
  142:17 160:10
  199:15
**factors**  65:23 97:3
  130:10,16,19,21
  131:21 144:12
  183:10
**facts**  69:15
**factual**  208:11
**fail**  226:16
**fails**  229:19
**fair**  8:18 167:2
  178:11 208:14
**fairly**  21:18 77:1
**fall**  3:13,22 36:22
  38:20 54:14 61:3
**falls**  166:16
**false**  104:15,16,18
**falsely**  104:5,22
  105:4,24
**familiar**  15:16,23
  50:15 51:4 60:4
  74:23 201:4

**family**  9:16
**famous**  43:2
**far**  90:16 218:17
**feel**  25:10 37:23
  44:1,4 67:18
  79:22 99:20 104:2
  109:23 111:8
  113:7 123:2
  129:17 160:8
  161:16 171:17
  184:1 214:9
**feeling**  8:21 67:10
**feels**  77:5 128:10
  129:11 153:4
  187:16 194:15
  195:21
**fellowship**  19:24
**felt**  78:24 79:11
  105:16 122:19
  126:9 167:16
  183:22 197:19
**female**  86:24
**field**  15:2 59:5,9
  77:1 78:11 92:4
  109:16,19
**fifth**  9:6 83:1
**figure**  211:11
**figures**  43:1
**file**  14:23 118:9
**files**  11:18,22 53:6
**fill**  94:10
**filled**  95:6,16 96:8
**final**  197:14 205:7
**find**  49:4 169:2
**finish**  7:21,23
  85:14,15 131:15
**finishing**  18:22
  19:5,5
**firm**  53:16
**firmly**  141:2

**first** 5:22 26:1
  29:1 35:3,9 37:11
  41:11 44:14 56:2
  59:15 64:15 68:4
  76:19 95:3 114:7
  114:7 115:1,5
  121:6 125:24
  126:4,12 137:20
  143:12 149:11
  155:5,11 156:14
  156:20 168:11,12
  175:24 179:10
  188:7,12 189:5
  207:11 217:10
**five** 10:18 45:22
  48:15 51:2 61:13
  62:6,23 63:13
  113:1 151:17
  170:3,7 219:23
**flagrantly** 104:16
**flip** 120:10 165:15
  214:16
**flipping** 75:16
  142:8 168:9
**flitting** 153:11
**floor** 138:17
**focus** 21:17 22:18
  22:20 26:21
  187:19 214:6
**focused** 20:8 177:5
  177:7
**focusing** 106:19
  135:18,20
**folks** 33:3 132:24
**follow** 66:11
  146:18 193:3
**following** 57:15
  81:4 137:8 142:2
  168:17 209:9
**follows** 5:24

**followup** 154:4
  207:7 213:5
  220:14 223:9
**foregoing** 228:2
**foremost** 155:5
**forensic** 147:23
**forensically** 148:1
**form** 61:12 69:2
  69:18 72:12,22
  73:15 78:5 79:3
  80:13 82:16 84:19
  87:1,18 88:3,15
  89:16 90:14,21
  91:2 94:23 96:2
  96:16 101:7,18
  102:4 104:7 105:5
  105:9 106:1
  107:23 108:7
  109:6,17 111:1
  118:17 119:8
  122:24 123:14,24
  124:14 127:13
  128:6,18 129:2
  130:2 138:18
  140:11 141:10
  143:6,23 145:17
  146:14 148:12
  149:2,4,13 156:20
  162:8,17,21,24
  163:9,20 164:23
  165:11 167:18,23
  178:12,15 183:21
  184:14 185:2
  186:4,22 187:7
  192:22 193:6,15
  194:11 195:16
  196:11 198:11
  200:20 201:18
  202:20,21 217:23
  228:6

**formal** 18:12
  58:14 105:8
**formation** 93:5
**formed** 92:19
**forming** 196:3
**forms** 55:10 58:7
  143:9
**formulating**
  126:15
**forth** 64:6,7
  136:20 137:5
  142:8 145:16
  148:2
**forward** 217:18
**found** 61:19,23
  62:3
**four** 3:13 14:24
  38:19 39:8,12,14
  41:18 48:4 49:1
  51:2 62:5 71:24
**fourth** 9:5 187:18
**framed** 85:21
**frames** 92:15
**franco** 1:19
  225:23
**fraternity** 152:12
**free** 223:20
**frequency** 117:16
**frequently** 112:24
**friends** 42:18
  152:4
**front** 55:12 157:4
  175:16 204:22,23
  209:16
**full** 92:23 112:19
  119:5
**fully** 161:13
  174:22
**function** 172:8
**functioning** 156:8
  170:22

**functions** 72:18
**further** 5:7 44:16
**furtherance**
  163:14,15

**g**

**gad** 182:3,19,24
  184:7 185:21
  186:2,11,19
**gallinaro** 2:2 3:4
  5:16,16 6:4 7:2
  28:11 38:13 40:1
  42:1 46:5 54:9
  60:18,23 69:3,4,10
  70:1,9 72:15 73:9
  73:23 78:21 79:8
  80:17 82:17 85:1
  85:16 86:2 87:7
  87:22 88:8,19
  90:7,18,22 91:7
  95:12 96:11 97:4
  101:9 102:1,8
  104:12 105:20
  106:2 108:1,20
  109:9,22 110:6,14
  111:6 113:21
  118:20 119:10
  120:18 123:4,17
  124:4 125:1
  127:17 128:11,22
  129:5 130:8
  131:16,20 137:19
  138:19 140:16
  141:13 143:8
  144:6 145:19
  146:17 148:15
  149:7,20 155:1
  162:19 163:13
  164:4 165:7,14
  173:4,17 178:22
  184:3,21 185:6
  186:5 187:1,10

[gallinaro - hearing]

193:1,8,18 194:6
194:12 195:7
196:1,18 201:8,23
203:2,17 205:15
207:23 218:3
219:22 220:3,13
221:2 223:5,17
**gap** 96:9
**gather** 53:15
**gathering** 40:17
**gay** 30:11
**geared** 158:1
**gender** 39:16
**general** 12:19
21:18 24:13 25:12
26:16 51:12,21
84:9 87:4 90:19
90:24 101:6
128:12 154:23
155:2,3,17 157:12
157:14 159:17
181:5 193:9
**generalized** 180:7
180:20 185:11
**generally** 10:11
12:13 74:23 75:2
87:23 90:11
110:18,23 158:18
**getting** 50:14
57:12 172:19
**gig** 112:19
**girls** 45:13
**give** 14:22 17:23
18:21 29:7 67:24
72:3 88:20,20
92:15 94:3 96:6
128:23 130:20
186:18 223:4
**given** 13:13,18
52:9 60:11 72:16
75:23 102:17

108:9,9,24 133:7
163:2 207:4
225:14 228:4
**giving** 42:11 74:24
75:2 93:16 107:16
122:7 194:20
**gleaned** 79:21
**go** 3:21 35:14
44:12 54:13 60:18
72:23 85:17 90:16
124:12 150:13
154:18 176:7
189:6 192:22
220:4 223:20
**goes** 7:4 151:18
170:10 180:8
**going** 14:3,19
15:12 31:10 32:21
33:21 36:6 67:8
67:22,23 82:12
83:14 85:5 104:23
107:9 110:6,7,16
112:18 137:4
138:8 142:8 149:8
155:12,13,16,24
156:15 161:11
172:11 187:24
188:18 191:8
192:21 204:18
213:1 215:11
217:18 219:22
**good** 6:5,7,8 73:2
79:11 110:8
119:16 172:19
225:4
**grad** 18:22 19:5
**grade** 44:18 45:7,7
**graduate** 9:20
12:17 18:6
**great** 6:24 172:23
183:5

**ground** 7:12 86:4
**group** 9:24 15:14
37:3,19 39:7
40:24 46:23 55:5
55:19 75:12 133:8
**groups** 20:9 25:23
35:6 36:15,21
54:20,23,24 56:12
72:19 111:20
**guess** 20:1 23:1,4
51:12 62:20 72:16
83:1 87:19 91:3
105:19 112:8
131:24,24 132:14
137:20 139:21
143:9 150:12
155:2 156:20
160:14 164:2
167:9 171:10
185:24 187:11
209:15
**guidance** 161:8
**guilty** 211:23
212:5

## h

**h** 3:6
**half** 11:13
**hall** 18:5
**hamill** 2:3
**hand** 57:7 61:6
225:18
**handle** 215:7
216:17
**handy** 6:22
**hang** 222:5
**happen** 94:14
190:22 201:14
**happened** 88:1
91:17 94:13
100:11 124:19,22
139:24 148:24

149:3,10 161:10
179:21 190:1,7,7
196:15 197:8
198:3,15,21,23
199:11 200:4
202:11 218:15
219:14
**happening** 35:7
124:16 126:20
141:6 171:19
**harassing** 43:10
**harassment** 33:1
35:20 43:6,18,24
74:9
**hard** 84:11 105:6
181:22 183:6,24
190:20
**harder** 58:22
**harvey** 43:2
**hashtag** 42:24
**hat** 9:7 73:11
**head** 8:4 15:15
37:23 203:8
**heading** 64:4
**health** 17:2 22:7
36:17 55:14 118:3
134:11 136:6
215:12,16,19,19
216:2,3
**healthcare** 118:9
129:18 133:14
**healthy** 3:20 54:11
**hear** 37:12 55:17
128:24 149:1,11
**heard** 7:16 16:1
18:10 50:17 59:24
60:7 86:18 99:8
214:24
**hearing** 30:20
31:1,8,10,12,14,18
31:20 32:22 33:18

34:3 38:2 79:19
84:8,10 87:4
102:21 121:9
142:18 143:20
149:19 163:11
164:1,16 174:12
179:7 188:1 204:5
204:6,22,24
209:17 213:1
219:20
**heavily** 197:20
**held** 22:5 220:23
**help** 67:7,7,12
68:17 82:5,11,21
163:7 164:6
204:19 205:18
213:24
**helped** 27:4,8 41:1
89:18 90:5
**helpful** 19:12
68:13 79:11
122:14 123:9
163:11
**helps** 222:14
**hi** 121:8
**high** 50:5 53:1
80:11
**higher** 126:2
181:9
**highly** 188:10
**hipaa** 207:19
**hired** 26:4
**history** 18:2,22
118:3 119:5 159:4
217:6
**hmm** 34:10 195:4
**hold** 18:15 95:23
**holding** 53:1
**home** 1:16
**honed** 190:16

**honest** 138:12
**honestly** 88:24
99:8 117:22
125:15
**honor** 31:11
**hopefully** 23:9
**hoping** 218:7
**horizon** 24:4
127:12 128:2
132:24 133:13
134:10
**hosted** 24:2,7,12
**hotline** 24:5
**hour** 11:13 110:8
116:12 119:4
175:11
**hours** 55:8,8 99:21
215:24
**house** 2:17 152:12
**housing** 55:23,24
**hsmb** 4:7 33:14
74:4 75:21 76:7
76:15 78:3,23
99:12,15 110:17
111:11 134:19
**huh** 8:5
**hundred** 167:21
**hungry** 172:19
**hyperaware** 153:2
**hypervigilance**
152:20 153:10
**hypothetical**
67:24 88:21
128:10 149:15
184:16 187:16
195:20
**hypothetically**
69:12,22 128:20
129:12 132:3
184:2

**i**

**idea** 31:22,23
34:20 37:11 56:15
67:4 99:8 115:7
116:23 119:17
121:19 162:20
208:19 209:3
**identification** 28:8
38:10 39:22 41:22
46:2 54:6 70:6
73:20 113:18
120:15 137:16
173:14 205:12
**identified** 30:2
204:14 220:18
221:8
**identify** 58:11
204:12,19
**illustrate** 121:12
122:17 124:7
162:13,16
**illustrating** 124:10
**image** 92:22
**imagine** 181:24
189:20 190:20
191:11 193:16
194:16 214:12
**impact** 59:19
101:10 103:15
105:23 110:22
184:10
**impacted** 126:3
187:14,17
**impacts** 109:12
**impairment**
170:21 171:12,24
**imperative** 226:13
**implies** 107:14
**important** 7:19
64:21 161:18
165:22 170:22

