CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
4/17/2021
JULIA C. DUDLEY, CLERK
BY:   s/ CARMEN AMOS
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

JOHN DOE,

*Plaintiff*,

v.

WASHINGTON & LEE UNIVERSITY,

*Defendant.*

CASE NO. 6:19-cv-00023

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

Plaintiff John Doe brought this case against Defendant Washington & Lee University ("W&L"), where he used to be an undergraduate student, arguing that W&L's disciplinary proceeding against him for sexual misconduct against another student was conducted in a manner that discriminated against him on the basis of his sex. Doe claims that W&L's conduct violated Title IX. Doe claims that W&L also violated Title IX when it purportedly retaliated against him after when his lawyer sent a letter to the University.

For the following reasons, the Court has concluded that Doe demonstrated the existence of a genuine issue of material fact whether W&L discriminated against him on the basis of sex, in violation of Title IX. Therefore, that claim will proceed to trial. By contrast, the Court holds there is no genuine dispute of material fact as to Doe's retaliation claim and therefore summary judgment in favor of W&L is appropriate on that claim.

**Background**

As this matter is before the Court on W&L's motion for summary judgment, the factual background of the case set forth below is either uncontested or viewed in the light most favorable

to Doe, as the non-movant. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986).[1]

1.   W&L's Sexual Misconduct Policy

W&L maintains a Sexual Discrimination and Misconduct Policy (the "Policy") which "prohibits a broad continuum of behaviors," including "sexual discrimination, sexual harassment, sexual assault, sexual exploitation, domestic and dating violence, stalking, and retaliation." Dkt. 74-1 at 2.[2] The Policy prohibits "non-consensual sexual penetration," which it defines as "[s]exual penetration with another individual without consent," and which "includes vaginal or anal penetration, however slight, with a body party (e.g., penis, tongue, finger, hand) or object, or oral penetration involving mount-to-genital contact." Id. at 13.

The Policy addresses what constitutes consent to engage in sexual activity at length. It explains that "[i]ndividuals who choose to engage in sexual activity of any type must first obtain the consent of the other party," which "is demonstrated through mutually understandable words and/or actions that clearly indicate a willingness to engage freely in sexual activity." Id. at 17. The Policy explains that "[c]onsent to one form of sexual activity does not, by itself, constitute consent to engage in all forms of sexual activity." Id.

Further, the Policy also states that an individual "who is physically incapacitated from alcohol or other drug consumption (voluntarily or involuntarily) or is asleep, unconscious, unaware, or otherwise physically helpless is considered unable to give consent." Id. at 18. That is because "[a]n individual who is incapacitated cannot consent to sexual activity." Id. at 19. Under the Policy, "incapacitation" is defined as "the inability, temporarily or permanently, to give

---

[1] The Court commends the parties for their extensive and helpful written submissions and oral argument in this case.

[2] Record pin-cites will generally be to PDF page numbers, except for the parties' briefs.

consent because an individual is mentally and/or physically helpless, asleep, unconscious, or unaware that sexual activity is occurring." Id.

Lauren Kozak is W&L's Title IX Coordinator. In that role, Ms. Kozak is responsible for overseeing W&L's "review, investigation, and resolution" of "all reports of sexual misconduct," and to further "ensure the University's compliance with Title IX and other applicable laws, and the effective implementation of [the Policy]." Id. at 6.

The University's Harassment and Sexual Misconduct Board ("HSMB") adjudicates cases of sexual misconduct. Id. at 47. It is comprised of ten individuals: three of whom may serve as Chair of an HSMB hearing, and seven administrators who may serve as members of the HSMB. Id. Under the Policy, each administrator "is appointed by the President and is specially trained to adjudicate cases of sexual misconduct." Id. at 47–48.

An allegation of sexual misconduct may prompt an investigation at W&L. Typically, a team of two investigators will conduct a sexual misconduct investigation, one of which may be the Title IX Coordinator. Id. at 45. Under the Policy, the investigators will have had "ongoing, specific training and experience investigating allegations of sexual misconduct." Id.

The Policy provides that during an investigation and any subsequent disciplinary proceeding, the complainant and respondent will be provided with one or two "Hearing Advisors." Id. at 45, 59. Hearing Advisors are "law and undergraduate students who have been trained to provide support and advice to complainants and respondents." Id. at 59. In addition, the complainant and respondent "have the right to obtain, at their own expense," assistance from an "Advisor of Choice." Id. at 59. An Advisor of Choice can be a "friend, mentor, family member, attorney, or any other supporter parties choose to advise them." Id. An Advisor of Choice, unlike a Hearing Advisor, is not trained by the University, and is not a University

3

resource. Id. However, both Hearing Advisors and Advisors of Choice may be "present at any meeting or proceeding related to the investigative or disciplinary process." Id. at 45.

Once an investigation is opened, the investigators "coordinate the gathering of information from the complainant, the respondent, and any other individuals who may have information relevant to the determination." Id. They will also obtain any available physical evidence, including "communications between the parties," and "other electronic records." Id.

The Policy provides that during the investigation, "[t]he complainant and respondent will have an equal opportunity to be heard, to submit information, and to identify witnesses who may have relevant information." Id. Under the Policy, "witnesses" are those who "have observed the acts in question or have information relevant to the incident," and not merely someone who would "speak about an individual's character." Id.

A respondent is "presumed to be not responsible." Id. That presumption is only overcome when an HSMB hearing panel "concludes that there is sufficient evidence, by a preponderance of the evidence, to support a finding that the respondent violated the policy." Id. at 46.

The investigators prepare a written report at the end of their investigation. Id. at 47. The report "summarizes the information gathered and synthesizes the areas of agreement and disagreement between the parties and any supporting information." Id. The investigators give the complainant and respondent the opportunity to review the investigation report before it is finalized, and they may "submit any additional comments, request changes, or request further information" from the investigators. Id. The investigators "will make changes to the investigation report based on those comments," at their discretion. Id. Lastly, they submit the report to the designated chair of the HSMB for the specific matter. Id.

Under the Policy, the Chair of the HSMB reviews the investigation report and, if the Chair concludes "it is plausible and more than a sheer possibility that the complainant's factual allegations could constitute a violation of [the Policy]," the Chair will issue a charge to the respondent. Id. at 48.

After the student-respondent answers the charge, the Chair holds separate pre-hearing conferences with the parties and their advisors "to address evidentiary or other matters before the investigation report is presented to the HSMB hearing panel." Id. At the pre-hearing conference, the parties may submit written requests "outlining any additional investigative steps they believe are necessary," such as "follow-up interview(s) with existing witnesses," an interview with the investigators, "identifying any new witnesses who should have been interviewed," and/or describing any additional evidence that should be collected. Id. at 49–50. Among other things, at the pre-hearing conference the parties are notified of the full composition of the proposed HSMB hearing panel and may object to the appointment of panel member on the basis of suspected bias or conflict. Id. at 50.

Under the Policy, the HSMB hearing is "closed to the public and may not be audio or video-recorded." Id. at 51. The complainant and respondent "are entitled to be present during the hearing." Id. A "privacy screen" is erected between the two unless both parties do not want it. Id. The HSMB hearing panel "will review the investigation report prior to the hearing." Id. During the hearing, the HSMB panel may ask questions of the complainant, respondent, any witnesses, or investigators, as well as may examine any evidence. Id. The parties may also pose questions to each other, though they would be submitted through the Chair of the HSMB who screens the questions. Id.