**impossible** 194:15
195:21
**impressions** 165:6
**improve** 90:12,24
**inability** 165:22
166:6,19 176:16
176:22 178:5
198:6 201:16
**incident** 44:17
45:1 126:3 139:16
140:13 176:6
177:8 179:7
181:15 197:17
208:12 211:2
217:11
**include** 43:24 52:9
76:18 82:5 84:6
102:9 165:17,22
166:1,22 170:7
190:2 201:24
**included** 43:9
51:13 78:2 79:1
101:5 121:11
163:24
**includes** 39:15
64:15 126:18
168:21
**including** 36:15
43:1 73:5 75:13
84:4 111:10
144:13 199:7
202:12
**inclusion** 71:16
**inclusive** 132:1
**incoming** 35:3
**incomplete** 83:4
93:18 95:15
108:11 109:1
**inconsistency** 96:8
97:10

inconsistent  83:5
  93:19 94:12,15
  95:11,17,24
  101:12 109:1
  110:5
incorrect  63:17
incredible  89:6
independent  11:22
  144:18
indicate  5:13
  180:14
indicated  225:6
indication  96:1
indicator  94:22
individual  20:9
  30:1 39:16 105:17
  149:17
individuals  148:18
  189:11
influence  163:7,18
  187:4
influenced  181:21
  183:12
information  9:13
  30:14 37:15 48:19
  57:19,23 65:11
  79:11 80:2 81:23
  82:4 83:21 93:8
  97:15 98:19
  100:15 108:11
  118:19 120:4
  123:12 126:10
  129:23 142:20
  147:16 161:16
  184:18,23 187:12
  190:17
informed  37:15
  59:6,18 60:13
  81:14,22 183:9
  189:14

ingested  200:13
  203:24
inhibitions  193:10
initial  119:21
  120:2 217:13
initially  92:14
injurious  20:13
injury  68:12 142:1
  197:24
inside  13:14
instance  94:20
instances  213:8
instinct  217:13
institution  18:13
instructions  226:1
intending  216:7
intensive  20:6,6
intent  93:21
interacting  47:10
interaction  157:13
interactions
  179:19
intercourse  166:7
  176:18 191:24
  192:4
interest  73:7
interested  37:6
  39:12,13,16
  174:12 192:5
  225:16
interpretation
  146:6
interrogating
  159:9
interrupt  19:8
  131:13
interrupting
  131:14
intervening
  124:16

intervention  12:23
  19:3 29:13 34:8
  34:18
interview  4:14,16
  167:17 173:24
  174:4,8,23 175:1,9
  175:14 197:15
  205:22 206:1
  208:3 209:18
interviewed
  135:16,19 145:10
  146:11,21 174:14
  175:18 205:1,3,6
  209:13 210:1,8,9
  221:13
interviewing
  12:24 157:18
interviews  157:5
  160:2
intoxicated  203:21
introduction  7:2
  76:19
intrusive  150:16
investigate  65:14
investigated
  212:23 213:2
investigating  92:5
investigation
  121:11 142:11,13
  144:18,22 146:11
  163:24 164:3
  188:1 191:13
  200:10
investigations
  210:17
investigator  66:3
  144:20 149:18
  159:10
investigator's
  12:22

investigators
  91:23 92:2 142:20
  143:1 144:5
  176:21 178:4
  205:2 206:2 210:1
  210:9
invitation  133:9
invited  46:18 71:2
  72:17 98:24 111:9
  111:14,16,18
invites  46:19
inviting  100:23
involuntary
  150:16
involved  9:14,16
  9:18 26:1 27:14
  27:19 31:6,17
  32:2,7 41:3,8
  68:11 69:16 133:3
  133:7 208:11
  216:22 221:9
involves  44:17
involving  10:5,7
  10:23 221:9,14
  222:2
issue  24:13 58:12
  60:13 122:15
issues  14:12 23:15
  23:16,20,24 24:17
  24:19 32:23 36:17
  37:8 55:14 166:8
it'll  68:17
ix  13:20 14:12
  24:17 32:2,7
  83:14 86:23 87:4
  87:10 135:14
  143:20 164:7
  204:2 206:2
  209:24 210:8,10
  210:17 218:19
  219:7

| j | kin 225:15 | 78:17 81:10,18 | 174:17,18 175:2 |
|---|---|---|---|

**j**

**jan** 16:23 35:11 46:20 61:20 70:13
**jana** 2:17 69:1
**janet** 1:15,16 3:3 4:8 5:21 74:5 226:1 227:1 228:1 229:5
**jarrett** 134:18,18
**jason** 29:4 30:3 136:2 174:1,5 205:22
**jefferson** 2:10
**jennifer** 2:16
**jest** 120:19
**job** 26:5 92:4 190:12
**john** 1:4 2:6 7:4 229:4
**join** 21:23
**journals** 12:8 13:8 13:11
**judge** 20:17
**judgment** 58:5
**judgments** 218:22
**jumping** 110:4
**justice** 15:7 16:17 92:1

**k**

**k** 37:4 59:16,16
**kauffman** 16:23 35:12 46:20 61:20
**kauffman's** 70:13
**keep** 6:22 38:2 49:2 53:6 87:17 88:2 94:19 95:1
**keeping** 25:11
**keeps** 25:2
**kids** 21:5

**kin** 225:15
**kind** 20:14 26:17 27:2 31:10 32:17 37:14 56:17 58:19 77:18 93:17,23 102:14 150:12 157:2,9 161:24 166:7 168:10 171:16 194:2,19 195:14 199:3 212:17
**kinds** 45:12
**kirk** 56:22
**kirkland** 2:16
**kiss** 63:2
**knew** 118:19 131:2 132:16,17 148:20 174:16,17 174:18 184:4,22 184:23 185:4,21 191:23 192:2 206:20 212:1
**knocked** 140:24
**know** 6:10 8:12 9:21 10:1 13:13 15:1,13,19 20:24 21:1 25:1 26:6 27:19 28:17 29:7 34:1,1 35:8 36:14 37:17 40:4,15 42:17,19 43:4,5,8 43:10,22 44:5,6,10 48:10,21,22 49:4 50:2,4 52:11,18 55:16,17,23,24 56:1,4,12,13 58:2 58:6,16,19,24 59:1 59:10 62:12,14,18 66:4,6,11,23 67:23 68:11 70:19 72:13 77:13,13,14,19

78:17 81:10,18 82:9,19 84:21 85:3 86:18 87:2 88:23 89:5,15,17 89:19,22,24 91:5,9 92:3,22,24 93:22 94:7,8 95:7,14 96:4,7,17 97:13,15 97:16 98:12 100:14 101:2 102:23 103:1 104:24 105:7 106:14,14,17 107:15 111:3,3,4 111:12,13 112:9 112:22 115:5 118:24 120:19 121:14,22 123:1,3 123:5 124:17,23 125:15,17 126:1,4 126:12,13,14,16 126:18 128:7,16 129:10,18,21 130:13 131:6 132:2,21 133:2,6 136:23 137:3,3 139:2,14 140:14 140:21 144:13,22 145:5,24 148:13 148:17,17,21 150:7,9 151:23 153:15,17 154:14 155:6,14,15 157:2 157:4,5,7,9,9 158:9,13,14,23,24 159:13 160:10,24 161:6,9,10,11 162:17 163:23 164:8,12,22,24 165:2 168:5 171:14,15,20

174:17,18 175:2 175:20 178:17,21 179:5,9 180:23 181:2,4,6,6,15 182:2,12 183:11 184:5,5,6,20 185:1 185:4 186:18 187:12,13,16 194:22 195:24 196:4,16 198:15 200:16 201:11 202:14 203:10,24 204:17 205:19 211:10,13,23 212:17,18,19,24 213:19,22 214:18 214:20,23 218:17 219:4,9 222:9,10 222:11 223:8
**knowing** 105:12 178:10 183:16 221:13
**knowledge** 25:13 31:14 49:2 73:13 198:23 219:16
**knowledgeable** 56:1
**known** 25:3 77:1 78:10 140:9
**kolk** 59:8,16
**kolk's** 25:2
**kozak** 4:14,17 17:20 30:3,23 32:8 97:24 98:22 111:20 114:9 135:3,11 136:1 173:24 174:5 205:23
**kozak's** 100:8

**l**

**l**  16:19 17:13,13
21:23 59:15,16,22
**label**  107:13
**language**  43:11
107:15 149:24
150:10
**large**  99:21 192:15
**largely**  67:15
109:20
**latitude**  109:1
**lauren**  17:20 30:3
30:22 32:5,8
97:24 98:21 99:8
100:3,8 111:19
114:9 135:3,11
136:1 173:24
174:5 205:23
**lauren's**  100:2
**law**  35:4 53:16
92:4
**lawsuit**  222:20
**lawyer**  68:13,16
122:3
**lay**  110:23 111:3
**layout**  171:9
**lead**  12:9 219:11
**leader**  3:21 54:14
54:17 55:3 56:17
61:1
**leaders**  55:20
**leadership**  23:2,13
54:20
**leading**  202:1
**learned**  137:23
138:15 212:22
**learning**  139:23
141:20
**leave**  99:2
**led**  180:20 182:19
183:20 184:7

222:16
**lee**  1:7 2:13,17,18
9:11,15,16 10:6,23
13:15,20 16:13
17:3,18 30:10
37:1 40:20,22
56:20 71:16 78:13
112:15 117:19
133:24 229:4
**left**  60:24 99:18
**legal**  1:22 10:2
62:13 63:5,7
148:3 229:23
**legitimately**  68:21
**length**  116:3
**lesbian**  30:11
**letter**  4:11 113:12
114:5 115:4,6,9,12
117:3,4,8 121:10
121:12,20 123:9
124:6,9 125:3,12
125:24 126:8,11
126:23 127:20
134:16 135:3,7,11
135:15,17 137:5
139:19 145:8,16
147:18 148:4,9
160:11 161:24
162:2,12 163:23
166:3,5 168:20
169:2 170:23
182:7,12 183:23
185:19 207:6
218:2,23,24 219:7
**letting**  93:21 95:7
96:7
**level**  43:10,24
**levine**  25:7 59:21
**lexapro**  118:16
182:4 186:12

**lexington**  1:17
21:11,13
**lgbtq**  30:15
**license**  134:3
**licensed**  17:16
18:17 134:2
**licenses**  18:15
**lied**  67:2,19
**lieu**  5:8
**life**  36:19 54:19
55:20 155:24
156:4
**likelihood**  127:3
**likes**  96:20
**likewise**  215:2
**limited**  113:5
**limits**  152:8
**line**  4:21 47:4
227:4
**lines**  44:7 55:12
**lisak**  77:10 79:13
**lisak's**  77:1
**list**  28:22 29:16
46:22 57:20 58:20
158:9 160:23
167:11
**listed**  33:15 35:12
36:5 47:4 57:1
70:13 71:21 98:11
146:1 167:8 169:4
169:14 170:13
175:24 176:1
180:4 185:8
**listening**  66:9
126:14 155:4
161:14
**listserv**  16:4,7
**literally**  42:19
203:8
**literature**  57:24
109:19

**litigation**  7:4,10
68:12 221:16
222:9,24 223:1
**little**  49:11 51:23
52:23 75:11,13,19
82:15 109:1
151:19 153:24
172:19 181:13
**lives**  43:11 56:2
**llp**  2:8
**local**  21:19 23:5
24:4
**location**  62:14,15
**long**  11:11 13:11
31:4 55:8 115:16
116:24 117:13
131:1,2 175:8
**longer**  27:13,15
29:12 34:18
117:21 217:19
**look**  11:17 40:3
42:5 53:4 70:21
75:4 82:1 96:20
97:20 98:6 103:7
117:2 120:20,21
121:4 139:13
141:22 153:10
168:20 169:6
170:4 189:2
**looked**  51:19
99:22 110:2
116:21 120:22
137:11 173:22
**looking**  14:22 45:2
51:7 52:3 98:4
100:7 115:18
138:11 143:13
149:21 152:22
156:22 160:10
169:23 172:4
178:17 188:23

lookout 158:10
looks 52:13,16
lose 131:19
lot 35:5 36:12
  49:18 52:16 75:18
  130:16 139:14
  155:3,8
lots 36:17 93:1
  150:9
loud 96:22
low 43:10
lowers 193:10
luder 56:22
lunch 172:21
  173:2
lynchburg 1:1

**m**

machine 225:10
main 1:17 174:24
majored 18:4
making 6:12 9:24
  44:1 53:10 77:3
  78:13 153:2
  192:16
male 79:14 210:23
  212:8,11 213:9
man's 25:6
mandate 161:5
mandated 67:6
manifested 170:6
manner 5:12
manual 58:15
manuals 12:5
manville 20:18
march 114:8
  115:2
marked 28:7 38:9
  39:21 41:21 46:1
  54:5 70:5 73:19
  113:17 120:14
  137:15 173:13