After receiving and considering the evidence, the HSMB hearing panel members deliberate whether the respondent can be found responsible for violating the Policy, by a preponderance of the evidence. At least two members of the HSMB panel must vote "responsible" for the respondent to be found in violation of the Policy. Id. at 52.

If the HSMB panel concludes that a student is responsible for the offense of non-consensual sexual penetration beyond a reasonable doubt, dismissal from W&L is the mandatory sanction. Id. at 53. If the student is found responsible for non-consensual sexual penetration only by a preponderance of the evidence, there are a range of sanctions available, up to and including dismissal, but also including suspension, probation, community service, educational counseling, loss of certain privileges to participate in W&L activities, "on campus residential relocation," and/or changing the student's academic schedule. Id.

Either party may appeal a finding of the HSMB panel whether there has been a violation, as well as appeal any sanctions imposed. Id. at 55–56. An appeal may be afforded depending upon whether there was a "reasonable basis" for the sanction, any "new relevant information," a "procedural defect," or other "extraordinary circumstances" warranted it. Id. at 56.

As asserted by W&L, Doe does not contest that the Policy is discriminatory on its face, but rather in how W&L applied it to him in the context of his proceeding. See Dkt. 74 at 4.

2.  W&L's Investigation into Jane Roe's Allegations

A.  *Initiation of Investigation*

On Sunday, March 12, 2017, Jane Roe emailed Ms. Kozak as W&L's Title IX Coordinator, stating that she was "reaching out because [she] was sexually assaulted on Friday night"—the night of Friday, March 10—and did not know "what to do in order to proceed," but that she wanted "to report it." Dkt. 74-7 at 2. That day, Ms. Kozak responded asking about

scheduling a meeting the following day, if not earlier, and providing Roe information if she would like to file a police report. Id.

On March 13, 2017, Ms. Kozak sent Plaintiff John Doe a letter informing him that "a complaint of sexual misconduct in violation of [the Policy] has been alleged against you and an investigation will be conducted pursuant to the Policy." Dkt. 74-9 at 2. Specifically, the letter stated that Doe was alleged to have committed "non-consensual sexual penetration." Id. The letter informed him that Ms. Kozak and Jason Rodocker, Associate Dean of Students, would be investigating the allegations. Id. The letter further scheduled an appointment with Doe to meet with them the following day (March 14). Although the letter did not further describe the alleged violation or who the complainant was, in the letter Ms. Kozak directed Doe to "have no verbal or physical contact with [Jane Roe]." Id. at 2–3. The letter also advised Doe that Hearing Advisors were available to assist him and a list of names would be provided to him. The letter further advised Doe: "you may seek advice and assistance of one Advisor of Choice, which can be an attorney, at your own expense." Id. at 2. The letter also provided Doe with a website link to the Policy. Id.

Doe selected a fraternity brother to serve as a Hearing Advisor, but W&L considered the fraternity brother his Advisor of Choice because he had not yet completed his training for the role. W&L also assigned Doe another undergraduate student to serve as his Hearing Advisor. Roe was assigned two law students as Hearing Advisors and she selected a third Advisor of Choice, whom Doe describes as "a female friend who had herself been a complainant in a W&L sexual misconduct matter." Dkt. 73 at 5; see also Dkt. 74-2 at 176–80.

B. *John Doe's Description of Incident*

On March 20, 2017, Doe met with Ms. Kozak and Mr. Rodocker to give his side of the story. Dkt. 74-11. He recounted the following to Ms. Kozak and Mr. Rodocker. Doe described that he and Roe, who were both undergraduate students at W&L, were "pretty good friends the whole year," though it was a "rocky friendship." Id. at 6. Doe said that on March 10, 2017, at 6:30 to 7:00 p.m., Doe was with his fraternity brothers. He drank a bottle of wine and smoked marijuana. Id. at 3. At the same time, he was also communicating with Roe through the Snapchat social media application, from 6:30 p.m. until midnight. At about midnight, he went back to his house and texted Roe at 12:11 a.m. (then, March 11), "asking if she was going to come over." Id. "He texted her because they had been snapchatting the whole night and [Roe] was saying how she wanted to come over." Id. They also texted arranging the logistics of how and when they would meet. Id. When they met, Roe "seemed excited to see [Doe]" and "ran up to him and gave him a hug." Id. To Doe, Roe "didn't really seem intoxicated," she "was coherent and could walk fine." Id. at 4.

Doe claimed that when they got back to his room and started watching Netflix on his computer, they were on his bed and Roe initiated physical contact with him. Id. He claimed she "grabbed his arm and pulled it over her body so it was grabbing her breast." Id. Doe also relayed that Roe "kept asking if it would be weird if they hooked up," and "said she didn't want to just hook up she wanted a relationship." Id. He "knew that she had just come out of a long relationship with somebody." Id. Doe recounted that Roe "turned around and started kissing him," and she "initiated the kissing, but it was mutual." Id. He claimed she gave him hickeys on his neck. When Roe said she was thirsty, Doe gave her a non-alcoholic beverage, which they both drank. Id. at 5. "While they made out each of them took their own clothes off." Id. "At one

point [Roe] was laying on top of him and she said 'I don't know if I want to have sex because I think it is going to be weird for our friendship and it will ruin it." Id. Doe responded that "it would only be weird if you make it weird." Id. Doe claims that Roe responded by offering him oral sex, which he agreed to. Id. After "a bit" of time, Doe "pulled her back up" because he "thought it was weird." Id.

Doe claimed that he and Roe laid on the bed for perhaps 20 or 30 minutes, during which time Roe "kept asking if sex would ruin their relationship." Id. Doe asked if Roe wanted him to get a condom, and Roe "nodded her head and said yes." Id. Doe claimed that while they were having sex, Roe was an enthusiastic participant and that he "told her not to be as loud because he didn't want anybody to hear them." Id. He did not know at what time of night they had sex. Id. The next morning Roe left while Doe was still in bed, though he remembers her leaving. Id. at 6. When Roe texted Doe that morning, he was confused at her text which asked him at what time they had sex, because it "seemed like a weird question to ask." Id.; see also Dkt. 81-1 at 59 (text messages).

C. *Certain "Undisputed Facts" from the Investigation Report*

The completed investigation report included numerous "undisputed facts" about the incident. As recounted in W&L's investigation report, on March 10, 2017, between 9:00 p.m. and midnight, Jane Roe went to several houses before she went to John Doe's. Dkt. 73-9 at 5. Roe went to the second house at 10:30 p.m. that evening, where she "went to Witness A's room" and "stayed there until around midnight." Id. "During that time, she had consensual sex with Witness A." Id.[3]

---

[3] Doe told Ms. Kozak and Mr. Rodocker that he had "no personal knowledge about whether these events occurred," just that he knew that Roe "was going out," but he did not dispute them necessarily. Id. at 5 n.2.

Later, a "sober driver" drove Roe home from that house back to her residence, and she got home "after midnight." Id. At which point Doe and Roe exchanged the following text messages:

Doe:    "Are you going to come over?"

Roe:    "well I just got back to apt"

Doe:    "So that's a no?"

Roe:    "Come hang!"

Doe:    "You come here"

       "I go there every time"

Roe:    "i don't know about walking there"

       "i mean i guess i could"

       "Should i"

Doe:    "It's fine"

Roe:    "but like walk all the way there and all the way back"

Doe:    "It's not that far"

Roe:    "ugh okay wel are you still up?"

Doe:    "yeah"

Roe:    "okay walk halfway and meet me"

Doe:    "Come on"

       "Just walk over"

Roe:    "okay hold on"

       "gonna grab a sweatshirt"

Doe:    "Who else is coming?"