205:11
market 1:23 2:3
massachusetts
  19:21
masters 18:7
match 144:15
material 13:24
  57:24 74:14 75:7
  75:9 76:11 81:14
materials 16:3
  53:17 61:2 63:21
  71:23 79:1,18
  93:10 110:20
  175:13,17,21
math 44:18 45:7,7
matter 10:16
  90:19,24 110:22
  112:4 128:13
  193:9 204:14,15
  206:3 209:8
  210:10 211:11,14
  211:22 222:18
matters 13:20
  204:2,12
mcguire 2:8
mcguirewoods.c...
  2:12,12 229:2
mean 22:23 26:14
  36:10 43:14,23
  58:13 70:21 72:14
  79:4 84:11,20,23
  88:4 91:3 93:11
  94:7 95:18,21
  96:9,23 97:15
  100:13 105:8
  108:6 110:1 111:2
  113:1,24 116:2,23
  118:22 120:2
  121:21 128:7
  129:9 132:14
  133:6 134:17

138:9 139:3
  140:12 142:22
  149:14 157:21
  159:8,13 162:11
  163:21 167:6
  168:2 171:12,13
  171:17 174:16
  175:19 176:17
  181:1,22 183:6
  184:15,17 190:14
  191:20 193:7
  194:14,14 195:17
  195:24 200:14
  201:19 204:5
  206:8 209:12
  210:13 218:20
  219:6,13
meaning 56:8
means 34:22 35:7
  82:19 91:16
  167:10
meant 187:8
  195:22
measure 12:18
media 51:3
medical 12:22
  19:2 118:5,10
  119:5 199:18
  215:22
medically 139:2
medication 8:21
medications
  200:15
meet 23:8 65:9
  143:10 155:11
  160:3 168:10
  181:10 192:6
meeting 11:12,21
  11:24 112:24
  115:2,5,17 125:24
  156:19

meetings 114:13
  114:16 115:1
  116:14,18 117:11
  167:17
meets 136:14
member 23:18,21
  26:7 40:22 47:7
  56:23 134:18
  149:19
members 16:12,19
  21:2 26:10,16
  27:1 32:12 34:21
  35:10 37:6 46:23
  55:15 57:3 74:9
  75:22,24 76:7
  78:23 79:19 80:9
  81:7 93:17,22
  95:7,22 133:9
  147:19 148:8
  164:18
memories 90:11
  90:24 150:17
  176:2,3,8,10 179:7
  200:12 202:20
  203:4
memory 89:14,19
  92:11,19 93:5
  166:8 200:15
  201:5,21,22 202:1
  202:4,7,10,14,15
  203:5
men 39:10,13
  77:14 80:11 211:5
mental 36:17
  55:14 58:15 119:6
  133:14 134:11
  156:21
mention 114:7
mentioned 27:10
  41:13 46:21 59:20
  61:20 78:8 132:7

[mentions - ███]                                            Page 20

mentions 178:24
  178:24
mentor's 12:16
merged 48:3
met 11:9 114:7,10
  117:23 121:9
  126:4 143:14
  146:4 165:17
  167:8 170:11
  207:20 208:5,7
  211:4 217:5
method 88:10
  154:17
methodology
  49:20 77:20
micah 2:9 220:8
mid 1:23
midatlantic
  229:15
milwaukee 19:4
mind 36:8 62:7,9
  148:14,16 172:21
  221:13
mine 40:6
minimal 43:10
minor 53:10,11
minute 60:19 78:8
  119:4 219:23
minutes 11:16
  110:9 116:12
misconduct 3:12
  29:15 31:12 32:19
  33:2,21 35:20
  37:7 38:18 52:12
  62:19 74:9 83:14
  84:15 112:6
  204:19
misremembering
  50:20
misreporting
  66:15

missing 171:4
mistake 147:9
  196:14
mistaken 196:6,21
  197:6
mm 34:10 195:4
moment 13:16
  42:17,22 44:16
  112:22 120:20
  205:16 223:4
money 24:3
month 89:3,12
  90:3
month's 74:19
months 91:21
monumental 89:7
  89:12
mood 151:2
  158:18 159:12
morbid 158:20
morning 6:5,7
  11:16 88:23 89:2
  138:16
motive 69:15
  161:18
mouth 159:9
move 189:17
moved 19:20
  21:11
movement 42:24
mschwartz 2:12
multiple 29:19
  58:4,7 61:23
  215:8 216:17
multitude 201:3
mutually 134:11

## n

n 3:1 59:16,22
name 5:14 7:2,4,5
  17:11 25:6 27:9
  27:14 29:12 33:6

34:16 45:8,18
  46:9,21 49:15
  50:3 57:1 59:9,10
  59:15,16,21 60:8
  60:15 70:12,13
  77:1,2 78:9 81:17
  98:3,14
named 9:12,17
  25:7
names 15:3,13
  33:14 47:4 60:1
  60:10 81:20
narrative 91:13
  92:23 93:11
  101:13
national 40:11
nationally 87:5
natural 104:1
nature 9:8 12:14
  20:3,21,23 31:5
  33:10 34:11 70:16
  70:23 102:10
  109:13
near 152:12
necessarily 43:23
  79:22 82:10 94:21
  96:9,23 104:9
  130:6 151:13
  185:16 203:6
necessary 141:7
  226:4
need 17:24 28:23
  59:12 76:16 97:17
  151:6 161:15,16
  168:16 169:18
  181:9
needed 11:4 68:21
  78:24 82:23
negative 101:17
  151:2

neither 184:6
  225:15
never 89:8 188:4,9
  188:19 190:14
  192:3
nevertheless
  107:20 108:4
new 52:20 53:11
  156:13 207:7
night 3:15,16 40:8
  40:11 41:4 42:3
  72:2 195:10
nine 168:17 169:2
  169:3,10,12,18
  170:12
nodding 8:4
nonconsensual
  176:17,23 177:6
  177:11 191:18,24
  192:2,18 194:24
  202:16
nonprofit 23:3,13
  23:18
nonprofits 22:22
nonverbal 144:14
nope 18:14 150:23
  209:5
███ 4:9,11 31:21
  47:4 56:8,11
  113:12 114:6
  120:1,24 121:3
  123:6 125:8 127:1
  136:11,14 137:21
  145:9,21 148:5
  150:2 151:19
  153:21 157:13
  160:6 161:21
  162:11 166:23
  171:20 172:1
  174:17 176:2,5
  177:9,24 179:3,14

181:15 189:22
190:6 193:20
194:22 197:15,17
198:8,18 199:16
199:19,21 200:2
202:17 206:19,23
207:4,7,18 210:11
210:20 218:2
█████ 161:18
163:6,6 176:21
177:18 188:11
199:7 203:20
207:9
**normal** 116:2,3
197:21
**normally** 94:18
102:15 129:22
**notary** 1:20 225:3
225:24 228:18
**note** 64:19 83:1
96:12 106:8 107:2
108:3 180:11
201:12 229:10
**noted** 36:11
226:11 228:7
**notes** 77:12 80:6
80:10,18,22 81:18
81:24 82:3,5,7,13
96:19 103:13
114:14,16 115:19
116:17 117:10
118:9 125:19,22
138:11 151:7,15
152:22 154:7
175:15,20 178:17
180:22 181:3
185:23 220:1
**notice** 225:6
**noticing** 153:16
**november** 29:22

**number** 3:8 4:3
13:14 14:22 15:19
19:22 25:22,23
28:19 33:3 48:8
48:14,15 50:4
61:11 71:19 140:3
149:23 152:16
169:3 170:3,7
227:24
**numbers** 57:7

**o**

**o** 59:16
**o'brien** 2:2
**oath** 5:8,9 7:16
**object** 69:1,18
72:12,22 73:15
78:5 79:3 80:13
82:16 84:19 87:1
87:18 88:3,15
89:16 90:14,21
91:2 94:23 96:2
96:16 101:7,18
102:4 104:7 105:5
106:1 107:23
108:7 109:6,17
111:1 118:17
119:8 122:24
123:14,24 124:14
127:13 128:6,18
129:2 130:2
138:18 140:11
141:10 143:6,23
145:17 146:14
148:12 149:4,13
162:8 163:9,20
164:23 165:11
178:15 183:21
184:14 185:2
186:4,22 187:7
192:21 193:6,15
194:11 195:16

196:11 200:20
201:18 202:21
217:23
**objecting** 38:3
**objection** 194:5
195:5
**objections** 5:11
**observable** 151:16
152:22,24 154:12
**observation**
153:23
**observations**
93:17 124:1 146:6
150:6
**observe** 64:12
150:14,15,21
151:1,11 152:15
152:20 153:1
154:10
**observed** 151:5,9
153:20 188:4
**observing** 130:1
**obtain** 57:18
**obtaining** 161:19
**occasion** 11:10
102:20 134:9
212:13
**occasions** 41:6
76:7 114:11
**occupational**
170:21
**occur** 194:21
198:10
**occurred** 44:23
124:5 130:7
138:15 139:10
140:9,14 152:13
174:22,24 176:18
177:17 191:14
194:18,18 202:18
204:14,16 209:9

**october** 4:5 30:18
70:12
**offer** 27:11 35:6
35:10,14 36:12,14
36:18,20 37:16
40:13 68:8 181:16
199:23 213:4
**offered** 35:3 37:19
197:18 199:17
**offering** 20:5
30:10 37:8 199:3
199:6
**office** 26:16 27:2,7
113:2 191:9
213:14 214:6,6
216:8
**official** 162:18
225:18
**oh** 48:20 57:8
83:20 100:12
113:14 126:9
204:4 222:6
**okay** 6:20,22,24
8:1,15,20 9:1,7
10:5 11:7,7,11
12:1,3 13:13,17
15:9,16 16:16
17:1,4,15,23 18:15
18:21 19:15,17
21:9,16,22 22:1,11
22:11 23:7 24:14
25:10,18 26:10
27:7,22 28:5,24
29:7,21 30:7,19,21
31:1 32:24 33:9
33:10 34:5,7 36:4
38:1,5,7 39:4,18
39:19 40:7 41:11
42:13 43:12,21
45:17,21,23 46:8
48:2,12 49:7,16

[okay - paragraph]

51:24 53:6 54:3
55:4 57:11 59:14
60:17 61:8 63:7
63:20,23 64:2,15
64:24 68:3,10
69:7 70:3 71:1,22
74:13,20 76:10
77:7 80:8 82:1
84:14 85:16 86:15
86:22 87:8,11
88:9 91:8 93:7,16
98:7,10,10,12
100:12 102:2
104:13,17,21
107:5 108:21
109:10 111:7,22
112:5,21 113:3,11
113:14,15,22
114:5,13,22 115:3
115:8,16,20 116:1
116:13 117:10,23
118:21 119:18,21
120:5,10,12,21,21
120:23 121:6,18
122:9,20 123:8,18
127:10 129:6
132:6,20,23 133:3
133:10 134:15,20
135:23 136:4,18
137:4,20 138:7,13
138:22 139:4,17
140:8,17,23
141:14,19 142:7
142:15,21 143:3,9
143:18 144:17
145:14 146:23
147:5,12 148:7
149:21 150:12,20
151:1,4,11,17
153:19 154:8,16
157:16 159:20,24

160:5,14 163:5
164:15 165:21
166:1,4,11 167:12
167:22 168:9,20
169:1,10,17 170:1
170:2,17,19 171:3
171:11 173:9,11
173:20 174:20
175:8,17 176:15
177:3,22 178:3,9
178:23 179:12
180:3,18 181:13
182:9 184:4
185:20,24 186:3,9
186:13,15,16
187:18 189:6
190:23 191:7,20
191:22 192:12
193:12,19 195:2
196:2,19 197:14
198:11,20 199:9
199:21 200:8
201:12,15 202:6
202:16 203:3,18
205:7,9,20,21
206:8,10,18,22
207:10,24 208:10
208:16 209:3,6,20
209:22 210:3,22
211:3,9,18,20
212:7 214:5 215:5
215:16 217:14
218:14,17 219:21
220:6 221:12,21
222:1,4,15,18
223:4
**old**   9:7 53:12
**once**   23:8 72:3
134:15 157:8
170:11 205:18