Roe:   "literally just me"

"sorry"

Doe:   "No, that's fine"

Roe:   "is that a deal breaker?"

Doe:   "Haha no"

Roe:   "okay"

"[on my way]"

Dkt. 73-9 at 5–6; see also Dkt. 81-1 at 56–59 (text messages).

The investigation report treated as undisputed that Doe and Roe then met and walked back to his room, watched Neflix while on the bed, and that Roe then said she was tired and that she would rather sleep. Dkt. 73-9 at 6. "After [Doe] put the computer away, they began to kiss and fondle each other," and that Roe's "skirt and bra were removed at some point," and that "she was not wearing underwear." Id. at 6–7. Then, "[a]t some point, [Doe] put on a condom and vaginal/penial penetration occurred." Id. at 7. Roe slept in Doe's room, woke up the next morning and left just after 9:00 a.m. Id.  Roe had "dark, large marks on the sides of her neck and parts of her shoulders," and Doe "also had marks on the sides of his neck." Id. At 9:29 a.m. that morning, Roe texted Doe "when did we have sex last night?" and Doe texted back several hours later, "Honestly no idea." Id. at 7. See also Dkt. 81-1 at 59 (text messages). Roe went to the health center that day and reported a sexual assault. Id. Doe did not dispute what Roe did later, although he said he had no personal knowledge of it. All of those facts were treated as "undisputed" in the investigation report.

D.  *Jane Roe's Description of Incident*

Jane Roe provided her description of the incident to Ms. Kozak and Mr. Rodocker on March 17, 2017. Dkt. 81-1 at 17. She described John Doe as a "good friend," and said that they had known each other since freshman year. Id. She claimed that she had a boyfriend and "never had any interest in having a romantic relationship with [Doe]." Id.

As Roe described the evening of March 10, 2017 to the investigators, she went out and had pizza and four glasses of wine over a three-hour period, but she "wasn't feeling very intoxicated." Id. She went to two houses, and her friend, "Witness A," lived at the second house. Roe got to the second house at around 10:00 p.m., and while she was there, Roe and Witness A had consensual sex. Id. at 18. Between 12:00 and 12:30 a.m. in the early morning of March 11, Roe left to go home. Id. A "sober driver" identified as "Student 6" drove Roe back to her apartment. Id.

After Roe got back home, she and Doe texted about meeting. Id. They met halfway between her place and his, and they walked back to his room. Id. In "[g]oing over there, [Roe] never had any intention to have a romantic or sexual relationship with him. She just considered him a close friend." Id. They got to Doe's room at 12:30 a.m. Id. They watched TV on his computer for a few minutes, and then, after Doe put his computer away, he "started to make out with her." Id. Roe claimed that "[s]he remembers kissing [Doe]," and that "[t]hey made out a little bit," but she began to "not remember as much of what happened." Id. She explained that it "started as consensual when kissing, but she did not want to go any further than that," and that she had no "desire to have sex with him" because she "viewed him solely as a friend." Id. Roe told him, "I don't want to have sex." Id. He asked her several times, "are you sure? Are you sure?" and Roe reiterated, "yes, I don't want to have sex." Id. at 19. Roe thought Doe was

"trying to convince her to have sex," but she remembered "stay[ing] very firm" in her response. Id. Roe showed Doe her nipple piercings when "her bra came off," and eventually she "was completely undressed." Id. They made out for 30 to 40 minutes. Id.

Roe then "wanted to go back to her apartment," and she began "putting her clothes on," but Doe said, "no, stay, it is late," and he "convinced her to stay." Id. According to Roe, "[s]he felt comfortable spending the night because she had so much trust in [Doe]." Id. Roe said she asked for water so that she "wouldn't have a hangover the next day." Id. Doe gave Roe a non-alcoholic beverage that she drank. Id. Roe said that she fell asleep and woke up around 9:00 a.m., at which time she saw a used condom on the ground next to the bed. Id. Roe asked Doe, "Did we have sex last night?" and said "There is a used condom on the ground." Id. at 19–20. Doe was not fully awake, and said, "Oh, you don't remember?" Id. Roe said "she remembered doing some stuff with him, but not having sex." Id. She was "shocked" and left. Id.

Roe claimed that "[s]he believes that any penetration occurred while she was not conscious." Id. at 20. She remembered going to sleep "but she does not remember penetration." Id. "That is not something that has ever happened to her at all before." Id. She explained that she "didn't feel overly intoxicated … at any point throughout the evening," though she "knew that she was slightly intoxicated … and definitely not at a level where felt out of control." Id. She woke up with a lot of bruises on her neck, and she took pictures of them. Id. She claimed these "felt more like bruises than hickeys." Id. "While she did hook up with Witness A earlier in the night she had a conversation with him not to do anything that would give hickeys," and Doe "doesn't remember doing anything that night that would have given her hickeys or bruises." Id.; see also id. at 63–69.

13

E. *Further Investigation and Evidence*

Ms. Kozak and Mr. Rodocker submitted their draft notes of Doe's interview to Doe for his comments and incorporated any edits he had. Dkt. 74-11 at 2. They also similarly sent draft notes of Roe's interview to her, and Roe suggested a few edits which were reflected in the ultimate version of the interview notes. Dkt. 81-1 at 22. Roe informed the investigators in her response to the draft investigation report that, while she was not interested in a romantic relationship with Doe, "[s]he was interested in a relationship with Witness A." Id. at 12 n.10.

Ms. Kozak and Mr. Rodocker conducted several other interviews as part of their investigation. They interviewed Witness A. Id. at 31–32. Witness A said that when he was with Roe on March 10, she was "pretty-drunk, but not at a level even close to worrisome," at a "normal level." Id. at 31. Witness A confirmed that he and Roe had sex that night, and that they had sex "a few times previously." Id. He thought it was "possible" he "may have given her hickeys." Id. Witness A called a sober driver after to take Roe home. Id. Later the following evening (March 11), Roe shared with Witness A that after she had seen Witness A the prior evening, she "went to watch a movie at a person she thought was a friend's house and he raped her later on in the night." Id. Roe mentioned Doe's name (who Witness A did not know), but otherwise "didn't share any specifics." Id. Roe and Witness A met in person on that Monday (March 13), at which point "Witness A got her in contact with someone he knows at Project Horizon to help her." Id.

Ms. Kozak and Mr. Rodocker also interviewed "Student 6," Roe's "sober driver" from the night of March 10. Dkt. 81-1 at 24. Student 6 characterized Roe as "fairly drunk," and "very friendly." Id. Student 6 said Roe "did not seem upset at all; she seemed happy." Id. He felt that "her conversation was coherent." Id. He mentioned that Roe was "walking fine and he didn't

14

have to get out of the car to help her get inside the car." Id. Roe also exited the car "without assistance and walked normally inside." Id. They also interviewed Student 7 and Student 9, two of Roe's friends whom Roe had spoken with after she left Doe's house (Student 9), and later in the day by phone (Student 7). See 81-1 at 20–21, 27–29, 40–42. And they interviewed a witness requested by Doe, Student 10. See id. at 46. Students 7, 9, and 10 had not witnessed the incident first-hand, though Roe and Doe had conveyed portions of their versions of the incident to these other students afterward.