**ones**   14:9 36:4
72:3 86:13 97:7
157:22 167:15
**ongoing**   215:4
**open**   6:16 28:3
215:24
**opening**   136:13
**operate**   186:1
**operating**   184:8
**opine**   201:9
**opining**   190:5
198:4
**opinion**   119:24
124:2 136:14
145:9,23 147:4,7
147:11,18 148:2,6
149:2 167:23
168:8 178:12,18
187:5 188:9
190:19 191:6
199:7 218:22
**opinions**   9:19
167:18
**opposed**   162:21
**opposing**   222:13
**oral**   1:15 177:17
177:19 178:6
193:21 200:3,11
**order**   31:9 33:23
125:12 126:11
143:11
**organization**
15:17,24 23:3
41:4 48:3,4 50:13
133:4,21
**organizations**
13:23 15:4 23:14
23:19,23 24:3,7,12
24:17 49:4 52:21
55:2 111:10

**orientation**   36:22
**original**   226:14
**outcome**   127:4
163:7,18 225:16
**outdated**   77:5
**outpatient**   20:7
**outside**   13:20 60:3
**outsider**   66:5
**overall**   171:8
**overlap**   180:12
181:5
**overly**   203:21
**override**   53:9

**p**

**p**   18:8 37:4
**p.m.**   173:2 224:1
**p.o.**   2:10
**package**   6:14
**pad**   175:19
**page**   3:3,8 4:3,21
29:1,22 30:17
32:24 33:5,6,8
34:6 35:18 41:11
57:6,14,15 61:6,6
63:24 76:20 77:12
80:7 81:4 82:2
91:8 98:6,8 103:7
106:6 121:7
165:19 170:5
227:4
**pages**   228:2
**paint**   88:21
**painting**   195:18
**panel**   75:24 79:9
79:19 80:9 81:7
93:17,21 95:7,22
122:21 201:2
**paper**   175:19
**paragraph**   41:12
42:5 83:2 126:24
136:13 139:20

[paragraph - plaintiff]                                                        Page 23

141:23 142:7,9
145:7 149:23
151:17 152:16
154:8 168:11,21
168:23 169:3
170:14,19
**paragraphs**
149:22
**paren** 83:3
**parkway** 2:10
**part** 9:21 16:3,7
20:18 26:4 27:15
32:7 35:21 55:2
56:6 81:2 83:12
85:24 93:8 99:21
103:4 129:22
143:17 153:22,23
166:20 177:24
192:1 197:4
**participate** 47:1
194:8
**participated** 56:16
196:9 204:20
210:16 211:13,21
217:15
**participating** 5:3
6:9 13:4 204:21
**participation** 50:8
**particular** 21:16
22:18,20 26:20
28:1 45:18 52:4
57:4,21 59:5,10
78:1 79:24 80:5
81:17 84:9 92:20
99:11 105:13
131:1 132:4
151:21 157:16
168:3 189:20
213:16
**particularities**
94:8 105:18

**particularly** 193:4
**parties** 5:10 9:14
56:5,8 177:17
**partly** 67:3,14
83:5
**party** 9:12,17
10:24 11:4 225:15
**pass** 63:22
**pasted** 75:18
**patient** 119:12
144:8,10 159:7
**patricia** 2:3
**pattern** 197:21
**patterns** 4:6 74:4
**paying** 158:17,18
158:19
**peer** 3:21 36:15,18
54:13,17,18,20
55:3,4,11,12,20
56:6,17 61:1
102:23
**peers** 37:11 42:18
**penetration**
138:14 139:10
**pennsylvania** 1:24
2:4
**people** 20:12
21:19 29:19 30:6
30:15 32:11 33:23
34:3 35:5 37:12
40:18 44:6,10
45:11 48:24 50:4
50:5 58:6 59:3
65:7 67:4,18 73:4
73:6 83:13 87:15
87:20 88:6 92:3
94:6,9 98:21
100:23 107:9,12
110:19 111:3,12
111:14,17 112:1
133:13 140:22

148:9,24 153:16
155:13 158:22
161:4,5 179:24
190:13 192:4
193:3,12 197:22
201:12 202:9
203:7 209:24
212:18 215:8
216:17,18 217:1
**people's** 12:18
50:6 90:11 110:23
193:10
**percent** 167:21
**percentage** 80:10
80:11
**perform** 26:17
**performed** 79:14
**performing**
177:19
**period** 36:23
135:21 207:21
**periphery** 153:17
**permitted** 206:24
**perp** 107:3
**perp's** 106:9
**perpetrator**
106:24 107:13,19
108:4 179:4,8,20
197:19
**perpetrator's**
77:16
**perpetrators**
76:20 77:9 79:15
79:20,24 80:2
**person** 5:8 32:20
52:10 64:17 65:2
66:6 68:21 84:17
86:21 96:24 97:12
97:18 102:17
103:1 105:3,13
110:23 111:4

128:5 131:2,3,4,7
132:18 134:1
155:4,11 157:24
189:21 207:1
213:3 216:19
**personal** 41:13
68:12 192:3,18
193:4,23 194:9
195:1,11 219:16
**personally** 150:14
150:15,20 151:1
**perspective** 95:8
96:6
**pertaining** 176:21
**pertains** 218:21
**pervasive** 217:6
**peter** 25:7 59:21
**phamill** 2:6
**phd** 226:1 227:1
**philadelphia** 1:24
2:4
**phrase** 83:2 107:3
129:19
**physical** 118:1
197:24 203:11
**physically** 5:4
**pick** 73:10
**picture** 88:22
94:11 97:2 126:17
**piece** 164:3 165:5
165:8
**pieces** 75:14 92:20
97:14
**pinpoint** 58:22
**place** 225:6
**places** 6:18 48:21
151:22,23,24
152:11
**plaintiff** 1:5 2:6
5:17 7:3

plan 131:3
planning 41:8
  100:16
play 37:10
played 105:13
please 5:13 19:19
  41:18 45:22
  114:19 121:13
  226:3,8
pled 211:22 212:5
point 65:21 91:11
  93:15 94:4 95:19
  95:20 97:17
  119:23,24 143:19
  143:21 170:7
  187:11 208:6
pointed 182:11
points 174:24
policy 32:8 62:13
  148:2
politics 18:5
population 35:8
  113:5
portion 99:1,3,18
  100:2 101:5
  192:15
position 21:9 22:2
  22:5 23:2 101:12
  105:14 123:2
  133:13 177:18,21
  214:10
positions 19:11
  22:16
possibilities
  198:19 199:6
possibility 158:13
  190:2
possible 12:10
  32:23 37:16,24
  69:23 84:23 103:9
  105:16,19,23

118:23 121:14
  156:7 183:11,13
  184:20 198:9
  209:16,18
possibly 12:21
  16:10 17:21 50:10
  67:17 81:21 91:5
  106:10,13,17
  108:3 128:20
  132:15 139:8
  155:8 182:14
  186:18,23
post 19:23 105:9
  181:16
potential 191:12
potentially 86:13
  97:8 107:18 215:8
practice 21:12,17
  68:6 73:12 82:3
  91:22 92:8,9
  112:13,18 113:4
  129:22 134:3
  157:14 159:17,20
practices 13:1
  64:12 157:12
pre 181:16
predicate 192:22
  195:6
preexisting 118:4
  185:15
prep 11:24
preparation 42:9
  74:21 81:14
  116:18 173:21
prepare 11:8
  115:9,12 125:12
  183:23
prepared 4:11
  113:12 117:2,4
  124:8 136:10
  161:20

preparing 100:15
prescribed 118:16
  182:4 186:12
presence 190:3
present 2:15 5:5
  11:9 20:13 27:24
  32:19 55:11 71:2
  71:8 72:18 76:4
  76:14 77:8 82:4
  84:3 98:24 99:8,9
  99:16,19 100:1,16
  110:20 181:7
  215:20,22,23
presentation 4:7
  36:14,20 37:3
  40:2 47:2 52:4,8
  57:4 70:21,23
  74:4 75:1,3 78:3
  96:15 97:19 98:3
  98:15,17 100:24
  102:21 103:4
  106:22 107:1,17
  110:17 126:17
  144:13 146:22
  190:9,10
presentations
  13:14,19 26:6
  27:20 36:12 53:7
  55:17 62:2,5,22
  71:6,24 72:2
  75:18,21 78:14
  81:19 96:5 99:5
  99:23 107:11
  112:7 133:8
  148:10
presented 13:24
  14:1 30:2 32:8
  33:3 46:15 61:2
  66:1 70:17 74:7
  74:15 94:13 98:18
  122:15 158:6

190:18 199:7
  212:14
presenters 46:10
presenting 76:12
  79:9,17 80:24
  83:21 93:9 98:19
  118:6 156:13
  195:19 198:18
  217:9
presently 125:22
presents 111:20
preserved 114:20
presume 176:17
pretty 14:19 72:6
  107:8 157:7,10
preventing 29:14
prevention 4:4
  27:11 29:14 70:11
previous 75:9
  182:15 183:16
  186:2,11
previously 45:14
  61:10 118:14
  182:3 186:19
primarily 20:10
primary 29:14
principal 12:21
prior 22:16 180:24
  181:19 187:3
private 19:21
  21:12,17 112:18
privy 147:15
probably 14:20
  25:1 26:23 27:4,6
  36:24 37:3,21
  53:9,12 56:18
  57:21 58:3 59:12
  60:1 67:13 73:5
  74:16 75:17
  100:12 148:20
  171:15 217:12

**problem** 77:18
**proceed** 173:7
219:2
**proceeded** 176:23
**proceeding** 7:13
56:5 69:17 84:15
104:24 122:4
147:21 163:8,19
164:7 203:15
218:19 219:8
**proceedings** 86:24
209:24
**process** 31:10,12
31:13,13 32:2,7,9
79:6 95:5 162:15
188:1,18 189:4
**processes** 12:19
108:13
**professional** 9:19
119:7 132:8 145:8
147:7,11,23,24
162:16 167:24
217:4
**program** 20:7,8
21:6 29:11,14
32:5 34:17,18,19
35:2,6,11,13,24
36:16 39:9,10,11
39:13 55:5 57:1
**programming**
27:11 61:23 70:24
**programs** 15:4
27:14 35:7,15
**project** 24:4
127:12 128:1
132:24 133:13
134:10 137:3
**projects** 13:10
**promotion** 17:3
**prompt** 211:19

**prompting** 122:2
157:2 160:18
**prompts** 156:21
**proposing** 198:9
**propounded** 228:5
**protected** 207:19
**protocol** 20:10,15
**provide** 7:9 10:15
15:19 25:17 26:6
27:2,6 38:23
52:21 53:8,15
65:11 83:13 93:9
98:17 99:1 102:13
122:19 123:12
133:12 134:7,23
148:3 151:18
162:5,17,20,24
206:1 218:1 219:6
**provided** 3:10
25:22 28:14,18
29:4,19 30:23
35:24 36:8 37:3
39:6 51:17 52:6,7
53:18,24 55:14
97:23 101:1
102:12 119:24
134:22 169:15
175:7,13 204:13
207:12 208:17
209:8 213:9
**provider** 95:9
118:9,10 129:18
129:24 145:5
**providers** 133:15
**provides** 136:13
**providing** 9:13
21:7 26:2 30:13
62:22 86:4 123:22
124:11 134:11
147:18 148:5
163:16 164:18

208:3
**psychiatrist** 56:22
**psychiatrists**
133:14
**psychological**
119:23 120:6
124:11
**psychologist** 18:18
22:7
**psychologists**
133:14
**psychology** 18:9
**psychopathology**
12:20
**psychotherapy**
20:6
**psychotic** 190:3,6
194:19
**psyd** 1:15 3:3 4:8
5:21 18:7 74:5
228:1 229:5
**ptsd** 105:10
157:21 158:14,14
160:2
**public** 1:20 13:19
43:3 225:4,24
228:18
**publicly** 43:19
**published** 12:8
58:17
**publishing** 137:12
**pull** 169:23
**purporting** 148:1
**purpose** 131:5
163:17 164:20
208:24 218:24
**purposely** 53:13
**purposes** 28:8
38:10 39:22 41:22
46:2 54:6 70:6
73:20 104:14

113:18 120:15
135:21 137:16
173:14 186:7
205:12
**pursuant** 5:22
136:20 225:5
**purview** 122:18
**put** 13:15 15:4
63:2 78:7 104:23
159:8 167:15
168:4
**putting** 100:4

**q**

**quantity** 180:13
**queer** 30:12
**question** 7:13,22
7:24 8:12,16 13:7
62:10,19,20 66:10
69:2 83:8,17
85:13,21 86:1,8
89:10,13 94:19
96:13 98:14
166:10 175:3,24
178:23 180:3
186:8 187:19
188:12,13 189:5
197:4,14 204:10
208:1,2 211:12
**questioning**
222:17
**questions** 8:7 12:2
32:9 95:3 103:2
104:15 135:22
148:3 154:2 155:8
155:10,16,18
156:15 157:3
158:1 159:1
161:15 175:4
177:4 185:14
204:18 220:4,15
220:16 221:5