The record before the investigators also included a letter that Dr. Janet Boller, Clinical Psychologist and University Counselor, submitted on Roe's behalf. Dkt. 81-1 at 76. The letter had the title: "Verification of Psychological Condition," dated April 13, 2017, and stated that it reflected several meetings between Roe and Dr. Boller. Id. Dr. Boller concluded that following her evaluation of Roe in both sessions, Dr. Boller "determined that her condition and symptoms met criteria for a diagnosis of Acute Stress Disorder." Id. In addition to describing those symptoms, notably, Dr. Boller wrote that Roe met the "following criteria for *Acute Stress Disorder*," including "[d]irect exposure to a traumatic event—as reported in the investigation report." Id. In Dr. Boller's "overall conclusions," she wrote: "In my professional, clinical opinion, [Roe] experienced a traumatic event, as she described when interviewed." Id. As W&L acknowledges, "[p]reviously, in August and September 2016, [Dr.] Boller participated in the training of HSMB members, focusing on the impact of trauma on complainants." Dkt. 74 at 7. W&L asserts that Ms. Kozak arranged for this training "as part of a broader training program, to comply with applicable laws." Id.

F.  *Investigation Report*

On March 28, 2017, Ms. Kozak and Mr. Rodocker provided a draft of their investigation report to Doe and Roe in separate meetings for their review. Doe and Roe commented on the report and the investigators made some changes in response. Dkt. 81-1 at 1.

Ms. Kozak and Mr. Rodocker completed their investigation report on April 20, 2017. Id. at 3. They attached to the investigation report the various witness statements, text messages, Dr. Boller's letter, and pictures of Roe's bruising. See Dkt. 81-1. In the report, they set forth the above-referenced "undisputed facts," before proceeding to an "analysis" whether penetration occurred and whether Roe consented. Id. at 9–16. In the report, they first found the penetration occurred, and, "[w]hile [Roe] does not specifically remember giving [Doe] oral sex, she thinks it is possible she did and does not dispute it." Id. at 10. Roe also said that any oral sex "would have been consensual." Id.

Most of the report's analysis considered whether Roe consented to vaginal intercourse. Id. at 10–16. The report noted that "[t]he parties engaged in some consensual activity," including "kissing and other sexual fondling," and oral sex also "would have been consensual." Id. But the investigators further wrote that Roe said "she did not consent to vaginal/penile penetration," because, to her, "[s]exual intercourse meant something more serious than a casual hookup" and Doe "was not someone with whom she wanted to have that connection." Id. Therefore, "[s]he was willing to make out," and that meant "everything up to vaginal/penile penetration," but "that was as far as she was willing to go." Id. The report reiterated Roe's claim that she told Doe several times she did not want to have sex. Id. at 10–11. And it recounted certain aspects of Roe's narrative. Id. Roe "alleged that she was incapacitated at the time of penetration and not capable of consenting to sexual activity," not "as a result of alcohol" or prescription medication,

but because, "[a]ccording to [Roe], she got very sleepy and believes that she fell asleep and penetration occurred while she was asleep." Id. at 11–12. Ms. Kozak and Mr. Rodocker further described portions of Doe's narrative for why he believed sexual intercourse was consensual. Id.

Ms. Kozak and Mr. Rodocker explained that, "[b]ecause the statements of the parties as to whether consent was present differ in crucial ways, the hearing panel must evaluate the credibility of the parties to determine whether [Roe] met her burden of proof to show that nonconsensual sexual penetration occurred by a preponderance of the evidence." Id. at 13. They noted that the following factors "may affect the hearing panel's assessment of credibility," (1) that "both parties had been drinking, which could impact memory," (2) that Roe "reported [the incident] immediately," telling her friend Student 9 after leaving Doe's room, (3) Roe's memory "becomes hazy at certain points," and "remembers aspects of the encounter clearly, but not the specifics of making out," and (4) Roe "reported symptoms during counseling," and that, "[a]ccording to Dr. Boller, these symptoms are consistent with the experience of a traumatic event." Id. at 13–14. Ms. Kozak and Mr. Rodocker also described differences in certain details of the night between Doe's and Roe's accounts. Id. at 14–15. The report concluded that "this case comes down to whether [Roe] said 'no' and fell asleep, or whether she said 'yes.' And even if she said 'yes,' as [Doe] states, whether she was incapacitated so that consent was not present (i.e., asleep, or so sleepy and out of it that she was unaware sexual penetration was occurring and that her state would have been apparent to a reasonable person)." Id. at 15. Accordingly, the HSMB panel would "need to determine by a preponderance of the evidence whether [Doe] engaged in nonconsensual sexual penetration." Id.

3.   Pre-Hearing and Hearing Proceedings

After the investigation report issued, Ms. Kozak asked Cliff Jarrett, the Assistant Dean of Career Strategy at W&L's Law School to chair Doe's proceeding (the "Chair"). Following his

review of the report, he issued the charge to Doe. See Dkt. 74 at 8 (citations omitted). The Chair
further selected the following for the HSMB panel in this proceeding: Mary Main (Executive
Director of Human Resources), Steve McAllister (Treasurer and Vice President for Finance and
Administration), and Lindsey Nair (Director of Content Development, Office of
Communications & Public Affairs) (collectively, the "HSMB panel"). See id. at 8–9. The Chair
provided the HSMB panel the investigation report and exhibits, which consisted of about 100
pages, and they had about a day to review it. See id. at 9.

Doe's hearing occurred on April 25, 2017. Doe and Roe attended, as did their Advisors.
Neither party called witnesses. See Dkt. 73-17 at 2. Ms. Kozak and Mr. Rodocker also attended
but did not participate. See Dkt. 74 at 9. The hearing began just before noon and lasted several
hours. See Dkt. 73-17 at 2, Dkt. 74 at 9.

4.   The Hearing Panel Decision

On April 27, 2017, the HSMB panel issued its written decision. Therein, the HSMB panel
found Doe responsible for violating University Policy by nonconsensual sexual penetration.
They reached this conclusion by a preponderance of the evidence, not beyond a reasonable
doubt. See Dkt. 73-17 at 2. The Panel's decision was unanimous. Id.

In an accompanying memorandum of "facts supporting findings and sanctions," the
HSMB panel wrote that the "basis for the decision came down to the credibility of the
Complainant and the Respondent," since "[t]heir accounts of what happened in the Respondent's
room on the night in question differ dramatically, and no witnesses exist to shed light on those
discrepancies." Id. at 3.

As for Roe's account, the HSMB found it "consistent and credible." Id. Significantly,
they wrote that Roe "stated that she knows she would never consent to sex with [Doe] if she
were capable of consenting." Id. The basis for that was her "personal rule that she only has full

18

sexual intercourse with partners if she is interested in a relationship, and said she has never been interested in that type of relationship with [Doe]." Id. The HSMB panel further wrote that Roe had "held firm that she told [Doe] that night that she did not want to have sex." Id. And the HSMB panel noted that Roe and Doe "were good friends for the past 18 months up until this point, and it did not follow that she would assert a baseless claim against him." Id.

As for Doe's account, it "did not strike the panel as credible." The HSMB panel wrote that Doe's account was not consistent. One perceived inconsistency was Doe's statement that Roe's "eyes were open during sex," but that he later said that "the room was completely dark." Id. Another perceived inconsistency was that Doe "interrupted oral sex from [Roe] because it 'seemed weird' for her to do that since they were just friends, but later said the reason he interrupted oral sex was because it 'didn't feel good.'" Id. Significantly, the panel "also had trouble with [Doe's] claim that receiving oral sex from a friend felt 'weird', but that he would then proceed to have sexual intercourse with her." Id. To the HSMB, Doe's answers to this question and others "lacked detail and conviction." Id. They also found incredible Doe's claims that despite drinking a bottle of wine and a significant amount of marijuana before meeting Roe, that his memory "was not impacted." Id. And they found suspect that Doe's "recall of events was strong relative to details that would exonerate him," such as "how their clothes came off, [and] his statement of her affirmative assent," but that Doe was "fuzzy on other details of how the evening progressed between the two of them." Id.