222:5 223:6,7,11
228:5
**quick** 75:4
**quickly** 75:15
103:7
**quote** 49:14
200:24
**quoted** 48:16
**quoting** 150:10

**r**

**r** 2:9 17:13 59:16
225:1 227:2,2
229:1
**ra** 56:6
**raise** 122:4
**rallie** 17:10,13
27:9 30:2 214:22
215:3 216:23
217:13
**rally** 40:12
**range** 189:22
198:13
**rape** 43:7,17 61:14
61:15 62:8,8,12
63:2,5,8,9,13,14
63:18 104:6,23
179:1 195:13
200:18,24
**raped** 179:5,8
**rapes** 80:12
**rapport** 157:8
**rare** 66:24
**ras** 36:19
**rate** 48:16 50:8
**reach** 35:8
**reached** 115:8
167:5 184:19
**reaching** 137:9
213:23
**reactions** 52:10
57:15,20 59:1

75:16 91:12 103:9
103:21 104:1
**read** 24:24 25:4,4
25:8 49:9,12
59:23 82:8 84:5
92:16 96:18,18
103:10 144:21
176:13 179:10
205:20 206:8,9
215:11 223:13,13
223:16 226:3
228:2 229:9
**readily** 157:7
**reading** 24:21,21
24:21 51:4 81:2
**reads** 145:8
**reality** 190:3
**realize** 85:17
**really** 25:3 26:8
30:12 33:23 41:7
77:3 79:4 82:7,10
89:23 96:19 97:18
105:12 106:19,19
117:15 126:16
128:20 129:12
135:1 138:10
139:14 153:15
159:11,14 160:24
161:13 164:11,13
165:4 178:7,17,19
183:15 185:22
196:15 198:7,15
198:18 204:4
**reason** 8:20 45:19
67:19 76:11 78:1
78:23 116:13
117:1 123:11
157:12,15 163:6
167:3 182:23
192:1 195:9
197:15 207:12

208:2 213:16
226:5 227:6,8,10
227:12,14,16,18
227:20,22 229:11
**reasonable** 119:7
167:24
**reasons** 129:10
**rebecca** 60:5
**recall** 10:14 13:4,6
15:10 16:17,22
17:5 19:10 24:8
24:24 26:3 27:16
27:18 32:15 39:1
42:11,23 44:15,19
45:6,14 47:9,10,13
50:7 51:4,6,8 52:1
59:22 63:15 71:1
71:14 74:24 75:2
75:20 76:8 77:8
77:22 79:6,12
80:4 93:13 99:14
100:5,13,18,21
101:4,8 103:3,23
109:12 115:15,18
116:22 117:15,22
118:23 121:18
125:6,7,21 127:15
128:3 134:12
135:1 136:7
137:24 138:2,5,13
140:15 141:2
151:14,24 152:15
153:7,19,22 154:7
154:11 157:15
162:14,23 171:23
174:3,7,9 175:10
176:22 177:1,12
177:18 178:2,3,7,9
181:4 185:22
191:20 192:7
200:7 204:4,21,23

205:24 206:9,10
206:13,15,20
207:8,10 208:16
208:20,23 209:3,6
209:11,15,19
210:12,19 211:2,2
211:9 212:4,6
213:8,11 217:15
217:20 218:13
219:1,14,18,19
220:15 221:3,21
**recalled** 45:1,15
121:22
**recalling** 24:11
37:22 211:10
**recast** 150:3
**receipt** 226:15
229:18
**receive** 16:2 55:8
97:16
**received** 6:14 18:6
102:11 120:24
125:14
**receiving** 37:14
148:18
**recess** 60:21
110:12 173:2
220:11
**recognize** 47:22
94:11 173:18
**recognized** 112:1
**recognizing** 55:9
79:2
**recollection** 31:7
33:13 46:17 70:22
78:6 100:22
125:10 133:20
134:20 136:9
138:21 174:20
212:21

recommendation
68:2 207:5
recommended
164:2
record 5:15 60:19
220:5,8,24 225:13
recorded 1:19
179:3 194:3
225:10
recruit 35:10
recurrent 150:16
150:21
reduce 127:3
refer 28:20 54:18
82:24 106:23
137:4 151:6
209:24 214:2
215:3
reference 31:19
42:15 43:21 48:7
48:8 77:6,21
78:14 95:17
189:10 199:15
203:18
referenced 38:14
48:20 182:7 229:6
references 49:8
61:9 62:4 64:20
166:19
referencing 86:5
referred 3:21
10:22 40:24 45:17
54:13 74:12 91:24
114:9 208:20
213:12,17 214:21
216:3
referring 6:23
24:9,16 41:14
42:21 43:7 49:8
55:19 56:7 86:21
92:14 95:14

111:22 112:6
121:23 127:7,19
127:21,24 130:23
132:3 139:8 140:3
140:6 141:20
142:16,17 143:5
145:12 146:11
188:13 189:12
refers 31:21 82:20
91:19 141:23
reflect 52:19
138:11
reflected 125:18
160:19 175:5
176:5 179:2
191:14
reflection 44:16
reflects 42:6
101:15 189:19
refreshing 125:10
refuse 214:19
regard 14:8 62:6
73:6 102:10
111:12,24 134:14
153:21 154:1
189:10 191:1
219:1
regarded 164:13
regarding 103:5
129:24
regards 159:17
region 1:23
reiterate 123:20
relate 53:17
176:10
related 10:16
12:16,17,21 13:20
14:24 24:19 25:3
26:24 27:20 30:10
55:17 57:24
158:15 166:8

179:1 189:3,5
190:13 208:12
212:23
relation 158:16
relationship 47:17
192:5 207:17,22
relationships 3:19
3:20 54:11,12
132:23
relaying 162:22
relevant 14:11
36:8 45:10,16
rely 62:22
remaining 143:14
remarked 197:22
remember 9:11
10:17 13:12 14:20
15:3,12 17:21
19:13 21:1 25:6,9
36:13 39:14 44:24
45:6,8,8 48:1 60:1
71:11 80:22 81:21
82:11,21 84:1
85:19,20 87:24
88:12 89:1,1,4,11
89:18,23 90:2,3,5
90:12 91:23 92:19
100:1 101:3 110:3
118:18,22 121:24
124:15,18 133:17
133:23 135:2
138:2,9 152:14
165:22 166:6,20
167:3,19 168:2,6,8
174:15 175:15
176:5,16 177:5,24
178:5,13,19,20
185:3,4 191:19
192:15 193:21,24
194:10,22 195:3
195:12 196:8

197:7,16,24 198:6
199:4 200:4,11
201:16 202:22
203:7,9,23 204:8
205:3,4,5 210:14
211:7,7,16 212:21
221:7 222:14
remembered
45:20 89:20
192:11 202:13
remembering
130:24
remembers 176:6
remind 54:21
remotely 1:16 2:1
5:7,9,22
removed 107:10
render 190:1
repeat 107:24
repeated 107:3,7
rephrase 8:13
166:14
report 65:19
108:12 118:7
121:11 126:19
142:11,13 143:2
144:22 145:18
146:3,12 148:19
150:6,10,19,24
152:18 153:23
154:5 164:1,3
165:4 172:15
188:6 190:11
191:13 203:21
reported 125:23
142:11,16 144:4
146:7 157:19
158:10 159:21
160:7,9 177:10
179:14 193:20
200:2,3 211:6

**reporter** 1:19 5:2
7:14 8:3,6 17:14
59:12
**reporting** 5:6,12
65:3 154:19
159:18 160:11
200:1
**represent** 7:3
31:21 120:23
177:14,16
**representation**
177:23
**representative**
2:16
**irei** 2:16
**represented** 165:5
209:7
**representing** 2:6
2:13 53:16
**represents** 42:2
109:14
**repressed** 203:5
**request** 3:9 4:20
115:11 121:1
122:7 123:23
124:6,7 125:14
163:6 204:11
217:2 218:6,8
**requested** 148:3
162:9 217:22
**requesting** 114:21
122:16 186:1
**requests** 28:16
**require** 170:11
**required** 143:10
169:18
**requirement**
170:24
**requires** 169:12
**research** 12:17,22
12:24 13:5 19:4
59:5 73:13 81:12

110:3
**researchers** 12:11
60:11
**residence** 54:19
55:20
**resident** 36:18,19
55:21
**residential** 55:24
**residents** 55:23
**resonate** 89:23
**resource** 31:16
**resources** 3:12
38:19 52:18,22
213:4
**respond** 3:21
54:12 64:11
102:23 215:9
**responded** 28:16
**respondent** 84:21
85:8 97:12 103:10
103:22 106:20,23
211:23 212:5
223:1
**respondent's**
97:17 103:15
108:15 144:23
**respondents**
102:10 108:23
109:2
**responding** 55:10
222:21
**response** 3:9,12
7:24 38:19 121:1
123:23 153:14,15
179:2 198:8
**responses** 4:7 7:22
8:8 25:21 36:6
74:4
**responsibility**
32:4 147:20
211:24

**responsible** 80:11
93:6
**rest** 110:9 188:23
**result** 115:11
139:16 194:2
195:14 197:10
**resulted** 221:15
**retread** 86:3
**retroactive** 201:5
**retrospectively**
183:8
**return** 226:13
229:13,17
**review** 11:18,22
62:21 109:18
116:17 118:3
173:20 183:20
205:16,19 229:7
**reviewed** 42:8
71:23 74:20 138:8
147:13 148:11
205:24
**reviewing** 25:20
162:3 215:17
**right** 11:6 15:6
32:6 44:3 57:7,12
61:6 67:20 73:14
76:13 80:20 86:15
94:12,17 97:22
99:13,14 102:22
105:9 108:9
110:15 112:19
114:5 115:22
127:16 133:1
135:10 143:10,16
152:6 154:14
155:19 156:23
157:22 158:20
161:24 163:15
164:17 166:18,24
168:13 170:18

173:6 177:13
180:10 181:18
182:18 184:7,23
187:18 190:17
191:9 193:14
198:21 199:1,24
201:13,17 202:20
203:9 206:6,17
219:18 221:3,11
222:23 223:13,14
223:16,17
**rings** 192:10
**rises** 43:23
**road** 91:21
**rodocker** 4:14,16
29:4 30:4 136:2
174:1,6 205:22
**roe** 31:20,21
**role** 23:13 32:14
32:16 33:17 64:13
65:4,6,14 147:22
147:23 208:7
217:21
**roles** 22:3 37:9
54:20 61:22
**room** 5:5 99:1,2
153:13
**rotate** 212:19
**roughly** 21:14
22:12 52:14
**rule** 66:12 192:3
193:24 194:9
195:1,11,13
**ruled** 167:10,14
**rules** 7:12 192:19
193:4
**running** 201:2
███ 7:5 138:20
140:9 146:13
147:20 192:6
193:22