Accordingly, the HSMB panel "believe[d] that [Roe] was not capable of providing consent because she was either asleep or nearly asleep, and that a sober, reasonable person should have known that proceeding with sexual intercourse under the circumstances was a violation of the university policy on consent." Id.

The HSMB panel imposed as a sanction Doe's "[s]uspension for the Fall 2017 school term, with the earliest opportunity to apply for readmission being the Winter 2018 term." Id. at 4. The HSMB panel further wrote that, "[i]n order to be considered for readmission, [Doe] shall successfully complete counseling for both sexual abuse and substance abuse." Id. The HSMB panel did not suspend Doe immediately, rather he was placed on probation for the rest of the Spring 2017 term. Id.; see also Dkt. 74-19 at 2. The HSMB panel also imposed other sanctions prohibiting Doe from having any verbal or physical contact with Roe and "to make every effort possible to avoid being in the same room as her." Dkt. 73-17 at 4; Dkt. 74-19 at 2.

5. *The Appeal*

The letter to Doe transmitting the HSMB decision noted that Doe or Roe could request an appeal. Possible grounds to "grant or reject an appeal" were identified as: "(1) no reasonable basis / reasonable basis for sanction, (2) new relevant information / no new relevant information, (3) procedural defect or error / no procedural defect or error[,] (4) extraordinary circumstances / no extraordinary circumstances." Dkt. 74-19 at 2.

Doe and Roe both appealed the HSMB's decision and sanctions—Roe asserted that the sanctions were too lenient. W&L assigned a new panel of HSMB members to hear the appeals. The panel rejected the appeals. The appeal panel unanimously voted to deny Doe's appeal. The appeal panel wrote that "[n]one of the grounds were met to grant the appeal. The finding of responsibility and the imposition of sanctions were within policy parameters." And the appeal panel further "concluded that there were no procedural discrepancies which would have had an impact on the underlying decision." Dkt. 74-21 at 2.

20

6. *Applications for Reinstatement*

Although Doe was permitted to finish his Spring 2017 semester, W&L sent him a letter on May 31, 2017, confirming his suspension for the Fall 2017 semester. Dkt. 74-22 at 2. In the letter, W&L stated that Doe was "eligible to apply for reinstatement" for the Winter 2018 term, and it provided instructions for him to apply. Id. The letter stated that the Committee on Automatic Rule and Reinstatement ("ARR Committee") would "evaluate[ ] all applications and make[] final decisions on reinstatement." Id. The Committee's "primary goal" was "gauging the applicant's readiness to make a successful return to full-time academic and campus life," and it would "also consider the campus community's and the University's best interests." Id. The letter expressly stated that meeting certain "minimum requirements does not guarantee reinstatement." Id. Those "minimum requirements" were for Doe to demonstrate his ability to succeed in a "rigorous academic environment" by being "fully engaged," which required about "forty hours per week in constructive undertakings," which could include "course work" at a college or university, employment, volunteering, or other "similarly developmentally enriching opportunities." Id. In the letter, W&L also required Doe to complete "counseling for both substance abuse and sexual abuse." Id. at 2–3.

On June 29, 2017, Doe's counsel sent W&L a letter seeking for Doe to review his academic record, including the investigation report. The letter mentioned the HSMB proceeding as a "Title IX matter." Dkt. 74-24 at 3. In the letter, Doe's counsel also demanded W&L prevent any dissemination of false, misleading or confidential information, and to preserve any and all relevant records. Id. at 3–4.

Doe applied for reinstatement twice. He first applied on November 12, 2017, seeking reinstatement for the Winter 2018 term. See Dkt. 74-25. In that application, Doe attached a short

(half-a-page) statement explaining that he had since volunteered at a family church, including helping to renovate portions of the church. Doe also asserted that he had completed counseling for both substance and sexual abuse. Id. at 5–6. He attached letters from the church and counselor(s) verifying Doe's volunteering and completion of counseling, respectively. On November 30, 2017, W&L sent Doe a letter denying his reinstatement application. Dkt. 74-27. This letter explained that the ARR Committee's consensus was that Doe's personal essay "did not demonstrate his readiness to return to Washington & Lee," and that a "greater length of time away from [W&L] will provide [him] more time to reflect on the seriousness of the circumstances that led to your suspension from the University." Id. The letter elaborated that "the Committee agreed that a future application would be strengthened if [Doe] were to demonstrate [his] ability to be successful in a rigorous academic environment." Id. They "strongly encourage[d]" Doe to "consider full-time coursework," as well as "volunteer work that allow[ed] [him] to further reflect upon issues surrounding alcohol abuse and/or sexual abuse," which "might make a more compelling case" for reinstatement. Id.

Doe again applied for reinstatement on July 29, 2018, seeking to be reinstated in the Fall 2018 semester. Dkt. 74-28. Doe included in his application a five-page essay in which he described why he wanted to come back to W&L, and what he learned while he had been away including through substance abuse and sexual abuse counseling. Id. at 5–6. Doe described his further volunteering at his church including running its food pantry. Id. at 7–8. He described other ways in which he sought to have a positive impact in others' lives. Id. at 8–9. However, Doe stated that while he sought to "enroll in [a] rigorous course of academic study" including at an accredited-University, his "disciplinary record as it stands prevented that." Id. at 9.

On August 14, 2018, W&L denied Doe's second reinstatement application. Dkt. 74-29. The letter stated that the ARR Committee "based its decision on the fact that [Doe had] not demonstrated successful coursework in a rigorous academic environment," and that his application "revealed no clear evidence of reflection and readiness to return" to W&L. Id. at 2. The letter reiterated the prior guidance regarding how a "future application" of Doe's would be strengthened if he demonstrated his ability to be "successful in a rigorous academic environment." Id. The letter "underscored its level of encouragement" for Doe to "consider full-time coursework, in person," at an accredited college or university. Id.

During discovery, W&L produced a summary of ten years' worth of HSMB panel findings, between the 2008-09 and 2018-19 academic years. Dkt. 74 at 15; Dkt. 74-31. Out of 35 total allegations of Policy violations, 27 included male respondents. Of those 27, only 14 claims proceeded to a hearing. Of those 14 cases that went to a hearing against male respondents, 9 male respondents were found responsible and 5 were found not responsible. See id. One case had a male complainant and male respondent; four cases had both female complainants and respondents. Dkt. 74-31.

## Procedural History

In April 2019, Doe filed a complaint in this Court against W&L alleging two federal claims: discrimination and retaliation in violation of Title IX, as well as state law claims for breach of an implied contract and negligence. Dkt. 1. W&L moved to dismiss Doe's state-law claims, which this Court granted in February 2020. Dkts. 41, 42. Following discovery, in September 2020, W&L filed a motion for summary judgment on the remaining Title IX claims. Dkt. 62. The parties briefed the motion for summary judgment and the Court heard oral argument on the motion. Dkts. 73, 74, 75.

**Standard of Review**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018). Once a party makes a Rule 56 motion, "[t]he burden is on the nonmoving party to show that there is a genuine issue of material fact for trial … by offering sufficient proof in the form of admissible evidence." Id. (quoting Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016)) (internal quotation marks omitted). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." Id. (cleaned up, citation omitted). "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013).