| s | | | |
|---|---|---|---|
| **s**  3:6 18:8 37:4 59:15,15 | **scale**  12:18 43:5 | 86:15 103:8 | **semester**  112:23 |
| **sad**  103:12 | **scared**  103:11 | 105:22 112:2 | **seminars**  13:23 |
| **safe**  13:1 29:23 | **scenario**  122:1 | 113:8,14,23 114:1 | 14:9,11 24:15 |
| 30:8,9 153:4 | 182:1 183:14 | 114:1,3,23 115:10 | **send**  134:16 |
| **salient**  167:16 | 189:21 191:11,12 | 116:4 117:18 | **sense**  31:18 87:12 |
| **sat**  174:13 | 192:12 193:19 | 120:5 121:6,16,21 | 87:14 88:7 93:23 |
| **satisfied**  172:1 | 194:17,21 195:19 | 124:17 125:4,11 | 94:3,6,9 110:18 |
| **satisfy**  170:13 | 196:2 | 126:24 127:5 | 126:2 130:19 |
| **save**  53:10 | **school**  9:21 10:24 | 128:13 129:15 | 158:3 183:3 |
| **saw**  42:13 51:18 | 12:17 18:6,23 | 136:16 152:4 | **senses**  92:21 |
| 74:7 94:15 115:6 | 19:5 20:19 21:3 | 153:14 160:3 | **sensitive**  32:23 |
| 138:16 176:9 | 155:14 | 165:3,18,20 | **sent**  134:21 229:14 |
| 186:10 208:17 | **schwartz**  2:9 | 169:24 170:8 | **sentence**  29:8 |
| **saying**  6:9 43:8,16 | 203:14 223:10,15 | 171:15 181:17 | 114:7 127:1 188:7 |
| 63:16 80:16,21 | **scientific**  12:8 | 188:24 211:18 | **sentences**  189:18 |
| 85:22 88:17 89:12 | 25:13 | 214:24 216:20 | **separate**  131:8 |
| 90:20 95:18 | **scope**  101:1 152:7 | 217:1 218:23 | 170:6 216:5 |
| 101:19,20,21 | **score**  25:2 | 219:23 | **separated**  188:24 |
| 108:6,8,17,18 | **se**  101:3 | **seeing**  75:20 82:13 | **september**  4:7 |
| 109:8 132:1 | **seal**  1:12 225:18 | 112:23 117:7,14 | 34:6 35:19 74:5,8 |
| 147:10 155:4 | **sealed**  6:18 | 125:9 127:11 | 74:14 76:1 |
| 170:9 176:8 | **second**  45:3 85:24 | 130:1 151:14 | **sequential**  93:1 |
| 177:13 181:23 | 115:6,10 125:12 | 161:21 185:23 | **serious**  105:1 |
| 184:20 187:15 | 125:16,24 126:6 | 214:1 216:21 | 142:1 |
| 190:7,8,9,17 192:9 | 126:23,24 169:7 | 217:2 | **serve**  31:15 55:23 |
| 195:23 197:1 | 178:23 222:5 | **seeking**  66:15 | 209:1 |
| 198:13,20 199:5 | **secondary**  12:10 | 131:7 | **served**  20:24 |
| 199:10 202:8 | **secondly**  187:23 | **seen**  47:18 48:20 | **service**  24:5 |
| 203:6,12 206:4 | 188:16 | 49:7 50:11 62:4 | **services**  15:7 21:7 |
| 217:10 219:18 | **secret**  6:19 | 63:21 75:17 | 68:8 92:2 134:11 |
| **says**  30:10 35:16 | **section**  77:12 | 115:12,13 121:13 | **session**  7:14 114:4 |
| 45:5 64:16 81:1 | 165:16 | 125:13,16,19 | 116:3 126:12,21 |
| 106:8 120:6 121:7 | **see**  8:3 21:19 | 131:3 162:13 | 126:23 212:15 |
| 127:1 151:18,19 | 28:12,21 29:5 | 183:9 | 213:2 |
| 163:12,23 165:16 | 30:22,24 31:19 | **selected**  37:5 55:6 | **sessions**  117:24 |
| 165:24 170:19 | 33:6,9 34:23 36:7 | **self**  20:13 37:5 | 119:4,12,14 |
| 176:1,1,5 180:4 | 38:20 41:11 42:7 | 82:22 118:7 | 160:13 178:1 |
| 185:8,8 187:20 | 45:5 47:3,5 54:14 | 172:15 190:11 | **set**  40:14 136:20 |
| 188:19 197:15 | 55:18 57:1,8,16 | **seltzer**  197:18 | 145:15 148:2 |
| | 69:14 70:14 75:15 | 199:17 200:6,10 | 157:21 174:4 |
| | 80:6 83:7,10 | | |

seton  18:5
sets  64:6,7
setting  11:20
  24:20 63:7 87:10
  149:18 152:24
seven  169:11
seventh  45:7
sex  13:1 177:17,19
  178:6 193:21,22
  194:8,23 200:3,11
  201:16
sexual  3:11,19,20
  4:4,6 10:7,16 14:5
  14:12 15:1 22:19
  23:10 24:20 26:21
  28:1 29:15 31:12
  32:18 33:2,21
  35:20 37:7 38:18
  40:18 41:14 43:7
  43:17 48:9 52:11
  54:10,12 57:15
  59:19 60:14 61:12
  62:6,8,16,24 63:10
  63:19 65:8 70:11
  71:17 74:3,9 83:3
  83:14 84:15 85:4
  86:11 112:6
  138:14 139:10,24
  140:2,6 142:1
  145:12 146:13
  155:12 159:21
  166:7 167:4
  176:18,22 178:11
  178:14 179:17
  190:13 191:16
  192:4 200:19
  202:16 203:22
  204:19 211:6
  213:20 214:16
  216:15 220:20
  221:9 222:2

sexually  64:8
  141:16 143:22
  157:19 158:11
share  82:9
shared  62:1
  100:12,14,16
  139:5 180:23
  184:12
sharing  66:24
  82:12
shc  208:8 214:6
  215:5,12
shearer  2:17
  223:12
sheet  3:18 46:7
  156:16 226:6,9,11
  226:14 228:7
  229:11
shelter  24:5
short  60:21 110:12
  220:11
shorthand  225:10
show  36:6 175:22
  212:17
showed  11:23 98:2
  99:22
shown  171:20
side  149:11 214:1
  214:4,16 222:8
sides  149:1
sidney  71:4 73:5
sign  3:17 46:7
  226:8 229:12
signature  225:22
  228:9
signed  229:20
significant  170:20
  171:13,24
signing  226:10
similar  26:11,13
  33:17 34:13 37:20

39:10 52:13,17
  102:10,14 132:8
  132:10 219:5
simply  121:12
  124:7 197:7
simultaneously
  128:15
single  39:3 57:22
  64:20 167:11
sitting  8:20,23
situation  9:23 10:3
  32:21 34:4 58:2
  68:20 84:22 86:9
  92:12 128:21,23
  129:14 132:4,16
  134:13 138:12,22
  179:23 197:13
  198:24 210:15
  211:7,17 212:1,6
  214:17 215:2
situations  143:24
six  54:2 71:20
  152:16
skepticism  49:23
  68:20 69:8
skills  34:22
skipped  120:11
sleep  92:10 152:16
  154:1,5 156:22
  159:12 172:9
  197:21
sleeping  154:4
  172:6
slide  64:3,16 74:18
  76:19 79:18 81:15
  81:24 82:5,6,14,14
  100:4,7,8 103:8,9
  103:14,20 110:16
slides  82:22
slightly  51:14

slow  197:5
small  19:21 80:10
  113:5
smell  92:22
smelled  90:1
snowden  17:10,14
  27:9 30:2 214:22
  216:23
soccer  23:5
social  17:16
  170:21
socially  172:10
solicit  118:8
solutions  1:22
  229:23
somebody  155:9
  155:17 219:20
someone's  17:11
  38:2 86:7 87:16
  93:24 102:3,16
  126:17 217:9
soon  121:14
sooner  88:18
sorry  14:2 16:5,6
  18:10 19:8,9
  20:22 33:5,7,8
  38:1,3 43:14
  44:13 60:2 83:16
  85:16 93:7 98:13
  101:20 112:5
  113:22 135:9,20
  141:12,12 142:8
  146:18 164:24
  197:2 200:22
  206:12 213:7
  215:15
sort  7:1,12 9:23
  12:2,20 17:24
  24:13 25:3,12
  28:12 29:8 31:15
  32:2,3 33:19,23

[sort - straight]                                                    Page 31

37:9,17 39:15
40:12,17 41:8
42:24 43:1,19
45:13 48:10,16
50:5 52:24 53:10
55:11 57:22 58:4
58:24 59:2 65:18
66:4,11 68:15
70:20 77:17,17
78:10 81:10 85:3
85:21 87:9,12
88:5 89:19 90:4,9
92:13 94:10
100:24 105:11,12
108:16,21 109:19
116:1 123:20
124:2,9 126:21
128:12 130:15
132:2 150:3
155:18,22 156:12
156:16 157:11,17
158:1,8,16 160:17
161:12 162:18
168:7 171:5,7,17
171:21 181:9,10
184:8 190:6,15,16
190:20 192:15
200:1 214:16
219:2
**sorts**  55:13 155:15
156:5
**sought**  68:14
**sound**  42:16 50:15
153:12
**sounds**  153:16
206:17
**source**  48:18
57:19,21,22 58:22
**sources**  50:12 58:4
58:9,10 61:24
62:3

**south**  1:17
**space**  15:20 29:23
30:8,9 72:6 226:6
**speak**  3:13,17
34:23 37:4,4,7
38:19 39:7,10,11
39:15 40:23 44:8
46:6,12,24 47:11
48:3 51:11,16
61:21 72:17 111:9
111:18 112:11
129:17 132:11,12
133:4,8,9 199:18
212:5
**speaker**  41:2,5
**speakers**  59:24
**speaking**  75:12
132:2 184:2 197:5
**speaks**  145:18
**special**  73:7
**specialty**  21:17,21
**specific**  20:14
27:20 49:15 50:2
58:10,22 60:1,15
62:13,15 63:5
75:12 130:20,24
132:22 155:22
157:21 181:10
189:15 209:19
212:4
**specifically**  24:11
29:11 32:15 48:22
49:5 51:10,13
75:8 79:5 93:13
112:8 125:8 153:8
159:18 171:9
177:19 208:24
213:24 214:21
219:14,19,20
**specificity**  180:13
189:22 190:19

**specify**  189:2
**speech**  3:14,16
40:6 41:12 42:3
42:11,13 44:12,13
44:14,21
**speeches**  13:19
72:1
**spell**  59:11
**spending**  82:15
**spent**  82:20
**sphere**  25:13
**spoke**  11:15 148:4
**spoken**  136:11
**sponsor**  41:1
**sponsored**  15:14
**spot**  212:19
**spring**  40:15
**square**  2:3
**staff**  54:19 55:21
56:6 135:14
**stance**  65:12
**stand**  37:5 63:12
84:12
**standard**  53:1
91:22 92:6 130:6
157:10
**standing**  225:4
**stands**  40:8 50:18
**start**  6:8 7:24 23:1
25:19 26:15 138:4
143:13 155:2
186:6
**started**  16:6 60:3
71:20
**starting**  18:2
143:19 149:23
157:6
**startle**  153:14
**starts**  83:2
**state**  16:18 25:12
61:13 115:1 226:5

**stated**  62:1 96:15
199:13
**statement**  87:21
106:12 168:4
200:9
**statements**  8:4
83:4 84:5,13,14
93:19 95:13,17
**states**  1:1
**stating**  5:14
**statistic**  48:23
49:10,13 50:13
61:17,19 63:12
**statistical**  58:15
**statistics**  49:21
51:2 52:6 61:10
62:21
**status**  156:22
**stay**  24:18 99:7
**steadfastly**  193:23
**steer**  217:12
**steered**  216:16,19
**steering**  46:24
47:7
**stenographically**
1:18
**step**  34:23 87:9
**stewardship**  25:5
**stood**  36:7
**stop**  131:9
**stories**  87:17
94:20 109:2,3
**story**  41:13 42:14
43:22 44:13 65:10
65:21 66:10,23
92:23 93:20 95:1
102:16 106:9,15
107:20 108:15
144:23
**straight**  87:17
88:2 94:20 95:2

**strangely** 89:5
**strategies** 127:3
**street** 1:17,23 2:3
**stress** 55:10
  105:10,11 136:15
  141:8 143:11
  157:22 158:14
  160:2 166:15
  180:7 181:8
  185:11 187:20,24
  188:17 189:3
**stretch** 201:7
**strong** 190:2
**student** 9:15,18
  10:12,23 22:7
  31:20,22 36:21
  37:13 40:24 54:24
  68:7,10 85:4
  86:10,11 117:21
  128:13 129:3
  130:10 134:10
  136:5 150:9 172:7
  172:8 206:11,13
  206:15 208:6
  210:24 211:22
  212:14,20 213:10
  215:12 217:22
  218:1,6,19 222:20
  222:21
**student's** 9:15
**students** 21:8 31:8
  31:9,15,16 32:12
  34:3 35:3,5,9,15
  36:16,19 37:10
  50:9 54:22 55:5
  56:3 62:1 68:5,9
  85:7 86:10 102:22
  112:13,23,24
  113:5,8,23 114:3
  134:8 211:4,5
  212:9,12 213:21

214:7,14 215:20
  217:5 220:21
  221:10
**studies** 49:9,9,12
**study** 49:15 76:20
  77:9 79:13,14,21
**stuff** 6:19
**subject** 110:22
  112:3 226:10
**subjective** 171:16
**submit** 123:9
**submitted** 114:6
  134:24
**subscribed** 228:11
**substance** 158:23
  228:6
**suddenly** 197:20
**suffered** 187:5
**sufficient** 119:6
**suggested** 121:10
**suggesting** 101:16
  122:13 159:6
  218:14
**suggestions** 64:10
**suicidal** 20:13
**suicide** 10:12,20
  221:23,24
**suite** 1:23 2:4,10
**summarizing**
  150:11
**summary** 4:13,16
  50:24 171:18
  173:24 174:24
  175:6 205:22
**supervision**
  225:11
**supplying** 148:8
**support** 3:20 11:5
  24:13 30:11,13
  31:16 36:18 37:9
  37:17 40:18 51:1