**Applicable Law**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). It is also enforceable through an implied private right of action. Cannon v. Univ. of Chicago, 441 U.S. 677, 703 (1979).

24

The Fourth Circuit has recently issued its first published decision addressing a Title IX claim in the context of higher-education disciplinary proceedings. Sheppard v. Visitors of Va. State Univ., ___ F.3d ___, 2021 WL 1227809, at *3 (4th Cir. Apr. 2, 2021). In Sheppard, the court explained that, in order for a plaintiff to state a plausible claim to relief under Title IX in this context, the plaintiff must allege facts that, if true, would "raise a plausible inference that the university discriminated against [the student] on the basis of sex." Id. at *4. The Fourth Circuit explained that this approach—first articulated by the Seventh Circuit—closely tracked Title IX's text. Id. The Fourth Circuit adopted that standard (adopted by the Third, Seventh, Eighth, and Ninth Circuits), rather than Second Circuit's "erroneous outcome" and "selective enforcement" theories of liability, though the Fourth Circuit clarified that there were "no inherent problems" with those theories and that "either theory, with sufficient facts, may suffice to state a plausible claim." Id. However, the Fourth Circuit "emphasize[d] that the text of Title IX prohibits all discrimination on the basis of sex." Id.

The Fourth Circuit in Sheppard further explained that a Title IX plaintiff must establish a "causal link between the student's sex and the university's challenged disciplinary proceeding," to prevail on a Title IX claim, and that the statute requires a showing of "but-for" causation. Id. In other words, the plaintiff must show that sex was the "but-for" cause of the university's challenged disciplinary action. Id.

## Reasoning

1.   Discrimination Claim under Title IX

The Court concludes—viewing the evidence in the light most favorable to Doe as the non-moving party and drawing all reasonable inferences in his favor—that Doe has shown that there is a genuine issue of material fact for trial whether W&L discriminated against him on the

basis of sex in its conduct of his sexual assault disciplinary proceeding. See Sheppard, 2021 WL 1227809, at *3–4. Doe has presented sufficient evidence from which a reasonable jury could conclude that the HSMB panel's determination of responsibility was predicated on biased assumptions regarding the sexual preferences of men and women.

Significantly, the HSMB's decision credited Roe's "personal rule" that she "only has full sexual intercourse with partners if she is interested in a relationship." Dkt. 73-17 at 3. Roe also conceded that she had no such personal rule for oral sex and did not have to be interested in a relationship. See Dkt. 73-9 at 9. Thus, Roe "was willing to make out," meaning "everything up to vaginal/penile penetration," but "that was as far as she was willing to go," with someone with whom she was not interested in a relationship. Id. Indeed, though Roe stated that she did not remember performing oral sex on Doe, she admitted she likely did and asserted that it would have been consensual. Id. However, according to Roe, "sexual intercourse meant something more serious than a casual hookup," and Doe "was not someone with whom she wanted to have that connection." Id. In its decision, the HSMB expressed no reservations in crediting Roe's "personal rule," and the distinction Roe drew between her willingness to engage in oral and vaginal sex. Dkt. 73-17 at 3. And, to be sure, the Policy explains that "[c]onsent to one form of sexual activity does not, by itself, constitute consent to engage in all forms of sexual activity." Dkt. 74-1 at 17. To be clear, there is nothing problematic in any of that, on its own.

The problem arises because, when Doe drew a distinction between his willingness to engage in oral and vaginal sex with a friend, the HSMB treated that as a source of inconsistency and incredibility. "The panel … had trouble with [Doe's] claim that receiving oral sex from a friend felt 'weird', but that he would then proceed to have sexual intercourse with her." Dkt. 73-17 at 3. The panel also found it inconsistent that Doe initially said he "interrupted oral sex from

[Roe] because it 'seemed weird' for her to do that since they were just friends," but later said he interrupted oral sex because it "didn't feel good." Id. Indeed, the HSMB asked him about it, seeking an answer with "detail" and "conviction," id., and, considering his response lacking those, the HSMB found the distinction difficult to accept from Doe: that he was comfortable with one (vaginal intercourse) but not the other (oral sex); or that he was comfortable having vaginal intercourse with a female friend, but just not oral sex.

Another recent Title IX case involving an inference of gender bias by a university adjudicator is instructive. In Doe v. Marymount University, the administrator at issue presiding over the plaintiff's sexual assault disciplinary proceeding had asked a male student complainant in yet another proceeding: "'[W]ere you aroused' by … unwanted touching? When the student responded, 'no,' the [adjudicator], in apparent disbelief, allegedly asked the male student again, 'not at all?'" 297 F. Supp. 3d 573, 586 (E.D. Va. 2018). The court concluded that the alleged statements reflected the adjudicator's "discriminatory view that males will always enjoy sexual contact even when that contact is not consensual." Id. That court also held that if the adjudicator had "possessed the outdated and discriminatory views of gender and sexuality alleged in [the plaintiff's] complaint, these views would have naturally infected the outcome of [his] Title IX disciplinary proceedings." Id. Indeed, that court found that "this allegation alone is sufficient to satisfy Doe's burden to plead a fact that creates an inference of gender discrimination in Marymount's disciplinary proceedings." Id. And in an another recent Title IX decision in which the court denied the college's motion for summary judgment, the court ruled that "[a] reasonable jury could draw different conclusions from the omissions in the determination of responsibility," one of which was that "the determination was influenced by the gendered assumption that a

27

women would not consent to sex she felt was meaningless." Doe v. Grinnell College, 473 F. Supp. 3d 909, 923 (S.D. Iowa 2019).

Similarly here, the HSMB panel's starkly different treatment of these portions of Roe's and Doe's testimony and its credibility determinations could lead a reasonable jury to find that (1) the HSMB followed its Policy in accepting that a female student could credibly draw boundaries to the type of sexual conduct she wished to engage in and with whom, but (2) did not follow that same Policy or treated as doubtful the fact that a male student could credibly draw the same boundaries.

The HSMB's differing treatment of Doe's and Roe's testimony on this subject was significant in its own right. It also had the effect in this case of cabining the evidence of Roe's credibility. As the HSMB panel acknowledged, "[t]he basis for the decision in this case came down to the credibility of [Roe] and [Doe]." Dkt. 73-17 at 3. And a substantial basis for the HSMB panel's finding of responsibility was Roe's "personal rule" that she only had sexual intercourse with a partner she saw as a relationship prospect, which the panel accepted. However, the record also reflected that earlier that evening Roe had sexual intercourse with Witness A just before she met with Doe. The HSMB panel's decision did not mention Witness A at all. Nor did the panel ask Roe at the hearing whether she was interested in a relationship with Witness A. Instead, as Doe testified, the HSMB panel "just [were] taking her word" for her personal rule "without any kind of validation or questioning." Dkt. 74-3 at 47.[4] The HSMB's refusal to consider Witness A renders even more significant and unexplained its differing

---

[4] To be sure, the investigation report included a footnote that Roe said when she was reviewing the investigation report that she was interested in a relationship with Witness A. Dkt. 73-9 at 11 n.11. But that appears to have come up unprompted. Though the investigators asked follow-up questions of Roe, they did not ask her about Witness A. Dkt. 81-1 at 49–53. Nor did they ask Witness A about it. Id. at 31.

assessment of Roe's and Doe's credibility on the issue how they drew boundaries of how and with whom they would have sex.[5] See, e.g., Doe v. Oberlin College, 963 F.3d 580, 587 (6th Cir. 2020) ("Likewise remarkable—in a proceeding in which the credibility of the accuser and accused were paramount—was the failure of the hearing panel even to comment on the flat contradiction … between what Roe told him during his investigation and what she told him during the hearing, regarding whether Doe 'asked' for oral sex."); Doe v. American Univ., No. 19-cv-3097, 2020 WL 5593909, at *7 (D.D.C. Sept. 18, 2020) (holding that credibility findings about Doe, "[w]hether fair or not … stand in stark contrast to how [the Title IX investigator] viewed Roe in the report," especially as "Roe's testimony presented a raft of potential problems, yet [the investigator] made no credibility findings as to Roe at all"). To be clear, a jury need not necessarily conclude that the HSMB panel's differing treatment of Doe's and Roe's testimony, or to the panel's failure to investigate or discuss Witness A, shows that gender bias impacted Doe's disciplinary proceeding. But a reasonable jury could so conclude.