52:16,21 54:11
  55:13,24 67:8,21
  69:16 87:5 103:1
  134:7 141:8 161:7
  164:11 165:9
  172:12 213:4,24
  214:4 219:7
**supported** 142:5
**supportive** 30:16
**supports** 169:14
**suppose** 22:23
  69:12 95:7 112:8
  183:13 208:14
**sure** 6:13 8:13
  14:18,22 15:22
  22:15 26:3 29:16
  36:12 39:2 40:16
  45:4 50:10,18
  60:9 61:8 66:16
  67:1 69:3,22 75:6
  76:18 86:3 90:8
  90:15 96:3 98:13
  98:16 100:16
  103:11 105:15
  108:2 114:19
  116:8 124:22
  128:10 131:10,18
  131:23 134:4
  138:10 139:6
  141:4 153:2
  156:24 158:4
  159:5,24 160:12
  166:9,13 167:6,13
  169:8 181:24
  184:17 185:20
  189:1 190:8
  193:11 199:2,5
  202:24 218:4
  220:2
**surface** 104:8

**surgery** 140:20
**surrounding**
  176:11
**surroundings**
  153:2
**survey** 50:16,18
  50:23 77:13
**survivors** 200:19
**suspect** 29:17
  33:16
**suspicion** 109:3
  122:5,11
**switch** 182:23
**switched** 34:16
**sworn** 5:22 225:7
  228:11
**symptom** 155:22
  160:1
**symptomatic**
  58:19
**symptoms** 118:6
  125:23 126:18,19
  139:15 146:1
  147:2 149:21,24
  150:2 151:12,18
  154:18 158:2,5
  159:6 160:19,23
  165:18,21 166:17
  168:18 169:2,4,11
  169:18 170:4,12
  171:6,21 180:4,12
  180:13,19 181:1,6
  181:10,20 182:6
  182:16,18,21
  183:1 184:5,6,9
  185:9 187:3 188:3
  188:4,11 189:22
  191:2 194:3
  195:14 196:14,20
  196:24 197:11

synonyms  138:24
synopsis  18:1 29:8
  30:8
system  199:19

**t**

t  3:6 225:1,1 227:2
tab  28:4,15,20
  38:6 39:18 41:17
  45:21 51:19,20
  52:3 54:2
tailer  75:13
take  3:14,16 8:3
  38:1,4 40:3,8,11
  41:4 42:3 65:18
  65:24 72:1 75:4
  81:19 96:5 97:1
  110:9 114:14
  119:14 130:11,14
  205:16 219:23
  220:8
taken  1:16 60:21
  110:12 181:3
  220:11 225:5
takes  32:4
talk  7:19 28:23
  32:17 52:23
  101:10 107:11
  155:7 203:3
talked  34:14
  108:14 182:12
talking  24:10
  27:17 33:19 39:6
  42:18 45:11 85:18
  86:17,20 92:5
  97:5,19 99:10
  107:17 110:18
  125:7 133:18
  154:14 160:17
  161:2 177:2 203:4
  207:8

taught  97:10
tbtn  40:8
teacher  44:18 45:8
  45:18
team  21:2 26:7
technical  10:2
technically  9:22
  23:5 46:22
teleconference  2:1
tell  9:1 12:13
  14:15 24:23 31:1
  34:11 44:12 67:8
  77:7 122:21,21
  123:16 138:5
  144:8,11 155:23
  159:11,12,15
  170:23 172:3
  204:9 225:7
telling  19:11 65:10
  65:13,15,22 66:10
  66:22 67:11,15,16
  121:18 144:16
  190:24
tells  64:8 179:4
ten  11:16 21:1
  110:9 169:4,11
  170:14
tend  92:24
term  10:2 36:22
  62:17 210:18
terms  52:20 53:2
  58:13,19 65:24
  103:24 139:3
  144:16 150:8
  155:5
test  201:1
testified  5:24
  162:9
testimony  7:9,16
  10:16 11:4 97:11
  136:19 164:19

191:22 198:16
  204:13 207:12
  208:17 209:9
  225:5,9,14 229:9
  229:18
tests  201:3
text  25:3
thank  6:8,9 22:14
  223:7,18
theirs  15:21
therapeutic  21:3
therapist  9:17
  21:6
therapists  21:7
therapy  20:9,11
  145:4
thereof  225:16
theresa  1:19
  225:23
thing  8:2 19:13
  64:21 68:12 89:20
  93:14 139:3
  167:11 198:8
  215:10
things  3:21 6:17
  7:20 49:18 52:9
  54:13 64:7 66:2
  66:17 82:12,21
  89:24 92:24 94:16
  109:13 144:13
  153:21 155:15,23
  155:24 156:5,17
  157:7,10 158:7
  159:2 160:11,16
  161:3,11,13 167:7
  167:15 171:19
  172:12,14 188:21
  193:12 198:14
  201:3 202:11,12
  202:13,22 203:7,9

think  7:5 15:11,12
  16:5 24:11 27:12
  28:21 31:5 36:10
  37:2 38:2,14
  40:14 42:5 45:9
  46:22 49:5 50:13
  52:13,14,23 58:21
  59:18,20 60:12,15
  63:20 65:1,11
  66:9,20,21,22 67:2
  67:3,13,14,19 71:7
  74:17 75:12 76:5
  76:13,16 77:5
  78:8,19 82:23
  85:24 88:16 91:4
  94:7,10,24 95:14
  96:14,22 97:1
  98:1 102:6,16,19
  105:2 107:9,13
  110:7 112:9
  113:24 119:16
  127:19 129:9
  130:6 156:23
  157:13 159:23
  160:5 161:17,17
  163:4,21 164:9
  165:8,12 167:20
  168:5 170:16
  171:5 172:18
  175:5,9 177:7
  179:22,23 180:2
  183:12 185:16
  192:10,20 194:14
  195:4 197:2,10
  198:7,17 202:14
  202:18 217:11
  219:24 221:22
  223:5
thinking  156:11
  158:4 162:15
  163:22 164:9

[thinking - transcription]

172:4
**thinks** 68:16 123:8
  177:19
**third** 11:3 41:12
  42:5 47:4 180:3
**thirsty** 176:8
**thirty** 226:15
**thoroughly** 53:21
**thought** 63:17
  67:16 79:6 111:23
  128:16 131:16
  164:12 183:7
  197:3 214:2
  215:17
**thoughts** 151:21
**threatened** 141:24
**three** 14:24 21:13
  39:18
**threshold** 181:9
**throw** 209:20
**thrust** 106:21
**tick** 28:21 160:17
**ticked** 170:11
**ticks** 160:22
**time** 6:23,23 7:21
  22:17 27:17 29:12
  31:4,6 34:16 42:4
  45:16 48:10 51:17
  51:22 71:7,8
  74:19 76:23 82:15
  82:20,24 88:13,14
  89:19 90:12,13
  91:1,18,20 92:15
  92:18 95:2 107:10
  110:3,8,10 112:19
  115:6,10 116:7,9
  116:21,24 117:16
  117:19,20 118:13
  120:4 123:19
  125:12,13,16
  126:4,7 127:10,15

133:18 134:8
  135:21 148:17
  151:7 155:11
  156:14,20 167:16
  172:4,19 174:16
  181:23 182:16
  190:16 193:24
  195:2 196:7
  203:22 205:4,6
  206:21 207:21
  212:4,17,18
  217:10 223:8,19
  225:6 229:19
**timeframe** 229:8
**timeline** 114:24
**times** 6:11 9:4
  16:14,14 43:11
  66:21 67:16 99:6
  99:7,12,15 115:13
  130:4,4,7,14
  133:24 207:10
  208:16 214:22
  217:3
**timing** 158:15
**tired** 197:6
**title** 13:19 14:12
  15:6 24:17 32:2,7
  83:14 86:23 87:4
  87:10 133:22
  134:2 135:14
  143:20 164:7
  204:2 206:2
  209:23 210:8,10
  210:16 218:19
  219:7
**titled** 3:11,19 4:4
  38:18 54:10 70:10
  76:20
**titles** 14:21
**today** 6:10 7:9,13
  8:21 9:13 11:8,10

27:17 47:20 84:4
  223:19
**told** 67:17 68:13
  123:6,21 138:6
  144:3 178:1
  191:15 197:8
  217:18 218:20
  219:1
**tool** 190:15
**top** 6:19 15:14
  37:23 46:9 120:5
  131:11 157:23
  158:8,9 216:24
**topic** 10:10 26:24
  27:3,20 28:1 36:9
  36:11 37:6 39:12
  39:14,17 55:18
  65:8 70:24 71:12
  71:13 72:11 73:8
  106:3 111:16,18
  111:19,24 112:7
  177:3 192:7
**topics** 26:8 27:23
  28:14 55:16 110:7
**touch** 182:1
**tower** 2:4
**track** 131:19
  149:24
**tracking** 154:18
**trademarked**
  34:19
**trailing** 106:11
**train** 35:2,12 76:6
  79:19,23
**trained** 31:8,15
  32:5 36:16 55:7
  55:13 78:22 81:7
  97:14,24 99:12,15
  126:13 143:1
  147:24 148:9

**training** 3:17,22
  25:17 26:2,17
  27:2 29:3,3,9,13
  29:21,23 30:3,8,9
  30:17,20,23 31:2
  32:1 33:2,11,13
  34:6,9,12,21 35:16
  35:20 37:20 38:22
  46:7 47:2,14 51:7
  51:9,16 53:23
  54:14,17 55:9
  56:17,24 57:2
  61:1 70:17,20
  71:23 73:7 74:2,6
  74:12 75:8,24
  76:1,15,17 79:1
  80:1 83:13 84:2,4
  84:6,8 85:6,9,22
  86:4,12 91:24
  97:9,16,23 98:17
  99:17,20 100:9,20
  101:5 102:9,11,11
  102:13 105:22
  106:4,20 107:19
  108:2,24 109:11
  111:15 157:6
**trainings** 3:10
  15:20 24:15 25:23
  26:11,23 27:19
  28:14,18 32:14,16
  36:8 46:19 51:11
  53:17 56:17 71:20
  72:18 73:12 75:7
  75:10 99:11
**transcribed**
  225:11
**transcript** 174:21
  215:12,18 226:16
  226:17 229:6,20
**transcription**
  225:12 228:4

**transgender** 30:12
**trauma** 15:1 22:19
  23:10 25:4,5,8
  34:1 58:1,6 59:1,7
  59:19,23 60:14
  81:8,11 83:2,5
  84:23 86:6,17
  91:13 92:18 93:3
  93:3,18,19,21 94:5
  94:8 96:1 101:11
  101:16 104:10
  105:8,23 108:11
  108:12 109:11,15
  110:22 111:5,23
  112:7 140:19
  141:3 146:20
  158:13 166:8
  167:9 168:13,16
  179:24 181:20
  182:13,15,18,19
  182:20 183:1,8
  189:7,7,11,14,19
  196:17,23 202:7,9
  203:8,11,11 214:1
**traumatic** 58:1,2
  92:7 97:21 104:5
  105:3,10,17
  137:22 139:21,22
  140:5 141:7 142:3
  142:10 143:4,13
  144:2 145:3,9,21
  145:24 146:2,10
  146:24 147:3,8
  165:23 166:20,21
  167:19 168:22
  187:3,22 194:3
  196:14 197:23
  201:13,24 202:2
**traumatized** 86:14
  94:21 97:8 167:4
  196:22 197:7,9

**treat** 20:12 53:3
  68:4,5
**treated** 207:11,13
  208:4
**treating** 118:14
  128:14 129:20,21
  131:7 132:7,10
  134:8 145:5
  200:19
**treatment** 20:10
  20:15 67:6,21
  68:15,19,22 95:9
  119:19 131:5
  145:5 161:6
  163:15 208:13
**triggering** 90:10
**triggers** 89:21
**tripped** 88:16
**trouble** 172:5,6
**troubling** 59:2
**true** 65:15,23
  67:15 73:3 90:17
  93:2 105:1 106:10
  106:13,16,17
  107:15 108:19
  144:19,20 172:16
  186:14 188:9,19
  189:23,24 193:17
  225:13
**trusted** 61:24
**trustees** 4:5 70:12
  70:18 71:3 72:17
**truth** 65:7,12,13
  65:20 66:5 143:20
  191:1 225:8,8,9
**truthful** 67:10
  88:11 94:1,22
**try** 86:3 88:21
  157:20 166:14
  218:6