The existence of substantial and particularized "procedural flaws" in Doe's proceeding "affecting the proof" only further demonstrates that there is a genuine dispute of material fact whether W&L discriminated against Doe on the basis of sex. See Yusuf v. Vassar College, 35 F.3d 709, 715 (2d. Cir. 1994); see also Sheppard, 2021 WL 1227809, at *3–4 & n.6 (describing "erroneous outcome" theory and holding that such a theory, "with sufficient facts, may suffice to state a claim"). Unlike Yusuf, there is no "lack of a particularized allegation relating to a causal

---

[5] W&L does not contend that it would have been improper for the HSMB to consider Witness A and whether Roe followed her "personal rule" with him earlier that evening. Indeed, the panel Chair testified in his deposition that by invoking her "personal rule," Roe had "opened the door" to questioning on an issue that might otherwise be inadmissible, and therefore, he thought that "it could be an appropriate topic for questioning." Dkt. 73-32 at 47. W&L only argues that Doe was on notice of Witness A's identity and that Doe could have submitted questions or called Witness A to testify on the topic. See Dkt. 75 at 3.

connection between the flawed outcome and gender bias." 35 F.3d at 715. Rather, the inference

of discrimination and causation is reasonably drawn here from the HSMB panel's decision itself.

And, notably, the submission to the HSMB panel of Dr. Boller's "Verification of Psychological

Condition" letter on behalf of Roe constituted such a procedural flaw affecting the proof of this

proceeding that casts doubt on its accuracy. Dkt. 73-12 at 3.

   In Dr. Boller's letter, she found that Roe's "condition meets the following criteria for

*Acute Stress Disorder*," including "[d]irect exposure to a traumatic event—as reported in the

investigation report." Id. (emphasis added) Further, in Dr. Boller's "overall conclusions," she

determined that Roe's "specific presentation of symptoms, including her affective / emotional,

cognitive and behavioral condition, and the way this coincided with the traumatic event she

described, meets the criteria for a diagnosis of Acute Stress Disorder. In my professional, clinical

opinion, [Roe] experienced a traumatic event, as she described when interviewed." Id. (emphasis

added). Individually or in combination, these statements suggest that Dr. Boller made a factual

determination that Roe had experienced the "traumatic event … reported in the investigation

report." Ms. Kozak, W&L's Title IX Coordinator, was concerned about those statements in the

letter because she "thought it was an overreach of a conclusion." Dkt. 74-2 at 21. Ms. Kozak also

testified that she thought it was an "improper opinion," because there was no way Dr. Boller

could have definitely known that. Id. at 23–24. Indeed, there is a substantial likelihood that this

opinion impacted the HSMB panel's determination. It was flagged in the investigation report.

Moreover, Dr. Boller had trained every member of the HSMB (albeit a number of months

earlier) and was presented as someone who was knowledgeable in the field of trauma, and

qualified to train the panel members on issues related to trauma. Id. at 22–23.

W&L criticizes Doe for not objecting to the investigators' and the Chair's acceptance of Dr. Boller's letter into the report. E.g., Dkt. 75 at 13. W&L also asserts that, "[a]bsent an objection from Doe, the Policy does not allow [the Chair of the HSMB] to alter the report before it reaches the panel." Dkt. 74 at 8. The Court concludes there is a genuine issue of material fact on this issue. Indeed, the Policy on its face permits investigators to "delete statements of personal opinion, rather than direct observations or reasonable inferences from the facts," Dkt. 74-1 at 47, even without an objection. To the extent there is contrary evidence, Dkt. 74 at 8, the Court must take the evidence and the Policy language in the light most favorable to Doe as the nonmovant at this stage. Moreover, Doe did not know and could not have known that Dr. Boller had trained the members of the HSMB. Dkt. 73 at 7. Given these considerations, the Court cannot conclude that Doe's failure to object insulated the letter from further review, or that its introduction would have been harmless.

All of the above evidence contributed to the existence of a genuine issue of material fact whether W&L discriminated against Doe on the basis of sex. Less probative, though not necessarily irrelevant, are several other arguments Doe made and evidence he submitted related thereto.

Doe contended that Ms. Kozak "improperly discouraged [Doe] from using an attorney as his advisor," and "responded dismissively when he asked if his advisor could be an attorney." Dkt. 73 at 10. Not so. Indeed, from W&L's first communication with Doe alerting him to the existence of the allegations against him, Ms. Kozak informed him that he "may seek the advice and assistance of one Advisor of Choice, which can be an attorney, at your [his] own expense." Dkt. 74-9 at 2. The letter further pointed Doe to the Policy itself, which also explained that he was entitled to obtain his own "Advisor of Choice," which "can be a friend, mentor, family

member, attorney, or any other supporter" sought by a party. Dkt. 74-1 at 59. In other words, there was clear and consistent information that Doe could hire a lawyer to represent him. The basis for Doe's argument in this regard is that, in response to his question to Ms. Kozak whether he could hire a lawyer, she mentioned that there was a case in which a student had a lawyer and was still found responsible, and in another case, another student did not have a lawyer and was found not responsible. To be sure, Doe may have felt this response conveyed to him that "hiring a lawyer would be held against him." Dkt. 73 at 10. But without any further articulable basis or evidentiary support to substantiate it, the Court concludes no reasonable inference could be drawn from that stray comment that Doe should not hire a lawyer.

Doe also challenges the training provided to the HSMB in August and September 2016. In Doe's view the training effectively stated: "there are two sets of rules for assessing credibility: one for accusers, and another for everyone else." Dkt. 73 at 3. Doe argues that Dr. Boller's presentation to HSMB members "explain[ed] that different rules apply to 'victims,' for whom memory gaps as well as inconsistent and evolving testimony demonstrate veracity." Id. He also challenges Dr. Boller's short-hand reference to a "perp story," which "may seem more clear, less ambiguous. Possibly because its true …" Id. at 4. And Doe argues that this was "biased training," which rested upon "questionable 'trauma-informed' theories." Id. at 23.

The training of the HSMB was held in August, September 2016, and included PowerPoint presentations. Dkt. 73-3; Dkt. 73-2. (The HSMB hearing for Doe occurred late in April 2017). Dr. Boller delivered a presentation referencing her credential, as a Doctor of Psychology. Dkt. 73-3. She was called to train the panel members on the effects of trauma. Dkt. 74-12 at 81.