**trying** 7:17 9:10
  15:11 27:12 49:1
  66:3,20 78:15
  79:23 87:15
  129:15 130:18
  139:21 140:17
  143:20 156:6
  159:8,15 160:14
  161:12 211:11,18
**tuned** 158:7
**tuning** 159:2
**turn** 25:16 34:5
  38:6 39:18 41:17
  45:21 54:2 57:6,9
  61:5 63:24 70:2
  73:24 81:5 91:8
  113:11 173:9
  205:7
**turned** 135:9,22
**turning** 139:19
**two** 7:20 9:11 10:5
  13:2 14:4 18:13
  19:6,22 20:16
  21:13 30:6 36:1
  38:6 51:20 52:4
  72:1 75:22 76:7
  85:6 86:10 92:9
  97:14 99:10,12,15
  114:10,13 115:1
  115:13 117:17
  119:3,12,14
  148:24 170:6
  180:12 188:21
  189:17,18 191:16
  204:1 205:5 207:4
  210:19 216:5,24
  217:15
**type** 7:20 43:11
  47:11 52:12 58:1
  58:2 62:2 63:9
  76:15 81:22,22

  93:14 118:1
  132:18 172:13
**types** 32:16 94:15
  157:4,10 170:8
**typical** 32:17
  112:23 116:9
  119:11 156:12
  179:16,22 180:2
**typically** 62:21
  91:19 93:24 96:18
  107:16 116:11
  133:16 149:1
  156:19,23 216:16

**u**

**uh** 8:5,5,5
**ulterior** 69:15
**ultimately** 211:14
**unable** 94:19
  167:19 177:4
  178:13 200:4
**unaware** 141:15
**uncomfortable**
  35:1 44:1 161:10
**unconscious** 140:1
  141:1,17
**undergo** 140:19
**undergrad** 18:4
**undergraduate**
  35:4
**underlying** 49:20
  56:5 208:12
**undermine** 165:9
**understand** 7:5,8
  8:11,14 19:12
  25:20 32:1 66:13
  67:11 74:2 94:18
  128:2 129:16,23
  139:22 140:18
  152:10 160:15
  161:4,13 164:20
  166:9 177:9

185:13 195:3
218:6
**understandable**
6:20
**understandably**
212:24
**understanding**
11:2 27:22 28:13
33:24 48:13 58:8
58:12 59:6,18
60:13 64:6 72:19
75:23 81:11 85:5
93:10 100:10
109:15 110:24
111:5 119:5
123:19 126:3
129:20 133:19
139:5 141:6 150:3
164:5,17 172:14
174:11 179:13
180:19 184:10,13
189:14 199:2
202:6 210:7
217:16
**understandings**
87:14
**understood** 8:17
26:5 88:10 111:23
113:24 131:6
132:17 148:5
163:5 216:9
**undertake** 53:20
**unfamiliar** 47:24
**united** 1:1
**university** 1:7
2:13,17,18 3:10
9:24 18:6 22:3,9
27:16 28:15,19
33:4 53:15,16
55:22 56:23 64:13
72:10,14,18 112:9

112:10 204:11
209:7 215:13
218:10 229:4
**university's** 36:5
**unrelated** 71:17
181:20
**untruthful** 96:10
**unusual** 6:10
160:21,23
**unwanted** 63:1
**unwittingly** 77:15
**update** 48:24
76:17
**updated** 52:1,19
76:11 84:2
**updates** 53:10
58:18
**upper** 56:3
**upstairs** 156:18
**urgent** 212:15
213:2 215:2
**use** 29:11 107:16
139:3 150:8 151:7
156:21 157:1
161:7 179:20
198:2
**usually** 36:20 37:7
47:1 90:12 107:8
107:14 119:14
149:16 157:1
161:1
**utilize** 127:2

**v**

**v** 59:16,22 229:4
**vacuum** 184:8
**vaginal** 191:23
193:21
**vague** 14:19
**vaguely** 192:10
205:4

**value** 65:19
**van** 25:1 59:8,16
**variable** 179:24
**variety** 62:18
129:10
**various** 26:7 53:7
58:9 111:10
**vary** 62:14
**venture** 217:2
**verbal** 8:8
**verbatim** 174:21
**verification** 120:6
124:11
**verify** 229:9
**veritext** 1:22
229:14,23
**veritext.com**
229:15
**version** 53:5 92:11
137:7,10,12
144:23
**versions** 52:8 53:7
53:12 58:17
**victim** 84:18 96:1
101:15 107:11
108:5
**victim's** 107:21
**victims** 61:14 83:3
86:17 93:18
179:17 214:15
**view** 65:21 97:18
110:19,21 153:18
165:1 199:3
**viewed** 109:3
164:12 165:4
**vigil** 40:12,17
**violate** 207:2
**violation** 31:11
142:1
**violence** 57:16
59:19 60:14

**virginia** 1:1,17
2:11 15:8 16:18
18:20 21:12
**virtually** 6:10
**visible** 126:18
**visits** 117:17
**volition** 67:20
**voluntarily** 67:5
**voracity** 69:9
**vs** 1:6

**w**

**w** 16:19 21:23
**w&l** 3:12,19 4:4
22:17 26:2,18
38:18 54:11 68:6
70:11 72:6 134:9
220:21 221:9
222:7
**wait** 7:23
**waive** 5:11
**walk** 154:16
168:10
**want** 6:8 12:1
13:15 28:12,20
74:1 82:21 89:15
89:17 94:17 98:5
106:15 113:11
114:23 128:15,24
129:7,11,23
132:11,12 139:5
149:11 153:8
186:14,18 191:7
191:10,12 209:20
215:10 216:20
219:24 223:12,13
**wanted** 36:7 63:22
75:3 128:4 129:3
131:18,22 141:19
152:11 174:8
186:17 199:1
215:4,21

wanting   176:7
washers   60:2
washington   1:7
   2:13,17,18 9:11,15
   9:16 10:6,23
   13:14,20 16:13
   17:3,17 30:9 37:1
   40:20,22 56:19
   71:16 78:12
   112:15 117:19
   133:24 229:4
way   7:1 12:19
   24:18 25:9 30:16
   32:13 36:13 40:19
   52:24 58:14 63:16
   63:21 77:14 88:7
   92:18,23 93:4,4
   94:3,6,9 103:22
   108:13,22 118:24
   125:10 129:19
   135:6 138:4
   139:11 140:13
   150:1 153:11
   158:20 162:15
   166:12 168:3
   171:22 183:2
   189:20 191:13
   197:20 198:4
   199:14 200:16
   201:9 219:3
ways   51:24 110:18
   142:2 155:9,20
   156:12 170:6
   202:15
we've   46:12 71:19
   81:10 109:11,13
   110:7 204:10
website   213:20
websites   49:3
wednesday   1:10

week   55:8 113:1
weeks   36:1,1
weigh   130:17,21
weighing   168:3
   199:9
weight   165:1
weighted   164:13
weinstein   43:2
weird   88:24
welcome   223:21
west   2:4
western   1:1
when's   116:21
who've   179:24
   202:9 213:21
willing   121:15
window   60:2,3
   116:7,9
wisconsin   12:23
   19:3,4
wish   193:13
withdrawn   211:15
witness   3:3 68:14
   68:17 69:7,19,21
   72:13,23 73:2,17
   78:6 79:4 80:15
   84:20 85:19 87:2
   87:19 88:4,16
   89:17 90:15 91:3
   94:24 96:3,17
   101:8,19 102:5
   104:8 105:6
   107:24 108:8
   109:7,18 111:2
   118:18 119:9
   123:1,15 124:1,15
   127:14 128:7,19
   129:3 130:3
   140:12 141:11
   143:7,24 146:15
   148:13 149:5,14

154:21 162:11
163:10,21 164:24
165:12 178:16
183:22 184:15
185:3 186:23
187:8 193:7,16
195:17 196:12
200:21 201:19
202:22 204:8,13
204:20,22 207:14
208:11 209:1,4,9
209:12,17,21,23
210:17,23 211:14
211:22 212:2,3
217:16,17,24
219:6 220:2,6
222:7,8 223:21,23
225:14,18 226:1
229:8,10,12,19
witnesses   210:2
wittingly   77:15
woman   44:5,8,9
women   39:11
   42:17 43:3,8
   45:12 48:9 61:11
   61:14 62:23 63:13
   87:6
wonder   190:1
wondered   197:17
   199:16
wondering   199:22
wood   2:9 5:18,18
   11:15 68:24 69:6
   69:18,20 72:12,22
   73:1,15 78:5 79:3
   80:13 82:16 84:19
   85:14,18 87:1,18
   88:3,15 89:16
   90:14,21 91:2
   94:23 96:2,16
   101:7,18 102:4

104:7 105:5 106:1
107:23 108:7
109:6,17 111:1
118:17 119:8
122:24 123:14,24
124:14 127:13
128:6,18 129:2
130:2 131:11
138:18 140:11
141:10 143:6,23
145:17 146:14
148:12 149:4,13
154:20,22 162:8
163:9,20 164:23
165:11 178:15
183:21 184:14
185:2 186:4,22
187:7 192:21
193:6,15 194:5,11
195:5,16 200:20
201:18 202:21
207:16 217:23
220:7 229:1
woods   2:8
word   63:8 82:8,9
   161:7 179:20
   209:21 217:17
worded   63:18
words   69:13 73:10
   96:22 107:10
   151:8 159:9 179:6
   222:11,16
work   20:3,23 25:8
   27:12 30:14 43:6
   59:23 60:5 76:24
   77:4,19 78:16
   80:16 100:3
   132:18 133:24
   171:15 172:17
   214:14

[worked - yesterday]

| | |
|---|---|
| **worked**   12:12 19:2 | 90:15 96:23 98:5 |
| 19:6,21 20:17,20 | 98:10 115:23 |
| 43:4 211:5 217:4 | 120:21 122:12 |
| **worker**   17:17 | 128:19 130:18 |
| **working**   58:5 66:5 | 132:19 154:22 |
| 127:2 132:19 | 158:4 171:1 |
| 149:16 214:3 | 195:17 211:20 |
| **works**   27:13 32:3 | 218:16,20 |
| 61:21 112:10 | **year**   3:16 10:17,21 |
| **workshop**   17:9 | 19:24 21:14 23:8 |
| **worried**   172:10 | 35:3,4,9 36:14 |
| 215:11 | 38:23 39:3 42:4 |
| **wrapping**   131:17 | 42:23 43:20 45:11 |
| 171:5 | 46:16 56:19 71:11 |
| **write**   7:18 126:11 | 204:15,16 209:10 |
| 126:11 | **years**   10:4,19 |
| **writes**   25:7 | 12:11 19:6,10 |
| **writing**   63:16 | 21:13 36:24 37:2 |
| 142:24 | 37:21 39:1,2 |
| **writings**   58:24 | 40:21 46:15 48:11 |
| **written**   3:9 16:3 | 48:24 49:17 50:22 |
| 28:16 40:2 61:2 | 56:2,18 58:18 |
| 77:12 121:21 | 99:4 133:20 |
| 134:17 135:17 | **yep**   19:1 29:24 |
| 185:7,18 198:17 | 46:8 223:6 |
| 204:11 | **yesterday**   121:9 |
| **wrong**   3:21 33:8 | |
| 50:14 54:13 | |
| 190:14 194:4,8 | |
| **wrongly**   104:2 | |
| **wrote**   124:21,21 | |
| 126:7,23 164:15 | |

| **x** |
|---|
| **x**   3:1,6 |

| **y** |
|---|
| **y**   18:8 |
| **yeah**   17:8 19:9 |
| 31:19 56:10 65:5 |
| 69:11 76:13 80:18 |
| 82:7 84:10 89:18 |

Rules of Supreme Court of Virginia

Part Four - Pretrial Procedures

Depositions and Production at Trial

Rule 4.5

(e) Submission to Witness; Changes; Signing.
When the testimony is fully transcribed, the
deposition shall be submitted to the witness for
examination and shall be read to or by him, unless
such examination and reading are waived by the
witness and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within 21 days of its
submission to him, the officer shall sign it and
state on the record the fact of the waiver or of
the illness or absence of the witness or the fact
of the refusal to sign together with the reason, if
any, given therefor; and the deposition may then be
used as fully as though signed unless on a motion

to suppress under Rule 4:7(d)(4) the court holds

that the reasons given for the refusal to sign

require rejection of the deposition in whole or in

part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019. PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.