Dr. Boller's presentation was entitled "Sexual Assault: Patterns & Responses," and included a slide on the "Effects of trauma." Dkt. 73-3 at 2. One of the notes reflected on the presentation apparently to guide Dr. Boller's discussion of the slide stated as follows: "Trauma victims (not just sexual assault) will make statements that are incomplete and partly inconsistent due to affects [sic] of trauma itself. This can make us question credibility, but should not." Id. at 4. As to that note, Dr. Boller testified: "I don't know that I read that. Again, I don't typically read from my notes. I'm someone who really likes to look up and make eye contact. Those [notes] are for me. I may or may not have said those words out loud." Dkt. 74-12 at 96.  Another part of the presentation itself included a line that a "common reaction" to the effects of trauma included "an 'evolving' narrative of events.'" Dkt. 73-3 at 7. With respect to that part of her presentation, Dr. Boller testified that she was not talking about "months down the road." Dkt. 74-12 at 92. Rather, she meant that "it has become standard practice … with investigators … to allow someone to have two sleep cycles before you would expect to have a more complete version of their memory or of the situation." Id. at 91–92.

While not irrelevant to the issue whether W&L discriminated against Doe on the basis of sex, this training does not itself establish a plausible inference of gender bias. The presentation materials principally challenged here are unlike those at issue in this Court's opinion in an earlier Title IX case, Doe v. Washington & Lee University, No. 6:14-cv-52, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (addressing article included in presentation "posit[ing] that sexual assault occurs whenever a woman has consensual sex with a man and regrets it because she had internal reservations that she did not outwardly express," which article was written in a gender-specific manner). By contrast, to the extent that there is any bias in the presentation materials challenged by Doe, it is based on an alleged bias in favor of an accuser but using neutral

language with respect to gender. See id. at *10 n.6 (citing Bleiler v. Coll. of Holy Cross, No. 11-cv-11541, 2013 WL 4714340, at *12 (D. Mass. Aug. 26, 2013)). Nor does any reference Dr. Boller made in her deposition to the fact that most complainants are female and most respondents are male turn the presentation into one evincing gender bias. See Messeri v. Univ. of Colo., Boulder, No. 18-cv-2658, 2019 WL 4597875, at *14 (D. Colo. Sept. 23, 2019) ("As for Plaintiff's claim that a greater number of male students are investigated and found responsible for violations of sexual misconduct, "the Court sees no inference to draw in Plaintiff's favor.").

For these reasons, the Court finds that Doe has demonstrated the existence of a genuine dispute of material fact on the issue whether W&L discriminated against him on account of his sex. A reasonable jury could conclude based on the above evidence and certain other evidence in the record, that in the HSMB panel's decision and evaluation of Jane Roe's and John Doe's credibility that the panel subjected them to materially different standards on account of their gender in its assessment of their competing narratives. Accordingly, the Court has denied W&L's motion for summary judgment on Doe's Title IX discrimination claim.[6]

2. Retaliation Claim under Title IX

Doe also claims that W&L retaliated against him in violation of Title IX after Doe's counsel sent a letter to W&L. See Dkt. 73 at 29–30. Doe's counsel sent this letter on June 29, 2017, in which they referred to themselves as Doe's "litigation counsel," and referenced Doe's

---

[6] Because the Court concludes that Doe's Title IX claim survives summary judgment by establishing a genuine dispute of material fact whether the HSMB discriminated against Doe "on the basis of" sex, see Sheppard, 2021 WL 1227809, at *3–4, the Court need not separately address whether Doe established a claim solely under the Second Circuit's theories of liability as set forth in Yusuf, 35 F.3d at 715. While the parties briefed the case before the Fourth Circuit's decision in Sheppard, Doe advocated in his opposition brief for this Court to adopt the Seventh Circuit's standard which the Fourth Circuit has now adopted. And counsel for W&L addressed at oral argument the competing lines of authority and did not see a "significant" difference between the standards for purposes of this case.

HSMB proceeding as a "Title IX matter." Dkt. 74-24 at 3. In this letter, Doe's counsel sought "a copy of the Title IX investigation report and his complete student conduct file." Id. In his opposition to W&L's motion to summary judgment on this claim, Doe asserts that, "[a]fter receiving this latter, W&L retaliated in two ways: (1) by unreasonably restricting [Doe's] access to records he was entitled to review—the same records it allowed [Roe] to publish without repercussion; and (2) by rejecting his applications for reinstatement when he met the criteria to return." Dkt. 73 at 29–30.

In its motion for summary judgment, W&L contends that Doe failed to establish any of the three elements of a prima facie retaliation claim including "(1) engagement in a protected activity; (2) an adverse action; and (3) a causal connection between the protected activity and the adverse action." Dkt. 74 at 27–28 (quoting Doe v. Salisbury Univ., 123 F. Supp. 3d 748, 769 (D. Md. 2015)). W&L asserts that Doe failed to show both that he engaged in protected activity, and that, even if he did, there was no causal connection between the protected activity and the adverse action. Dkt. 74 at 27–28. Further, W&L contends that even if Doe made out a prima facie case of retaliation, W&L advanced a legitimate, non-retaliatory reason for its conduct— namely, that W&L "feared [Doe] would struggle academically if he returned," and argues that Doe has failed to rebut that showing. Id. at 28–29.

For purposes of this opinion, the Court will assume that Doe has adequately shown two of the three prima facie elements of retaliation: that his counsel's June 29, 2017 letter that threatened a Title IX suit constituted protected activity; and that refusing to readmit Doe would constitute adverse action. As Doe has articulated his retaliation claim, however, the Court cannot conclude that Doe has shown any genuine dispute of material fact over the third element of the claim: causation. Doe has not shown a "causal connection between the protected activity," i.e., as

Doe has framed the issue, his counsel's sending the letter, and "the adverse action," i.e., W&L's refusal to readmit.[7] In response to W&L's summary judgment motion, Doe has failed to present any more than a scintilla of evidence that his counsel's June 29, 2017 letter itself resulted in W&L's denial of his applications. See Dkt. 75 at 19. Doe's proffered evidence that Roe and her family continued to protest the leniency of Doe's sanction in correspondence with Ms. Kozak and other W&L officials, Dkt. 73 at 15–16, does not support a conclusion that Doe's counsel's letter caused W&L to refuse to readmit him. Nor does Doe's argument that evidence also supported the fact that W&L administrators were "discussing their concerns" about Doe's "potential return" even before he submitted an application, support a finding that the letter itself as the protected activity claimed prompted that retaliation. Id. at 20.

Accordingly, Doe appears to rely heavily on the length of time between the letter and denials, and the sequence of events to demonstrate causation. His counsel sent the letter in June 2017, and W&L denied his applications in November 2017 and July 2018. Thus, roughly five months and thirteen months passed between the letter and the denials, respectively. That is too long, without more, to provide a basis for causation. See Clarke County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) ("The cases accept that mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close."); see also King v. Rumsfeld, 328 F.3d 145, 151 & n.5 (4th Cir. 2003) (concluding that ten weeks between protected activity and adverse employment action "gives rise to a sufficient inference of causation to satisfy the prima facie requirement," but noting that

---

[7] Doe's variation of his retaliation claim challenging W&L's unreasonable restriction of access to files is meritless, as Doe has not raised anything more than an inconvenience. See Dkt. 75 at 18.

"[t]his length of time … is sufficiently long so as to weaken significantly the inference of causation between the two events."). The Court therefore has concluded that Doe's retaliation claim fails because he has not shown any evidence of causation that his letter caused W&L to refuse to readmit him, and therefore failed to state a prima facie claim of retaliation. As such, the Court has not needed to address W&L's further argument that the evidence supports a showing that W&L rejected his applications for readmission because they were concerned about his academic performance.

The Clerk of Court is directed to send this Memorandum Opinion to all counsel of record.

Entered this __17th__ day of April, 2021.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE